## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    :
**ANTOINETTE WOODLAND**                             :
607 Galveston Place, S.E.                            :
Washington, D.C.   20032                            :
                                                    :
                    Plaintiff,                      :        Civil Action No.:
                                                    :
            v.                                       :        **JURY DEMAND**
                                                    :
**VIACOM INC.,**                                    :
a Delaware Corporation,                             :
1515 Broadway                                       :
New York, New York 10036                            :
                                                    :
                    Defendant.                      :
_____ :


## COMPLAINT

COMES NOW the Plaintiff, Antoinette Woodland, by and through her counsel,

The Law Office of Jimmy A. Bell, P.C., Janelle N. Richards, Esquire, and Jimmy A. Bell,

Esquire, and respectfully presents this complaint against the Defendant, Viacom Inc., to

enforce her rights under the District of Columbia Human Rights Act.

## JURISDICTION

1.      Plaintiff Antoinette Woodland is a citizen of the District of Columbia.

        Defendant, Viacom, Inc. ("Viacom") is a corporation chartered in the

        State of Delaware.  As these parties are citizens of different states and the

        amount in controversy is $1,000,000.00, federal jurisdiction is proper

        under 28 U.S.C. § 1332(a).

## VENUE

2.    Venue is proper in the District of Columbia as the Defendant conducts

business within said District of Columbia, and the acts complained of

occurred within the said jurisdiction.

## STATEMENT OF FACTS

3.    During all times mentioned in this complaint, Plaintiff Antoinette

Woodland was, and still is, a citizen of the United States and she resided,

and still resides, in the District of Columbia.

4.    During all times mentioned in this complaint, Defendant Viacom Inc.

("Viacom") was a corporation chartered in the State of Delaware.

5.    During all times mentioned in this complaint, Defendant Viacom was the

corporate parent of Black Entertainment Television ("BET").

6.    During all times mentioned in this complaint, Plaintiff Antoinette

Woodland was an employee of Defendant Viacom.

7.    During all times mentioned in this complaint, Defendant Viacom's payroll

department prepared Plaintiff's pay stubs.

8.    In December 2001, Defendant Viacom hired Plaintiff as a Property

Manager for BET.

9.    In 2003, Plaintiff was promoted to the position of Senior Logistics

Manager for BET by Defendant.

10.    Plaintiff performed well in both of her positions, a fact well documented

in her performance appraisals dated June 30, 2002; December 31, 2002;

June 30, 2003; June 30, 2004; and June 30, 2005.

11.  Plaintiff's overall performance ratings were, on a four-point scale, 3.44 on June 30, 2002; 3.63 on December 31, 2002; 3.32 on June 30, 2003; 3.32 on June 30, 2004; and 3.44 on June 30, 2005.

12.  Plaintiff currently holds a Bachelor's Degree in Business Administration.

13.  Plaintiff currently holds a Masters Degree in Business Administration.

14.  In 2003, Plaintiff was awarded a 25% salary adjustment and 500 shares of Viacom stock, which was given only to those employees with outstanding performance records.

15.  At or about July 2004, Plaintiff's manager, Troy Saunders ("Saunders"), Senior Director of Corporate Administration, resigned from BET.

16.  At the direction of Saunders, and under his fiscal authority as a Senior Director for BET, Plaintiff planned a going-away luncheon for Saunders to be paid for by BET.

17.  At the time of Saunders' resignation, Plaintiff's department was told that Edward Gilmore ("Gilmore") would assume the position that Saunders had vacated.

18.  Within two months, Plaintiff started to hear that Gilmore and Gwenn Dennis ("Dennis") were making negative, disparaging and/or slanderous remarks about Plaintiff's job performance to BET employees.

19.  Afterwards, Plaintiff heard some of the remarks enumerated in paragraph 18 from Debra Heard, a finance manager.

20.  Plaintiff contacted Quinton Bowman ("Bowman"), Senior Vice President, Human Resources, to complain about the remarks enumerated in paragraph 18.

21.  Bowman told Plaintiff that Gilmore was an unfair manager, but suggested that Plaintiff try to get along with Gilmore as Gilmore had been placed in his position by Byron Marchant ("Marchant"), General Counsel and Chief Administrative Officer of BET.

22.  Bowman told Plaintiff that Gilmore was Marchant's friend.

23.  In October 2004, Gilmore hired Carol Holland ("Holland") as Director of Corporate Administrative Operations ("CAO"), responsible for management of Plaintiff's entire department.

24.  Upon information and belief, on Holland's first day as CAO, Gilmore and Dennis instructed Holland to fire Plaintiff Antoinette Woodland.

25.  Upon information and belief, during the course of the two months after Holland was hired as CAO, Gilmore and Dennis informed Holland in repeated verbal conversations that Plaintiff was a poor performer who should not remain with the company.

26.  Upon information and belief, Gilmore informed Holland that he possessed documentation that corroborated their assertions of Plaintiff's poor performance, but when Holland requested such documentation, Gilmore admitted that no such documentation existed.

