In the U.S. District Court

For the District of Columbia

--------------------------x

Antoinette Woodland            :

                               : NO. 1:05 CV 01611

            v.            :

                               :

Viacom, Inc.                   :

--------------------------x

June 15, 2007

DEPOSITION OF:

            Antoinette Woodland,

a witness, called by counsel pursuant to notice,

commencing at 10:00 a.m., which was taken at Morgan,

Lewis, 1111 Pennsylvania Ave., NW, Washington, DC

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                    Woodland v. Viacom

Page 2

```
 1                    Appearances

 2      Jimmy A. Bell, Esq.

 3      9610 Marlboro Pike

 4      Upper Marlboro, MD 20772

 5      for the Plaintiff

 6

 7      John S. Ferrer, Esq.

 8      Morgan, Lewis

 9      1111 Pennsylvania Ave., NW

10      Washington, DC 20004

11      for the Defendant

12

13

14

15

16

17

18

19

20

21
```

Page 15

1        A.    1235 W Street NE.  At the time Jones Lang

2     LaSalle was managing BET property, providing

3     property management services to BET.

4        Q.    What was your position there?

5        A.    Occupant services coordinator.

6        Q.    Briefly describe your duties.

7        A.    I was responsible for vendor management,

8     help desk management response, the day to day

9     operations of the day porters, engineers,

10    maintenance and upkeep of the campus.

11       Q.    Any other jobs prior to working for BET?

12       A.    No.

13       Q.    Let's start with your first position at

14    BET.  When did you start working for BET?

15       A.    In 1998.

16       Q.    What was your position there?

17       A.    Fashion stylist.

18       Q.    Briefly describe your duties.

19       A.    I was responsible for the image of on air

20    talent, buying clothes, selecting clothes, makeup,

21    wardrobe, shoes, everything to prepare them for on

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                    Woodland v. Viacom

Page 16

1    air.

2         Q.    How long did you hold that position?

3         A.    Two years.

4         Q.    To whom did you report?

5         A.    Erica Fennel.

6         Q.    What was her position?

7         A.    She was a logistics coordinator.

8         Q.    Did anyone report to you?

9         A.    I had three people in my chain of command,

10   two wardrobe assistants and at any time two to three

11   interns.

12        Q.    Do you recall the names of the wardrobe

13   assistants?

14        A.    Janice Holloway and Keith -- I can't

15   remember the guy's last name.

16        Q.    Why did you stop performing that position?

17        A.    They were moving the offices to New York

18   and I did not want to relocate.

19        Q.    What was your next job after that?

20        A.    TV1.

21        Q.    At some point you came back to BET?

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 17

1        A.    I came back to BET under Jones Lang

2   LaSalle as the occupant services coordinator.

3        Q.    Jones Lang LaSalle was a separate company?

4        A.    A separate company.  It was a company that

5   BET hired to provide property management services to

6   the campus.

7        Q.    Then when did you start working for BET

8   again?

9        A.    2001 again.  I was offered a full time

10  position -- BET decided to terminate their agreement

11  with Jones Lang LaSalle and I was one of the people

12  that they asked to come on as the occupant services

13  manager.

14       Q.    Let me just back up.  When you were a

15  fashion stylist where were you located?

16       A.    For BET?  1235 W Street NE.

17       Q.    How long have they been at that location,

18  to your knowledge?

19       A.    I want to say probably since 1980.

20       Q.    When you came back on 2001 as occupant

21  services manager, was that BET?

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 18

1       A.   Yes.

2       Q.   Same location?

3       A.   Yes.

4       Q.   Briefly describe your duties.

5       A.   I was responsible for vendor relations.  I

6   was responsible for on site vendors, the security

7   team, cafeteria team, the day porters, the night

8   cleaning crew, the engineers, the chief engineer and

9   all of his men, the mail room and document center,

10  the xerox contract and any other facility functions

11  that happen on the campus.  They all reported to me

12  day to day.

13      Q.   Who did you report to?

14      A.   Troy Saunders.

15      Q.   What was Mr. Saunders' title?

16      A.   He was senior director of corporate admin

17  operations when he left.

