## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ANTOINETTE WOODLAND** | : | |
| | : | |
| | : | Case No.:  1:05cv01611 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **VIACOM INC.,** | : | |
| | : | |
| Defendant. | : | |
| _____: | | |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING

COMES NOW Plaintiff, Antionette Woodland, by and through counsel, Jimmy A.

Bell, Esq. and the Law Office of Jimmy A. Bell, P.C. and hereby submits this Opposition

to Defendants' Motion for Summary Judgment on all counts of Plaintiffs' Complaint.

Plaintiff's requests a hearing on this matter.

For cause, Plaintiffs state as follows:

### STATEMENT OF FACTS

Plaintiff filed her Complaint in this action on August 12, 2005, and served the

Defendant on September 30, 2005.  In her Complaint, Plaintiff states succinctly and

correctly that she is an employee of Defendant.  (Complaint ¶ 6).  Testimony and

documents produced during discovery and throughout the course of litigation demonstrate

that Defendant is Plaintiff's employer.  Specifically, Defendant acquired the BET

business, as well as its assets and building and/or real estate holdings. Exhibit 1,

Deposition of Quinton Bowman at 18:16-21; 19:1-17  Moreover, when Defendant

acquired its BET business unit, Defendant took over paying Plaintiff and withholding her

Federal income taxes and other deductions as employers are required by law to do.  See, Exhibit 1 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Plaintiff's Paystub Processed by Defendant's Payroll ("Paystub").  Defendant also issued Plaintiff a Business Conduct Statement that Plaintiff was required to annually certify as Defendant's employee.  See, Exhibit 2 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Plaintiff's Copy of Defendant's Business Conduct Manual ("Business Conduct Manual"); see also, Exhibit 3 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Viacom Business Conduct Statement Employee Certification ("Employee Certification").  With regard to business compliance and ethics, Defendant exercises such significant control over BET that BET Vice President Quinton Bowman passed through unedited, to all employees of Defendant's BET unit, a "Viacom Memo" on that subject.  See, Exhibit 4 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Plaintiff's Copy of E-mail from Tom Freston & Leslie Moonves to All of Defendant's Employees ("Moonves E-mail").  Defendant not only sets corporate policy, requiring acknowledgement and compliance with said policy, but Defendant conducts audits of BET to ensure its compliance with Defendant's policies, requiring explanations and corrections where BET is not found to be in compliance with Defendant's mandates.  Exhibit 1 at 16:4-21; Exhibit 2, Plaintiff's Deposition at 50:3-21; 51; 52:1-17.  If Defendant did not have control over BET, it would not be able to control and audit BET's financial systems, nor would Defendant have access to BET's payroll and other computer systems via remote networks.  Plaintiff's deposition, taken together with the deposition of Mr. Bowman demonstrate that Defendant's control over BET is far reaching and encompasses not only

control of payroll and withholdings, but also day to day corporate conduct and operations,

including conducting financial and security related audits to ensure that BET is in

compliance with Defendant's promulgated procedures. Id.1

     Additionally, Defendant issued Plaintiff, as Defendant's employee, stock option

certificates, as well as a letter explaining said stock options. See Exhibit 3, Letter

Explaining Plaintiff's Stock Option; Exhibit 4, Plaintiff's Stock Option Certificate.

     While in the employ of Defendant, Plaintiff was effectively demoted from her

position as Senior Manager to Logistics Coordinator. Exhibit 5, Affidavit of Carol

Holland at 1.2  As Plaintiff testified, Plaintiff's duties were reduced from supervisory

responsibilities to nothing more than answering telephones. Id.  Plaintiff specifically

testified that:

    A.  Okay.  Managing day to day operations of

       3   the campus, interior design for the BET campus,

       4   coordinating logistics facility concerns.

       5    Q.  I don't mean to interrupt you but, again,

       6   I'm asking you just based on what you can recall.

       7   That's in the complaint.  I understand that and

       8   that's what you are reading from.

       9    A.  Project management, bill paying, signing

      10   AP vouchers, day to day management, security,

---

1 Plaintiff invites the Court to review Mr. Bowman's deposition in its entirety.  Said deposition makes clear
that Defendant does, in fact, exercise control over BET's corporate conduct, including its financial systems,
time tracking systems, and day to day conduct of BET employees.
2 Defense Counsel was faxed a signed copy of Ms. Holland's Affidavit.  Plaintiff is having scanning
difficulties and will supplement her Opposition with a signed copy of Mr. Holland's statement as well as
sending a copy of the same to the Court.

11    cleaning, mail room document center, warehouse

12    management, marketing effort for remote sites and

13    other things that are in the document, in the

14    complaint document.

15        Q.  How did your duties change, if at all,

16    when you became logistics coordinator?

17        A.  I was responsible for answering the phone.

18    That's it.

19        Q.  Answering what phone?

20        A.  The help desk line, the complaint line.

21        Q.  What type of inquiries?

195

1        A.  Excuse me?

2        Q.  What type of inquiries would be called in

3    to this help desk?

4        A.  It's too cold, it's too hot, the toilet is

5    stopped up.

6        Q.  Regarding the facility maintenance?

7        A.  Yes, maintenance requests, facility

8    requests. Exhibit 2 at 194:2-21; 195:1-8.

As Plaintiff's testimony makes clear, Plaintiff's duties were reduced from the

management of numerous departments, to the sole task of answering a complaint

telephone line.  Moreover, Plaintiff testified that as Senior Manager many persons

reported directly to Plaintiff, whereas when demoted to Logistics Manager, nobody

4

reported to Plaintiff:

Q.   When you were senior manager who reported

10    to you?

11        A.   The receptionist.

12        Q.   What was her name?

13        A.   Mae McClarty, Regina Wilson.

14        Q.   How do you spell the first name?

15        A.   M-C-C-L-A-R-T-Y.  The cafeteria staff, the

16    security team on site, the chief engineer, the

17    assistant chief engineer and the two engineer

18    supports, the warehouse manager, the mail room

19    manager and the mail room associates, the records

20    management manager, the document center, the office

21    managers at the remote locations.

196

1        Q.   Where are the remote locations?

2        A.   Chicago, New York, LA.  I think that's

3    probably it.

4        Q.   All these people directly reported to you?

5        A.   Yes.  They reported through the chief

6    engineer.  At one point they were reporting to me

7    and then as my responsibilities grew it was narrowed

8    down.

9            They started reporting to the chief engineer

10    who in turn reported to me.  He took all the

5

11   facility related, the engineers and the day porters

12   and the vendors all still reported to me, along with

13   him.

14      Q.  Vendors reported straight to you?

15      A.  Yes.

16      Q.  The chief engineer again was?

17      A.  Carlos Medina.

18      Q.  You say Medina was at --

19      A.  The BET location.

20      Q.  When you became logistics coordinator who

21   reported to you?   197
 1      A.  No one.  Id. at 195:9-21; 196; 197:1.

     Prior to her demotion, Plaintiff received excellent performance appraisals and had

never received any disciplinary action and/or counseling regarding her performance.

Exhibit 5 at 1.   Moreover, Plaintiff's duties and responsibilities were given to a person

outside of her protected class, namely, Sammy Williams, a male. Id.  Said action was

taken at the direction of Mr. Ed Gilmore. Id.  Plaintiff testified, during her sworn

deposition, that:

     A.  Because my responsibilities and everything

14   was given to a man.  The man who was responsible for

15   doing it was allowed to do it with no documentation.

16   He did it only because I was a woman.

17        This is a man who commonly referred to women

18   as bitches.  The same man who acted as if he was

19    going to back-hand me in a meeting, this is a man

20    who has a problem with women.

21        Q.   You have to use names?

200

1        A.   Ed Gilmore.  It's also the same person who

2    two other women came and filed complaints against

3    before they would do anything about my complaint.

4        Q.    You believe Mr. Gilmore gave your

5    responsibilities to a man?

6        A.   Yes.

7        Q.   What man was that?

8        A.   Sammy Williams.

9        Q.   Why do you think he gave your prior duties

10    to Mr. Williams?

11        A.   He has a problem with women.

12        Q.    Why do you think he has a problem with

13    women?

