1

1  UNITED STATES DISTRICT COURT FOR THE
2              DISTRICT OF COLUMBIA
3  _____
4  ANTOINETTE WOODLAND,        )
5          Plaintiff,    )
6  vs.                    ) CASE NO.:
7  VIACOM, INC.,              ) 1:05CV01611
8          Defendant.    )
9  _____)
10           UPPER MARLBORO, MARYLAND
11           WEDNESDAY, SEPTEMBER 5, 2007
12  The deposition of:
13           QUINTON BOWMAN,
14      called for oral examination by Counsel for the
15  Plaintiff, pursuant to notice, held in the Law
16  Office of Jimmy A. Bell, P.C., 9610 Old Marlboro
17  Pike, Upper Marlboro, Maryland, beginning at
18  10:05 a.m., before Cathelyn Matthews, Court Reporter
19  and a Notary Public in and for the State of
20  Maryland, when were present:
21

2

1  APPEARANCES
2     ON BEHALF OF DEFENDANT:
3        JOHN FERRER, ESQUIRE
4        MORGAN, LEWIS & BOCKIUS, LLP
5        1111 Pennsylvania Avenue, N.W.
6        Washington, D.C.  20004
7        (202) 739-5317
8        DAMIEN ALEXANDER, ESQUIRE
9        Black Entertainment Television
10        Legal Affairs
11        1235 W Street, N.E.
12        Washington, D.C. 20018-1211
13        (202) 608-2188
14
15     ON BEHALF OF PLAINTIFF:
16        JIMMY A. BELL, ESQUIRE
17        LAW OFFICE OF JIMMY A. BELL, P.C.
18        9610 Old Marlboro Pike
19        Upper Marlboro, Maryland  20772
20        (301) 599-7620
21  ALSO PRESENT:  Antoinette Woodland

3

1              C O N T E N T S
2  DEPOSITION OF QUINTON BOWMAN              PAGE
3     By Mr. Bell                    4
4     By Mr. Ferrer                  49
5     By Mr. Bell                    51
6
7              E X H I B I T S
8              (RETAINED)
9  EXHIBIT NUMBER                        PAGE
10  1   Statement of Corporate Policy and Code      8
11     of Conduct signed by Antoinette Woodland
12
13  2   Signed Confirmation of Receipt by      8
14
15  3   BET Regular Employee Handbook          10
16
17
18         CERTIFIED QUESTIONS AND
19  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
20              (NONE)
21

4

1          P R O C E E D I N G S
2  Thereupon:
3  The following proceedings were had:
4              Quinton Bowman,
5  having been previously duly sworn, testified as
6  follows:
7  BY MR. BELL:
8     Q.  Can you state your name for the record,
9  please.
10     A.  Yes.  My name is Quinton Bowman.
11     Q.  And your address?
12     A.  2410 14th Street, North Arlington,
13  Virginia.
14     Q.  Have you ever had your deposition taken
15  before?
16     A.  Yes.
17     Q.  I just want to ask if you allow me to
18  finish the question, even if you believe that you
19  know the answer, so we can make a complete record.
20     A.  Okay.
21     Q.  And any time that you need to take a

5

1  break, as long as there's not a pending question on
2  it, just let me know.
3      A.  Okay.
4      Q.  Can you state your occupation?
5      A.  Yes.  I'm the Senior Vice President of
6  Human Resources and Administration, BET.
7      Q.  What does that entail?  What is your --
8  tell me your job duties?
9      A.  My duties are to manage the day-to-day
10  operations of the Human Resources Department.
11          I also oversee administrative operations
12  to include Purchasing and Travel and other
13  administrative functions for the company.
14      Q.  How long have you had those duties?
15      A.  I've had the Human Resources duties since
16  2001.  I recently acquired within the last year the
17  additional duties.
18      Q.  By Human Resources duties, you said you --
19  had you first got them in 2001?
20      A.  Yes.
21      Q.  And can you tell me what those duties are

6

1  as it relates to Human Resources?
2      A.  It essentially means I investigate
3  employee relations issues related to claims of
4  discrimination or other claims of improper conduct
5  by employees or managers.
6          I also oversee the benefits operations.
7  Everything for medical and dental benefits.
8          I also am involved in hiring new
9  employees, making sure they get paid in a timely
10  fashion.  Processing raises, processing changes in
11  status.
12          Overseeing other personnel, compensation
13  and benefits matters.
14      Q.  In 2001 did you conduct any
15  investigations?
16      A.  In 2001?
17      Q.  Yes.
18      MR. FERRER:  Objection, ambiguous.
19  BY MR. BELL:
20      Q.  You can answer.
21      A.  Yes.

7

1    Q.   Okay.  Now did you conduct any
2  discrimination investigations?
3    A.   I don't recall a particular year, but I
4  have, from time to time, investigated claims of
5  discrimination.
6    Q.   And was that based on any printed policy?
7    A.   Yes.
8    Q.   And what printed policy in -- let's go
9  from 2001 and we'll go forward.  Let's just go with
10  2001.
11    A.   In 2001 we had and continue to have the
12  BET Employee Handbook, which sets forth what the
13  rules of conduct are regarding discrimination.
14         And in 2002, thereabouts, we also acquired
15  another set of rules under the Viacom Business
16  Conduct Statement that direct what we should do.
17    Q.   What do you mean with "direct what you
18  should do"?
19    A.   That provide the rules of conduct for
20  Viacom and subsidiary Viacom employees.
21    Q.   So does that mean that that is -- the