27.  Upon information and belief, Gilmore informed Holland that Plaintiff was "banned from traveling" on business.

28.    Gilmore and Dennis never mentioned any concerns with Plaintiff's performance to Plaintiff.

29.    Upon information and belief, Gilmore and Dennis never documented any concerns with Plaintiff's performance.

30.    Upon information and belief, Dennis told Holland that Plaintiff did not arrive to work on time and did not work very hard when Plaintiff did com to work.

31.    Upon information and belief, upon being informed of Gilmore's complaints regarding Plaintiff enumerated in paragraphs 25, 26, and 30, Holland asked Gilmore why Gilmore had not made the decision to fire Plaintiff.

32.    Upon information and belief, Gilmore told Holland that Plaintiff's performance appraisals did not warrant that action.

33.    Upon information and belief, Holland subsequently discovered that Plaintiff Antoinette Woodland had not been informed that Plaintiff had been banned from business travel.

34.    During Holland's tenure as CAO, Plaintiff never reported to work late without first gaining supervisory approval.

35.    Upon information and belief, Holland found Plaintiff to be an above-average performer, praised Plaintiff's initiative, and stated that Plaintiff met or exceeded all of Plaintiff's performance objectives.

36.    Upon information and belief, Holland found Plaintiff to be knowledgeable and experienced in all aspects of the Facilities, Logistics and Security business.

37.    Upon information and belief, Holland found Plaintiff's long experience to be especially valuable.

38.    Upon information and belief, Holland praised Plaintiff as "a good leader, and someone you would want in a high-stress environment because of [Plaintiff's] ability to make good, fast decisions, and to direct a large team in a variety of tasks."

39.    In October 2004, Gilmore hired Mr. Samuel Williams ("Mr. Williams") as a Senior Manager.

40.    During Mr. Williams's hiring interview, Gilmore informed Mr. Williams that the position of Senior Manager was open.

41.    As Senior Manager, Mr. Williams was given Plaintiff's former title and job responsibilities.

42.    Upon information and belief, Plaintiff's change of job title and responsibilities was a *de facto* demotion.

43.    Plaintiff's *de facto* demotion from Senior Manager to Logistics Coordinator took place in a public meeting in front of logistics, facilities, travel, and tape library staffs, Plaintiff's former subordinates, new managers, peers, managers, and subordinates.

44.    Plaintiff Antoinette Woodland's *de facto* demotion coincided with Mr. Williams's hiring.

45.    Plaintiff's position as Senior Manager entailed responsibilities including, but not limited to the following:

- Managing the day-to-day operations on the BET campus;

- Interior design of the BET campus;

- Coordinating logistical/facility concerns for the BET remote sites;

- Coordinating the national relocation of departments;

- Project management logistical support to awards shows;

- Vendor management;

- Contract negotiations;

- Purchasing office furniture and equipment;

- Space management

- Break room management

- Payments;

- Endorsing vouchers for vendor payment;

- Emergency planning;

- Construction management;

- Marketing;

- Help Desk Management.

46.    Initially, Plaintiff's new position as Logistics Coordinator had no specific duties whatsoever.

47.    Later, Plaintiff's position as a Logistics Coordinator entailed primarily *ad hoc* assignments, including the following:

- Ordering coffee for the work campus;

- Answering the "help desk" phone regarding internal complaints.

48. The change in Plaintiff's job title from Senior Manager to Logistics Coordinator and the diminution and change of her employment duties, enumerated in paragraphs 45 and 47, constituted a demotion.

49. In November 2004, Plaintiff was relocated from the Corporate Building to a vacated "Studio 3" building.

50. The "Studio 3" building is separated from the other central corporate divisions.

51. In December 2004, Gilmore was presented with the invoice for Saunders' July going-away luncheon enumerated in paragraph 16.

52. Gilmore indicated he would not authorize payment of the invoice, claiming Plaintiff had violated CAO policy by incurring the obligation of funds.

53. Gilmore directed Holland to counsel Plaintiff in the matter of this invoice.

54. Holland informed Plaintiff via email that she had been tasked with counseling Plaintiff in the matter and asked Plaintiff to provide a statement of the authority she had to incur the obligation of funds.

55. Plaintiff responded to Holland, via email, that she had had Saunders' authority to incur the obligation.

56. Plaintiff also stated in her email to Holland that Plaintiff had become aware of Gilmore's and Dennis' baseless and defamatory statements disparaging her job performance.

57.    Plaintiff requested in her email to Holland that the making of such
baseless and defamatory remarks, which Plaintiff characterized as
"attempts at slander and character assassination," cease immediately.

58.    Plaintiff asked, in her email to Holland, that Holland provide her with
specific examples of any company policies Plaintiff had violated.

59.    Upon information and belief, Holland relayed Plaintiff's message to
Gilmore, and requested of Bowman a copy of the written company policy
Plaintiff had violated.