18      Q.   Where is Mr. Saunders located?

19      A.   He's now in Atlanta, Georgia.

20      Q.   Where was he located then?

21      A.   1235 W Street NE at the BET headquarters.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                    Woodland v. Viacom

Page 21

```
 1        Q.    Did Mr. Carlman have a successor?

 2        A.    No, he did not.

 3        Q.    Why did you stop performing the duties of

 4   occupant services manager?

 5        A.    I got promoted a few times.  After the

 6   last promotion I was a senior manager and --

 7        Q.    Well, tell me about the promotion.

 8        A.    They brought me on as an occupant services

 9   manager.  Then they gave me the title of property

10   manager.

11        Q.    When was that?

12        A.    2002.

13        Q.    This was at BET?

14        A.    At BET.  And then 2003 I was promoted to

15   senior manager of corporate planning.

16        Q.    You said 2003?

17        A.    2003.

18        Q.    Really you were occupant services manager

19   or you held that title from 2001 to 2002?

20        A.    Yes.

21        Q.    Then you became property manager?
```

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 22

```
 1        A.    Yes.

 2        Q.    Did your duties change at all?

 3        A.    I was given more responsibility.

 4        Q.    How so?

 5        A.    I was then not only the day to day

 6   operations of the campus, I was more involved with

 7   special projects then.

 8        Q.    Can you give me an example?

 9        A.    Office relocations, the moving of the 106

10   and Park office down to 555 West 57th Street in

11   New York.  Interior design projects inside the

12   campus, just more things outside of day to day

13   facilities.

14        Q.    To whom did you report as property

15   manager?

16        A.    Troy Saunders.

17        Q.    Those other gentlemen you mentioned, did

18   they still report to you?

19        A.    Yes.

20        Q.    Then you were promoted to senior manager?

21        A.    Senior manager of corporate planning and
```

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                    Woodland v. Viacom

Page 23

1    asset management operations.

2         Q.    Did you still report to Mr. Saunders?

3         A.    I did.

4         Q.    How about the other two gentlemen?

5         A.    They still reported to me.  Frank Carlman

6    had left so it was still -- it was just Carlos

7    Medina and all the people -- the department was

8    reorganized and he reported to me and everybody else

9    reported to him day to day.

10        Q.    You mean Mr. Medina?

11        A.    Yes.

12        Q.    You all were still at --

13        A.    1235 W Street.

14        Q.    When you became senior manager how did

15   your duties change, if at all?

16        A.    More special projects, being involved with

17   award shows, all of the moves on campus, being

18   responsible for the office managers at all the

19   remote office locations, just being the one stop

20   person for any service that the company in general

21   would need, in addition to managing the day to day

Page 24

1    of the facility.

2          Q.    Did you hold any position after senior

3    manager?  Let me go back.

4                How long did you hold the senior manager

5    position?

6          A.    Until October, I believe, of 2005 when it

7    was taken away from me.

8          Q.    We'll get into why you believe it was

9    taken away.  But what position did you hold after

10   senior manager?

11         A.    Coordinator, logistics coordinator.

12         Q.    This was at the same BET location?

13         A.    Yes, 1235.

14         Q.    To whom did you report?

15         A.    Samuel Williams.

16         Q.    What's Mr. Williams' title?

17         A.    Senior manager of logistics.

18         Q.    Where is he located?

19         A.    1235 W Street.

20         Q.    He was employed by BET?

21         A.    Yes.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                    Woodland v. Viacom

Page 25

 1          Q.    Did you report to anyone else?

 2          A.    Carol Holland.

 3          Q.    Ms. Holland's title?

 4          A.    Director of corporate administrative

 5     operations.

 6          Q.    She was located at BET?

 7          A.    Yes.

 8          Q.    She was employed by BET?

 9          A.    Yes.

10          Q.    Did you report to anyone else?

11          A.    Not day to day.  Ed Gilmore was in our

12     chain of command.  Carol reported to Ed Gilmore.

13          Q.    You did not report to Mr. Gilmore on a day

14     to day basis?

15          A.    No.

16          Q.    What was his title?

17          A.    Senior director of corporate admin

18     operations.

19          Q.    Do you recall the date or month, year when

20     you became logistics coordinator?

21          A.    It was October.  I don't have the exact

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                Woodland v. Viacom

Page 26

1    date with me but it was in October.

2         Q.    Of what year?

3         A.    2005.

4         Q.    Who reported to you as logistics

5    coordinator?