14        A.    Because he always refers to them as

15    bitches.  He always refers to them as that.  Every

16    woman in his chain of command has had problems with

17    him and has gone to Human Resources to complain, the

18    same complaints I complained about.  Just his

19    conversations, the conversations that he's had

20    around me about women, they've always been

21    derogatory.

201

7

1    Q.  Can you give me any specific examples?

2    A.  He's always referred to the vice-president

3    of special events who was a woman as a B, a fat B

4    actually. <u>Exhibit 2</u>  at 199:13-21; 200; 201:1-4.

Mr. Gilmore had at least three complaints filed against him by women, including
Plaintiff, regarding his treatment of women in the workplace.  These complaints were not
investigated and there was not any action taken against Mr. Gilmore.  Mr. Gilmore was
repeatedly overheard referring to women as "bitches" and "fat bitches."  Moreover, Ms.
Holland's affidavit makes clear that Plaintiff was subjected to treatment that similarly
situated persons were not subjected to. <u>Exhibit 5</u> at 2, 4.  Such circumstances create an
inference that illegal discrimination was at the center of Plaintiff's demotion.

Accordingly, because Defendant and BET are so interrelated so as to effectively
be a single employer, Defendant is liable for the discriminatory conduct of its BET
employees and the circumstances surrounding Plaintiff's demotion give rise to an
inference of illegal discrimination, Defendant's instant Motion must be denied.

I.    <u>STANDARD OF REVIEW FOR SUMMARY JUDGMENT</u>

Under Rule 56 of the Federal Rules of Civil Procedure, the Court must grant
summary judgment when no genuine dispute of material fact exists and the moving party
is entitled to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
250 (1986); <u>Haavistola v. Community Fire Co. of Rising Sun, Inc.</u>, 6 F.3d 211, 214 (4th
Cir. 1993); <u>Etefia v. East Baltimore Comm. Corp.</u>, 2 F. Supp.2d 751, 756 (D.Md. 1998).
The court is required to "draw all justifiable inferences in favor of the nonmoving party,

including questions of credibility and of the weight to be accorded particular evidence."

Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991) (citations omitted). Evidence

submitted by the non-movant is to be believed and all justifiable inferences drawn in his

or her favor.  In its response to a motion for summary judgment, the non-moving party

must show evidence of specific facts from which the finder of fact could reasonably

return a verdict in his or her favor. Anderson, 477 U.S. at 252; Celotex, 477 at 322-23.  In

this way, the opposing party demonstrates that he has discovered admissible evidence for

presentation at trial. Celotex, 477 U.S. at 327. If the opponent fails to establish a genuine

dispute as to a material fact, the moving party is entitled to judgment as a matter of law.

Celotex, 477 U.S. at 323. While the non-moving party must do more than merely raise

some doubt as to the existence of a fact, the moving party ultimately bears the burden of

demonstrating the absence of all genuine issues of material fact. See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II.     DEFENDANT AND BET ARE A SINGLE, INTEGRATED ENTITY AS DEFENDANT EXERCISES SUCH CONTROL OVER BET AS TO MAKE SAID COMPANIES A SINGLE ENTITY, THUS DEFENDANT IS LIABLE FOR THE ACTIONS OF ITS BET EMPLOYEES

Where, as is the case here, sufficient facts exist to show an interrelationship

between an employer subsidiary and its corporate parent that justifies an aggrieved

plaintiff's belief that the corporate parent is jointly responsible for the acts of the

subsidiary business unit, the corporate parent is liable.  See, EEOC v. St. Francis Xavier

Parochial Sch., 928 F. Supp. 29, 33 (D.D.C. 1996) (hereinafter, "St. Francis Xavier").

Under this "integrated enterprise theory," or "single employer doctrine," this Court must

look at four factors to determine the degree of interrelationship that exists between Defendant and BET: 1) the interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership or financial control.  Id. While the presence or absence of any one factor is not conclusive, control over the elements of labor relations is a central concern.  Id.

Courts apply this test because the question of whether a parent is liable for the acts of its subsidiary will, in the context of a discrimination claim, decide whether the parent is an employer within the meaning of the law.  Id.  An individual may be the employee of more than one employer.  Id., n3.  Enterprises that appear to be discreet entities can represent a single integrated enterprise, and if they do, they are exposed to liability as a single employer.  Id. (citing, St. Francis Xavier, 928 F. Supp. at 33).

A.    **Defendant is Plaintiff's Employer Because Defendant and BET Have Common Ownership; Defendant Exercises Substantial Control Over BET's Labor Relations; Defendant and BET Have Interrelated Operations; and Defendant and BET Have Common Management**

In discrimination cases, this Court will apply a four-factor test to determine whether a corporation is liable for the illegal discriminatory acts of a subsidiary.  See, St. Francis Xavier, 928 F. Supp. 29 (D.D.C. 1996) (applying the test to an Americans with Disabilities Act claim); see also, Richard v. Bell Atl. Corp., 946 F. Supp. 54 (D.D.C. 1996) (hereinafter, "Richard") (applying test to Title VII claims)3; see also, Hunter v. Ark Restaurants Corp., 3 F. Supp. 2d 9 (D.D.C. 1998) (applying test to D.C. Human Rights Act, or "DCHRA," claim).

10

Where evidence exists showing an interrelationship between parent and subsidiary in the areas of: 1) interrelation of operations; 2) centralized control of labor; 3) common management; and 4) common ownership or financial control; the parent and subsidiary are treated as a single employer, and the parent is held liable for acts that amount to discrimination by one of the parent's layers of management. Id. In the instant case, this Court has already decided, in its Memorandum Opinion, that Defendant failed to bring forth evidence sufficient to demonstrate that Defendant and BET are separate entities when it denied Defendant's initial Motion to Dismiss pursuant to Federal Rule of Civil Procedure 19. While Plaintiff, through discovery, has brought forth additional evidence demonstrating Defendant's pervasive control over BET, Defendant has failed to bring forth any evidence, other than that which it submitted in its initial Motion to Dismiss, that would tend to demonstrate that it is separate and distinct from BET. As such, the law of the case doctrine applies and forecloses Defendant's restatement of the arguments it presented in its Motion to Dismiss as Defendant has completely failed to produce any additional evidence upon which this Court could rest a differing finding.

Even if this Court finds that Defendant can reargue its original Motion to Dismiss, Plaintiff has brought forth sufficient evidence to establish that Defendant and BET are so interrelated that they must be treated as a single employer, making Defendant liable for the actions of its BET employees.

---

3 Plaintiff must point out, in all fairness, that ultimately the Richard plaintiffs lost on summary judgment on the merits of their claims, but prevailed to the end on the issue who was their "employer."

**1.    Defendant and BET Have Interrelated Operations, as well as, Common Management**

Although Defendant continues to maintain that it is not Plaintiff's employer, all evidence, documentary and otherwise, demonstrates the contrary.  After Defendant acquired BET and its assets, Defendant began implementing corporate policies and operating procedures, which it requires BET and all BET employees to acknowledge, complete yearly certifications on, and abide by.  Specifically, on October 10, 2002, Plaintiff was required to sign a certification of Defendant's Business Conduct Statement by Defendant.  This statement reads:

> In order to promote an ethical environment, Viacom requires that all employees complete and return this form.  In may cases, simple disclosure is adequate to avoid an impermissible conflict of interest.  **Please note that all exceptions since your last certification of this type are to be listed, even if previously approved**.

> The word "Company" in this certification form refers to the business unit you work for, or Viacom if you work for Viacom's corporate offices.   Each Viacom division has determined the amount that constitutes "minimal value" for purposes of the Conflict of Interest policy in the Statement. Please contact A.B. Cruz III, BET Vice President & Deputy General Counsel, at (202) 603-2085 or Quinton Bowman, BET Vice President, Human Resources, at (202) 603-2376 if you have a question about this or any other aspect of this certification form.