8

1  Viacom rules are the first set and then BET has
2  their own set in addition to Viacom?
3    A.   The BET rules were there first.  And
4  Viacom laid on top an additional set of guidelines.
5         THE COURT REPORTER:  Excuse me, laid?
6         THE WITNESS:  Laid on top later.  In other
7  words, the BET rules were in existence prior to
8  Viacom acquiring Black Entertainment Television.
9  BY MR. BELL:
10    Q.   And when they acquired it, these new set
11  of rules, they superceded the BET rules?
12    A.   No they didn't.  Our rules are still in
13  effect.
14    Q.   Was there a statement of corporate policy
15  and conduct that BET had prior to Viacom?
16    A.   Yes.
17    Q.   Had you ever seen one?
18    A.   Yes.
19         MR. BELL:  Mark these.
20         (Deposition Exhibit Numbers 1 and 2
21           were marked for identification)

9

1  BY MR. BELL:
2    Q.  I've given you what's been marked as
3  Bowman Exhibit No. 1 and Bowman Exhibit No. 2.
4    A.  Okay.
5    Q.  Let's go Bowman Exhibit No. 1.
6       MR. FERRER:  Which one is which?
7       MR. BELL:  Oh, I'm sorry.  Here.  Let's do
8  it that way.
9       THE WITNESS:  Okay.
10  BY MR. BELL:
11    Q.  Can you identify what Bowman Exhibit No. 1
12  is?
13    A.  Yes.  It appears to be a Statement of
14  Corporate Policy and Code of Conduct that was signed
15  by Antoinette Woodland in December of '01.
16    Q.  Is this the Corporate Policy and Conduct
17  that you were speaking of a minute ago?
18    A.  No.  It actually isn't.  I mean, it's a
19  certain part of what we set as guidelines.
20       But it's also -- there are certain
21  policies also set forth in the employee handbook.


10

1    Q.  Okay.  But let me ask you this question.
2  Maybe I need to make it more clear, okay?
3       Is this the document prior to -- the
4  Viacom document that you spoke about, is this the
5  document that you had in place?
6    A.  Yes.
7    Q.  Okay.  I'm going to turn to Bowman Exhibit
8  No. 2.  Can you identify that document?
9    A.  This appears to be a signed confirmation
10  of receipt by Antoinette Woodland regarding her
11  receipt of the BET Employee Handbook.
12       MR. BELL:  Will you mark this?
13       (Deposition Exhibit No. 3 was
14        marked for identification)
15  BY MR. BELL:
16    Q.  I'm showing you what's been marked as
17  Bowman Exhibit No. 3.
18    A.  Okay.
19    Q.  Have you ever seen that document before?
20    A.  Yes.
21    Q.  Can you tell me what that document is?

11

1    A.   This is the Black Entertainment Television
2    Regular Employee Handbook.
3    Q.   Is this the handbook that you were
4    speaking about?  About the BET handbook?
5    A.   Yes.
6    Q.   Okay.  You said that now that Viacom
7    acquired BET, that there's a different book.  Can
8    you tell me what the name of that book is?
9    A.   It's the Viacom Business Conduct
10   Statement.
11    Q.   And can you tell me the difference between
12   the Business Conduct Statement and BET's Employee
13   Handbook?
14    A.   The BET handbook essentially tells Black
15   Entertainment Television employees how they should
16   conduct themselves with regards to their work
17   relationships of BET.
18        It also informs them concerning their
19   rights -- benefit rights and other procedural
20   aspects of being a BET employee.
21        The Viacom BCS essentially tells -- is a

12

1    corporate code of conduct that applies to Viacom,
2    Incorporated employees as well to Black
3    Entertainment Television, Paramount and other
4    subsidiary Viacom employees.
5    Q.   In that business statement of conduct do
6    they have to also sign a document?
7    A.   Yes.
8    Q.   And does that document -- can you describe
9    what that document is?
10   A.   It's actually been in various forms.  It
11   initially -- the first two iterations, as I recall,
12   were written acknowledgements of receipt.
13        And since -- starting this year, we
14   actually have a sign-off, but it's done
15   electronically.  That you've read the Viacom
16   Business Conduct Statement and you've received
17   training.
18        And we also have an additional
19   requirement, as I think back to it.  Even
20   acknowledge receipt when an employee's new, that he
21   or she has received a new Viacom Business Conduct

13

1  Statement.
2    Q.  Okay.  Have you ever read the Business
3  Conduct Statement?
4    A.  Yes.
5    Q.  Can you tell me what it says?
6    A.  Obviously, it's a big document.  I can
7  tell you, in essence, it talks about the rules of
8  the road for Viacom, Inc. employees and subsidiary
9  employees.  It talks about things like conflicts of
10  interest, illegal discrimination, uses of employer
11  resources.
12        It also talks about financial
13  improprieties.  How we conduct ourselves with
14  regards to handling of intellectual properties.
15        So it covers a number of things for a
16  corporate -- Viacom, Incorporated and BET employees.
17    Q.  The individuals who work at BET, are they
18  required to sign that Viacom Business Conduct
19  Statement?
20    A.  Yes.  They're required to acknowledge
21  receipt of the Viacom Business Conduct Statement and

14

1  undergo training.
2    Q.  It's not an option, is it?
3    A.  No.
4    Q.  In dealing with personnel you deal with
5  payroll issues?
6    A.  Yes.
7    Q.  Okay.  Let's go back to 2001.
8    A.  Okay.
9    Q.  What type of payment setup did BET have in
10  2001?
11    A.  In 2001 we had a system called "Pay
12  America" that processed our payroll for employees.
13    Q.  And can you describe that system?
14    A.  I didn't get involved in it directly,
15  day-to-day.  But it is a web based system -- a
16  secure web based system that was managed by the
17  Human Resources Department and the Payroll
18  Department that paid employees, that terminated
19  employees, that process raises.
20        Those kinds of things that you think of
21  with a payroll.