60.    Upon information and belief, Holland learned from Bowman that there
was no written company policy that Plaintiff had violated.

61.    Upon information and belief, Gilmore told Holland via email that Holland
needed "to investigate the slanders and character assassinations" to which
Plaintiff had referred.

62.    Upon information and belief, Holland forwarded Gilmore's message to
Shelley Johnson ("Johnson") for the purpose of conducting an
investigation regarding the facts and circumstances surrounding Plaintiff's
complaints of slander and character assassination.

63.    On December 6, 2004, Bowman informed Plaintiff that he would contact
an outside counsel for investigation of the facts and circumstances
surrounding Plaintiff's complaints of slander and character assassination.

64.    From February 6-8, 2005 an outside investigator, Naomi Young,
conducted interviews regarding the facts and circumstances surrounding
Plaintiff's complaints of slander and character assassination.

65.    Plaintiff requested a copy of the outside investigator's findings.

66.    Plaintiff has never been furnished a copy of the outside investigator's report, analysis, and/or conclusions.

67.    On April 4, 2005, Plaintiff filled out an "ICR" form at Holland's request.

68.    Upon information and belief, when Holland submitted the form, Dennis and Gilmore rejected it and instructed Holland that it would be accepted once Plaintiff's name was removed from the properly completed "ICR" report.

69.    Holland subsequently removed Plaintiff's name from the "ICR" form and resubmitted the otherwise unaltered form to Dennis and Gilmore, who thereafter accepted it.

70.    In June 2005, two other women complained to human resources about Gilmore.

71.    An outside counsel was brought in to investigate the complaints enumerated in paragraph 70.

72.    During the course of the outside investigation enumerated in paragraph 70, Bowman informed Plaintiff that, in light of the outside investigation enumerated in paragraph 70, Plaintiff was not permitted to discuss the investigation with anyone.

73.    On June 20, 2005, during the course of the outside investigation enumerated in paragraph 70, Bowman informed Plaintiff that BET had formally withdrawn any performance evaluations regarding Plaintiff.

74. Upon information and belief, the purpose of Bowman's actions enumerated in paragraph 73 was to deny Plaintiff access to her performance evaluations and disclaim the validity of the positive performance evaluations enumerated in paragraphs 10-11.

75. On July 8, 2005, Plaintiff's title was again changed, this time from Logistics Coordinator to Senior Manager of Occupant Services.

76. Plaintiff's current position is Senior Manager for Occupant Services.

77. Plaintiff's responsibilities as a Senior Manager of Occupant Services entails primarily the following:

- Answering the "help desk" phone regarding internal complaints;

- Relaying the internal complaints to the appropriate department to facilitate remedies for the complaints;

- Preparing paperwork for the engineering department to remedy complaints.

78. On July 8-9, 2005 a second outside investigator conducted interviews regarding the facts and circumstances surrounding complaints enumerated in paragraph 70.

79. On July 8 and/or 9, 2005, Plaintiff was interviewed by the investigator enumerated in paragraph 78 and informed the investigator of the facts and circumstances surrounding her complaints of slander and character assassination enumerated in paragraph 56.

80. Plaintiff has never been furnished a copy of the outside investigator's report, analysis, and/or conclusions from the outside investigation described in paragraph 78.

## COUNT I

## UNLAWFUL DISCRIMINATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT § 2-1402.11

81.    Plaintiff re-pleads and re-alleges, with the same force and effect as if set forth separately and at length herein, paragraphs 1 – 80.

82.    Plaintiff is a member of a protected class based on her sex (female).

83.    Plaintiff suffered an unlawful, discriminatory, and adverse change in employment with respect to her terms, conditions, or privileges of employment, including promotion based on her membership in a protected class, namely her sex (female).

84.    Plaintiff suffered an unlawful, discriminatory, and adverse employment action, change, limitation and/or classification that deprived and/or tended to deprive Plaintiff of employment opportunities and otherwise adversely affect her status as an employee and/or privileges of employment based on her membership in a protected class, namely her sex (female).

85.    Plaintiff's position was subsequently filled by a person outside her protected class.

86.    Defendant intentionally discriminated against Plaintiff Antoinette Woodland in violation of the District of Columbia Human Rights Act § 2-1402.11 on account of her sex (female).

## RELIEF SOUGHT

87.    Plaintiff re-pleads and re-alleges, with the same force and effect as if set forth separately and at length herein, paragraphs 1 – 86.

88. Plaintiff Antoinette Woodland requests the following relief:

89. Compensatory and punitive damages in the amount of $1,000,000.00.

90. Pre- and post-judgment interest.

91. The costs of litigation, including reasonable attorney's fees and expert
witness fees.

92. Such other relief that may be just.

### JURY DEMAND

93. Plaintiff Antoinette Woodland demands a trial by jury.

Respectfully submitted,

Jimmy A. Bell, Esq.
The Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD   20772
(301) 599-7620
(301) 599-7623 (Fax)
Bar No. MD 14639