6         A.    No one.

7         Q.    Briefly describe your duties for me as

8    logistics coordinator.

9         A.    Answered the telephone.

10        Q.    Anything else?

11        A.    No.

12        Q.    Is that your current position?

13        A.    No.

14        Q.    What position did you hold after logistics

15    coordinator?

16        A.    I was moved back up to a senior manager of

17    corporate planning.

18        Q.    When was that?  Month and year is fine.

19        A.    2006, like June of 2006.

20        Q.    To whom did you report?

21        A.    Quinton Bowman.  Oh, and Bernadette

ANTOINETTE WOODLAND DEPOSITION June 15, 2007              Woodland v. Viacom

Page 30

1    LaSalle as occupant services coordinator.  So I was

2    working in that position.  I was reporting directly

3    to Mr. Saunders.

4            So as he made the decision to let Jones Lang

5    LaSalle go, I was offered a position.  In the

6    process of me being offered the position he had to

7    fill out the paperwork.  As the process began,

8    that's when we started working on the paperwork and

9    the job description.

10    Q.    Do you know who Mr. Saunders submitted the

11   job description to?

12   A.    The general counsel who was his direct

13   boss, Byron Marchant.  It was a process that had to

14   go through Byron Marchant and had to go to Human

15   Resources for signature and approval.

16   Q.    Byron Marchant you said is the general

17   counsel?

18   A.    Yes.

19   Q.    Where is he located?

20   A.    1235 W Street.

21   Q.    He's employed by BET?

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 31

1        A.    Yes.

2        Q.    You said HR had to go through -- Human

3    Resources.

4        A.    Yes.

5        Q.    What Human Resources are you referring to?

6        A.    It's BET at 1235, the offices that are

7    located at 1235.

8        Q.    Did you interview with anyone for the

9    occupant services manager position?

10       A.    Yes, Carla Merritt.  She was the property

11   manager for Jones Lang LaSalle on site.

12       Q.    I'm referring to when it became a BET

13   position.  You interviewed with her when you took

14   over the job, again, under BET?

15       A.    No.  It wasn't an interview process.  I

16   had been working for them for a while and they had

17   seen my performance and they offered it to me

18   because they wanted me to stay, although the company

19   and a few other employees were going away.

20       Q.    Who offered you the position?

21       A.    Troy Saunders.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 32

1      Q.    Other than Mr. Marchant and the Human

2   Resources for BET, do you recall anyone specifically

3   involved in HR for BET?

4      A.    Quint Bowman.

5      Q.    Other than those individuals, was anyone

6   else involved in your hiring as occupant services

7   manager in October 2001?

8      A.    Not to my knowledge.

9      Q.    Then I believe you said you were promoted

10   to property manager.

11      A.    Yes.

12      Q.    That was in 2002.

13      A.    Yes.

14      Q.    Do you recall the specific month or time

15   of the year in 2002?

16      A.    Somewhere in June, because that's when

17   salary performance appraisals are done, somewhere in

18   the area of May, June.

19      Q.    How did it come about that you were

20   promoted?

21      A.    I don't understand the question.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 33

1     Q.    How did you get into that position?  Was

2   there a posting?

3     A.    Hard work.  I just worked hard and they

4   rewarded me with a promotion.

5     Q.    So you didn't have to put in for it or

6   anything?

7     A.    That's not typically the way it's done at

8   BET.  It's based upon performance.

9     Q.    Who offered you the job?

10    A.    My immediate supervisor, Troy Saunders.

11    Q.    Was anyone else involved?

12    A.    Human Resources and Byron Marchant.  My

13  immediate supervisor reported to Byron Marchant, so

14  he was aware of and signed off on every promotion or

15  whatever that went down before it went to Human

16  Resources.

17    Q.    You are referring to the BET Human

18  Resources?

19    A.    I'm referring to BET.

20    Q.    Was anyone else involved other than those

21  individuals?

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 34

1        A.    Not to my knowledge.

2        Q.    Then you were promoted again you said in

3   2003 to senior manager, correct?

4        A.    Correct.

5        Q.    Again, do you recall the month of 2003?

6        A.    Around the May, June time.

7        Q.    Tell me how you came -- how it came about

8   that you were put into that position.

9        A.    I was given a lot more responsibility and

10  with the responsibility came a title change and the

11  raise.