> **<u>EMPLOYEE CERTIFICATION</u>:**

> **I certify that I have received, carefully read and understood the Viacom Business Conduct Statement and in particular the Conflicts of Interest policy at pages 1 and 2.  I also certify, to the best of my knowledge, that I have fully complied with each of the policies in the Statement during the period January 1, 2000 through the date of this certification and that I do not have anything to disclose**

12

**under the Conflicts of Interest or other policies, except for items I have previously disclosed in a form of this type and any exceptions listed below. I agree to follow each of the policies in the Statement while I work for the Company and to promptly disclose anything these policies require me to disclose.**

Exhibit 2 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Business Conduct Manual, at pp. 2-3.

Plaintiff duly signed and executed this document, as Defendant required of all its employees. Exhibit 3 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Employee Certification, at 1. On November 30, 2004, Defendant required Plaintiff to refresh her certification, which Plaintiff, as Defendant's employee, did. Id. at 2-3. The language is starkly clear: "Viacom" requires that all its "employees" certify Viacom's business conduct manual. Viacom, not BET, retained the originals of this statement. Exhibit 5 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Woodland Aff., ¶ 3.

Plaintiff specifically testified that after Defendant acquired BET, Plaintiff was made to sign and acknowledge different corporate policies and procedures as required by Defendant, as well as having her paychecks produced and distributed by Defendant and bearing Defendant's corporate logo. Plaintiff explained that:

> 8    Q. Counsel asked you and you testified that
>
> 9    you had worked at BET in 1998.
>
> 10    A. Correct.
>
> 11    Q. Is that prior to BET's sale to Viacom?
>
> 12    A. Yes.

13

13      Q.  When you worked at BET in 1998, did you

14   sign any documents that indicated you were a BET

15   employee?

16      A.  I did.  I signed the BET handbook.

17      Q.  Was that BET handbook different than

18   exhibit number two, which is the business conduct

19   statement?

20      A.  Yes, it was.

21      Q.  Deposition exhibit number five, which were

282

1   your statement of earnings, do you see that?

2      A.  Yes.

3      Q.  It has on the bottom of it Viacom payroll

4   department.

5      A.  Yes.

6      Q.  Was this the same statement of earnings

7   and deductions document that you received in 1998

8   from BET?

9      A.  No.

10      Q.  What did you receive in 1998?

11      A.  We received checks drawn on a local bank

12   with just the BET name on them.  I believe it was

13   Suntrust or Citibank, but it was a local branch.

14      Q.  You said you signed an employee manual,

15   employee handbook.

14

16     A.  Yes.

17     Q.  Did that employee handbook have policies

18  and procedures of BET?

19     A.  Yes.

20     Q.  Were those different than the policies and

21  procedures in exhibit number, deposition exhibit

283

1  number two, the business conduct statement?

2     A.  Yes, they were. <u>Exhibit 2</u> at 281:8-21282; 283:1-2.

Additionally, Plaintiff testified that all of Defendant's employees were required to sign, abide by, and attend trainings regarding Defendant's corporate code of conduct and operating procedures.  Plaintiff specifically stated that:

Q.  Did you ever supervise anyone while you

15  were at the BET business unit?

16     A.  Yes.

17     Q.  As a supervisor were you required to

18  follow the business conduct statement?

19     A.  Yes, I was.

20     Q.  How do you know you were required to

21  follow it?

292

1     A.  Because we all had to sign it.  There was

2  training on the business conduct statement.  Every

3  year we all had to go through training and sign

4  paperwork saying we were certified as to having been

15

5      through training.

6          Q.  Who is "we all"?

7          A.  Every associate, every Viacom associate

8      had to go through it.

9          Q.  You used the word "associate."  What do

10     you mean by that?

11         A.  Every Viacom employee.

12         Q.  How do you know you were a Viacom

13     employee?

14         A.  Because we had to -- they sent the

15     paperwork down and we had to fill it out every year.

16     Every employee was required to fill it out every

17     year.

18         Q.  I'm turning your attention to deposition

19     exhibit number three, the Viacom business conduct

20     employee certification form.

21         A.  Yes.      293

1          Q.  Does it state that Viacom requires that

2      all employees complete and return this form?

3          A.  Yes.

4          Q.  Were you required to complete and return

5      the form?

5          A.  Yes, I was.  <u>Id.</u> at 291:14-21; 292; 293:1-6.

On April 14, 2005, Plaintiff received the Moonves E-Mail in her corporate email

account.  <u>Exhibit 4 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Moonves</u>

E-Mail.  This email is from Leslie Moonves and Tom Freston, Defendant's Co-Presidents and Co-Chief Operating Officers.  It is frankly addressed to "All Viacom Employees." As an employee of Defendant, Plaintiff quite naturally received a copy from BET Human Resources Vice President Quinton Bowman.  As Mr. Bowman passed this message through unedited, he obviously held no position of corporate or business independence between Plaintiff and Defendant.  This, most tellingly, demonstrates the degree of interrelatedness of business operations between Defendant and its employees in the BET business unit, which includes Plaintiff.  Nowhere is there any contraindication that Plaintiff is not in the group of "All Viacom Employees."

Moreover, Defendant as part of Defendant's requirement that BET abide by its corporate policies and operating procedures, Defendant conducts audits of BET to ensure that BET is in full compliance with said procedures.  Where BET is found not to be in compliance, Defendant requires that BET submit documentation showing that it has come into compliance with Defendant's operating procedures and/or corporate policies.  Not only does Defendant have control over BET's corporate operations and the ability to conduct audits regarding BET's compliance with Defendant's policies and procedures, Defendant maintains remote access to BET's computer systems and has the ability to conduct oversight functions from Defendant's New York headquarters via computer networking capabilities.

As Defendant communicates with Plaintiff as its employee, tells her she is its employee, withholds her taxes and pays her as an employee, as well as maintaining ultimate control over the corporate operations of BET, Plaintiff is justified in holding

17

Defendant liable, as her employer, for her claims of illegal workforce discrimination.

> **2.    Defendant is Plaintiff's Employer Because Defendant Exercises Substantial Control Over BET's Labor Relations**

Defendant has, repeatedly, told Plaintiff that she is its employee.  Defendant has done so through communications from its officers to its employees, and, most tellingly, through its exercise of control over BET's employment policies, procedures, and compliance.  Plaintiff was, in fact, able to retrieve copies of Defendant's own documentation from her own personnel file, the originals of which are in Defendant's control, in which Defendant states quite clearly that Plaintiff is its employee.  As Plaintiff states in her Affidavit:

> On an annual basis, Human Resources conducts what they call "Human Resource Training."  At that time all associates are required to renew their disclosure statements and sign the Viacom handbook as Viacom employees.  Upon the signing of the documents, the originals are sent to Viacom and copies are placed in the associate's human resources file.  Viacom also sent email to its employees regarding its business conduct statement.  I was able to secure copies out of my personnel file of previously signed "Viacom Business Conduct Statement" that I signed as a Viacom employee.
>
> Exhibit 5 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Woodland Aff., at ¶¶ 3-4.

As Plaintiff attests, Defendant exercises such a degree of control over this process that it retains the original documents itself.  Defendant plainly wants Plaintiff to think of herself as "a Viacom employee."  From the Viacom Business Conduct Statement Plaintiff was required by Defendant to sign and certify:

Dear Directors and Employees,

. . .

What Is The Purpose of This Statement?

The purpose of this statement is to bring together in one convenient place a summary of the most important policies and rules that apply to Viacom, its employees and the members of its Board of Directors and to help us maintain a lawful, honest and ethical environment in our company.

To Whom Do the Rules and Policies in this Statement Apply?

The rules and policies referenced in this Statement apply to all members of the Board of Directors of Viacom Inc. ("directors") and to <u>all</u> employees of the Viacom family of companies worldwide including those employed on a temporary, freelance or per diem basis.  When we refer to "your Company," that means the business unit you work for, or Viacom Inc. if you are a director or employee of the Viacom Inc. corporate offices.  When we refer to Viacom, that includes your business unit as well Viacom Inc.

<u>Exhibit 2 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Business Conduct Manual</u>, at pp. 2-3.