15

1    Q.   Where was that Human Resources Department
2    located at?
3    A.   Well, actually, the Pay America system was
4    a virtual system.  We had software on our various
5    computers, so people who actually administered it
6    day-to-day.
7         The Human Resources Department Payroll was
8    in -- I'm sorry, the BET Payroll Department was in
9    DC.  And the BET Human Resources Department that
10   also played a role was also in DC.
11   Q.   And that's where the actual checks were
12   cut?
13   A.   No.  I'm not sure where the checks were
14   cut, but they weren't cut at the company.
15   Q.   Were they drawn on a local bank?
16   A.   I don't know for sure, but it was drawn
17   upon a bank that BET obviously had an account.  I
18   don't know where the bank was.
19   Q.   What system -- is that system still in
20   place now?
21   A.   No, it's not.


16

1    Q.   When did that system change?
2    A.   In or about 2003 we moved from Pay America
3    to a system called "Infinium".
4    Q.   And can you tell me -- what is "Infinium"?
5    A.   Infinium is another web based system, or
6    at least computer based system, that Viacom and BET
7    uses to process payroll.
8    Q.   Was it -- do employees have an option to
9    utilize the old system?
10   A.   No.
11   Q.   It's a requirement to go through this new
12   system?
13   A.   Yes.
14   Q.   And it's a system that Viacom required the
15   individuals at BET to utilize?
16   A.   Viacom required BET to utilize the system.
17   Q.   And does this system take out the taxes?
18   A.   Yes.
19   Q.   What about 401Ks?
20   A.   It processes all of the payroll.  It pays
21   people.  It does withholding.  It does 401K.  It

17

1  does all the things you associate with a payroll
2  system.
3     Q.  Okay.  Now the other system -- I didn't
4  ask that question.  The other system that you used
5  to have, did that system do the same type of --
6     A.  Yes.
7     Q.  Let's go back to the question.  I have to
8  ask just to make sure the record is clear.
9        The older system that you first talked
10  about, what's the name of that system?
11     A.  Pay America.
12     Q.  Pay America.  Did Pay America utilize all
13  of the same aspects as it related to payroll
14  deductions and taxes and things of that nature?
15     A.  Yes.
16     Q.  Okay.  And do you know what year Viacom
17  required BET to go on that system?  Required BET to
18  utilize "Infinity"?
19     A.  Infinium.
20     Q.  Infinium.
21     A.  As I recall, it was about 2003.


18

1     Q.  Okay.  Did you play any role in the
2  transition for -- well, strike that.  Let me first
3  lay some foundation.
4        Can you tell me when Viacom purchased BET?
5     A.  January 23, 2001.
6     Q.  Okay.  Can you tell me were you involved
7  in any of the transition?
8     A.  Yes.
9     Q.  Can you describe what transition
10  activities you were involved in?
11     A.  At the time I was an attorney working in
12  the Legal Affairs Department.  So I assisted BET in
13  the transition of the company from a private --
14  essentially a private corporation, to being
15  purchased and the coming of subsidiary of Viacom,
16  Incorporated.
17        THE COURT REPORTER:  Excuse me, a little
18  clearer.
19        THE WITNESS:  Okay.  I assisted BET
20  management in the movement from BET as a small
21  private corporation -- well, a private corporation.

19

1  Transitioning it from being a wholly owned
2  subsidiary of Viacom, Inc.
3  BY MR. BELL:
4     Q.  Okay.  Now by you meaning "wholly owned"
5  do that mean the acquisition also?  Was it just one
6  based on title, or was it one based on title and
7  property?
8        What do you mean by "acquisition"?
9     A.  As I recall, Black Entertainment
10  Television was purchased in total as a corporation
11  by Viacom, Inc. with some exception.  Some of the
12  businesses that were previously owned by BET were
13  spun off.
14     Q.  Okay.  How about the building that BET was
15  located at in Washington, DC?  Was that part of the
16  purchase?
17     A.  Yes.
18     Q.  Okay.  What about the Georgetown property?
19     A.  I don't recall specifically what the
20  ultimate -- what ultimately happened to Georgetown
21  other than I don't recall it was part of the

20

1  purchase.
2     Q.  Okay.  But you're sure that the actual
3  building that housed BET in Washington, DC, that was
4  part of the purchase?
5     A.  Yes.
6     Q.  Okay.
7        MR. BELL:  Can we take about two minutes?
8        MR. FERRER:  Sure.
9        (Pause in proceedings)
10  BY MR. BELL:
11     Q.  I forgot to do this in the beginning.  Can
12  you tell me what your education is?
13     A.  I graduated in 1978 with a Bachelors of
14  Science Degree from the United States Military
15  Academy.  I graduated out of the University of
16  Virginia Law School in 1985, a Juris Doctorate
17  Degree.
18     Q.  Are you licensed to practice anywhere?
19     A.  Yes, Virginia.
20     Q.  Besides the Human Resources
21  responsibilities that you have now, what else are

21

1  you responsibilities?
2      A.  I am also in charge of, currently,
3  Logistics for BET.  Also Administration generally,
4  which includes Purchasing and Travel.
5      Q.  Can you explain what "Logistics" is?
6      A.  Currently, it means occupant services.  It
7  means the mail room.  It means the warehouse that we
8  have that archives and stores various BET documents
9  and materials.
10         It also means the cafeteria and security.
11     Q.  Okay.  Can you tell me what
12  "Administration" means?
13     A.  I include those things that were just
14  described.  Well, Administration -- I'm sorry, also
15  means purchasing the -- purchasing, which is
16  essentially the buying of various services and
17  products at a corporate level for the company to
18  include things like UPS, courier services, DHL,
19  Federal Express as it applies.
20         It also means things like courier services
21  that we use, business cards, budget oversight for