12       Q.    Who offered you the promotion?

13       A.    My immediate supervisor.

14       Q.    Who was that?

15       A.    Troy Saunders.

16       Q.    Anyone else involved?

17       A.    Byron Marchant and Quint Bowman.

18       Q.    Other than those individuals, anyone else

19  involved?

20       A.    Not to my knowledge.

21       Q.    When you became -- going back to occupant

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                    Woodland v. Viacom

Page 37

1       A.    1235.

2       Q.    W Street?

3       A.    Correct.

4       Q.    Do you recall if the memo had any type of

5   corporate logo on it?

6       A.    It had the BET corporate logo on it.

7       Q.    Do you know where Viacom is located?

8       A.    Yes.

9       Q.    Where is it located?

10      A.    1515 Broadway, New York.

11      Q.    When you were hired as occupant services

12   manager back in 2001, back in October of 2001 no one

13   from Viacom was involved in that hiring, is that

14   correct?

15      A.    No one from Viacom was involved in that

16   hiring, but I was made to sign a Viacom employee

17   handbook upon my hiring.

18              MR. FERRER:  Mark this Woodland two,

19   please.

20              (Whereupon the proffered item was

21          marked as exhibit number 2.)

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                    Woodland v. Viacom

Page 40

 1      Q.   Who gave you this document?

 2      A.   It was sent to me by Quint Bowman.

 3      Q.   Were you told the purpose of the document?

 4      A.   Yes.

 5      Q.   What were you told?

 6      A.   That it was a Viacom business conduct

 7 training statement and I needed to sign it.

 8      Q.   Just so I'm clear, this was e-mailed to

 9 you?

10      A.   Yes.

11      Q.   Did you sign something acknowledging that

12 you received this?

13      A.   I did, every year from 2001 until the

14 present day.

15      Q.   Annually?

16      A.   Annually it's done.

17      Q.   Annually they send these out to you?

18      A.   Yes.

19           MR. FERRER:  Can I have this marked

20 as Woodland three, please?

21                (Whereupon the proffered item was

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                    Woodland v. Viacom

```
                                                        Page 42

 1    certification looks like just this, is that correct?

 2         A.    Yes.

 3         Q.    I'm noticing here at the bottom the date

 4    is 4/29/2007.  Is this the one for 2007?

 5         A.    Yes.

 6         Q.    When you sign this, who do you return it

 7    to?

 8         A.    I return it to the Human Resources' office

 9    on site.

10         Q.    I think you said that you -- correct me if

11    I'm wrong, the certification you said is to

12    acknowledge that you have received the statement,

13    correct?

14         A.    That I read it, understood it and

15    understand what the Viacom policy is all about.

16         Q.    Did you mention that you received

17    training?

18         A.    Yes.

19         Q.    What type of training?

20         A.    The first couple of years when they rolled

21    it out, they would have the on site Human Resources
```

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                Woodland v. Viacom

Page 43

1    team to go through the book with you and address any

2    questions that anyone would have.

3         Q.   Who was on the on site HR team?

4         A.   Shelly Johnson, Quint Bowman and that's

5    it.

6         Q.   Ms. Johnson, what's her position?

7         A.   She is a senior manager of Human

8    Relations.

9         Q.   Where is she located?

10        A.   1235 W Street.

11        Q.   She is employed by BET?

12        A.   Yes.

13        Q.   For how many years can you recall did they

14   provide the training regarding this statement?

15        A.   Probably the first three years.

16        Q.   From 2001 to 2004?

17        A.   Yes.

18        Q.   To your knowledge or based on your

19   recollection, what did the training consist of?

20        A.   Them just going through the conduct

21   statement and telling us what Viacom's requirements

Page 44

1    were and if we had any questions, they addressed the

2    questions, but it was more along the lines of a

3    mandate from Viacom that they have this and had all

4    of us sign it on site.

5         Q.    So you signed the certification after the

6    training?

7         A.    Yes.

8         Q.    Was anyone else involved in the training?

9         A.    Every associate had to take part in the

10   training.

11        Q.    How about as far as providing the

12   training?  Did anyone else provide the training

13   other than Ms. Johnson and Mr. Bowman?

14        A.    On site, no.

15        Q.    No one from Viacom was involved in

16   providing the training?