Defendant has told Plaintiff that when it refers to "Viacom," that also means "BET."  By referring to BET as Viacom and addressing Plaintiff as "Employee," Defendant clearly established an employer-employee relationship with Plaintiff. Defendant cannot seriously argue that the use of its own name in the Business Conduct Manual in reference to its "employees" somehow makes it not an "employer" of the people it calls "employees."  Such an argument would strain the logical capacity of the English language, and allow Defendant to avoid liability for the illegal discriminatory acts of its employees.  Indeed, the Manual states else where that Plaintiff will be "carrying out

19

Viacom's business" (Business Conduct Manual, at 10), and that "Viacom has a 'zero tolerance' policy for sexual harassment" (Business Conduct Manual at 15). Quinton Bowman, Senior Vice President of Human Resources and Administration for BET stated, in his sworn deposition testimony that:

                                    7
     8  Q.  And what printed policy in -- let's go
     9  from 2001 and we'll go forward.  Let's just go with
    10  2001.
    11      A.  In 2001 we had and continue to have the
    12  BET Employee Handbook, which sets forth what the
    13  rules of conduct are regarding discrimination.
    14          And in 2002, thereabouts, we also acquired
    15  another set of rules under the Viacom Business
    16  Conduct Statement that direct what we should do.
    17      Q.  What do you mean with "direct what you
    18  should do"?
    19      A.  That provide the rules of conduct for
    20  Viacom and subsidiary Viacom employees.

                                   …

                                   11
     6  Q.  Okay.  You said that now that Viacom
     7  acquired BET, that there's a different book.  Can
     8  you tell me what the name of that book is?
     9      A.  It's the Viacom Business Conduct
    10  Statement.
    11      Q.  And can you tell me the difference between
    12  the Business Conduct Statement and BET's Employee
    13  Handbook?
    14      A.  The BET handbook essentially tells Black
    15  Entertainment Television employees how they should
    16  conduct themselves with regards to their work
    17  relationships of BET.
    18          It also informs them concerning their
    19  rights -- benefit rights and other procedural
    20  aspects of being a BET employee.
    21          The Viacom BCS essentially tells -- is a

                                   12
     1  corporate code of conduct that applies to Viacom,
     2  Incorporated employees as well to Black
     3  Entertainment Television, Paramount and other

                                   20

4   subsidiary Viacom employees.
5       Q.   In that business statement of conduct do
6   they have to also sign a document?
7       A.   Yes.
8       Q.   And does that document -- can you describe
9   what that document is?
10      A.   It's actually been in various forms.  It
11   initially -- the first two iterations, as I recall,
12   were written acknowledgements of receipt.
13          And since -- starting this year, we
14   actually have a sign-off, but it's done
15   electronically.  That you've read the Viacom
16   Business Conduct Statement and you've received
17   training.
18          And we also have an additional
19   requirement, as I think back to it.  Even
20   acknowledge receipt when an employee's new, that he
21   or she has received a new Viacom Business Conduct

                                13
1   Statement.
2       Q.   Okay.  Have you ever read the Business
3   Conduct Statement?
4       A.   Yes.
5       Q.   Can you tell me what it says?
6       A.   Obviously, it's a big document.  I can
7   tell you, in essence, it talks about the rules of
8   the road for Viacom, Inc. employees and subsidiary
9   employees.  It talks about things like conflicts of
10   interest, illegal discrimination, uses of employer
11   resources.
12          It also talks about financial
13   improprieties.  How we conduct ourselves with
14   regards to handling of intellectual properties.
15          So it covers a number of things for a
16   corporate -- Viacom, Incorporated and BET employees.
17      Q.   The individuals who work at BET, are they
18   required to sign that Viacom Business Conduct
19   Statement?
20      A.   Yes.  They're required to acknowledge
21   receipt of the Viacom Business Conduct Statement and

                                14
1   undergo training.
2       Q.   It's not an option, is it?
3       A.   No.  Exhibit 1 at 7:8-20; 11:6-21; 12; 13; 14:1-3.

Mr. Bowman admitted that he was involved in the transitional period after

                                21

Defendant acquired BET.  Specifically, Mr. Bowman stated the following:

                                    18
         6   Q.   Okay.  Can you tell me were you involved
         7   in any of the transition?
         8      A.   Yes.
         9   Q.   Can you describe what transition
        10   activities you were involved in?
        11      A.   At the time I was an attorney working in
        12   the Legal Affairs Department.  So I assisted BET in
        13   the transition of the company from a private --
        14   essentially a private corporation, to being
        15   purchased and the coming of subsidiary of Viacom,
        16   Incorporated.
        17         THE COURT REPORTER:  Excuse me, a little
        18   clearer.
        19         THE WITNESS:  Okay.  I assisted BET
        20   management in the movement from BET as a small
        21   private corporation -- well, a private corporation.

                                    19
         1   Transitioning it from being a wholly owned
         2   subsidiary of Viacom, Inc.
         3   BY MR. BELL:
         4      Q.   Okay.  Now by you meaning "wholly owned"
         5   do that mean the acquisition also?  Was it just one
         6   based on title, or was it one based on title and
         7   property?
         8         What do you mean by "acquisition"?
         9      A.   As I recall, Black Entertainment
        10   Television was purchased in total as a corporation
        11   by Viacom, Inc. with some exception.  Some of the
        12   businesses that were previously owned by BET were
        13   spun off.
        14      Q.   Okay.  How about the building that BET was
        15   located at in Washington, DC?  Was that part of the
        16   purchase?
        17      A.   Yes.  Exhibit 1 at 18:6-21; 19:1-17.

    Moreover, Defendant as part of Defendant's requirement that BET abide by its

corporate policies and operating procedures, Defendant conducts audits of BET to ensure

that BET is in full compliance with said procedures.  Where BET is found not to be in

compliance, Defendant requires that BET submit documentation showing that it has come

                                    22

into compliance with Defendant's operating procedures and/or corporate policies. Not only does Defendant have control over BET's corporate operations and the ability to conduct audits regarding BET's compliance with Defendant's policies and procedures, Defendant maintains remote access to BET's computer systems and has the ability to conduct oversight functions from Defendant's New York headquarters via computer networking capabilities.

      In Plaintiff's sworn deposition testimony, Plaintiff explained that:

A.  Because they were.  They were starting to

4    make all of our -- put all of our systems -- to

5    modernize all the systems and put them on computers,

6    different software systems, so that they have access

7    to them and payroll was probably one of the first

8    ones that they did.

9      Q.  What other systems?

10     A.  Human Resources.  Human Resources did not

11    used to use any type of software system.  They were

12    operating sort of like a mom and pop shop and with

13    the purchase or us being acquired by the Viacom

14    family, they started getting all types of Infinium,

15    all types of different systems in order to be linked

16    with the Viacom family.

17      Q.  What is Infinium?

18     A.  It's a software, a Human Resources

19    software system that ties the two together.  We can

20    input information here in D.C. and New York has

21    access -- can access that same information.

51

1        They also conduct audits.  We are audited a

2    couple of times a year.  Human Resources was just

3    recently audited by Viacom where they come down and

4    search the files and make sure that the paperwork is

5    intact.

6        Q.  Anything else?

7        A.  No.

8        Q.  You stated that you believe the payroll

9    system -- what is the payroll system, do you know?

10        A.  I do not.  I don't deal with the payroll,

11    but I know that it is input and it goes to 1515

12    Broadway.

13        Q.  How do you know that?

14        A.  Because I was involved in putting up the

15    machines around the campus to make sure that it

16    would go.  I was involved in making sure that people

17    were testing the machines to make sure that someone

18    at Viacom could read them.

19        Q.  What do you mean read them?

20        A.  We have cards.  Whenever someone comes in,

21    they would swipe in.  Typically that information

52

24

1    would have been used for BET.  When the campuses

2    became connected, now if they swipe in Viacom has

3    that information and they are using that information

4    for payroll.

5       Q.   What type of card are you referring to?

6       A.   An identification card.  Each associate

7    has an identification card with a number on it and

8    for hourly associates, they swipe in and that's how

9    they are paid.

10       Q.   How do you know Viacom gets this

11    information?