22

1  the departments.
2      Q.  Budget oversights for the -- I didn't
3  quite hear you.
4      A.  For the departments that I oversee.
5      Q.  Okay.  What departments do you oversee?
6      A.  Again, Logistics, Travel, Purchasing and
7  Human Resources.
8      Q.  Does Legal fall inside or outside of that?
9      A.  It falls outside.
10     Q.  Okay.  Do you know a person by the name of
11  Donna Cooper?
12     A.  Yes.
13     Q.  Can you tell me who she is?
14     A.  She is our Vice President and Associate
15  General Counsel.
16     Q.  Okay.  Can you tell me who -- well, can
17  you tell me if you know a Byron Marchant?
18     A.  Yes.
19     Q.  Can you tell me who he is?
20     A.  He is our Executive Vice President in
21  charge of Administrative Operations, and he's also

23

1  our General Counsel.
2    Q.  Can you tell me whether you know a person
3  by the name of Scott Mills?
4    A.  Yes.
5    Q.  Can you tell me what Scott --
6    A.  Scott currently is our President and Chief
7  Operating Officer.
8    Q.  When you have -- well, do you ever have
9  meetings with Scott Mills?
10    A.  Yes.
11    Q.  Now does -- I'm trying to understand how
12  the corporate structure is.  You said you had four
13  departments that you had budget oversight over?
14    A.  Yes.
15    Q.  Now Scott Mills, is he above you on that
16  ladder?
17    A.  Yes, he is.
18    Q.  Okay.  Who would be your contemporaries?
19    A.  Currently?
20    Q.  Yes.
21    A.  Currently my contemporaries would be

24

1  Lawrence Cooper who is Senior Vice President and
2  Deputy General Counsel.
3       My other peers would be Deidra Jackson who
4  is our Chief of Technology.  There is a Senior
5  Director, Ray Garrett, who reports to Byron and he
6  is the Chief of Broadcast Operations.
7       Those are the three that come to mind.
8    Q.  Okay.  Now by contemporaries I want to
9  make sure I got this clear for the record.
10       That means they each have a number of
11  departments under them where they are responsible
12  for the budgets?
13    A.  They would have one or more departments
14  that they're responsible for.
15    Q.  Okay.  And is there ever a time when
16  yourself and your contemporaries meet with -- you
17  said Scott Mills is your boss?
18    A.  No.  My first level boss is Byron
19  Marchant.
20    Q.  Okay.
21    A.  And my next boss is Scott Mills.

25

1    Q.  Okay.  So Scott is above Byron Marchant?
2    A.  That's correct.
3    Q.  Okay.  Have you participated in any
4  budgetary meetings with Scott Mills?
5    A.  No.
6    Q.  Have you participated in any budgetary
7  meetings with Byron Marchant?
8    A.  Yes.
9    Q.  Did you participate in any budgetary
10  meetings with Byron Marchant last month?
11    A.  Yes.
12    Q.  Do you recall a budgetary meeting where
13  there was discussion regarding Viacom sending
14  invoices for legal fees to BET regarding this case?
15    A.  Yes.
16    Q.  Tell me about that conversation?
17    A.  The conversation related to charge backs
18  that Viacom was doing for BET for work that it had
19  done by outside counsel for matters that related to
20  BET.
21    Q.  What does that mean?  That means this

26

1  case?
2    A.  Yes.
3    Q.  By outside counsel, you mean what?
4    A.  The outside counsels that Viacom was
5  employing for this case.
6    Q.  Let me see if I got this straight.
7    A.  Okay.
8    Q.  To make sure I'm clear on this.  Is it
9  your understanding that the outside counsel sent a
10  bill to Viacom, and then Viacom sent BET a bill for
11  that outside counsel?
12    A.  That's correct.
13    Q.  Do you know how much the bill was?
14    A.  No.
15        MR. FERRER:  Objection.
16  BY MR. BELL:
17    Q.  Is it all you remember from the
18  discussion?
19    A.  No.
20    Q.  What else do you remember?
21    A.  That we had to budget for it.  That we had

27

1  to pay for whatever the counsel -- whatever the
2  amount was, that we had to pay it.  And, therefore,
3  had to find room in the budget to pay it.
4     Q.   Did that -- by finding room in the budget
5  to pay it, what does that mean?
6     A.   That means that we have a finite budget
7  for the year 2007.  That we had to pay the bill and
8  that, therefore, that would affect what we would be
9  able to do going forward for the next year -- for
10  this year.
11     Q.   So does that mean it put you out of
12  budget?
13     A.   No.
14     Q.   Well, what do you mean by you had to find
15  money?  I'm trying to understand that part.
16     A.   Well, my impression -- well, the bill was
17  -- when the bill came to us it had not been
18  expected.  So we had to process it to be paid, which
19  means we had to -- which mean we had to find room in
20  the budget to pay for the bill.
21        MR. BELL:  Can you read back his answer

28

1  for me, please?
2        (Record read)
3        MR. BELL:  Okay.  We can go forward.  I
4  know what I was asking.  I just wanted to make sure
5  I was clear, so I might as well just ask the
6  question again.
7  BY MR. BELL:
8     Q.   If I recall correctly, you stated that the
9  bill was not expected?
10     A.   Yes.
11     Q.   Can you explain what that means?
12     A.   It was apparent to me that we had not
13  anticipated the bill coming when it came.  So when
14  it came it had to be paid, which means that we had
15  to budget for it being paid.
16     Q.   Now I want to make sure I'm clear on this.
17  Had you anticipated the bill coming at some point?
18     A.   That, I don't know.  I don't work in
19  Legal.
20     Q.   Okay.  Your statement was, if I'm -- tell
21  me if I'm misstating you.

29

1      Your statement was you weren't
2  anticipating the bill to come at that time; is that
3  correct?
4      MR. FERRER:  Objection.  That wasn't his
5  testimony.
6      THE WITNESS:  My understanding was -- I
7  don't oversee that department, but I know the
8  discussion.
9      It was that the bill came as a surprise.
10  Whether it came as a complete surprise or whether
11  the timing of its arrival was a surprise.  But the
12  bottom line is that we had to pay the bill for this
13  particular month when it occurred in either June or
14  July, as I recall.
15      So I don't know, beyond that, what it
16  meant.
17  BY MR. BELL:
18  Q.  Is that July of 2007?
19  A.  It's June or July; I'm not sure.
20  Q.  But it was this current year?
21  A.  Yes.  June or July, yes.