17        A.    On site?  I want to say I don't think so,

18   although I believe in the first year someone from

19   Viacom did come down and do the first year's

20   training and then every year thereafter it was done

21   on site by the on site Human Resources people.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                Woodland v. Viacom

Page 45

```
 1        Q.   Do you recall who that person may have

 2   been?

 3        A.   I do not.

 4        Q.   Do you recall the person's position or

 5   title?

 6        A.   It was someone from their Human Resources

 7   department.

 8        Q.   Who provided the training regarding the

 9   statement after 2004?

10        A.   It was the same, Shelly Johnson and Quint

11   Bowman and then this year it was electronically sent

12   to us from Viacom.

13        Q.   What do you mean when you say it was

14   electronically sent from Viacom?

15        A.   I mean that it was an e-mail that was sent

16   to Viacom and once we completed it they would let

17   our Human Resources people know who still was

18   outstanding, who hadn't completed it, because there

19   was a timeframe in which we were required to

20   complete it.  So everything that they sent us, it

21   was almost like a test this year.
```

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                Woodland v. Viacom

Page 49

1    believe that Viacom played any part in your

2    promotion from occupant services manager to property

3    manager?

4        A.   I wouldn't say Viacom played a part.   I

5    would say Viacom was aware of it.

6             In order to promote me they had to give me

7    more money.   A lot of the money spending -- the way

8    that monies were being spent were being approved on

9    a Viacom level.   They were approved through the BET

10   business unit but they went further.

11       Q.   How do you know that Viacom was aware of

12   your promotion from occupant services manager to

13   property manager?

14       A.   I can't say 100 percent that I know a

15   person who sits in Viacom and who knows that I got

16   promoted.   I know that Viacom was very involved in

17   the business unit and what we were doing.

18   Specifically who would have received the paperwork,

19   I don't know.

20       Q.   You just said that you were aware that

21   they were involved -- was it the business unit?

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 99

1    there any other reason why you believe that Viacom

2    is your employer?

3         A.    No, other than the stock.  I was given 500

4    shares of Viacom stock.

5                   MR. FERRER:  Mark this as exhibit

6    six, please.

7                   (Whereupon the proffered item was

8         marked as exhibit number 6.)

9    BY MR. FERRER:

10        Q.    I just handed you exhibit six,

11   Ms. Woodland.  Can you identify that document for

12   me?

13        A.    It is a letter and a copy of 500 shares

14   of -- excuse me -- a letter and a copy of my 500

15   shares of Viacom stock that was given to me by

16   Viacom.

17        Q.    Do you know why you received this?

18        A.    It was my understanding that it was given

19   to high performing individuals in the company.

20        Q.    Do you know the process behind which or

21   the other process behind which you received this?

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 103

1    on and listen to the split and what it meant for you

2    and what your stock would mean and what price your

3    stock would be at once they split.

4         Q.    When did that letter go out?

5         A.    Around the time it split, so probably

6    about two years ago.  I believe that's when it split

7    from CBS and all the rest.

8         Q.    Do you have a copy of that letter?

9         A.    I don't think so.

10        Q.    Other than Mr. Marchant who you believe

11   was involved in your recommendation or your

12   selection for this stock certificate, do you know of

13   anyone else who may have been involved or who was

14   involved in your selection to receive this?

15        A.    Maybe my immediate supervisor, Troy

16   Saunders.

17        Q.    Do you know for sure or you are

18   speculating?

19        A.    I'm pretty sure he had some hand in my

20   being awarded the certificate.

21        Q.    Anyone else?

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 117

1    was a substantial amount of money.  He had to

2    justify why they were giving me the money.

3         Q.   When did this conversation take place?

4         A.   Around 2003, around the time that the

5    money was being disbursed.

6         Q.   Do you recall where this conversation took

7    place?

8         A.   In his office at 1235 W Street, fourth

9    floor.

10        Q.   Was there anyone else there?

11        A.   No, just he and I.

12        Q.   What was said?

13        A.   That he really had to go to bat for me

14   because it was a large amount.

15        Q.   Did he say to whom he had to go to bat for

16   you?

17        A.   Deborah.

18        Q.   Deborah Lee?

19        A.   Yes.

20        Q.   Deborah Lee is located where?

21        A.   1235 W Street.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                Woodland v. Viacom

Page 118

1        Q.    In 2003 when you were promoted to the

2    position of senior manager -- just so I'm clear, is

3    that when you had the 20,000 jump?