12       A.   Because I was a part of the testing.  I

13    was asked by BET Human Resources to have a few of

14    the people test their cards and the reason they gave

15    me was because Viacom were now -- it was now on the

16    Viacom payroll system and we need to be sure Viacom

17    can read those cards. Exhibit 2 at 50:3-21; 51; 52:1-17.

Clearly, with respect both to payroll and business conduct, Defendant is pulling the strings through its BET business unit, exercising sufficient control over Plaintiff's workplace to justify liability to her on a sexual harassment claim.  Clearly, BET exists as just another layer of management in Defendant's structure; Defendant exercises control over the labor relations of its business units; and Defendant is liable to Plaintiff on her claim.

25

### 3. Defendant is Plaintiff's Employer Because Defendant and BET Have Common Ownership

On the prong of "common ownership or financial control," probative evidence that the parent employs the subsidiary's employees for purposes of liability for workplace discrimination may be found if the "parent . . . handled the subsidiary's payroll." See, Id. at 62 (citing to Johnson v. Flowers Indus., Inc., 814 F.2d 978, 981 (4th Cir. 1987); Armbruster v. Quinn, 711 F.2d 1332, 1338 (6th Cir. 1983). Here, Defendant does indeed handle the payroll, and issues Plaintiff's paystubs every pay period. See, Exhibit 1. In addition to the fact that Defendant is the sole owner of its BET enterprise, and they have common ownership, insofar as Defendant is the whole owner of BET. This, too, is a factor in Plaintiff's favor. On this prong, the weight of the evidence is clearly in support of Plaintiff's argument that Defendant is her employer.

Moreover, Defendant held control over Plaintiff's payroll while simultaneously allowing Plaintiff access to the payroll system through an intranet server that Defendant controls. On June 25, 2004, Defendant issued to Plaintiff and all of its other BET employees a memorandum directing them to their earnings statements at https://employeedocs.viacom.com. An alternate address of https://employeedocsweb.viacom.com was given for employees needing access while away from work. See, Exhibit 6 of Plaintiff's Opposition to Defendant's Motion to Dismiss, Payroll Memorandum, at 1. Moreover, all salaries and payroll changes must be documented and sent to Defendant to be processed so that such changes may be reflected in any given employees salary and/or pay. Mr. Bowman explained that:

16

4  Q.  And can you tell me -- what is "Infinium"?
5     A.  Infinium is another web based system, or
6  at least computer based system, that Viacom and BET
7  uses to process payroll.
8     Q.  Was it -- do employees have an option to
9  utilize the old system?
10    A.  No.
11    Q.  It's a requirement to go through this new
12  system?
13    A.  Yes.
14    Q.  And it's a system that Viacom required the
15  individuals at BET to utilize?
16    A.  Viacom required BET to utilize the system.
17    Q.  And does this system take out the taxes?
18    A.  Yes.
19    Q.  What about 401Ks?
20    A.  It processes all of the payroll.  It pays
21  people.  It does withholding.  It does 401K.  It

                          17
1  does all the things you associate with a payroll
2  system.  Exhibit 1 at 16:4-21; 17:1-2.


     Anytime a BET employee is promoted, Defendant requires certain forms to be

completed and submitted to Defendant.  In fact, although Defendant has continuously

maintained that Defendant is separate and distinct from BET, Plaintiff found it interesting

to learn, during discovery, that Defendant paid the Counsel's legal fees in the instant case,

and in turn, required BET to reimburse Defendant for said payment. Mr. Bowman

explained that:

                          26
21    A.  That we had to budget for it.  That we had

                          27
1  to pay for whatever the counsel -- whatever the
2  amount was, that we had to pay it.  And, therefore,
3  had to find room in the budget to pay it.
4     Q.  Did that -- by finding room in the budget
5  to pay it, what does that mean?
6     A.  That means that we have a finite budget

                          27

7   for the year 2007.  That we had to pay the bill and
8   that, therefore, that would affect what we would be
9   able to do going forward for the next year -- for
10  this year.
11      Q.   So does that mean it put you out of
12  budget?
13      A.   No.
14      Q.   Well, what do you mean by you had to find
15  money?  I'm trying to understand that part.
16      A.   Well, my impression -- well, the bill was
17  -- when the bill came to us it had not been
18  expected.  So we had to process it to be paid, which
19  means we had to -- which mean we had to find room in
20  the budget to pay for the bill.
21         MR. BELL:  Can you read back his answer

                            28
1   for me, please?
2          (Record read)
3          MR. BELL:  Okay.  We can go forward.  I
4   know what I was asking.  I just wanted to make sure
5   I was clear, so I might as well just ask the
6   question again.
7   BY MR. BELL:
8      Q.   If I recall correctly, you stated that the
9   bill was not expected?
10      A.   Yes.
11      Q.   Can you explain what that means?
12      A.   It was apparent to me that we had not
13  anticipated the bill coming when it came.  So when
14  it came it had to be paid, which means that we had
15  to budget for it being paid.
16      Q.   Now I want to make sure I'm clear on this.
17  Had you anticipated the bill coming at some point?
18      A.   That, I don't know.  I don't work in
19  Legal.
20      Q.   Okay.  Your statement was, if I'm -- tell
21  me if I'm misstating you.

                            29
1          Your statement was you weren't
2   anticipating the bill to come at that time; is that
3   correct?
4          MR. FERRER:  Objection.  That wasn't his
5   testimony.
6          THE WITNESS:  My understanding was -- I
7   don't oversee that department, but I know the
8   discussion.

9      It was that the bill came as a surprise.
10  Whether it came as a complete surprise or whether
11  the timing of its arrival was a surprise.  But the
12  bottom line is that we had to pay the bill for this
13  particular month when it occurred in either June or
14  July, as I recall.
15      So I don't know, beyond that, what it
16  meant.
17  BY MR. BELL:
18      Q.  Is that July of 2007?
19      A.  It's June or July; I'm not sure.
20      Q.  But it was this current year?
21      A.  Yes.  June or July, yes.

30

1      Q.  Okay.  Was there any more discussion
2  regarding that -- that matter that you haven't told
3  me?
4      A.  Not that I recall other than we had to
5  process it to be paid.
6      Q.  Did I identify -- you said it was
7  regarding this case.  Was it about any other case?
8      A.  Yes.
9      Q.  What other case?
10      A.  I'm not sure.  I'm not sure.  I know there
11  were several legal matters that were being
12  processed.
13      Q.  Was one of those matters Andre Combo?
14      A.  I'm not sure.
15      Q.  When Viacom bought BET -- going back to
16  what we talked about before, were you involved in
17  any of the logistics of like showing the facilities
18  or anything?
19      A.  Not that I recall.
20      Q.  Okay.
21      MR. BELL:  Let's take like a two or three

31

1  minute break.  I'm almost done.
2      (Pause in proceedings)
3  BY MR. BELL:
4      Q.  Okay.  I need one thing for clarification.
5  When you said you had to pay a bill to counsel, who
6  were you referring to?
7      A.  I don't know for sure.  And the way it
8  actually occurred is we had to reimburse Viacom for
9  a bill that was being paid.
10      Q.  Regarding this case?

29

```
11   A.  Yes.
12   Q.  Legal bill?
13   A.  Yes.
14   Q.  Do you remember the name of the law firm?
15   A.  No. Exhibit 1 at 26:1; 27; 28; 29; 30; 31:1-15
```

Additionally, Defendant controls the amount and timing of Plaintiff's bonuses and must approve the same before BET employees receive said bonuses.  Defendant controls not only Plaintiff's salary, payroll, withholdings, and bonuses, but also issued Plaintiff, as Defendant's employee, Viacom stock and a letter regarding the same, addressing Plaintiff as its employee in said letter.  See Exhibit 3; Exhibit 4.  Plaintiff testified that:

```
Q.  I'm turning your attention now to exhibit

 8    number six.  Exhibit number six is your letter

 9    from --

10       A.  William Roskin.

11       Q.  Does this say I'm pleased to advise that

12    the compensation committee of Viacom's board of

13    directors has approved to grant you a nonqualified

14    stock option for Viacom's class B common stock?

15       A.  Yes, it does.

16       Q.  Does it also say that you may exercise

17    these options at any time until they expire at the

18    close of business on January 29, 2013 provided you

19    continue as an employee?

20       A.  Yes, it does. Exhibit 2.
```

Clearly, Defendant holds significant financial control over BET and its payroll,

and on this prong Plaintiff is very much Defendant's employee.