30

1  Q.  Okay.  Was there any more discussion
2  regarding that -- that matter that you haven't told
3  me?
4      A.  Not that I recall other than we had to
5  process it to be paid.
6  Q.  Did I identify -- you said it was
7  regarding this case.  Was it about any other case?
8  A.  Yes.
9  Q.  What other case?
10  A.  I'm not sure.  I'm not sure.  I know there
11  were several legal matters that were being
12  processed.
13  Q.  Was one of those matters Andre Combo?
14  A.  I'm not sure.
15  Q.  When Viacom bought BET -- going back to
16  what we talked about before, were you involved in
17  any of the logistics of like showing the facilities
18  or anything?
19  A.  Not that I recall.
20  Q.  Okay.
21      MR. BELL:  Let's take like a two or three

31

1    minute break.  I'm almost done.
2          (Pause in proceedings)
3    BY MR. BELL:
4      Q.  Okay.  I need one thing for clarification.
5    When you said you had to pay a bill to counsel, who
6    were you referring to?
7      A.  I don't know for sure.  And the way it
8    actually occurred is we had to reimburse Viacom for
9    a bill that was being paid.
10     Q.  Regarding this case?
11     A.  Yes.
12     Q.  Legal bill?
13     A.  Yes.
14     Q.  Do you remember the name of the law firm?
15     A.  No.
16     Q.  Okay.  Who would have a copy of that bill?
17     A.  I assume the Legal Affairs Department
18   would have it.
19     Q.  Can you tell me a name?
20     A.  Lawrence Cooper, the Senior Vice President
21   and Deputy General Counsel.

32

1      Q.  Okay.  Anybody else besides that person
2    that would have this document?
3      A.  Others within the Legal Affairs Department
4    who might help to process the bill.
5      Q.  Okay.  Did you see a copy of the bill?
6      A.  No.
7      Q.  You just assumed it was a line item?
8      A.  No.  It was a topic of discussion.
9      Q.  Okay.  Do you know my client?
10     A.  Yes.
11     Q.  Can you tell me in what capacity do you
12   know my client?
13     A.  She currently works for me as the Manager
14   for Occupant Services.
15     Q.  Okay.  Can you tell me how long would you
16   have known her?
17     A.  I would say approximately 2001, 2002.
18     Q.  Did it ever come to a time where you had
19   any involvement in her getting any type of salary
20   increase?
21     A.  Yes.

33

1    Q.  Can you tell me about that?
2    A.   She -- Antoinette would have been part of
3   a regular merit increase that we do on a yearly
4   basis for all employees.  All employees typically
5   were considered for raises once a year.  Usually
6   July of each year.  So she would have been part of
7   that group on a yearly basis.
8         She also -- I specifically remember some
9   time, I don't recall the year, was promoted from
10   Manager to Senior Manager.  And I would have
11   processed that document.
12    Q.   Now you said she was a part of a yearly --
13   it was a yearly salary increase.  What's the range
14   in that salary increase?
15    A.   Typically the budget for those raises is 4
16   percent.
17    Q.   Do you remember how much my client got?
18    A.   Yes.
19    Q.   How much did she get?
20    A.   Four percent, typically.  Except for the
21   one instance where she got a raise, and I don't

34

1   recall what that percentage increase was.  I'm
2   sorry, a promotion.
3         And I don't recall what that raise amount
4   was.
5    Q.   Did you have to do anything different in
6   order for her to get the salary increase along with
7   the raise?
8    A.   I don't understand the question.
9    Q.   Did you have to speak to someone higher up
10   in order to get approval to give her a higher
11   salary?
12    A.   At the time, before she worked for me, the
13   raises were recommended by her various bosses and I
14   would have processed it as part of my duties in
15   Human Resources.
16         Since she's been working for me, I would
17   have recommended it to my boss, Byron Marchant, and
18   he would have approved it.
19    Q.   Do you recall of ever a time talking to
20   Debra Lee regarding my client getting an increase?
21    A.   No.

35

1    Q.  You say that my client made a -- got a
2  promotion to a Senior Manager position?
3    A.  Yes.
4    Q.  Do you remember what her duties were then?
5    A.  My recollection is that she reported to
6  Troy Saunders and was a manager helping him to
7  manage the logistics and facilities and purchasing
8  roles in the company.
9    Q.  And that was a Senior Manager?
10    A.  Yes.
11    Q.  Okay.  Do you ever recall her position
12  being changed to a Logistics Coordinator?
13    A.  No.
14    Q.  Do you ever remember having conversations
15  with my client regarding her job duties at work?
16    A.  Yes.
17    Q.  Can you tell me about those conversations?
18    A.  Since she's come to work for me we've had
19  discussions about her role as an Occupant Services
20  Manager, both in terms of what she does for the
21  day-to-day occupant services function and also the

36

1  assistance she has provided to the company and the
2  various moves of people and property to new offices.
3    Q.  Do you ever recall talking to my client
4  regarding her job duties before she worked for you?
5    A.  Yes.
6    Q.  Can you tell me about those conversations?
7    A.  My recollection is that at some point she
8  complained about working for her then boss, Ed
9  Gilmore.
10    Q.  Do you remember the substance of those
11  complaints?
12    A.  My recollection is that she didn't like
13  working for him and that she had challenges with his
14  management style.
15    Q.  Did you ever talk to Mr. Gilmore regarding
16  her?
17    A.  I'm sure I did.  Yes.
18    Q.  Do you remember any of those
19  conversations?
20    A.  Yes.
21    Q.  Can you tell me about those?