4        A.    Yes.

5        Q.    When that occurred, is it accurate to say

6    that you have no knowledge whether anyone from

7    Viacom was involved in your promotion?

8        A.    I'm going to say they had to have had

9    knowledge because we had to provide justification

10   for the moneys being allotted.  Everything is done

11   from a money standard.  Everything is inputted into

12   a system that goes to Viacom.

13       Q.    Isn't that after the fact, after the

14   promotion has already gone through?

15       A.    I'm not sure at what point it goes back.

16   I know that it does go to Viacom and I know we are

17   required to submit documentation.  I think Deborah

18   from an internal standpoint does sign off on it, but

19   I do know that it does go to Viacom.

20       Q.    How do you know that?

21       A.    Because I know they insert it into the

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                Woodland v. Viacom

Page 178

1        A.    Not right now, I don't think so.

2        Q.    Let's talk about the change from senior

3    manager to logistics coordinator which you allege to

4    be a demotion, right?

5        A.    Yes.

6        Q.    Why did you believe that this change was a

7    demotion?

8        A.    Because it was.  Professionally I went

9    from being a senior manager to being a coordinator,

10   a logistics coordinator.  That's a demotion in any

11   professional environment.

12       Q.    What was your pay as a senior manager?

13       A.    67,000, something like that.

14       Q.    What was your pay when you were changed to

15   a logistics coordinator?

16       A.    The same.  My pay was not affected.

17       Q.    Were your benefits affected?

18       A.    No, they were not.

19       Q.    As logistics coordinator, you were no

20   longer considered a senior manager?

21       A.    No.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 179

1        Q.    How do you know that?

2        A.    Because I was told I wasn't.  All my

3   responsibility was removed.  I was reduced to

4   answering the telephone.

5        Q.    Who told you this?

6        A.    My manager at the time, Carol Holland, who

7   was instructed by Mr. Gilmore that that would be the

8   new order of operations.

9        Q.    Just so we get this straight, Mr. Williams

10   at the time, his position again was what?

11        A.    Senior logistics manager.

12        Q.    And Ms. Holland?

13        A.    Director of corporate admin operations.

14        Q.    And Mr. Gilmore?

15        A.    Senior director of corporate admin

16   operations.

17        Q.    Who told you that by becoming the

18   logistics coordinator that you were no longer a

19   senior manager?

20        A.    Who told me?  Byron Marchant, Quint

21   Bowman, Ed Gilmore.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 180

```
 1       Q.   What did Mr. Marchant tell you

 2   specifically?

 3       A.   He brought me in a room with everyone who

 4   used to report to me and my colleagues and peers and

 5   passed out an org chart that showed I was a

 6   coordinator as opposed to a member of the management

 7   team.

 8       Q.   When did this meeting take place?

 9       A.   The end of October.

10       Q.   2004?

11       A.   Yes.

12       Q.   Who was present at the meeting?

13       A.   Byron Marchant, Quint Bowman, Ed Gilmore,

14   Carol Holland, Erwin Hicks, Carlos Medina, Andre

15   Combo, Anthony Walton, Miriam Vargas, Jose Reyes.  I

16   think that's it.  Oh, Adrian Daniels also.

17       Q.   Who is Mr. Hicks?

18       A.   He's an engineer on the staff.

19       Q.   And Mr. Combo?

20       A.   He was the manager of the tape library.

21       Q.   And Walton, what was the first name?
```

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                Woodland v. Viacom

Page 194

1    you can recall.

2          A.    Okay.  Managing day to day operations of

3    the campus, interior design for the BET campus,

4    coordinating logistics facility concerns.

5          Q.    I don't mean to interrupt you but, again,

6    I'm asking you just based on what you can recall.

7    That's in the complaint.  I understand that and

8    that's what you are reading from.

9          A.    Project management, bill paying, signing

10   AP vouchers, day to day management, security,

11   cleaning, mail room document center, warehouse

12   management, marketing effort for remote sites and

13   other things that are in the document, in the

14   complaint document.

15         Q.    How did your duties change, if at all,

16   when you became logistics coordinator?