On each of the prongs of the "interrelated enterprise test," Plaintiff has evidence support the notion that Defendant is, in fact, Plaintiff's employer. The record makes clear, that Defendant exercises substantial control over, not only BET's corporate conduct through Defendant's corporate policies and operating procedures, which it requires BET to comply with and conducts audits to ensure BET's compliance.

III.    **SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF PLAINTIFFS ON COUNT ONE AS PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW FOR DEFENDANT'S VIOLATIONS OF THE DCHRA**

Plaintiff has established her claims of discrimination according to the District of Columbia Human Rights Act ("DCHRA"). Violations of DCHRA are analyzed according to the same standards as violations of Title VII. Chandamuri v. Georgetown Univ., 274 F. Supp. 2d 71, 85 (D.D.C. 2003) (Lamberth, J.), citing, Howard Univ. v. Green, 652 A.2d 41, 45 (D.C. 1994); Stith v. Chadbourne & Parke, LLP, 160 F. Supp. 2d 1, 11 (D.D.C. 2001) (Lamberth, J.) (DCHRA claims are "analyzed in the same manner as claims arising under Title VII . . . under the framework established by the Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)"), (citing, Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1553 (D.C. Cir. 1997)).

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must present evidence sufficient to prove four elements: (1) membership in a protected group, (2) qualification for the job in question, (3) an adverse employment action, and (4)

circumstances supporting an inference of discrimination. <u>Karpel v. Inova Health Sys.</u> <u>Servs.,</u> 134 F.3d 1222, 1227-28 (4th Cir. 1998)(<u>citing</u>, <u>McDonnell Douglas Corp. v.</u> <u>Green</u>, 411 U.S. 792, 802 (1973)).  <u>McDonnell Douglas</u> also established the "rebuttable presumption" method of proof.  Once the defendant offers a legitimate nondiscriminatory reason for the alleged adverse employment action, the plaintiff is "afforded the 'opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" <u>Reeves</u> <u>v. Sanderson Plumbing Products, Inc.,</u> 530 U.S. 133, 142 (2000) (citations omitted).

Here, Defendant does not dispute the facts, as stated in Plaintiff's Complaint or Plaintiff's deposition, both of which demonstrate, as will be discussed below, that Plaintiff has established a prima facie case of discrimination. <u>Defendant's Statement of</u> <u>Material Facts</u> at 1, fn. 1.  Because Viacom does not dispute any of the facts, as set forth in Plaintiff's Complaint and Plaintiff's Deposition, these facts are treated as conceded. <u>See</u> <u>LCvR 7(h)</u> (facts set forth in motion for summary judgment are admitted if not controverted in response to summary judgment); <u>see</u> <u>also</u> <u>Jackson v. Finnegan,</u> <u>Henderson, Farabow, Garrett & Dunner</u>, 101 F.3d 145, 151 (D.C. Cir. 1996); <u>Twist v.</u> <u>Meese</u>, 854 F.2d 1421,1423-25 (D.C. Cir. 1988); <u>Heasley v. D.C. Gen. Hosp.</u>, 180 F. Supp. 2d 158, 163 (D.D.C. 2002). Defendant, even having made such a concession, did not make any attempt to rebut Plaintiff's prima facie showing of discrimination, which it is required to do once Plaintiff has made a prima facie showing of discrimination.  As such, Defendant's instant Motion must be denied.

**A.    Plaintiff Has Established a Prima Facie Case of Discrimination**.

Plaintiff has established a prima facie case of discrimination as Plaintiff: (1) is a member of a protected class, female; (2) was qualified for the position of Senior Manager as she was performing said position at the time of her demotion and her performance appraisals were above average; (3) was transferred out of her position to the position of Logistics Coordinator; and (4) the position was filled by a person outside of Plaintiff's protected class, namely Sammy Williams, a male.

First, Plaintiff was qualified for the position of Senior Manager as she was more than satisfactorily performing in said position at the time of her demotion. Carol Holland, former Director of Facilities and Logistics for BET, stated that Plaintiff performance was above average. In her affidavit, Ms. Holland explained that: "I found Ms. Woodland's performance to be above average. She took initiative to get the job done and she met or exceeded all of her performance objectives. She was knowledgeable and experienced in all aspects of the Facilities, Logistics and Security Business as it related to BET(Viacom). She was particularly helpful through all special evolutions because of her years experience in the position. Ms. Woodland's managerial skills were average." Exhibit 5 at 1.

Second, Plaintiff's change in duties and ultimate reassignment to the position of Logistic Coordinator constituted actionable adverse employment action. "An employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (internal quotations omitted). "A tangible employment action constitutes a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in

benefits." Moore v. Ashcroft, 401 F. Supp. 2d 1, 25 (D.D.C. 2005) (quoting, Burlington

Indus., Inc. v. Ellerth, 524 U.S. 742, 761, (1998)).

    Ms. Holland specifically explained that soon after she arrived, Plaintiff was

demoted to the position of Logistics Coordinator and her previous position and duties

were given to Mr. Williams, a male outside of Plaintiff's protected class. Ms. Holland

also explained that Mr. Gilmore subjected Plaintiff to procedures and requirements that

similarly situated employees were not subjected to. Specifically, Ms. Holland stated that:

> Soon after I arrived, my supervisor, Mr. Ed Gilmore, and the
> executive assistant to his supervisor, Mrs. Gwenn Dennis
> indicated to me in repeated verbal conversations that Ms.
> Woodland and another employee were poor performers, who
> probably should not remain with the company. Mr. Gilmore
> indicated to me on one occasion that Ms. Woodland was "banned
> from traveling" because on a previous business trip, she had
> failed to accomplish her mission and failed to report her results.
> Ms. Dennis indicated to me that Ms. Woodland didn't arrive to
> work on time, and didn't work too hard while she was there.
> When these comments were made, I asked the question of Mr.
> Gilmore, why the decision had not been made to fire her. His
> response was that her performance appraisals didn't warrant it. I
> later found out that she was never informed or counseled in any
> way that she had been "banned" from traveling. Nor in my tenure
> did she ever report to work late, without gaining previous
> supervisor approval. I also found her work ethic to be above
> average.
> a. In mid October, 2004 the department was reorganized; Mr.
> Samuel Williams was given the same title Ms. Woodland
> previously held. Ms. Woodland was given the title of Logistics
> Coordinator, with no specific duties. These decisions were made
> by Mr. Byron Marchant, Executive Vice President, Corporate
> Administrative Operations.
> b. In the October through November timeframe, several instances
> took place, which led me to the conclusion that Ms. Woodland
> had been singled out for some reason. The most glaring was the
> incident of the going away party for Mr. Troy Saunders, my

34

predecessor. When the invoice came for this party, Mr. Ed
Gilmore indicated that he would not approve payment. He
claimed that the obligations of funds by Ms. Woodland violated
CAO policy. In fact, upon conferring with Mr. Quinton Bowman,
Senior Vice President of Human Resources for BET, it didn't
violate policy, it was not unprecedented and since the services
had already been rendered, the invoice needed to be paid. Mr.
Gilmore again refused to pay, and only relented when directed by
Mr. Byron Marchant. There were several instances dealing with
reimbursable payment that seemed to be centered on Ms.
Woodland's requests, and no one else's. In three separate
instances, Mr. Gilmore refused to provide reimbursement through
the petty cash fund, which he controlled, based on policies or
precedents, which he cited that either didn't exist, or were not
applied to any other request. He finally wrote a petty cash policy,
which severely restricted all use of the petty cash fund. I believe
these types of instances combined with the "reorganization
"resulted in Ms. Woodland filing a complaint through the Human
Resource Department of BET. I witnessed all of these events, and
came to the conclusion that Mr. Gilmore had a problem with Ms.
Woodland and would never treat her fairly, nor would she ever be
eligible for promotion while under his indirect supervision. Id. at
2.