37

1     A.   We talked about his difficulty in managing
2   Ms. Woodland.  And he said he didn't understand what
3   the difficulty was.  That he'd always treated her
4   with respect.  And I told him, essentially, he
5   needed to work through it.
6        He also described to me a situation where
7   Antoinette had been -- I don't remember the
8   specifics.  Had been arguably disrespectful, and
9   that he had essentially not taken any action.
10     Q.   Do you ever recall hearing anything about
11   a statement Mr. Gilmore made as it relates to women?
12     A.   No.
13     Q.   Do you ever remember my client talking to
14   you regarding her belief that she had been
15   essentially demoted because she was working the Help
16   Desk?
17     A.   No, I don't recall.
18       MR. BELL:  We'll take one more break.  I'm
19   almost done.
20   BY MR. BELL:
21     Q.   Did it ever come a time that my client and

38

1   her supervisor came to you regarding an event where
2   Mr. Gilmore had acted like he was going to backhand
3   her in a meeting in New York?
4     A.   No.
5     Q.   Do you ever recall anyone coming to you
6   regarding Mr. Gilmore referring to Jackie Willis --
7   well, first of all, let me ask you.  Do you know
8   Jackie Willis?
9     A.   Yes.
10     Q.   Okay.  Who is Jackie Willis?
11     A.   She's a former Vice President of Special
12   Events for BET.
13     Q.   Do you ever recall anyone coming to you or
14   telling you that Mr. Gilmore was -- Ed Gilmore was
15   referring to Jackie Willis as a "fat bitch"?
16     A.   No.
17     Q.   You stated that you couldn't recall my
18   client being a Logistics Coordinator?
19     A.   That's correct.
20     Q.   Are you a person responsible for doing the
21   organizational chart?

39

1    A.  No.
2    Q.  Do you ever remember giving an
3  organizational chart out that had my client listed
4  as a Logistics Coordinator?
5    A.  No.  I don't specifically remember giving
6  your client such an org chart.
7    Q.  I couldn't hear the last part.
8    A.  I don't recall giving her an
9  organizational chart that had her listed as a
10  Logistics Coordinator.
11    Q.  Do you ever recall giving anyone a
12  organizational chart that had my client listed as a
13  Logistics Coordinator?
14    A.  Yes.
15    Q.  Who did you give that chart to?
16    A.  It was to a group of people which probably
17  included your client.  It was passed around for a
18  group of people who were at a meeting that was
19  headed by my boss, Byron Marchant.
20    Q.  Okay.  And what was the purpose of that
21  organizational chart?

40

1    A.  It was to list or to identify the new
2  organizational structure under the new management of
3  the Logistics Admin Facilities Department.
4    Q.  Do you remember what the duties of this
5  Logistics Clerk -- excuse me, Logistics Coordinator
6  position were?
7    A.  No.
8    Q.  What's the difference between a Logistics
9  Coordinator and a Senior Manager?
10    A.  Well, in this instance the Logistics
11  Coordinator, as I recall, was a description of the
12  duties.  And so they could be one in the same,
13  actually.
14        So it depends on the context.
15    Q.  Okay.  Well, let me ask you this.  Do you
16  know my client's educational background?
17    A.  Somewhat.
18    Q.  Tell me what you know.
19    A.  As I recall, she has at least a BS or a BA
20  degree.  And my recollection is she's working on or
21  may have completed a Masters for a high level -- a

41

1  graduate degree.
2     Q.  Okay.  You said you were responsible for
3  hiring individuals?
4     A.  Yes.
5     Q.  Okay.  And you were in charge of Human
6  Resources?
7     A.  Yes.
8     Q.  What type of education and training is
9  required for a person to answer telephones?
10     A.  Typically that is an entry level position.
11  So probably a high school graduation or a GED.
12         And let me clarify that I'm assuming
13  you're talking about something like a receptionist
14  as opposed to -- whose principal duties are to
15  answer the phone.  Because we all answer the phone.
16     Q.  Okay.  Well, let me clarify it for you.
17     A.  Okay.
18     Q.  Okay.  What type of -- I'll give you a --
19  let me ask you this question.  I'll do it this way
20  and make it quicker.  Okay.
21         Ordering coffee for the work campus would

42

1  be what type of -- what person would be responsible
2  for that?
3     A.  It depends.  It could be an Admin Support
4  person.  It could be somewhat at a higher level
5  depending on the circumstances.
6     Q.  Your level?
7     A.  Typically not.
8     Q.  A senior management level?
9     A.  A Senior Manager?
10     Q.  Yes.
11     A.  Maybe.
12     Q.  Answering Help Desk phone questions
13  regarding internal complaints.  What type of
14  position would that job detail be of?
15     A.  Again, it could be a range from an Admin
16  Support person up to a Manager level, in my
17  experience.
18     Q.  Okay.  What about managing the day-to-day
19  operations on the BET campus?
20     A.  That's typically a Director, a higher
21  level position.

43

1    Q.  What about interior design of BET campus?
2    A.  Interior design of the BET campus.  That,
3  I don't know.  It could be a consultant.  It could
4  be a range of people.
5    Q.  Could it be an Admin person?
6    A.  Potentially.  I don't know.
7    Q.  Is that unlikely?
8        MR. FERRER:  Objection, asked and
9  answered.
10        THE WITNESS:  I don't know.
11  BY MR. BELL:
12    Q.  What about coordinating the national
13  relocation of departments?
14    A.  You said coordinating?
15    Q.  Yes.
16    A.  It could be Admin up to Manager or
17  Director.
18    Q.  Project management of logistical support
19  to award shows?
20    A.  That typically would be a Manager level
21  position or higher.