17         A.    I was responsible for answering the phone.

18   That's it.

19         Q.    Answering what phone?

20         A.    The help desk line, the complaint line.

21         Q.    What type of inquiries?

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 195

1       A.    Excuse me?

2       Q.    What type of inquiries would be called in

3   to this help desk?

4       A.    It's too cold, it's too hot, the toilet is

5   stopped up.

6       Q.    Regarding the facility maintenance?

7       A.    Yes, maintenance requests, facility

8   requests.

9       Q.    When you were senior manager who reported

10   to you?

11      A.    The receptionist.

12      Q.    What was her name?

13      A.    Mae McClarty, Regina Wilson.

14      Q.    How do you spell the first name?

15      A.    M-C-C-L-A-R-T-Y.   The cafeteria staff, the

16   security team on site, the chief engineer, the

17   assistant chief engineer and the two engineer

18   supports, the warehouse manager, the mail room

19   manager and the mail room associates, the records

20   management manager, the document center, the office

21   managers at the remote locations.

Page 196

1        Q.    Where are the remote locations?

2        A.    Chicago, New York, LA.  I think that's

3    probably it.

4        Q.    All these people directly reported to you?

5        A.    Yes.  They reported through the chief

6    engineer.  At one point they were reporting to me

7    and then as my responsibilities grew it was narrowed

8    down.

9             They started reporting to the chief engineer

10   who in turn reported to me.  He took all the

11   facility related, the engineers and the day porters

12   and the vendors all still reported to me, along with

13   him.

14       Q.    Vendors reported straight to you?

15       A.    Yes.

16       Q.    The chief engineer again was?

17       A.    Carlos Medina.

18       Q.    You say Medina was at --

19       A.    The BET location.

20       Q.    When you became logistics coordinator who

21   reported to you?

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                    Woodland v. Viacom

Page 197

1          A.    No one.

2          Q.    When you were senior manager to whom did

3     you report?

4          A.    As senior manager I reported to Troy

5     Saunders and when Troy Saunders left, Ed Gilmore.

6          Q.    I thought earlier you testified -- at some

7     point you testified you reported to Mr. Williams.

8          A.    There was a transition period.  They

9     didn't come immediately after Troy left.  I was

10    reporting directly to Mr. Gilmore.  Then in late

11    September, October of 2004 was when Carol Holland

12    came and two weeks later Sammy Williams came and

13    then I started reporting to them.

14         Q.    When you became logistics coordinator, who

15    did you report to?

16         A.    Sammy Williams.

17         Q.    It was after you became logistics

18    coordinator you started reporting to Mr. Williams?

19         A.    Yes.

20         Q.    Mr. Williams reported to Ms. Holland?

21         A.    Yes.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007                Woodland v. Viacom

Page 212

1    alleged about Mr. Gilmore, are there any other

2    reasons why you believe your alleged demotion was

3    due to your gender?

4         A.    That's about it.

5         Q.    You allege that Mr. Williams took over

6    your duties, is that correct?

7         A.    He did.

8         Q.    When did Mr. Williams start?

9         A.    The end of October of 2004.

10        Q.    When he first came on, that's when he took

11   over your duties?

12        A.    Yes.

13        Q.    When did Ms. Holland come on?

14        A.    The 1st of October, end of September, 1st

15   of October.

16        Q.    Mr. Williams reported to Ms. Holland, is

17   that correct?

18        A.    Yes.

19        Q.    You indicated that you filed a complaint

20   against Mr. Gilmore.

21        A.    Yes.

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 221

1              MR. FERRER:   36.

2              (Whereupon the proffered item was

3         marked as exhibit number 36.)

4    BY MR. FERRER:

5         Q.   Before we talk about exhibit 36,

6    Ms. Woodland, let me just back up a little bit.

7              With respect to the change in your title,

8    other than what you testified before about the

9    conversation -- the meeting that was held by

10   Mr. Marchant and the organizational chart that he

11   gave out that day, I think your testimony was that

12   was the first time that you learned of your change

13   in title?

14        A.   Yes.

15        Q.   Do you know who was involved in that

16   decision?

17        A.   I do not.  I know it was Byron, Quint, Ed.

18   They were all in Byron's office putting together the

19   form.

20        Q.   How do you know that?

21        A.   Because they had us all waiting outside of

ANTOINETTE WOODLAND DEPOSITION June 15, 2007            Woodland v. Viacom

Page 234

1          Q.    Did anyone else provide you a response

2     other than Mr. Bowman as to the results of the

3     investigation?