When Mr. Gilmore was asked if he knew what Plaintiff's job duties were, he

responded that he did not know, but that Carol Holland would know better what

Plaintiff's job duties actually were.  Mr. Gilmore explained, during his deposition, that:

17

12  Q.  Do you know what her job duties actually
13  were after the organizational chart came out?
14    A.  Do I?
15    Q.  Yes.
16    A.  No, I don't.
17    Q.  Who would have a better understanding of
18  what her job duties were?
19    A.  Probably Samuel Williams who was her
20  supervisor.
21    Q.  Would Ms. Holland have a good

18

 1  understanding --
 2    A.  She probably would. Exhibit 6, Deposition of Gilmore at 17:21-21; 18:1-2.

35

Plaintiff identified Ms. Holland in her Complaint as having information relevant to her claims of discrimination.  Although Mr. Gilmore also referred to Ms. Holland as having information regarding Plaintiff's duties and change thereof, Defendant made a tactical decision not to depose Ms. Holland, a decision, which may prove unwise.

Mr. Bowman admitted in his sworn deposition, that the duties Plaintiff was required to perform as Logistics Coordinator were those duties of a non-management level employee and further that those duties Plaintiff held while in the Senior Management position were duties only a management level employee or higher could perform.  Specifically, Mr. Bowman stated the following:

```
                                    41
       18    Q.   Okay.  What type of -- I'll give you a --
       19    let me ask you this question.  I'll do it this way
       20    and make it quicker.  Okay.
       21           Ordering coffee for the work campus would

                                    42
        1    be what type of -- what person would be responsible
        2    for that?
        3       A.   It depends.  It could be an Admin Support
        4    person.  It could be somewhat at a higher level
        5    depending on the circumstances.
        6       Q.   Your level?
        7       A.   Typically not.
        8       Q.   A senior management level?
        9       A.   A Senior Manager?
       10       Q.   Yes.
       11       A.   Maybe.
       12       Q.   Answering Help Desk phone questions
       13    regarding internal complaints.  What type of
       14    position would that job detail be of?
       15       A.   Again, it could be a range from an Admin
       16    Support person up to a Manager level, in my
       17    experience.
       18       Q.   Okay.  What about managing the day-to-day
       19    operations on the BET campus?
       20       A.   That's typically a Director, a higher
       21    level position.
```

43

1     Q.   What about interior design of BET campus?
2     A.   Interior design of the BET campus.  That,
3  I don't know.  It could be a consultant.  It could
4  be a range of people.
5     Q.   Could it be an Admin person?
6     A.   Potentially.  I don't know.
7     Q.   Is that unlikely?
8         MR. FERRER:  Objection, asked and
9  answered.
10        THE WITNESS:  I don't know.
11  BY MR. BELL:
12     Q.   What about coordinating the national
13  relocation of departments?
14     A.   You said coordinating?
15     Q.   Yes.
16     A.   It could be Admin up to Manager or
17  Director.
18     Q.   Project management of logistical support
19  to award shows?
20     A.   That typically would be a Manager level
21  position or higher.

44

1     Q.   Vendor management?
2     A.   Typically a Manager level or higher.
3     Q.   Contract negotiations?
4     A.   Typically -- depending on the contract, a
5  Manager level or higher.
6     Q.   Purchasing office furniture and equipment?
7     A.   Manager or higher.
8     Q.   Endorsing vouchers for vendor payments?
9     A.   That could be administrative or higher.
10     Q.   Emergency planning?
11     A.   A Manager or higher, typically.
12     Q.   Construction management?
13     A.   A Manager or higher, typically.
14     Q.   Marketing?
15     A.   That could be a non management position
16  and higher.
17     Q.   By a non management, what does that mean?
18     A.   Administrative support and higher.
19     Q.   Would you say managing the day-to-day
20  operations of the BET campus would be at a different
21  level than ordering coffee for the work campus?

45

37

1    A.  Yes.
2    Q.  What about coordinating logistical and
3  facility concerns for BET remote sites?
4    A.  A Manager or higher, typically.
5    Q.  Would that be different than ordering
6  coffee for the work campus?
7    A.  Yes.
8    Q.  Vendor management?  That would be
9  different than -- at a different level than ordering
10  coffee for a work campus?
11    A.  Yes.
12    Q.  Contract negotiations, the same?
13    A.  Yes.
14    Q.  Purchasing of office and furniture
15  equipment, the same?
16    A.  Yes.
17    Q.  Construction management, the same?
18    A.  Yes. Exhibit 1 at 41:18-21; 42; 43; 44; 45:1-18.

Moreover, Ms. Holland explained that:

> I was not a part of the decision to hire Mr. Williams, I also was not
> aware that a position was open in my department. There was
> considerable confusion regarding Mr. Williams responsibilities. I recall
> one visit to New York with Mr. Ed Gilmore where he introduced me to
> the Vice President of VIACOM for Facilities as doing "one half of [my
> predecessors] former duties" inferring that the other half would be
> accomplished by Mr. Williams. After Mr. Williams arrived, he became
> my direct report with the identical title, duties and responsibilities as
> Ms. Woodland previously held. Additionally, her job title was changed
> to Logistics Coordinator with unspecified duties. She no longer had
> managerial duties except to direct the work of the help desk ticket crew.
> Exhibit 5 at 1.

Ms. Holland and Mr. Bowman's statements make clear that Defendant took all of

Plaintiff's supervisory responsibilities away from her when she was demoted to Logistics'

Coordinator and Plaintiff was reduced to a position akin to an administrative assistant.

Said reduction in duties from managerial to administrative constitutes adverse

employment action. Burke v. Gould, 286 F.3d 513, 522 (D.C. Cir. 2001) (Withdrawing

an employee's supervisory duties constitutes an adverse employment action).

38

Plaintiff specifically explained that prior to her demotion, she was managing the day to day operations of numerous departments and had various persons that reported directly to her and that after her demotion, Plaintiff was only responsible for answering a telephone.  Plaintiff specifically testified that:

A.   Okay.  Managing day to day operations of

3    the campus, interior design for the BET campus,

4    coordinating logistics facility concerns.

5        Q.  I don't mean to interrupt you but, again,

6    I'm asking you just based on what you can recall.

7    That's in the complaint.  I understand that and

8    that's what you are reading from.

9        A.  Project management, bill paying, signing

10   AP vouchers, day to day management, security,

11   cleaning, mail room document center, warehouse

12   management, marketing effort for remote sites and

13   other things that are in the document, in the

14   complaint document.

15       Q.  How did your duties change, if at all,

16   when you became logistics coordinator?

17       A.  I was responsible for answering the phone.

18   That's it.

19       Q.  Answering what phone?

20       A.  The help desk line, the complaint line.

21       Q.  What type of inquiries?

39

195
1      A.  Excuse me?

2      Q.   What type of inquiries would be called in

3  to this help desk?

4      A.  It's too cold, it's too hot, the toilet is

5  stopped up.

6      Q.   Regarding the facility maintenance?

7      A.  Yes, maintenance requests, facility

9  requests. Exhibit 2 at 194:2-21; 195:1-8.


Plaintiff further explained that:

       Q.   When you were senior manager who reported

10   to you?

11      A.  The receptionist.

12      Q.  What was her name?

13      A.  Mae McClarty, Regina Wilson.

14      Q.  How do you spell the first name?

15      A.  M-C-C-L-A-R-T-Y.  The cafeteria staff, the

16   security team on site, the chief engineer, the

17   assistant chief engineer and the two engineer

18   supports, the warehouse manager, the mail room

19   manager and the mail room associates, the records

20   management manager, the document center, the office

21   managers at the remote locations.
196
1      Q.   Where are the remote locations?

40

2       A.   Chicago, New York, LA.  I think that's

3    probably it.

4       Q.   All these people directly reported to you?

5       A.   Yes.  They reported through the chief

6    engineer.  At one point they were reporting to me

7    and then as my responsibilities grew it was narrowed

8    down.

9         They started reporting to the chief engineer

10    who in turn reported to me.  He took all the

11    facility related, the engineers and the day porters

12    and the vendors all still reported to me, along with

13    him.