44

1    Q.  Vendor management?
2    A.  Typically a Manager level or higher.
3    Q.  Contract negotiations?
4    A.  Typically -- depending on the contract, a
5  Manager level or higher.
6    Q.  Purchasing office furniture and equipment?
7    A.  Manager or higher.
8    Q.  Endorsing vouchers for vendor payments?
9    A.  That could be administrative or higher.
10    Q.  Emergency planning?
11    A.  A Manager or higher, typically.
12    Q.  Construction management?
13    A.  A Manager or higher, typically.
14    Q.  Marketing?
15    A.  That could be a non management position
16  and higher.
17    Q.  By a non management, what does that mean?
18    A.  Administrative support and higher.
19    Q.  Would you say managing the day-to-day
20  operations of the BET campus would be at a different
21  level than ordering coffee for the work campus?

45

1    A.  Yes.
2    Q.  What about coordinating logistical and
3  facility concerns for BET remote sites?
4    A.  A Manager or higher, typically.
5    Q.  Would that be different than ordering
6  coffee for the work campus?
7    A.  Yes.
8    Q.  Vendor management?  That would be
9  different than -- at a different level than ordering
10  coffee for a work campus?
11    A.  Yes.
12    Q.  Contract negotiations, the same?
13    A.  Yes.
14    Q.  Purchasing of office and furniture
15  equipment, the same?
16    A.  Yes.
17    Q.  Construction management, the same?
18    A.  Yes.
19    Q.  Did you ever conduct an investigation
20  regarding a discrimination complaint of my client?
21    A.  No.

46

1    Q.  Did you ever see a report of an
2  investigation done regarding the complaint of my
3  client for discrimination?
4    A.  Yes.  I may have seen excerpts.
5    Q.  What excerpts did you see?
6      MR. FERRER:  Objection.
7      THE WITNESS:  They were excerpts from our
8  attorney.
9  BY MR. BELL:
10    Q.  Who has that document in their possession?
11    A.  I don't know.
12      MR. BELL:  One more break.
13      (Pause in proceedings)
14  BY MR. BELL:
15    Q.  Do you recall when I asked you was part of
16  your job duties to conduct investigations?
17    A.  Yes.
18    Q.  When someone comes to you and identifies a
19  situation where they believe it was discriminatory,
20  based on sex, what are you required to do?
21    A.  I'm required to either conduct an inquiry,

47

1  have someone else conduct an inquiry who works for
2  me.  On occasion our Legal Affairs Department may
3  conduct an inquiry, or our outside counsel may
4  conduct an inquiry.
5          But the bottom line is an inquiry has to
6  be conducted.
7     Q.  Okay.  I asked you before did my client
8  ever come to you regarding an incident in New York
9  where Mr. Gilmore had allegedly acted like he was
10  going to backhand her in front of a group of people.
11         Do you remember that?
12    A.  I don't recall that incident.
13    Q.  Okay.  Do you remember Troy Saunders
14  coming to you regarding that same incident?
15    A.  No, I don't.
16    Q.  Now is that you don't recall?  I'm trying
17  to make sure I'm clear on this.  That it didn't
18  happen or you just don't remember it at this time?
19    A.  I don't recall it occurring, and I think I
20  would have remembered it, had it happened.
21    Q.  Okay.  Would you have been required to do

48

1  an investigation?
2     A.  Yes.
3     Q.  Okay.
4          MR. BELL:  I have nothing further,
5  counsel.
6          MR. FERRER:  I just have a few questions
7  for Mr. Bowman.  But before I do that, I just want
8  to note my objection, counsel, to these exhibits.
9          These exhibits, it's the first time I've
10  seen them.  The plaintiff did not turn these over
11  during discovery.  So, again, I object to their
12  being exhibits to this deposition.
13         And, of course, we'd want copies of them
14  in her discovery responses.
15         MR. BELL:  I just got them yesterday and
16  they're going to be supplemented to you.  They'll be
17  supplemented today.  I just got the documents
18  yesterday.
19         MR. FERRER:  Okay.
20         MR. BELL:  But they're in BET's folder.
21         MR. FERRER:  What do you mean BET's

49

1  folder?
2      MR. BELL:  The person -- we have testimony
3  already, right here on the record, that -- well, you
4  and I will deal with that later.  We'll do it that
5  way.
6      MR. FERRER:  All right.  You guys, I have
7  a couple of questions.
8      MR. BELL:  Is Ed going to be --
9      MR. ALEXANDER:  Yeah.  Can we take a time
10  out, because I know he was lost.
11      MR. FERRER:  Sure.
12      (Pause in proceedings)
13  BY MR. FERRER:
14    Q.  Mr. Bowman, plaintiff's counsel asked you
15  about BET's Employee Handbook marked as Bowman
16  Exhibit 3?
17    A.  Yes.
18    Q.  Do you have that in front of you?
19    A.  Yes, I do.
20    Q.  All right.  Is that handbook still in
21  effect?

50

1    A.  Yes, it is.
2    Q.  And when Viacom acquired BET that
3  handbook, again, was still applicable to BET
4  employees?
5    A.  Yes.
6    Q.  All right.  Now Mr. Bell asked you about,
7  again, the acquisition of BET by Viacom.  And he
8  asked you some questions regarding the BET building
9  in Washington, DC.
10      I don't think we ever specified the
11  address to that building.  Do you know the address
12  of the building?
13    A.  The corporate building's address is 1235 W
14  Place.  I'm sorry.  The corporate building's address
15  is 1900 W Place.
16      And there are two other buildings, whose
17  address I'm not sure of.  But there are three
18  buildings on the campus.
19    Q.  Okay.  Do you know, prior to Viacom
20  acquiring BET as a wholly owned subsidiary, do you
21  recall or do you know who held the title of those

51

1  buildings that you're referring to?
2    A.  Yes.
3    Q.  And who was that?
4    A.  It was either Black Entertainment
5  Television or a BET subsidiary.
6    Q.  Okay.  Do you know whether post
7  acquisitions or after Viacom acquired BET, whether
8  the title of those buildings were transferred to
9  Viacom?
10    A.  No, I don't know if they were transferred.
11    Q.  Okay.  So you don't know who held the
12  title or whose title the name is under after Viacom
13  acquired BET?
14    A.  That's correct.
15    Q.  All right.
16      MR. FERRIS:  I have nothing further.
17      MR. BELL:  Well, I've got a couple.
18  BY MR. BELL:
19    Q.  Dealing with the BET Employee Handbook,
20  you stated that you it's still in effect?
21    A.  That's correct.