4          A.    No.

5          Q.    Did you ever complain to anyone about your

6     alleged demotion?

7          A.    To my manager, Carol Holland, to Human

8     Resources and that's probably it.

9          Q.    Did you ever complain to anyone that your

10    alleged demotion was because of your gender?

11         A.    I'm not sure.  I was angry at the time so

12    I may have said it to someone.  I'm not sure.

13         Q.    Now --

14         A.    I know it did happen at a time when three

15    women were complaining about this man.  So we were

16    all pretty much saying it was gender related, Ofie

17    Kodjoe, Carol Holland and myself.

18              Members of Human Resources has also said he

19    has a problem with women.  So we weren't the only

20    people who said he had a problem with women.

21         Q.    You didn't file any type of formal

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 235

1    complaint or any complaint for that matter with

2    anyone alleging that your demotion was due to your

3    gender?

4         A.   I did not at the time, no.

5         Q.   You referred to a complaint by

6    Ms. Holland.  What do you know about that complaint?

7         A.   I know that she wrote a five page letter

8    to Byron Marchant complaining about Mr. Gilmore.  I

9    know that she met with Byron Marchant to complain in

10   person and submitted a five page document as

11   documentation for what she was enduring under his

12   leadership.

13        From what she shared with me, he told her he

14   did not believe her and would not remove her from

15   Mr. Gilmore's chain of command and that's when she

16   tendered her resignation.

17        Q.   This conversation she had with whom?

18        A.   Byron Marchant.

19        Q.   Were you present?

20        A.   I was not.

21        Q.   How do you know that this conversation

ANTOINETTE WOODLAND DEPOSITION June 15, 2007          Woodland v. Viacom

Page 244

1    manager of logistics.  He had a different title, but

2    they gave him all my responsibilities.

3          Q.    How do you know that?

4          A.    The org chart for visible proof will speak

5    to the fact they gave him all my responsibilities.

6          Q.    Any other reason why you believe they gave

7    him all your responsibility other than the org

8    chart?

9          A.    They did.  A conversation with Carol

10   Holland, conversation with Sammy Williams.

11         Q.    What was your conversation with

12   Ms. Holland regarding this issue?

13         A.    She didn't understand why they had done

14   it.

15         Q.    Done what?

16         A.    Taken all my responsibilities and given

17   them to Sammy Williams.  She didn't understand it.

18         Q.    Where did this conversation take place?

19         A.    In her office, 1235 W Street.

20         Q.    When was that?

21         A.    After the -- a couple of days after the

Page 250

1      Q.   How about 34D?

2      A.   2005, August sometime, I believe, 2005.

3      Q.   Is this the one that's currently in

4  effect?

5      A.   No.

6      Q.   How long was this one in effect, do you

7  know?

8      A.   Probably four or five months.

9      Q.   On this 180 title is senior manager,

10  occupant services, help desk?

11      A.   Yes.

12      Q.   That's the position that you are currently

13  in, correct?

14      A.   No.  I'm back to my original title.

15      Q.   Which is?

16      A.   Senior manager, corporate planning, asset

17  management operations.

18      Q.   How long have you been back in that title?

19      A.   Since August, I believe, 2006 to the

20  present day.

21      Q.   How long were you in the senior manager

ANTOINETTE WOODLAND DEPOSITION June 15, 2007            Woodland v. Viacom

Page 269

1    one talked to me based upon the information that

2    they were getting from Mr. Gilmore.

3         Q.    What meetings were you no longer invited

4    to?

5         A.    None, none.  The weekly meetings, the

6    departmental meetings, anything that pertained to

7    the department.

8         My old assistant was a participant and I

9    wasn't.  I was excluded from all of the business

10   dealings.

11        Q.    What were these weekly meetings about?

12        A.    Department, the goings and comings of the

13   department, what's going on, what services we're

14   trying to acquire, projects.  Anything department

15   related, company related I was excluded from.

16        Q.    Did you complain to anyone about your

17   exclusion from these activities?

18        A.    No, because at this point the org chart

19   had been finalized and I had spoken with Mr. Bowman

20   previous and he didn't give me any information so I

21   was done talking to them at that point.