14       Q.   Vendors reported straight to you?

15       A.   Yes.

16       Q.   The chief engineer again was?

17       A.   Carlos Medina.

18       Q.   You say Medina was at --

19       A.   The BET location.

20       Q.   When you became logistics coordinator who

21    reported to you?  197

3       A.   No one.  Id. at 195:9-21; 196; 197:1.

Finally, the circumstances surrounding Plaintiff's demotion give rise to an

inference of illegal discrimination as Plaintiff's supervisor, Mr. Gilmore, repeatedly made

41

derogatory remarks regarding women, required Plaintiff to follow procedures not required

of similarly situated employees, Mr. Gilmore was the subject of complaints made by at

least two other women under his direct supervision, and Plaintiff's supervisory

responsibilities were given to Mr. Williams, a male outside of Plaintiff's protected class.

Plaintiff specifically testified that:

> A.  Because my responsibilities and everything
>
> 14   was given to a man.  The man who was responsible for
>
> 15   doing it was allowed to do it with no documentation.
>
> 16   He did it only because I was a woman.
>
> 17       This is a man who commonly referred to women
>
> 18   as bitches.  The same man who acted as if he was
>
> 19   going to back-hand me in a meeting, this is a man
>
> 20   who has a problem with women.
>
> 21     Q.   You have to use names?
> 200
> 1       A.   Ed Gilmore.  It's also the same person who
>
> 2   two other women came and filed complaints against
>
> 3   before they would do anything about my complaint.
>
> 4       Q.   You believe Mr. Gilmore gave your
>
> 5   responsibilities to a man?
>
> 6       A.   Yes.
>
> 7       Q.   What man was that?
>
> 8       A.   Sammy Williams.
>
> 9       Q.   Why do you think he gave your prior duties
>
> 10   to Mr. Williams?

11    A.  He has a problem with women.

12    Q.  Why do you think he has a problem with

13    women?

14    A.  Because he always refers to them as

15    bitches.  He always refers to them as that.  Every

16    woman in his chain of command has had problems with

17    him and has gone to Human Resources to complain, the

18    same complaints I complained about.  Just his

19    conversations, the conversations that he's had

20    around me about women, they've always been

21    derogatory.

201

1    Q.  Can you give me any specific examples?

2    A.  He's always referred to the vice-president

3    of special events who was a woman as a B, a fat B

6    actually. Exhibit 2 at 199:13-21; 200; 201:1-4.

Because Plaintiff was assigned duties not commensurate with her experience and

prior position, had her duties delegated to other staff members, and was ultimately

reassigned to a position without supervisory responsibilities and responsibilities

significantly different from her position as Senior Manager, Plaintiff has established a

prima facie case of discrimination and summary judgment must be denied.  Moore, 401 F.

Supp. 2d at 25; see also, Burlington Indus., Inc., 524 U.S. at 761; Burke v. Gould, 286

F.3d 513, 522 (D.C. Cir. 2001) (Withdrawing an employee's supervisory duties

43

constitutes an adverse employment action).

**B.    Defendant's Motion for Summary Judgment Must be Denied as Plaintiff has Established a Prima Facie Case of Discrimination, which Defendant has Failed to Rebut.**

Once the Plaintiff has established a prima facie case of discrimination, Defendant must rebut said prima facie showing by providing a legitimate, non-discriminatory reason for its actions. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (citations omitted). Plaintiff is then "afforded the 'opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Id.

Here, Defendant does not dispute the facts, as stated in Plaintiff's Complaint or Plaintiff's deposition, both of which demonstrate, as will be discussed below, that Plaintiff has established a prima facie case of discrimination. Defendant's Statement of Material Facts at 1, fn. 1. Because Viacom does not dispute any of the facts, as set forth in Plaintiff's Complaint and Plaintiff's Deposition, these facts are treated as conceded. See LCvR 7(h) (facts set forth in motion for summary judgment are admitted if not controverted in response to summary judgment); see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151 (D.C. Cir. 1996); Twist v. Meese, 854 F.2d 1421,1423-25 (D.C. Cir. 1988); Heasley v. D.C. Gen. Hosp., 180 F. Supp. 2d 158, 163 (D.D.C. 2002). Defendant, even having made such a concession, did not make any attempt to rebut Plaintiff's prima facie showing of discrimination, which it is required to do once Plaintiff has made a prima facie showing of discrimination. As such, Defendant's instant Motion must be denied.

44

Even if Defendant had offered any legitimate, non-discriminatory reasons for demoting Plaintiff, the Supreme Court, in Reeves, 530 U.S. at 147, explained that a plaintiff may establish pretext by proving that the defendant's explanation for an employment decision is not credible or that the defendant's explanation is false. The Reeves Court further noted that "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." 530 U.S. at 147. The Supreme Court has instructed trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. "The trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." Id. at 143 (quoting, Burdine, 450 US at 255 n.10).

Here, as Plaintiff and Ms. Holland have made clear, Mr. Gilmore made numerous derogatory comments regarding women, subjected Plaintiff to treatment not imposed on persons outside of Plaintiff's protected class, and was the subject of multiple complaints from women, including Plaintiff. Specifically, Plaintiff stated that:

> A. Because my responsibilities and everything
>
> 14    was given to a man. The man who was responsible for
>
> 15    doing it was allowed to do it with no documentation.
>
> 16    He did it only because I was a woman.
>
> 17        This is a man who commonly referred to women

45

18    as bitches.  The same man who acted as if he was

19    going to back-hand me in a meeting, this is a man

20    who has a problem with women.

21        Q.   You have to use names?

200

1        A.   Ed Gilmore.  It's also the same person who

2    two other women came and filed complaints against

3    before they would do anything about my complaint.

4        Q.   You believe Mr. Gilmore gave your

5    responsibilities to a man?

6        A.   Yes.

7        Q.   What man was that?

8        A.   Sammy Williams.

9        Q.   Why do you think he gave your prior duties

10    to Mr. Williams?

11        A.   He has a problem with women.

12        Q.   Why do you think he has a problem with

13    women?

14        A.   Because he always refers to them as

15    bitches.  He always refers to them as that.  Every

16    woman in his chain of command has had problems with

17    him and has gone to Human Resources to complain, the

18    same complaints I complained about.  Just his

19    conversations, the conversations that he's had

20    around me about women, they've always been

46

21    derogatory.
201
1       Q.  Can you give me any specific examples?

2       A.  He's always referred to the vice-president

3    of special events who was a woman as a B, a fat B

7    actually. <u>Exhibit 2</u> at 199:13-21; 200; 201:1-4.


Moreover, Ms. Holland explained that:

> I was not a part of the decision to hire Mr. Williams, I also was not
> aware that a position was open in my department. There was
> considerable confusion regarding Mr. Williams responsibilities. I recall
> one visit to New York with Mr. Ed Gilmore where he introduced me to
> the Vice President of VIACOM for Facilities as doing "one half of [my
> predecessors] former duties" inferring that the other half would be
> accomplished by Mr. Williams. After Mr. Williams arrived, he became
> my direct report with the identical title, duties and responsibilities as
> Ms. Woodland previously held. Additionally, her job title was changed
> to Logistics Coordinator with unspecified duties. She no longer had
> managerial duties except to direct the work of the help desk ticket crew.
> <u>Exhibit 5</u> at 1.


Accordingly, Mr. Gilmore's demotion of Plaintiff was clearly motivated by

discriminatory treatment that only women were subjected to, as such, Plaintiff would be

able to demonstrate that any non-discriminatory reasons Defendant could have attempted

to offer, if it had chosen to offer any, would be nothing more than pretext for illegal

gender discrimination and Defendant's Motion for Summary Judgment must be denied.

## <u>CONCLUSION</u>

Because disputes as to material facts exist in this case and Defendant is not

entitled to judgment as a matter of law on any counts of Plaintiff's Complaint, Summary

Judgment must be denied.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this

Court deny Defendants Motion for Summary Judgment on all counts of Plaintiffs'

Complaint.

Respectfully submitted,

_____

Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, Maryland 20772
(301) 599-7620
(301) 599-7623 (Fax)
MD Bar No. 14639