52

1    Q.  And that's in addition to the Business
2  Conduct document that Viacom put out; am I correct?
3    A.  That's correct.
4    Q.  That Business Conduct document that Viacom
5  issued, you're required to follow?
6    A.  Yes.
7    Q.  Does that Business Conduct document deal
8  with personnel matters?
9    A.  It's on a limited basis.  Yes.
10    Q.  Does Viacom audit BET's Personnel
11  Department?
12    A.  No.
13    Q.  Do they audit BET at all?
14      MR. FERRER:  Objection.  This is way
15  beyond scope, counsel.
16  BY MR. BELL:
17    Q.  You can answer.
18    A.  Yes.
19    Q.  What do they audit?
20    A.  I'm aware that they audit the financial
21  books, generally.

53

1     Q.  And what do you mean by that?
2     A.  They look at the expenses, they look at
3  the profits, they look at the reporting that we do.
4  Processes for financial reporting, under Sarbanes-
5  Oxley primarily.
6         So, yes, I'm aware that they do do audits.
7     Q.  Are you aware of whether or not they've
8  issued any concerns regarding the audits?
9         MR. FERRER:  Objection to this whole line
10  of questioning.
11        THE WITNESS:  No, I'm not.  Excuse me, can
12  you repeat the question?  Am I aware of what now?
13        MR. BELL:  I'll let her read it back.
14        (Record read)
15        THE WITNESS:  Okay.  I need to clarify it.
16  I am aware that there have been times when there
17  have been issues related to audits that BET had to
18  respond to.
19  BY MR. BELL:
20     Q.  What do you mean by "had to respond to"?
21     A.  In other words, had to explain or provide

54

1  additional information.
2     Q.  By "had to", you mean were required to?
3     A.  Were requested to provide additional
4  information.  They were required to -- asked to
5  provide additional information.
6         THE COURT REPORTER:  Excuse me?
7         THE WITNESS:  They were asked or required
8  to provide additional information.
9  BY MR. BELL:
10     Q.  Asked or required?
11     A.  Right.
12     Q.  So they didn't have a choice?
13     A.  I don't know.
14     Q.  Were you required to sign the Viacom
15  Business Conduct Statement?
16     A.  Yes.
17     Q.  Is the Business Conduct Statement that you
18  were required to sign the same as Ms. Woodland was
19  required to sign?
20     A.  Yes.
21     Q.  The exact same wording?

55

1    A.  Yes.
2    Q.  Is every person who works at the BET
3  location required to sign the exact same Viacom
4  Business Conduct Statement?
5    A.  No.
6    Q.  Okay.  Who's not required to sign it?
7    A.  The only people who are required to sign
8  are regular employees or people who regularly work
9  for BET.
10      Consultants, freelancers and others who
11  are not regular employees are not required to sign
12  the document.
13    Q.  Okay.  Do you mean people where their --
14  I'm trying to make sure I understand.  I'll ask it
15  this way.  People who -- was it Infinium.  What did
16  you say, Infinium?
17    A.  Infinium.
18    Q.  Infinium.  People who process -- who get
19  their payroll checks processed through Infinium, do
20  all of them have to sign the Viacom Business Conduct
21  Statement?

56

1      MR. FERRER:  Objection, counsel, again to
2  this line of questions.  This is beyond scope.
3      THE WITNESS:  Yes.
4  BY MR. BELL:
5    Q.  Counsel asked you a question regarding
6  whether or not you know whether Viacom owns the
7  title of the BET buildings that were purchased.  And
8  do you remember your answer to that?
9    A.  Yes.
10    Q.  And you answer was what?
11    A.  I don't know.
12    Q.  Well, do you know that the buildings were
13  part of the purchase of BET by Viacom?
14    A.  I know that the purchase of Viacom
15  included the purchase of some of the buildings as
16  part of BET's assets.
17    Q.  Was the main campus BET was at, was that
18  part of the purchase?
19    A.  Yes.
20      MR. BELL:  I have nothing further on that,
21  counsel.

57

1          MR. FERRER:  I have nothing.  Mr. Bowman,
2    you have the right to review the transcript, make
3    any corrections.
4          Would you like to exercise that right?
5          THE WITNESS:  We're done.
6          (Signature having not been waived,
7           the deposition of QUINTON BOWMAN
8           was concluded at 11:47 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21

58

1          CERTIFICATE FOR READING AND SIGNING
2
3       I hereby certify that I have read and examined
4    the within transcript and the same is a true and
5    accurate record of the testimony given by me.
6          Any corrections that I feel are necessary, I
7    have listed on the separate ERRATA SHEET enclosed,
8    indicating the page and line number of each
9    correction.
10
11
12    _____
13          QUINTON BOWMAN
14
15
16    _____
17          DATE
18
19
20
21

59

1  CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
2        I, Cathelyn Matthews, a Notary Public of
3  the State of Maryland, Baltimore County, do hereby
4  certify that the within-named witness personally
5  appeared before me at the time and place herein set
6  out, and after having been first duly sworn by me,
7  according to law, was examined by counsel.
8        I further certify that the examination
9  was recorded stenographically by me, and that this
10  transcript is a true record of the proceedings.
11        I further certify that I am not of
12  counsel to any of the parties, nor an employee of
13  counsel, nor related to any of the parties, nor in
14  any way interested in the outcome of the action.
15        As witness my hand and seal this 5th day
16  of September, 2007.
17
18
19                  Cathelyn Matthews
20                  My Commission Expires
21                  11-08-08