1

1

2              In the U.S. District Court

3              For the District of Columbia

4    -------------------------x

5    Antoinette Woodland        :

6                        : NO. 1:05 CV 01611

7              v.      :

8                        :

9    Viacom, Inc.              :

10    -------------------------x

11                   June 15, 2007

12    DEPOSITION OF:

13              Antoinette Woodland,

14    a witness, called by counsel pursuant to notice,

15    commencing at 10:00 a.m., which was taken at Morgan,

16    Lewis, 1111 Pennsylvania Ave., NW, Washington, DC

17

18

19

20

21

2

1                    Appearances

2     Jimmy A. Bell, Esq.

3     9610 Marlboro Pike

4     Upper Marlboro, MD 20772

5     for the Plaintiff

6

7     John S. Ferrer, Esq.

8     Morgan, Lewis

9     1111 Pennsylvania Ave., NW

10     Washington, DC 20004

11     for the Defendant

12

13

14

15

16

17

18

19

20

21

3

1                    INDEX OF EXAMINATIONS

2    WITNESS                        PAGE

3

4    Antoinette Woodland

5      Direct Examination By Mr. Ferrer          6

6      Cross-Examination By Mr. Bell          279

7

8                    Index of Exhibits

9    Description                    Page

10   exhibit number 1 ............................  10

11   exhibit number 2 ............................  37

12   exhibit number 3 ............................   40

13   exhibit number 4 ............................   59

14   exhibit number 5 ............................   90

15   exhibit number 6 ............................   99

16   exhibit number 7 ............................  128

17   exhibit number 8 ............................  129

18   exhibit number 9 ............................  132

19   exhibit number 10 ...........................  133

20   exhibit number 11 ...........................  137

21   exhibit number 12 ...........................  140

4

1

2          Index of Exhibits (cont.)

3     Description                    Page

4     exhibit number 13 ........................... 141

5     exhibit number 14 ........................... 143

6     exhibit number 15 ........................... 148

7     exhibit number 16 ........................... 149

8     exhibit number 17 ........................... 150

9     exhibit number 18 ........................... 151

10    exhibit number 19 ........................... 152

11    exhibit number 20 ........................... 152

12    exhibit number 21 ........................... 154

13    exhibit number 22 ........................... 155

14    exhibit number 23 ........................... 156

15    exhibit number 24 ........................... 157

16    exhibit number 25 ........................... 158

17    exhibit number 26 ........................... 160

18    exhibit number 27 ........................... 161

19    exhibit number 28 ........................... 166

20    exhibit number 29 ........................... 169

21

5

1          Index of Exhibits (cont.)

2     Description                    Page

3     exhibit number 30 ............................  170

4     exhibit number 31 ...........................  172

5     exhibit number 32 ...........................  172

6     exhibit number 33 ...........................  173

7     exhibit number 34 A,B,C,D ..................  183

8     exhibit number 35 ...........................  214

9     exhibit number 36 ...........................  221

10    exhibit number 37 ...........................  236

11    exhibit number 38 ...........................  248

12    exhibit number 39 ...........................  256

13    exhibit number 40 ...........................  259

14    exhibit number 41 ...........................  259

15    exhibit number 42 ...........................  259

16    exhibit number 43 ...........................  259

17    exhibit number 44 ...........................  260

18    exhibit number 45 ...........................  260

19    exhibit number 46 ...........................  263

20    exhibit number 47 ...........................  264

21

6

1              (Morning Session)

2                  Stipulations

3          (It is stipulated and agreed by and

4      between counsel for the respective parties that

5      the reading and signing of this transcript by the

6      witness are not waived.

7              It is further stipulated and agreed

8      that the filing of this transcript with the clerk

9      of the court be and the same is hereby waived.)

10                 *   *   *   *   *

11

12      Whereupon,

13                  Antoinette Woodland

14

15      was called for examination by counsel and,

16      after having been duly sworn, was examined

17      and testified as follows:

18      DIRECT EXAMINATION:

19      BY MR. FERRER:

20          Q.   Good morning, Ms. Woodland.

21          A.   Good morning.

7

1          Q.   My name is John Ferrer.  I'm an attorney

2    with Morgan, Lewis and Bockius.  We represent Viacom

3    in this matter and I'm going to ask you some

4    questions today.  Okay?

5          A.   Okay.

6          Q.   You understand that you are here to give

7    formal testimony?

8          A.   Yes.

9          Q.   You understand that you are under oath?

10         A.   I do.

11         Q.   Have you ever been deposed before?

12         A.   No.

13         Q.   Have you ever been involved in a court

14   case before?

15         A.   No.

16         Q.   I'll ask you questions.  The questions and

17   answers will be recorded.  You need to give audible

18   answers.  No nods or uh-huhs.

19              If you don't understand my question, just

20   tell me and I'll re-ask it.  If you need a break for

21   any reason, let me know and after answering an open

8

1   question then we can see about taking a break.

2      A.   Yes.

3      Q.   Are you taking any medications or drugs

4   that would make it difficult for you to answer any

5   questions today?

6      A.   No.

7      Q.   Any alcohol in the last eight hours?

8      A.   No.

9      Q.   Are you currently under a doctor's care

10   for any illness?

11      A.   I was involved in a fender bender but I'm

12   fine.  I don't think that would impact my testimony.

13      Q.   Any reason you can think of that will

14   prevent you from answering any of my questions

15   today?

16      A.   No.

17      Q.   You understand my instructions so far?

18      A.   I do.

19      Q.   Have you reviewed any documents in

20   preparation for this deposition?

21      A.   Just my notes that I've shared with you is

9

1   all.

2       Q.  Anything else?

3       A.  No.

4       Q.  The responses that you sent to us in

5   regards to our questions, our discovery requests,

6   those are the documents you reviewed?

7       A.  Yes.

8       Q.  I assume you met with your counsel prior

9   to this deposition?

10      A.  Yes.

11      Q.  Did you meet with anyone else?

12      A.  No.

13      Q.  Can you state your full name?

14      A.  Antoinette Lolita Woodland.

15      Q.  What's your current address?

16      A.  607 Galveston Place, SE, Washington, D.C.

17   20032.

18      Q.  How long have you lived there?

19      A.  Twelve, 13 years.

20      Q.  Have you ever been convicted of a crime?

21      A.  No.

10

1      Q.  As a preliminary matter, let me show you

2    this document.

3              MR. FERRER:  Can we have this marked

4    as exhibit one?

5              (Whereupon the proffered item was

6      marked as exhibit number 1.)

7    BY MR. FERRER:

8      Q.  Do you recognize this document,

9    Ms. Woodland?

10      A.  I do.

11      Q.  These are your answers to Viacom's

12    interrogatories?

13      A.  Yes.

14      Q.  Did you draft these answers?

15      A.  I did.

16      Q.  Did anyone assist you?

17      A.  No.

18      Q.  Are these answers accurate and complete?

19      A.  Yes, they are.

20      Q.  Turn to the last page of the document.  Is

21    that your signature?

11

1     A.  Yes, it is.

2     Q.  Is there anything that you want to add or

3   change about your answers?

4     A.  I think they're pretty complete.

5     Q.  Where did you attend high school,

6   Ms. Woodland?

7     A.  Anacostia Senior High.

8     Q.  That's in Washington, D.C.?

9     A.  Correct.

10     Q.  What years were you there?

11     A.  1981 to 1985, four years.

12     Q.  You graduated from Anacostia?

13     A.  I did.

14     Q.  Did you attend college?

15     A.  I did.

16     Q.  Where is that?

17     A.  Trinity College in northeast Washington.

18     Q.  Washington, D.C.?

19     A.  Yes.

20     Q.  The years you were there?

21     A.  2001 to 2003.

12

1    Q.  Did you earn any degrees there?

2    A.  Bachelors of Science and an MBA.

3    Q.  2001 to 2003?

4    A.  I had prior college credits.

5    Q.  What prior college did you go to?

6    A.  UDC, PG Community College.

7    Q.  When did you go to UDC?

8    A.  1985 to 1987, I believe.

9    Q.  And how about PG?

10   A.  Maybe 1999 to 2000.

11   Q.  UDC is in the District of Columbia?

12   A.  Yes.

13   Q.  That's the University --

14   A.  Of the District of Columbia.

15   Q.  PG?

16   A.  PG County Community College.

17   Q.  That's located in?

18   A.  PG County, Maryland.

19   Q.  Any other educational background?

20   A.  No.

21   Q.  Any degrees from the other school?

13

1     A.   No.

2     Q.   Tell me every employer you've worked at

3   since 2000.

4     A.   BET, Black Entertainment Television.

5     Q.   What were the dates?

6     A.   It was TV1 and that was from June through

7   October of 2000 and then BET from October until now,

8   present day.

9     Q.   October 2000?

10     A.   Wait a minute.  I'm sorry.  Jones Lang

11   LaSalle, it's a property management company that was

12   on site at BET.

13     Q.   Can you spell that?

14     A.   Lang is L-A-N-G, LaSalle, L-A-S-A-L-L-E.

15     Q.   When did you work there?

16     A.   Gosh, I know these dates -- let me see.

17   Right after TV1.

18     Q.   Somewhere around October 2000?

19     A.   Yes.

20     Q.   Then BET from when?

21     A.   BET from 2001 through present day.

14

1    Q.  Let's go back to TV1.  Where is TV1

2    located?

3    A.  They were located downtown

4    Washington, D.C., but they are no longer in

5    business.

6    Q.  What position did you hold there?

7    A.  Stylist.

8    Q.  Briefly describe your job duties.

9    A.  I was responsible for the image of the on

10   air talent.

11   Q.  Why did you stop working for that

12   employer?

13   A.  The company was starting to fold.  It was

14   a new business and they weren't staying around

15   longer.  They couldn't get distribution so they were

16   going to fold.

17   Q.  Then you said you worked for Jones Lang

18   LaSalle.  Where are they located?

19   A.  I'm not sure where they were located.  It

20   was on the BET campus.

21   Q.  Where is the BET campus?

15

1    A.  1235 W Street NE.  At the time Jones Lang

2  LaSalle was managing BET property, providing

3  property management services to BET.

4    Q.  What was your position there?

5    A.  Occupant services coordinator.

6    Q.  Briefly describe your duties.

7    A.  I was responsible for vendor management,

8  help desk management response, the day to day

9  operations of the day porters, engineers,

10   maintenance and upkeep of the campus.

11    Q.  Any other jobs prior to working for BET?

12    A.  No.

13    Q.  Let's start with your first position at

14   BET.  When did you start working for BET?

15    A.  In 1998.

16    Q.  What was your position there?

17    A.  Fashion stylist.

18    Q.  Briefly describe your duties.

19    A.  I was responsible for the image of on air

20   talent, buying clothes, selecting clothes, makeup,

21   wardrobe, shoes, everything to prepare them for on

16

1   air.

2       Q.  How long did you hold that position?

3       A.  Two years.

4       Q.  To whom did you report?

5       A.  Erica Fennel.

6       Q.  What was her position?

7       A.  She was a logistics coordinator.

8       Q.  Did anyone report to you?

9       A.  I had three people in my chain of command,

10  two wardrobe assistants and at any time two to three

11  interns.

12      Q.  Do you recall the names of the wardrobe

13  assistants?

14      A.  Janice Holloway and Keith -- I can't

15  remember the guy's last name.

16      Q.  Why did you stop performing that position?

17      A.  They were moving the offices to New York

18  and I did not want to relocate.

19      Q.  What was your next job after that?

20      A.  TV1.

21      Q.  At some point you came back to BET?

17

1      A.  I came back to BET under Jones Lang

2   LaSalle as the occupant services coordinator.

3      Q.  Jones Lang LaSalle was a separate company?

4      A.  A separate company.  It was a company that

5   BET hired to provide property management services to

6   the campus.

7      Q.  Then when did you start working for BET

8   again?

9      A.  2001 again.  I was offered a full time

10  position -- BET decided to terminate their agreement

11  with Jones Lang LaSalle and I was one of the people

12  that they asked to come on as the occupant services

13  manager.

14     Q.  Let me just back up.  When you were a

15  fashion stylist where were you located?

16     A.  For BET?  1235 W Street NE.

17     Q.  How long have they been at that location,

18  to your knowledge?

19     A.  I want to say probably since 1980.

20     Q.  When you came back on 2001 as occupant

21  services manager, was that BET?

18

1    A.  Yes.

2    Q.  Same location?

3    A.  Yes.

4    Q.  Briefly describe your duties.

5    A.  I was responsible for vendor relations.  I

6  was responsible for on site vendors, the security

7  team, cafeteria team, the day porters, the night

8  cleaning crew, the engineers, the chief engineer and

9  all of his men, the mail room and document center,

10   the xerox contract and any other facility functions

11   that happen on the campus.  They all reported to me

12   day to day.

13    Q.  Who did you report to?

14    A.  Troy Saunders.

15    Q.  What was Mr. Saunders' title?

16    A.  He was senior director of corporate admin

17  operations when he left.

18    Q.  Where is Mr. Saunders located?

19    A.  He's now in Atlanta, Georgia.

20    Q.  Where was he located then?

21    A.  1235 W Street NE at the BET headquarters.

19

1    Q.  He was employed by BET?

2    A.  Correct.

3    Q.  I guess back in 2001 -- well, do you

4    recall what Mr. Saunders' title was?

5    A.  He was director of corporate admin

6    operations.

7    Q.  You reported directly to Mr. Saunders?

8    A.  I did.

9    Q.  How long did you hold that position?

10    A.  Until he left, four years later, for four

11    years.

12    Q.  2005, 2004?

13    A.  Yes, 2004, nearing the end of 2004.

14    Q.  Who reported to you when you were occupant

15    services manager?

16    A.  All the vendors, the manager of the mail

17    room warehouse.

18    Q.  Who was that, do you recall?

19    A.  Frank Carlman, chief engineer, Carlos

20    Medina and all the vendors.

21    Q.  When you say vendors --

20

1     A.   Securitas, Sodexo.

2     Q.   These are outside --

3     A.   Outside contractors who were performing

4  work on site daily.

5     Q.   Where was Mr. Carlman located?

6     A.   At 1235 W Street.

7     Q.   How about Mr. Medina?

8     A.   1235 W Street.

9     Q.   Both of them were employees of BET?

10    A.   Yes.

11    Q.   Did you report to Mr. Saunders, again, for

12  that entire time that you held this position from

13  2001 to 2004?

14    A.   Correct.

15    Q.   The gentlemen you just mentioned, did they

16  report to you during that time?

17    A.   They reported to me.  Not the whole time

18  period.

19        Frank Carlman ended up leaving probably the

20  end of 2002 and Carlos Medina was still there up

21  until 2005, the end of 2005.

21

1     Q.   Did Mr. Carlman have a successor?

2     A.   No, he did not.

3     Q.   Why did you stop performing the duties of

4   occupant services manager?

5     A.   I got promoted a few times.  After the

6   last promotion I was a senior manager and --

7     Q.   Well, tell me about the promotion.

8     A.   They brought me on as an occupant services

9   manager.  Then they gave me the title of property

10    manager.

11    Q.   When was that?

12    A.   2002.

13    Q.   This was at BET?

14    A.   At BET.  And then 2003 I was promoted to

15   senior manager of corporate planning.

16    Q.   You said 2003?

17    A.   2003.

18    Q.   Really you were occupant services manager

19   or you held that title from 2001 to 2002?

20    A.   Yes.

21    Q.   Then you became property manager?

22

1    A.  Yes.

2    Q.  Did your duties change at all?

3    A.  I was given more responsibility.

4    Q.  How so?

5    A.  I was then not only the day to day

6  operations of the campus, I was more involved with

7  special projects then.

8    Q.  Can you give me an example?

9    A.  Office relocations, the moving of the 106

10  and Park office down to 555 West 57th Street in

11  New York.  Interior design projects inside the

12  campus, just more things outside of day to day

13  facilities.

14    Q.  To whom did you report as property

15  manager?

16    A.  Troy Saunders.

17    Q.  Those other gentlemen you mentioned, did

18  they still report to you?

19    A.  Yes.

20    Q.  Then you were promoted to senior manager?

21    A.  Senior manager of corporate planning and

23

1    asset management operations.

2        Q.   Did you still report to Mr. Saunders?

3        A.   I did.

4        Q.   How about the other two gentlemen?

5        A.   They still reported to me.  Frank Carlman

6    had left so it was still -- it was just Carlos

7    Medina and all the people -- the department was

8    reorganized and he reported to me and everybody else

9    reported to him day to day.

10       Q.   You mean Mr. Medina?

11       A.   Yes.

12       Q.   You all were still at --

13       A.   1235 W Street.

14       Q.   When you became senior manager how did

15   your duties change, if at all?

16       A.   More special projects, being involved with

17   award shows, all of the moves on campus, being

18   responsible for the office managers at all the

19   remote office locations, just being the one stop

20   person for any service that the company in general

21   would need, in addition to managing the day to day

24

1    of the facility.

2        Q.  Did you hold any position after senior

3    manager?  Let me go back.

4            How long did you hold the senior manager

5    position?

6        A.  Until October, I believe, of 2005 when it

7    was taken away from me.

8        Q.  We'll get into why you believe it was

9    taken away.  But what position did you hold after

10    senior manager?

11        A.  Coordinator, logistics coordinator.

12        Q.  This was at the same BET location?

13        A.  Yes, 1235.

14        Q.  To whom did you report?

15        A.  Samuel Williams.

16        Q.  What's Mr. Williams' title?

17        A.  Senior manager of logistics.

18        Q.  Where is he located?

19        A.  1235 W Street.

20        Q.  He was employed by BET?

21        A.  Yes.

25

1    Q.  Did you report to anyone else?

2    A.  Carol Holland.

3    Q.  Ms. Holland's title?

4    A.  Director of corporate administrative

5    operations.

6    Q.  She was located at BET?

7    A.  Yes.

8    Q.  She was employed by BET?

9    A.  Yes.

10   Q.  Did you report to anyone else?

11   A.  Not day to day.  Ed Gilmore was in our

12   chain of command.  Carol reported to Ed Gilmore.

13   Q.  You did not report to Mr. Gilmore on a day

14   to day basis?

15   A.  No.

16   Q.  What was his title?

17   A.  Senior director of corporate admin

18   operations.

19   Q.  Do you recall the date or month, year when

20   you became logistics coordinator?

21   A.  It was October.  I don't have the exact

26

1    date with me but it was in October.

2        Q.   Of what year?

3        A.   2005.

4        Q.   Who reported to you as logistics

5    coordinator?

6        A.   No one.

7        Q.   Briefly describe your duties for me as

8    logistics coordinator.

9        A.   Answered the telephone.

10       Q.   Anything else?

11       A.   No.

12       Q.   Is that your current position?

13       A.   No.

14       Q.   What position did you hold after logistics

15   coordinator?

16       A.   I was moved back up to a senior manager of

17   corporate planning.

18       Q.   When was that?  Month and year is fine.

19       A.   2006, like June of 2006.

20       Q.   To whom did you report?

21       A.   Quinton Bowman.  Oh, and Bernadette

27

1    Williams.

2        Q.   What's Ms. Williams' title?

3        A.   Director of travel.

4        Q.   You mentioned Mr. Bowman.  Did you report

5    to him as well?

6        A.   After working for Ms. Williams for a

7    couple of months, he decided that he wanted me to

8    report directly to him because I was given

9    additional responsibilities.

10       Q.   What's Mr. Bowman's title?

11       A.   Senior vice-president of Human Resources.

12       Q.   In your position as senior manager, was it

13   at the same BET location?

14       A.   Yes.

15       Q.   How about Ms. Williams, where is she

16   located?

17       A.   She is no longer with the company.  She

18   left about three months ago.

19       Q.   Was she located at BET?

20       A.   Yes.

21       Q.   Was she employed by BET?

28

1    A.  Yes.

2    Q.  How about Mr. Bowman, where is he located?

3    A.  1235 W Street.

4    Q.  He's employed by BET?

5    A.  Yes.

6    Q.  Senior manager corporate planning?

7    A.  Yes, and asset management operations, yes.

8    Q.  That's your current position?

9    A.  Yes.

10    Q.  Let's start with the occupant services

11   manager position.  Do you recall when in 2001 you

12   started working in that position, early, mid, late?

13    A.  Octoberish, sometime in the fall.

14    Q.  How did you learn about that position?

15    A.  A friend from BET called me and told me

16   there was a position open.

17    Q.  Do you recall who that was?

18    A.  Tiajuana Butler.

19    Q.  Did you ever see a job notice or

20   advertisement for occupant services management

21   position?

29

1      A.  I did, occupant manager services position,

2   I did, because we had to generate one.

3      Q.  What do you mean?

4      A.  Troy Saunders had to put it together

5   because Human Resources just didn't have everything

6   together so we had to put it together when he did

7   the requisition for an employee.

8      Q.  So this was after you were hired?

9      A.  I was hired -- he brought me on as

10   occupant services manager but prior to bringing me

11   on he had to do all the new hire paperwork to give

12   to Human Resources and in preparing the paperwork we

13   had to come up with a job description to submit to

14   Human Resources.

15      Q.  But this was prior to you being employed

16   at BET?

17      A.  No, I was employed.  They offered me a

18   position.

19      Q.  They offered it and then you came up with

20   the job description with Mr. Saunders?

21      A.  I was already there working for Jones Lang

30

1    LaSalle as occupant services coordinator.  So I was

2    working in that position.  I was reporting directly

3    to Mr. Saunders.

4         So as he made the decision to let Jones Lang

5    LaSalle go, I was offered a position.  In the

6    process of me being offered the position he had to

7    fill out the paperwork.  As the process began,

8    that's when we started working on the paperwork and

9    the job description.

10        Q.  Do you know who Mr. Saunders submitted the

11   job description to?

12        A.  The general counsel who was his direct

13   boss, Byron Marchant.  It was a process that had to

14   go through Byron Marchant and had to go to Human

15   Resources for signature and approval.

16        Q.  Byron Marchant you said is the general

17   counsel?

18        A.  Yes.

19        Q.  Where is he located?

20        A.  1235 W Street.

21        Q.  He's employed by BET?

31

1      A.  Yes.

2      Q.  You said HR had to go through -- Human

3   Resources.

4      A.  Yes.

5      Q.  What Human Resources are you referring to?

6      A.  It's BET at 1235, the offices that are

7   located at 1235.

8      Q.  Did you interview with anyone for the

9   occupant services manager position?

10      A.  Yes, Carla Merritt.  She was the property

11   manager for Jones Lang LaSalle on site.

12      Q.  I'm referring to when it became a BET

13   position.  You interviewed with her when you took

14   over the job, again, under BET?

15      A.  No.  It wasn't an interview process.  I

16   had been working for them for a while and they had

17   seen my performance and they offered it to me

18   because they wanted me to stay, although the company

19   and a few other employees were going away.

20      Q.  Who offered you the position?

21      A.  Troy Saunders.

32

1     Q.   Other than Mr. Marchant and the Human

2     Resources for BET, do you recall anyone specifically

3     involved in HR for BET?

4     A.   Quint Bowman.

5     Q.   Other than those individuals, was anyone

6     else involved in your hiring as occupant services

7     manager in October 2001?

8     A.   Not to my knowledge.

9     Q.   Then I believe you said you were promoted

10    to property manager.

11    A.   Yes.

12    Q.   That was in 2002.

13    A.   Yes.

14    Q.   Do you recall the specific month or time

15    of the year in 2002?

16    A.   Somewhere in June, because that's when

17    salary performance appraisals are done, somewhere in

18    the area of May, June.

19    Q.   How did it come about that you were

20    promoted?

21    A.   I don't understand the question.

33

1    Q.  How did you get into that position?  Was

2    there a posting?

3    A.  Hard work.  I just worked hard and they

4    rewarded me with a promotion.

5    Q.  So you didn't have to put in for it or

6    anything?

7    A.  That's not typically the way it's done at

8    BET.  It's based upon performance.

9    Q.  Who offered you the job?

10   A.  My immediate supervisor, Troy Saunders.

11   Q.  Was anyone else involved?

12   A.  Human Resources and Byron Marchant.  My

13   immediate supervisor reported to Byron Marchant, so

14   he was aware of and signed off on every promotion or

15   whatever that went down before it went to Human

16   Resources.

17   Q.  You are referring to the BET Human

18   Resources?

19   A.  I'm referring to BET.

20   Q.  Was anyone else involved other than those

21   individuals?

34

1     A.   Not to my knowledge.

2     Q.   Then you were promoted again you said in

3   2003 to senior manager, correct?

4     A.   Correct.

5     Q.   Again, do you recall the month of 2003?

6     A.   Around the May, June time.

7     Q.   Tell me how you came -- how it came about

8   that you were put into that position.

9     A.   I was given a lot more responsibility and

10   with the responsibility came a title change and the

11   raise.

12     Q.   Who offered you the promotion?

13     A.   My immediate supervisor.

14     Q.   Who was that?

15     A.   Troy Saunders.

16     Q.   Anyone else involved?

17     A.   Byron Marchant and Quint Bowman.

18     Q.   Other than those individuals, anyone else

19   involved?

20     A.   Not to my knowledge.

21     Q.   When you became -- going back to occupant

35

1   services manager, did you meet with anyone regarding

2   what your job duties would be?

3       A.  That was Troy Saunders.

4       Q.  Anyone else?

5       A.  No.

6       Q.  Do you recall there being any type of

7   announcement that you were filling that position?

8       A.  I'm not sure.

9       Q.  Did you meet with anyone about what your

10  job duties would be as property manager?

11      A.  My immediate supervisor, Mr. Saunders.

12      Q.  Did you meet with anyone else?

13      A.  No.

14      Q.  How about as a senior manager, did you

15  meet with anybody about what your job duties would

16  be?

17      A.  Mr. Saunders.

18      Q.  Anyone else?

19      A.  No.

20      Q.  When you became property manager, do you

21  recall there being any announcement that you had

36

1    filled that position, that was your title?

2        A.  I'm not sure.

3        Q.  How about senior manager?

4        A.  I'm not sure.

5        Q.  What type of announcement?

6        A.  Byron Marchant's office sent out

7    something.  By that time he promoted quite a few

8    people so everybody's name was on a list who had

9    been promoted.

10        Q.  It was a memo?

11        A.  Yes.

12        Q.  What do you recall the memo saying?

13        A.  Just congratulations to the following

14    individuals who have been promoted in the CAO group

15    and a list of names and the titles.

16        Q.  You said that was sent out by

17    Mr. Marchant?

18        A.  His office, his assistant sent them out.

19        Q.  Who was his assistant?

20        A.  Gwen Dennis.

21        Q.  Where is Ms. Dennis located?

37

1     A.  1235.

2     Q.  W Street?

3     A.  Correct.

4     Q.  Do you recall if the memo had any type of

5     corporate logo on it?

6     A.  It had the BET corporate logo on it.

7     Q.  Do you know where Viacom is located?

8     A.  Yes.

9     Q.  Where is it located?

10    A.  1515 Broadway, New York.

11    Q.  When you were hired as occupant services

12    manager back in 2001, back in October of 2001 no one

13    from Viacom was involved in that hiring, is that

14    correct?

15    A.  No one from Viacom was involved in that

16    hiring, but I was made to sign a Viacom employee

17    handbook upon my hiring.

18         MR. FERRER:  Mark this Woodland two,

19    please.

20         (Whereupon the proffered item was

21    marked as exhibit number 2.)

38

1   BY MR. FERRER:

2       Q.  Do you recognize this document,

3   Ms. Woodland?

4       A.  I do.

5       Q.  Can you identify this document for us?

6       A.  It is the business conduct statement that

7   was sent via e-mail.

8       Q.  To you?

9       A.  It was sent to me.

10      Q.  Just so that the record is clear, the

11  first page looks like an e-mail from Quinton Bowman

12  to a number of recipients including yourself, is

13  that correct?

14      A.  Correct.

15      Q.  The subsequent pages, the first page has

16  no number and then -- actually, I think I gave you

17  too many pages.

18          MR. FERRER:  Let's go off the record.

19          (A discussion takes place which is

20      held off the record)

21  BY MR. FERRER:

39

1     Q.  Looking at Woodland two, the first page is

2     again an e-mail and following that is a document

3     entitled business conduct statement.  The first page

4     has no number and it goes to page 40.  Is that

5     correct, Ms. Woodland?

6     A.  Yes.

7     Q.  Is that the handbook that you are

8     referring to that you received once you were hired

9     as occupant services manager?

10     A.  Something similar in nature to this.  It

11     wasn't exactly this.  This one is from 2004.  So I

12     signed one in 2001 that wasn't exactly like this

13     one.

14     Q.  Do you have a copy of that?

15     A.  I do not.  There may be a copy in my file,

16     my employee file.

17     Q.  Do you recall whether it was titled

18     "business conduct statement"?

19     A.  It was.

20     Q.  It was just the 2001 version?

21     A.  Correct.

40

1      Q.  Who gave you this document?

2      A.  It was sent to me by Quint Bowman.

3      Q.  Were you told the purpose of the document?

4      A.  Yes.

5      Q.  What were you told?

6      A.  That it was a Viacom business conduct

7   training statement and I needed to sign it.

8      Q.  Just so I'm clear, this was e-mailed to

9   you?

10      A.  Yes.

11      Q.  Did you sign something acknowledging that

12   you received this?

13      A.  I did, every year from 2001 until the

14   present day.

15      Q.  Annually?

16      A.  Annually it's done.

17      Q.  Annually they send these out to you?

18      A.  Yes.

19          MR. FERRER:  Can I have this marked

20   as Woodland three, please?

21          (Whereupon the proffered item was

41

1        marked as exhibit number 3.)

2    BY MR. FERRER:

3        Q.  Can you identify this document,

4    Ms. Woodland?

5        A.  Yes.

6        Q.  What is this?

7        A.  It's the employment certification form

8    saying that we have in fact participated in the

9    business conduct training and we're signing this to

10    acknowledge that we've received it.

11        Q.  This is a certification that you signed or

12    I guess that goes along with the exhibit we were

13    just referring to, the business conduct statement,

14    exhibit two?

15        A.  Yes.

16        Q.  This one is not signed.  Do you have a

17    copy of one that you have signed?

18        A.  I don't have one with me currently, but I

19    believe we submitted signed copies of every year to

20    present.

21        Q.  This is what you provided.  The

42

1    certification looks like just this, is that correct?

2        A.  Yes.

3        Q.  I'm noticing here at the bottom the date

4    is 4/29/2007.  Is this the one for 2007?

5        A.  Yes.

6        Q.  When you sign this, who do you return it

7    to?

8        A.  I return it to the Human Resources' office

9    on site.

10       Q.  I think you said that you -- correct me if

11   I'm wrong, the certification you said is to

12   acknowledge that you have received the statement,

13   correct?

14       A.  That I read it, understood it and

15   understand what the Viacom policy is all about.

16       Q.  Did you mention that you received

17   training?

18       A.  Yes.

19       Q.  What type of training?

20       A.  The first couple of years when they rolled

21   it out, they would have the on site Human Resources

43

1    team to go through the book with you and address any

2    questions that anyone would have.

3        Q.  Who was on the on site HR team?

4        A.  Shelly Johnson, Quint Bowman and that's

5    it.

6        Q.  Ms. Johnson, what's her position?

7        A.  She is a senior manager of Human

8    Relations.

9        Q.  Where is she located?

10        A.  1235 W Street.

11        Q.  She is employed by BET?

12        A.  Yes.

13        Q.  For how many years can you recall did they

14    provide the training regarding this statement?

15        A.  Probably the first three years.

16        Q.  From 2001 to 2004?

17        A.  Yes.

18        Q.  To your knowledge or based on your

19    recollection, what did the training consist of?

20        A.  Them just going through the conduct

21    statement and telling us what Viacom's requirements

44

1    were and if we had any questions, they addressed the

2    questions, but it was more along the lines of a

3    mandate from Viacom that they have this and had all

4    of us sign it on site.

5        Q.   So you signed the certification after the

6    training?

7        A.   Yes.

8        Q.   Was anyone else involved in the training?

9        A.   Every associate had to take part in the

10   training.

11       Q.   How about as far as providing the

12   training?  Did anyone else provide the training

13   other than Ms. Johnson and Mr. Bowman?

14       A.   On site, no.

15       Q.   No one from Viacom was involved in

16   providing the training?

17       A.   On site?  I want to say I don't think so,

18   although I believe in the first year someone from

19   Viacom did come down and do the first year's

20   training and then every year thereafter it was done

21   on site by the on site Human Resources people.

45

1    Q.  Do you recall who that person may have

2    been?

3    A.  I do not.

4    Q.  Do you recall the person's position or

5    title?

6    A.  It was someone from their Human Resources

7    department.

8    Q.  Who provided the training regarding the

9    statement after 2004?

10   A.  It was the same, Shelly Johnson and Quint

11   Bowman and then this year it was electronically sent

12   to us from Viacom.

13   Q.  What do you mean when you say it was

14   electronically sent from Viacom?

15   A.  I mean that it was an e-mail that was sent

16   to Viacom and once we completed it they would let

17   our Human Resources people know who still was

18   outstanding, who hadn't completed it, because there

19   was a timeframe in which we were required to

20   complete it.  So everything that they sent us, it

21   was almost like a test this year.

46

1    Q.  So you received -- you are talking about

2    2007 when you say "this year"?

3    A.  Yes.

4    Q.  2005 and 2006 you received the business

5    conduct statement how?

6    A.  Through the on site Human Resources

7    department.

8    Q.  That would be Mr. Bowman?

9    A.  And Shelly, right.

10    Q.  For those years you would sign the

11    certification and return the certification to them,

12    is that right?

13    A.  Yes.

14    Q.  In 2007 you received it electronically?

15    A.  Yes.

16    Q.  From whom?

17    A.  I don't recall exactly who the e-mail came

18    from but I know we all had to do it, complete it and

19    once it was completed then Viacom would know that we

20    had completed it.

21    Q.  How do you know that Viacom would know

47

1    that you completed it?

2        A.   Because I was told that by someone in

3    Human Resources department, by Ms. Johnson.

4        Q.   Did she tell you how Viacom would know?

5        A.   She did not.

6        Q.   This year in 2007 did you sign it, the

7    certification statement again?

8        A.   Yes.

9        Q.   After you signed, it who did you submit it

10   to?

11       A.   Human Resources on site.

12       Q.   Ms. Johnson and Mr. Bowman did the

13   training again this year?

14       A.   No.  There was no training this year.  We

15   just received an e-mail, instructed you to go to the

16   website, log on, conduct the -- I mean complete the

17   questionnaire.

18          There were more questions this time.  Once

19   you were finished, it would ring a flag that said

20   this person had completed it.

21       Q.   All that was done online?

48

1      A.  Yes.

2      Q.  Did you actually sign the certification

3   this year?

4      A.  I believe that I did.  I'm not 100 percent

5   sure, but I believe that I did.

6      Q.  Let's go back to when you were promoted to

7   property manager in I believe you said June of 2002.

8      A.  Okay.

9      Q.  When you were promoted from I guess it was

10   occupant services manager, correct, to property

11   manager, Viacom was not involved in that promotion?

12      A.  I can't say that.  We were a business unit

13   of Viacom so I'm quite sure that they were aware

14   that the promotion had taken place.  I dealt with

15   the on site BET Human Resources unit.

16      Q.  Why do you believe Viacom was involved?

17      A.  Because they are our parent company.

18   Everything that we were doing was tied in to Viacom.

19   Our payroll, everything was going to 1515 through

20   electronic devices.

21      Q.  Can you be any more specific as to why you

49

1    believe that Viacom played any part in your

2    promotion from occupant services manager to property

3    manager?

4        A.  I wouldn't say Viacom played a part.  I

5    would say Viacom was aware of it.

6         In order to promote me they had to give me

7    more money.  A lot of the money spending -- the way

8    that monies were being spent were being approved on

9    a Viacom level.  They were approved through the BET

10    business unit but they went further.

11        Q.  How do you know that Viacom was aware of

12    your promotion from occupant services manager to

13    property manager?

14        A.  I can't say 100 percent that I know a

15    person who sits in Viacom and who knows that I got

16    promoted.  I know that Viacom was very involved in

17    the business unit and what we were doing.

18    Specifically who would have received the paperwork,

19    I don't know.

20        Q.  You just said that you were aware that

21    they were involved -- was it the business unit?

50

1    A.  Yes.

2    Q.  Why do you say that?

3    A.  Because they were.  They were starting to

4    make all of our -- put all of our systems -- to

5    modernize all the systems and put them on computers,

6    different software systems, so that they have access

7    to them and payroll was probably one of the first

8    ones that they did.

9    Q.  What other systems?

10    A.  Human Resources.  Human Resources did not

11    used to use any type of software system.  They were

12    operating sort of like a mom and pop shop and with

13    the purchase or us being acquired by the Viacom

14    family, they started getting all types of Infinium,

15    all types of different systems in order to be linked

16    with the Viacom family.

17    Q.  What is Infinium?

18    A.  It's a software, a Human Resources

19    software system that ties the two together.  We can

20    input information here in D.C. and New York has

21    access -- can access that same information.

51

1          They also conduct audits.  We are audited a

2     couple of times a year.  Human Resources was just

3     recently audited by Viacom where they come down and

4     search the files and make sure that the paperwork is

5     intact.

6          Q.  Anything else?

7          A.  No.

8          Q.  You stated that you believe the payroll

9     system -- what is the payroll system, do you know?

10         A.  I do not.  I don't deal with the payroll,

11     but I know that it is input and it goes to 1515

12     Broadway.

13         Q.  How do you know that?

14         A.  Because I was involved in putting up the

15     machines around the campus to make sure that it

16     would go.  I was involved in making sure that people

17     were testing the machines to make sure that someone

18     at Viacom could read them.

19         Q.  What do you mean read them?

20         A.  We have cards.  Whenever someone comes in,

21     they would swipe in.  Typically that information

52

1    would have been used for BET.  When the campuses

2    became connected, now if they swipe in Viacom has

3    that information and they are using that information

4    for payroll.

5        Q.  What type of card are you referring to?

6        A.  An identification card.  Each associate

7    has an identification card with a number on it and

8    for hourly associates, they swipe in and that's how

9    they are paid.

10        Q.  How do you know Viacom gets this

11    information?

12        A.  Because I was a part of the testing.  I

13    was asked by BET Human Resources to have a few of

14    the people test their cards and the reason they gave

15    me was because Viacom were now -- it was now on the

16    Viacom payroll system and we need to be sure Viacom

17    can read those cards.

18        Q.  Who told you that?

19        A.  Dana Woodruff.

20        Q.  What's her title?

21        A.  She is the director of Human Resources.

53

1      Q.   You said Infinium is some type of HR

2   software?

3      A.   Yes.

4      Q.   Do you know what it's used for?

5      A.   It's used for time, collecting time.  It's

6   used for employee information, salaries, all sorts

7   of things.  I'm not very knowledgeable of it because

8   I don't work in Human Resources.

9      Q.   How do you know that information?

10      A.   I've been speaking to people in Human

11   Resources.  When the transition started happening

12   they were just telling us -- I was told what was

13   going on and what they were doing.

14      Q.   Do you recall when BET started using that

15   system, the Infinium system?

16      A.   Not exactly.  Probably 2002, 2003.  2003

17   at the latest.

18      Q.   Who in HR, if you remember, told you about

19   the information you just testified about regarding

20   the Infinium system?

21      A.   Everyone.  I talked to all the girls in

54

1    Human Resources.  They were all talking about it.

2        Dana Woodruff gave me insight.  She wanted

3    me to have a few of the people scan their cards for

4    the test and she needed my assistance and getting

5    the card readers put you up so they can be tested

6    and make sure they can be read at 1515.

7        Alicia Campbell, the girl who installed the

8    numbers or who verified the numbers before they are

9    sent up to be processed, you know.

10        Q.   What's Ms. Campbell's position?

11        A.   She is an HR coordinator.

12        Q.   Where is she located?

13        A.   At 1235.

14        Q.   Where is Ms. Woodruff located?

15        A.   1235 W Street.

16        Q.   Ms. Woodruff is a BET employee?

17        A.   Yes.

18        Q.   How about Ms. Campbell?

19        A.   Yes, they work on site.

20        Q.   Do you recall when you had this

21     conversation or these conversations with

55

1    Ms. Woodruff?

2        A.   Around the time, I guess around 2003 when

3    they started connecting, when they started changing

4    the payroll system.

5        Q.   How about Ms. Campbell?

6        A.   I don't.  It was all a side bar

7    conversation.

8        Q.   You have no day to day involvement with

9    running the system, is that right?

10       A.   No.

11       Q.   No day to day knowledge of how the system

12   works, is that correct?

13       A.   No.

14       Q.   Do you recall anyone else you spoke with

15   about the Infinium system?

16       A.   No.

17       Q.   Other than what you've testified already,

18   is there any other reason you believe why Viacom

19   would have been aware of your promotion from

20   occupant services manager to property manager?

21       A.   Like I said, I'm not quite sure.  I'm a

56

1   senior manager.

2       They are promoting vice-presidents and

3   senior vice-presidents.  I don't think it was a big

4   deal for me because I'm not a contract employee.

5       Q.  How about when you were promoted to senior

6   manager I think you said back in May or June of

7   2003, would you say that Viacom was not involved in

8   that promotion?

9       A.  I wouldn't say that they are not involved

10   in that promotion because my paychecks come from

11   them.  I think they were involved.  How much of

12   their involvement, I can't say.

13      Q.  What do you mean your paychecks come from

14   them?

15      A.  My paychecks are produced at 1515 Broadway

16   and are sent to the 1235 campus.

17      Q.  How do you receive your check?

18      A.  Electronic.  It's deposited in my account

19   and I receive an electronic pay stub from Viacom.

20      Q.  Because they send you your paychecks you

21   think they were involved in your promotion from

57

1    property manager to senior manager?

2        A.   I won't say they are involved.  I think

3    your question was did they know about it.  I think

4    they did know about it because my paycheck changed.

5        Q.   So your testimony is that they were not

6    involved?

7        A.   No, that's not my testimony.  My testimony

8    is I don't know who was involved but someone at

9    Viacom knew that a promotion had taken place.

10       Q.   What is the basis for why you think Viacom

11   knew of the promotion?

12       A.   Because Viacom is involved in our Human

13   Resources.  They are involved in our finances.  They

14   are involved in the whole way the business units

15   operates, so they would know if someone is getting a

16   raise.

17       Q.   Can you give me any other specific reasons

18   why, other than what you just said, but any other

19   specific reasons why you think Viacom was involved

20   in your promotion from property manager to senior

21   manager?

58

1    A.  No.

2    Q.  When you were promoted from occupant

3  services manager to property manager in June 2002,

4  you received a raise?

5    A.  Yes.

6    Q.  How about from property manager to senior

7  manager in June 2003?

8    A.  Yes.

9    Q.  Let me just go back to make sure I have

10  all your employment information right.

11     You started out with BET in 1998, right, as

12  fashion stylist?

13    A.  Yes.

14    Q.  Then you went to TV1.  Then you went to

15  Jones Lang LaSalle.  Then you came back to BET?

16    A.  Yes.

17    Q.  Is there anything else?  Are we leaving

18  out any other job?

19    A.  No.

20     (Recess from 11:17 a.m. - 11:24 a.m.)

21     MR. FERRER:  This will be exhibit

59

1    four.

2            (Whereupon the proffered item was

3        marked as exhibit number 4.)

4    BY MR. FERRER:

5        Q.  Ms. Woodland, I handed you a document.

6    Can you identify that document for me?

7        A.  It is my complaint document.

8        Q.  Turn to the last page, which is page 13.

9    That is your attorney's signature, Mr. Bell?

10        A.  Yes.

11        Q.  Did you assist or provide information in

12    preparing the complaint?

13        A.  I did.

14        Q.  You believe the complaint is an accurate

15    description of the complaints and allegations in

16    this case?

17        A.  Yes.

18        Q.  Look at paragraph six of the complaint,

19    Ms. Woodland, page two.  It says:  During all times

20    mentioned in this complaint, plaintiff Antoinette

21    Woodland was an employee of defendant Viacom.

60

1        That's what is says, correct?

2        A.  Correct.

3        Q.  I want you to tell me all of the reasons

4    why you believe that you were an employee of Viacom.

5        A.  Because the rules that we operate under

6    are Viacom's comes.  I receive my paycheck from

7    Viacom.  Viacom takes out taxes out of my paycheck.

8    The insurance program is Viacom's.  The rules,

9    everything that we do is based upon protocol that

10    has been sent to us via Viacom.

11        Q.  Anything else?

12        A.  Viacom owns BET.

13        Q.  I may have asked you this earlier.  Do you

14    know when Viacom acquired BET?

15        A.  2000.

16        Q.  It was 2000?

17        A.  Yes.

18        Q.  I'm going to go through the things that

19    you just said.  You said Viacom's rules.  What rules

20    are you referring to?

21        A.  Their operating procedures.

61

1    Q.  Are you referring to a particular

2    document?

3        A.  No, I'm talking about the practices that

4    we are mandated to operate under, from the way the

5    offices look, from the signing of their handbook to

6    the -- just everything, the way we do business.

7        Q.  So you are not referring to, when you say

8    operating procedures, any particular document?

9        A.  Not a particular document.  It's how we

10   operate, how we do the day to day business.  We're

11   audited a couple of times a year, finance more than

12   that, from Viacom to ensure that we're in line with

13   the Viacom rules and regulations.  Bonus time,

14   Viacom approved how much our bonuses would be.

15       Q.  You mentioned that Viacom mandates the way

16   the offices look, is that correct?

17       A.  Yes.

18       Q.  Why do you believe that Viacom mandates

19   the way offices look?

20       A.  Because I'm working on a project right now

21   in New York and we've been going back and forth on

62

1    the space issues for the last three weeks because

2    Felipe, the new CEO, has mandated a certain look and

3    feel of the offices.  He has a certain mandate.

4    Everything is done to make sure this new office

5    falls in line with his vision of how the company

6    should look.

7        Q.  Who is Felipe?

8        A.  The new CEO.

9        Q.  Of?

10       A.  Of Viacom.

11       Q.  You said you were working on a project in

12   New York?

13       A.  Yes.

14       Q.  For BET?

15       A.  Yes.

16       Q.  What project is that?

17       A.  We're moving our ad sales and combining

18   all the units that are up in New York.  They are all

19   going to be combined inside the Viacom building.  So

20   it's a construction project, new space.

21       Q.  When did that project begin?

63

1     A.   Probably about three or four months ago.

2     Q.   Who do you report to on that project?

3     A.   Byron Marchant.

4     Q.   Why do you believe that Felipe issued this

5   mandate that you speak of regarding how offices

6   should look?

7     A.   Because we're working with people who work

8   directly for him and they are giving us his

9   feedback.

10       We have a different vision of how we wanted

11   the office set up and his senior vice-president of

12   facilities, Ellen Albert, has said on several

13   occasions what Felipe's vision is and how he wants

14   X, Y and Z to look a certain way, how he wants the

15   offices to look a certain way, lower walls, more

16   natural light, things along those lines.

17     Q.   You said it was Ellen Albert?

18     A.   Ellen Albert.

19     Q.   Senior VP?

20     A.   She is senior VP.

21     Q.   Of?

64

1     A.  Facilities for MTV.

2     Q.  Ms. Albert works for MTV?

3     A.  Yes.  She works for that unit, but she

4  reports to Felipe.

5     Q.  How do you know that?

6     A.  Because she said it.  I guess we all do.

7  He's over the units that we support.

8     Q.  Do you have anyone working or reporting to

9  you on this particular project?

10     A.  No.

11     Q.  Any other reason why, other than what you

12  testified already, why you believe that Viacom

13  mandates the way BET's offices look?

14     A.  No.  That's enough.  They approve the

15  budgets, how much we're allotted to spend on the

16  offices.

17     Q.  Who approves the budget?

18     A.  It comes from Viacom.  Who in Viacom I'm

19  not sure, but Viacom approves the budgets.

20     Q.  How do you know Viacom approves the

21  budgets?

65

1      A.   Because I've been told by senior staff

2   members that we're waiting for Viacom to approve the

3   budget on numerous projects.  Operating budget,

4   project budget, everything has to go through Viacom.

5      Q.   Who told you this information?

6      A.   I've heard it from Quinton Bowman, Manny

7   Rodriguez.

8      Q.   Who is that?

9      A.   He's a new associate, but he handles the

10   budgets.

11      Q.   What's his title?

12      A.   He's director of special projects.

13      Q.   Where is he located?

14      A.   1235 W Street.

15      Q.   He's employed by BET?

16      A.   He's employed by the unit.

17      Q.   What does that mean?

18      A.   It means he works for BET but ultimately

19   we all report to Viacom.

20      Q.   Do you recall when you had this

21   conversation with Mr. Bowman about the budget?

66

1     A.   The first of this year.  We were all

2     waiting to find out what the budgets were going to

3     be, the operating budgets were going to be, and

4     everyone from Mr. Bowman to anyone who has anything

5     to do with budgets basically kept repeating that

6     Viacom has not approved the budgets.  So we were

7     working through first quarter and we had not had an

8     approved budget for Viacom.

9          I believe they just approved it within the

10     last couple of weeks.  It was just approved.

11     Q.   What is your involvement, if any, in the

12     budget process?

13     A.   None.

14     Q.   Where is Felipe located?

15     A.   At 1515.

16     Q.   Broadway?

17     A.   Yes.

18     Q.   In New York?

19     A.   Yes.

20     Q.   You said Ms. Albert.

21     A.   Also 1515 Broadway, New York, 35th floor.

67

1      Q.  So you don't know how, for example, BET

2   gets the money for the particular project that you

3   are working on?

4      A.  The money is allotted to us from Viacom.

5   The reason I know this is because last year we

6   didn't make our numbers but we were the highest

7   operating unit out of the family.

8        Viacom approved for us to get a larger bonus

9   than we normally would have gotten because of our

10   numbers.  They sent out an e-mail.  They sent out an

11   e-mail saying Viacom approved a special bonus for us

12   all to get more than what we should have gotten just

13   based upon our efforts and our ratings.

14      Q.  When was this?

15      A.  February of this year.

16      Q.  February of this year?

17      A.  That's right.

18      Q.  You were referring to a bonus.  You are

19   talking about, again, compensation for

20   each -- additional compensation for each employee?

21      A.  Yes.

68

1    Q.  Back to the budget question.  Are

2   you -- is it accurate to say that you are not

3   familiar with how the budget process works, how BET

4   gets its money for a particular project like the one

5   that you described?

6    A.  I don't know specifically how we get our

7   money.  I am told that Viacom had not approved a

8   budget or we were waiting for Viacom's approval for

9   us to move forward and that's been with almost every

10   project I worked on.  I'm working on four right now

11   and each one we were waiting for Viacom's approval

12   on the money.

13    Q.  Again, your knowledge is based on --

14    A.  Conversations that I've had with people

15   who are above me or at my level who specifically

16   don't do anything but handle budgets.

17    Q.  That was Byron --

18    A.  Byron Marchant is the chief general

19   counsel, so I work for him.  Manny Rodriguez, he and

20   I are co-project managers on a lot of the projects

21   but he deals more with the financial end of it.

69

1     Q.  I think you mentioned Mr. Bowman.

2     A.  Mr. Bowman, he's my direct supervisor.  If

3  I ask for money for X, Y or Z, I'm told the budget

4  has not been approved yet.

5     Q.  Anyone else?

6     A.  Them particularly.

7     Q.  Tell me about this bonus that you were

8  just referring to.

9     A.  Every year the company gives associates a

10  bonus.  It's based upon titles.  It equates to a

11  certain percentage amount.  This year if we reach

12  100 percent then you get your whole 15, 20,

13  25 percent that you are supposed to get based upon

14  your title.

15     This year we did not reach the goal, but

16  apparently Viacom saw the efforts or what have

17  you -- I cannot remember exactly what the e-mail

18  said but Viacom approved them to give us a higher

19  percentage than we would have normally received.

20     Q.  Do you have a copy of the e-mail?

21     A.  I can get a copy.  I don't have one with

70

1    me.

2        Q.  So you didn't provide this e-mail in

3    response to Viacom's discovery request?

4        A.  They didn't ask for it.

5        Q.  I think we asked for all documents that go

6    to your belief that Viacom is your employer.

7        A.  When was this information asked?

8        Q.  Discovery requests that were issued to

9    you.

10            MR. BELL:  Which specific discovery

11    request?

12            THE WITNESS:  It could have come out

13    after I provided the information.

14            MR. FERRER:  Let's go off the record

15    for a second.

16            (A discussion takes place which is

17      held off the record)

18    BY MR. FERRER:

19        Q.  In Viacom's request for production of

20    documents that was issued to you on May 1,

21    2007 -- I'm sorry.  Issued March 16, 2007.

71

1   Paragraph 5 asked for any and all documents that

2   pertain to plaintiff's allegation, paragraph six of

3   her complaint, that she was an employee of Viacom.

4      A.  When did I submit my information?  The

5   time I submitted my information -- and I don't know

6   the exact date of the e-mail, but I do know I did

7   receive the e-mail.  It was a mistake on my part.

8     Q.  Who is the e-mail from?

9      A.  Deborah Lee.  She is the chief executive

10   officer and president of BET unit.

11     Q.  Where is Ms. Lee located?

12     A.  1235 W Street NE.

13        MR. BELL:  Off the record.

14        MR. FERRER:  Sure.

15        (A discussion takes place which is

16   held off the record)

17        MR. BELL:  I can get it to you by

18   Monday.  I'll fax it over to you once she gives it

19   to me.

20   BY MR. FERRER:

21     Q.  The e-mail is from Ms. Lee.  And who was

72

1   it to?

2       A.   It was all BET, an all BET e-mail.

3       Q.   All BET employees?

4       A.   It was the BET unit.

5       Q.   When did this e-mail come out?

6       A.   Sometime in March.

7       Q.   Of this year?

8       A.   Yes.

9       Q.   What was the context of the e-mail?

10      A.   The bonus, the annual bonuses, just

11   basically how we came short of our sales goal but

12   that Viacom wanted to award us for our efforts or

13   whatever and allowed them to give us a certain

14   percentage, more of a percentage than we normally

15   would have had had they not okayed it.

16      Q.   You referred to it as an annual bonus.  Is

17   it some type of bonus program?

18      A.   Every year they give a bonus.

19      Q.   Who gives a bonus?

20      A.   The unit, BET unit.  But since we're owned

21   by Viacom, it's approved through Viacom.

73

1    Q.  How do you know it was approved by Viacom?

2    A.  Because there have been instances where

3  it's been held up and this year it wasn't given in

4  the normal first week of February like it has been

5  the past years.  It was waiting Viacom approval.

6    Q.  How do you know it was awaiting Viacom

7  approval?

8    A.  Because I was told by Human Resources that

9  it was waiting Viacom's approval.

10    Q.  Who in Human Resources told you that?

11    A.  Quint Bowman, Shelly Johnson, Stephanie

12  Boykin, Dana Woodruff.

13    Q.  You had separate conversations with all of

14  these individuals about the bonus?

15    A.  We were just having a generic conversation

16  and everyone would bring up the conversation that

17  the bonus hadn't been paid yet and everyone was

18  saying they was waiting on Viacom's approval,

19  waiting on Viacom's approval.

20      Finally when Viacom approved it, Deborah Lee

21  sent out an e-mail that said listen, Viacom has

74

1    approved for us to give you -- I think we were

2    projected to get 60 percent or 70 percent and Viacom

3    said it was okay to give us 85 percent.

4        Q.   Who sets the sales goal, do you know?

5        A.   Viacom.

6        Q.   How do you know?

7        A.   The difficult thing is the department I

8    work in, I mingle with a lot of senior staff

9    members.  So I have conversations, side bar

10    conversations, and I knew that once we were

11    acquired -- we were required to give 20 percent to

12    Viacom regardless of what our numbers are, we have

13    to make enough to give them 20 percent.  So they set

14    the goals, Viacom sets the goals.

15        Q.   You believe this based on your

16    conversations with other people?

17        A.   Yes.

18        Q.   Who are those people?

19        A.   Lewis Carr.

20        Q.   Who is that?

21        A.   The president of ad sales for the BET

75

1    unit.

2        Q.  President of ad sales?

3        A.  Yes.  Byron Marchant, general counsel,

4    Quint Bowman, senior vice-president.

5        Q.  All of these individuals told you that

6    Viacom sets the sales goal?

7        A.  They didn't just come to me and say Viacom

8    sets the sales goal.  In a conversation about

9    whatever it comes up, you know, we've got to make

10    that sales goal, Viacom sets the sales goal.

11        Everyone knows that Lewis is responsible for

12    meeting a certain goal.  He'll tell you I've got to

13    make a certain goal because Viacom wants their

14    20 percent.  It was public knowledge when the sale

15    took place that we would have to pay 20 percent to

16    Viacom regardless of what the profits were.

17        Q.  That BET would have to pay 20 percent?

18        A.  20 percent of the sales revenue.

19        Q.  Are you talking about ad sales?

20        A.  All the money.  Now it's more but

21    20 percent of the revenue generated by the BET brand

76

1    would have to be paid to Viacom.

2       Q.   Your knowledge of this is based on your

3    conversation with Mr. Carr?

4       A.   Based on my conversations with everybody.

5    Everyone at the company knows it.  It's a very lax

6    organization.

7          Everyone talks about what the requirements

8    are, what finance is doing, what's holding up stuff,

9    how much we're required.  I work with all the

10    departments so it's just conversation.

11       Q.   Do you work with that particular -- do you

12    work with sales revenue?

13       A.   I have.  I'm working sales revenue now.

14       Q.   How so?

15       A.   I'm responsible for rebuilding their

16    Chicago office and rebuilding the 1540 office that

17    they are locating to, and Broadway.  The New York

18    and Chicago offices are two projects that I'm

19    working on.

20       Q.   When you say their Chicago office, you are

21    talking about BET?

77

1      A.  The unit, yes.

2      Q.  What are you referring to when you say

3   "unit"?

4      A.  Because BET, MTV, VH1, we're all units of

5   Viacom.  We're different.  We operate as units but

6   we all report to Viacom.  We're under the Viacom

7   umbrella as they put it, the family.

8      Q.  Did Mr. Bell tell you to use that word,

9   "unit"?

10      A.  No, it was in my paperwork.  Should I stop

11   using "unit"?

12      Q.  Feel free.  It's your testimony.

13      A.  I started using it because I felt -- it's

14   all the same thing to us who have to live it every

15   day, what we're required to do.  Who they say says

16   it, it all points back to Viacom.  That's why I'm

17   saying units, to specify we are BET.

18          And we put BET on -- the logo on

19   paraphernalia, on paper and all that stuff but at

20   the end of the day we're being held accountable by

21   Viacom.  It's no secret.  It's known.  It's spoken

78

1   about at BET.  Everyone knows at the end of the day

2   we report to Viacom.

3      Q.  Do you have any documentation regarding

4   your statement that BET has to pay 20 percent of its

5   sales revenue to Viacom?

6      A.  I don't.  I don't work with sales.  It was

7   just in conversation.  People say it.

8       If we are working on a project or the awards

9   show and it's after hours, everybody is at a table

10   or having cocktails, it's just table conversation.

11      Q.  I think you mentioned Stephanie Boykin.

12      A.  Senior manager of benefits for Human

13   Resources.

14      Q.  Where is she located?

15      A.  1235 W Street.

16      Q.  Mr. Carr, where is he located?

17      A.  He has offices in New York and Chicago.

18      Q.  Does he have a primary office?

19      A.  Chicago.

20      Q.  Anything else you can tell me about this

21   bonus program?  Let me be more specific.

79

1         Is this bonus, you received it or at least

2     it's been in place every year that you've been

3     employed or worked for BET?

4         A.  Yes.

5         Q.  How do you normally find out whether you

6     are receiving a bonus?

7         A.  Well, typically the -- I guess from its

8     past history, BET has always given employees

9     bonuses.  It's a certain amount based on your

10     position.

11         Historically you can just go to someone in

12     Human Resources and find out exactly when they are

13     going to pay them out.  Is it going to be the first

14     week of February as it has been for years; is it

15     going to be the second week of February; when is it

16     going to be?

17         Q.  Do you have any specific knowledge of how

18     the bonus program works, how you come up with -- or

19     how the bonus amount is calculated?

20         A.  It's calculated after the percentage is

21     paid and what's left.  The bonus is based upon how

80

1    well the sales team does.

2         If they do very well then the bonuses are

3    lucrative.  If they don't, then it's a percentage.

4         Q.   Have you ever received or seen any

5    document explaining what the bonus program is?

6         A.   I want to say I did a long time ago.

7         Q.   Was this bonus program in place back in

8    1998 when you worked there, at BET?

9         A.   Yes.

10        Q.   In 1999 when you worked there?

11        A.   Yes.

12        Q.   2000?

13        A.   Yes.

14        Q.   The information that you told me about as

15   far as you believe the bonus is based on how the

16   sales team does, you know that how?

17        A.   Conversations with people in the sales

18   department, finance, Human Resources, just coffee,

19   water cooler conversations.

20        Q.   Other than the people that you mentioned

21   already that you discussed the bonuses with, can you

81

1    think of anyone else that you talked to regarding

2    this bonus program who provided you with this

3    information?

4        A.  Troy Saunders, my manager at the time.

5        Q.  Anyone else?

6        A.  No.

7        Q.  Going back to when I initially asked you

8    the question of tell me all the reasons why you

9    think Viacom is your employer, you had mentioned the

10   handbook.  I just want to be clear that you are

11   referring to what we marked as exhibit two, the

12   business conduct statement.

13       A.  Yes.

14       Q.  There's no other handbook that you are

15   referring to?

16       A.  No.

17       Q.  Now --

18       A.  That's all they require us to sign

19   annually.

20       Q.  So you also mentioned being audited.  Why

21   do you believe that Viacom audits BET?

82

1     A.  Because I know that they do.

2     Q.  How do you know that?

3     A.  Because when I was running security Viacom

4     came down and conducted an audit.  They checked

5     identifications, checked forms that are used to get

6     an identification badge.  They checked everything,

7     the way we were operating.

8         And then they came back and gave us a list

9     of the things that they found that were not in line

10    with Viacom procedures and we had to change it.  We

11    would write up what our procedures were and then

12    submit them to Viacom and tell them how we were

13    going to right the situation.

14    Q.  When did this occur?

15    A.  2002 or 2003.

16    Q.  Who conducted the audit?

17    A.  Members of Viacom's team.  I'm not sure

18    who they are but they came down from Viacom.

19    Q.  You say from Viacom.  You mean the

20    New York office?

21    A.  Yes.

83

1    Q.  You don't recall any of their names?

2    A.  I don't.  It was a couple of years ago.

3    It was a brief, one, two day audit.

4    Q.  Do you recall their titles or their

5    positions?

6    A.  I don't.

7    Q.  At the time you said you were doing

8    security.  What do you mean by that?

9    A.  Security reported to me at the time.  The

10   vendor, Securitas, they reported to me day to day.

11   Q.  What is it called?

12   A.  Securitas.

13   Q.  Specifically what did Securitas -- what

14   was their contract for?

15   A.  Security services.

16   Q.  Can you be more specific as far as

17   describing what security services they provide?

18   A.  Access control, responsible for printing

19   identification badges, and that's pretty much it.

20   Just access control and security badges, making sure

21   that it was a safe work environment.

84

1    Q.  What did the audit entail?

2    A.  Them coming through, looking through all

3    of our paperwork, our on site security paperwork,

4    the forms that are used for identification badges,

5    seeing who has access, making sure that associates

6    that had not been terminated still maintain access.

7    They wanted to see the procedures for getting

8    identifications and who was granted access to

9    certain areas.

10    Q.  Who set up the procedures?  Who created

11    the procedures for identification that you just

12    talked about?

13    A.  I believe Troy Saunders.  I'm not

14    100 percent sure but I believe he created them and

15    if they did not, he created them once we were

16    audited.  They were recreated.

17    Q.  What was the result of the audit?

18    A.  People in New York had access.  A few

19    people were terminated and had not been terminated

20    from the system.  That was the gist of it.

21    Q.  What do you mean the people in New York

85

1   had access?

2      A.   Well, we have people in New York, Chicago

3   and LA and they all typically have access to D.C.

4   because they come into D.C. for meetings or

5   whatever.  However, when they were terminating

6   people in those offices they didn't tell us so

7   we -- they took their badges but they didn't tell us

8   and so the people weren't deleted from the system.

9      Q.   What happened with the procedures, if

10   anything, after the audit?

11      A.   We changed the procedures.

12      Q.   Why did you change your procedures?

13      A.   Because they had -- Viacom had found that

14   the way we were doing it wasn't to their

15   satisfaction.  So we created a new system whereby

16   Human Resources now notifies security when someone

17   is being terminated and security in turn will go

18   ahead and delete the person from the system and make

19   sure that we get the identification back.

20      Q.   How do you know that the procedures were

21   not to Viacom's satisfaction?

86

1      A.   Because I was told by my manager at the

2   time that they weren't.  After they conducted the

3   audit, that -- some of the things weren't to their

4   satisfaction and the things that I mentioned

5   previously were things that weren't to their

6   satisfaction.

7      Q.   You were told by Mr. Saunders?

8      A.   Yes.

9      Q.   Were you told by anyone else?

10     A.   No.  He was told -- Mr. Marchant told him

11   and he in turn told me.

12     Q.   How do you know Mr. Marchant told him?

13     A.   Because he told me Mr. Marchant told him.

14     Q.   Is there anything else in regards to why

15   you believe that Viacom audits BET?

16     A.   Just to ensure we were operating in the

17   fashion they want us to operate.

18     Q.   Anything else as to how you know Viacom

19   audits BET?

20     A.   Just conversations.

21     Q.   With?

87

1     A.  With anyone.  If I walk up on the fifth

2   floor and see a bunch of people in the conference

3   room, then someone will say to you -- the

4   comptroller's secretary may say to me that's Viacom,

5   they are auditing us.

6      If I go to the fourth floor and see people

7   in the conference rooms, people in Human Resources

8   digging through the files, they might say we are

9   being audited, or if I have see Human Resources

10   cleaning out files for two weeks straight, I say

11   what are you doing and they say Viacom is coming

12   down to audit us.

13     Q.  Can you tell me about any specific audit,

14   but one you were involved in, when you were told --

15   when you were informed that Viacom was auditing BET?

16     A.  That was the only one that I was a part

17   of.  That's the only one I really feel comfortable

18   speaking about.  I've heard other things but it's

19   merely hearsay.

20     Q.  What was your involvement specifically

21   regarding that audit, the security audit that you

88

1    were just reporting about?

2        A.   Security reported to me day to day.

3        Q.   What role did you play, if any, during the

4    particular audit or responding to the audit?

5        A.   Preparing a draft as to how we were going

6    to change our procedures, communicating the new

7    rules and regulations to the head of security, to

8    ensure they were being carried out, working with

9    Human Resources to set up a system whereby they

10    communicate with us when someone is terminated.  So

11    they created a -- once someone is hired, I get that,

12    when someone is leaving, I get that.

13        Q.   The contractor creates that?

14        A.   No, Human Resources, BET Human Resources.

15    That was their way of contributing so that we would

16    all be in compliance.

17        Q.   You mentioned you prepared draft

18    procedures, new procedures, and this was post-audit?

19        A.   Yes.

20        Q.   You also mentioned new rules and

21    regulations.  Are you speaking of the same thing?

89

1     A.  The same thing.  It was all in the draft.

2     Q.  Who did you submit the procedures to?

3     A.  To Troy Saunders who in turn submitted

4  them to Byron Marchant, who it was my understanding

5  in turn submitted them to Viacom to let them know we

6  had corrected the violations.

7     Q.  How do you know Mr. Marchant gave the

8  procedures -- the new procedures to Viacom?

9     A.  Because I was told from all the other

10  units, all the other people who reported under

11  Byron's chain of command that they all had to write

12  up things to give to him and he's the compliance

13  officer.  So when they come and do audit, he will in

14  turn -- once it's corrected, he will in turn submit

15  that information to Viacom as the compliance

16  officer.

17     Q.  So no one specifically told you that

18  Mr. Marchant gave this to Viacom?

19     A.  Troy told me when he was preparing

20  information that he had to give it to Byron, who

21  would submit it to Viacom and let them know that we

90

1   were in compliance.

2       Q.   Other than Mr. Saunders, did you have any

3   other communications with anyone else regarding

4   these new security procedures?

5       A.   Just the head of security, Alex Lucas.

6       Q.   Alex Lucas you said?

7       A.   Yes.

8       Q.   Where is Mr. Lucas located?

9       A.   1235 W Street NE.

10      Q.   He's employed by BET?

11      A.   No, he was employed by Securitas.  He was

12   a vendor.

13          MR. FERRER:  Mark this as exhibit

14   five.

15          (Whereupon the proffered item was

16      marked as exhibit number 5.)

17   BY MR. FERRER:

18      Q.   Ms. Woodland, I just handed you a document

19   of several pages.  It has nine pages.  The first

20   page -- well, identify the document for me, please.

21      A.   It's a statement of earnings and

91

1    deductions, my payroll document.

2        Q.   The first page -- and these are separate

3    pay statements, is that correct?

4        A.   Correct.

5        Q.   Just so the record is clear, the first

6    page, the check date is June 10, 2005, is that

7    right?

8        A.   Yes.

9        Q.   The last page of the document, the check

10    date is July 22, 2005.

11        A.   Correct.

12        Q.   You had mentioned that you get your

13    paychecks from Viacom.  Why do you say you get your

14    paychecks from Viacom?

15        A.   Because they are processed in the Viacom

16    payroll department.

17        Q.   Is there any other reason why you believe

18    Viacom issues you your paychecks?

19        A.   No, other than they are processed by

20    Viacom.  My hours are sent to Viacom.  Viacom

21    processes the check.  They deposit it into my

92

1    account.

2        Q.   How do you keep track of your hours?

3        A.   I don't.  I'm a salaried employee.

4        Q.   Why do you say your hours are sent to

5    Viacom?

6        A.   Because if I take sick leave then the

7    office secretary will say I took sick one day or

8    whatever and put it into the system that goes to

9    Viacom and they'll deduct it off of my leave

10    schedule and send me a pay stub.

11        Q.   Tell me about that process.  When you

12    submit leave or you take leave, whatever leave it

13    may be, let's say -- you just mentioned sick leave.

14        A.   Yes.

15        Q.   How does that process work?

16        A.   I call in, I say I'm not coming in.  When

17    I come in the next day I submit a form that

18    says -- it's a sick form.

19        The office secretary will put it into the

20    Infinium system and that's it.  When I get my pay

21    stub, which I have to log on to a Viacom website,

93

1   I'll submit my pay stub and I'll see they -- when I

2   accumulate, I can log on to that same website and

3   see it.

4        Q.   You fill out a sick form.

5        A.   I get it from the BET Human Resources,

6   yes, on site office.

7        Q.   You say you fill it out, you give it to a

8   secretary?

9        A.   I gave it to the senior vice-president of

10   Human Resources' secretary and she will input it

11   into the system.

12        Q.   Who is that secretary?

13        A.   Carmen Arias.

14        Q.   After you give it to Ms. Arias, how do you

15   know what she does with it?

16        A.   She puts it into the Infinium system.

17        Q.   How do you know that?

18        A.   I know.  I talk to everybody.  I know that

19   it goes into the Infinium system because when I had

20   a huge amount of people used to report to me, I used

21   to have to check the Infinium system for our office

94

1    manager to make sure that she had put the hours in

2    correctly.

3        Q.   All right.

4        A.   So I did it and when I stopped doing

5    it -- I just know what needs to be done.

6        Q.   Ms. Arias is located where?

7        A.   1235 W Street.

8        Q.   She is employed by BET?

9        A.   Yes.  She is employed by the BET -- I'm

10   sorry.

11           MR. FERRER:  We can go off the

12   record.

13           (A discussion takes place which is

14    held off the record)

15   BY MR. FERRER:

16       Q.   How about if you want to make like

17   changes, for example, to your deductions, your

18   payroll deductions, how do you do that?

19       A.   I would get a form from the on site Human

20   Resources department and they would in turn put the

21   information into the Infinium system and Infinium,

95

1    which goes directly to Viacom, will make the

2    adjustments before the next pay period and it will

3    be reflected on my paycheck.

4        Q.   How do you know that HR puts it into the

5    system?

6        A.   I've been there on several occasions when

7    they were doing it for other people.

8        Q.   What do you mean you've been there, like

9    looking over their shoulder?

10       A.   No.  It's an open office.  The girls sit

11   in cubicles.  If you are going to talk to somebody

12   in the office, you have to pass them and they are

13   very vocal.  They'll say it.  Or if someone asks me

14   how do I get it done, I'll take them up there and

15   they'll stand there and give the girl the

16   information and she will put it in.

17       Q.   They put it in the system and then the

18   next payroll period --

19       A.   It comes out and it's on your paycheck.

20       Q.   Do you still have the complaint in front

21   of you?  It's exhibit four.

96

1    A.  Yes.

2    Q.  Looking at paragraph seven on page two.

3  It says:  During all times mentioned in this

4  complaint defendant Viacom's payroll department

5  prepared plaintiff's pay stubs.

6      Other than what you've testified to already,

7  is there any other reason why you believe that

8  Viacom's payroll department prepares your pay stubs?

9    A.  No.

10    Q.  You also mentioned something about Viacom

11  and the insurance program.  What were you referring

12  to?

13    A.  Just my last insurance card had Viacom on

14  it.  Aetna, who is the insurance provider, they had

15  Viacom as a company on the card.

16    Q.  Viacom's name was on the card?

17    A.  Yes.

18    Q.  What's the process of getting the

19  insurance card?

20    A.  They are sent to you.  Every year the

21  Human Resources department will send them out to

97

1    you.  I don't know where they come from because they

2    are mailed to you.

3        Q.   BET's HR department mails it to you?

4        A.   I don't know if they do.  You know what,

5    no, because this year they weren't.  They came from

6    Viacom.  They came from 1515.

7        Q.   How do you know that?

8        A.   Because I recall not knowing what was in

9    the envelope and opening it up and seeing 1515 on it

10    and it was my insurance cards.

11        Q.   Who is your carrier?

12        A.   Aetna.

13        Q.   How did you choose Aetna?

14        A.   It was the company -- the company was with

15    Aetna.  It wasn't our choice.

16        Q.   You don't have any choice?

17        A.   No.

18        Q.   Was this health insurance?

19        A.   Yes.

20        Q.   Are there different plans you can choose

21    from?

98

1       A.   HMO or PPO.

2       Q.   How did you go about choosing one of

3    those?  What's the process?

4       A.   You'll receive an e-mail from the on site

5    Human Resources department that says it's open

6    enrollment.  You can get either an HMO or PPO.  You

7    check a box, sign the form and turn it in to on site

8    Human Resources.

9       Q.   When you say on site Human Resources, you

10   are referring to BET?

11      A.   The unit, yes.

12      Q.   Do you have a copy of your insurance card?

13      A.   I didn't bring it with me, no.  I think I

14   submitted a copy of it with my identification.

15      Q.   You submitted your identification card but

16   I don't think your insurance card.

17      A.   I can get you a copy of it.

18          MR. BELL:  I'll get it to you on

19   Monday with the other document.

20   BY MR. FERRER:

21      Q.   Other than what you testified already, is

99

1     there any other reason why you believe that Viacom

2     is your employer?

3         A.   No, other than the stock.  I was given 500

4     shares of Viacom stock.

5              MR. FERRER:  Mark this as exhibit

6     six, please.

7              (Whereupon the proffered item was

8         marked as exhibit number 6.)

9     BY MR. FERRER:

10        Q.   I just handed you exhibit six,

11    Ms. Woodland.  Can you identify that document for

12    me?

13        A.   It is a letter and a copy of 500 shares

14    of -- excuse me -- a letter and a copy of my 500

15    shares of Viacom stock that was given to me by

16    Viacom.

17        Q.   Do you know why you received this?

18        A.   It was my understanding that it was given

19    to high performing individuals in the company.

20        Q.   Do you know the process behind which or

21    the other process behind which you received this?

100

1      A.   My executive vice-president I guess had to

2   pick select individuals within his chain of command

3   to award the stock to and I was one of them.

4      Q.   Who was your executive vice-president?

5      A.   Byron Marchant.

6      Q.   What is the basis of your knowledge that

7   Mr. Marchant had to pick certain individuals?

8      A.   Because it didn't go to everyone.  What I

9   was told -- when I was issued the certificate, I was

10   told it went to high performing and he was pleased

11   with my performance.

12      Q.   You spoke with Mr. Marchant?

13      A.   No.  It was passed down to me through

14   Human Resources and then they had a meeting.  Viacom

15   came in, conducted a meeting and told us basically

16   how they -- how it was selected.  At the time Bill

17   Roskin wanted to recognize those high performing

18   associates and so they decided to give us stock.

19      Q.   He came down?

20      A.   He didn't come down.  He sent someone from

21   Viacom down.

101

1      Q.  Who was that?

2      A.  I do not remember.  They had

3   different -- they were there I believe for two days

4   and they had different groups because execs don't

5   think a certain type of stock -- VP's got a certain

6   type of stock.  So they met with everyone who got

7   stock and told us about the program, why we were

8   getting it and so forth and so on.

9      Q.  I believe you said, correct me if I'm

10  wrong, that the stock certificate was passed down to

11  you from HR.

12     A.  They are sent from Viacom to the general

13  counsel.  He gives them to I guess Human Resources

14  and Human Resources in turn will pass it out to the

15  supervisors and the supervisors will pass it down to

16  the people.

17     Q.  Do you know how you were selected to

18  receive one of these?

19     A.  Just my performance.

20     Q.  Do you know who selected you?

21     A.  I do not know.

102

1    Q.  You believe it went through Mr. Marchant?

2    A.  It had to go through Mr. Marchant.

3    Q.  Do you know who else received it?

4    A.  A gentleman by the name of Andre Combo.

5  He was in our group.  He was at BET.  I know Troy

6  Saunders received some.  He didn't receive this

7  kind.  He received other stock.

8    Q.  When this meeting occurred -- I'm sorry.

9  Was there anyone else that you can recall?

10    A.  There was quite a few people.  I just

11  don't remember every one.

12    Q.  Do you remember anything else about the

13  meeting that was conducted, what was communicated to

14  you regarding the stock certificate?

15    A.  No, other than what I shared earlier.  It

16  was a simple meeting, just for people who had stock

17  and what it meant and so forth and so on and when

18  the company split they sent out a letter to those

19  individuals who had stock and said this is what your

20  stock will be classified as and it came from Viacom

21  and there was a conference call if you wanted to log

103

1    on and listen to the split and what it meant for you

2    and what your stock would mean and what price your

3    stock would be at once they split.

4        Q.  When did that letter go out?

5        A.  Around the time it split, so probably

6    about two years ago.  I believe that's when it split

7    from CBS and all the rest.

8        Q.  Do you have a copy of that letter?

9        A.  I don't think so.

10        Q.  Other than Mr. Marchant who you believe

11    was involved in your recommendation or your

12    selection for this stock certificate, do you know of

13    anyone else who may have been involved or who was

14    involved in your selection to receive this?

15        A.  Maybe my immediate supervisor, Troy

16    Saunders.

17        Q.  Do you know for sure or you are

18    speculating?

19        A.  I'm pretty sure he had some hand in my

20    being awarded the certificate.

21        Q.  Anyone else?

104

1     A.  No.

2     Q.  Any other reasons why you believe that

3   Viacom is your employer other than what you've

4   testified about already?

5     A.  I think that's it.

6     Q.  Looking at paragraph eight of the

7   complaint, Ms. Woodland, do you have that?

8     A.  Yes.

9     Q.  Paragraph eight reads:  In December 2001

10   defendant Viacom hired plaintiff as a property

11   manager for BET.

12      Tell me all the reasons why you believe that

13   Viacom hired you as property manager for BET.

14     A.  Because we were owned and operating under

15   Viacom's procedures.  We were owned by them and we

16   were being paid by them.

17     Q.  When you say paid by Viacom, you are

18   referring to the pay stubs we just went over?

19     A.  Pay stubs and so forth and so on.  We were

20   under their rules.  We were acquired in 2000 and

21   ever since then we were being slowly rolled into

105

1    their processes, financial, sales.

2        Q.   Was anyone from Viacom, to your knowledge,

3    specifically involved in your hiring as property

4    manager?

5        A.   Not to my knowledge, but I wouldn't say

6    that they weren't necessarily involved.

7        Q.   When you say rules, you had mentioned that

8    you were under Viacom's rules and regulations.  Are

9    you referring to the business conduct statement?

10       A.   The business conduct statement and also

11   the way that we were starting to do business.  It

12   was no longer a mom and pop shop.  It was more of a

13   corporate conglomerate.  We had to abide by their

14   rules.

15       Q.   What other rules did you have to abide by?

16       A.   Their standard operating procedures, their

17   payroll processes.  The affiliate sales department

18   started to be rolled into their affiliate sales

19   department.  We started collaborating with them

20   on -- it started to become -- real estate deals.  We

21   were given lower rates and given the family discount

106

1    when we started negotiating real estate deals, like

2    that.

3        Q.   You mentioned the standard operating

4    procedures.  Is that an actual document?

5        A.   It's not a document.  It's just how things

6    are going.  Every time they come down and do an

7    audit, something changes.

8          In Human Resources when their files weren't

9    together, whatever, they had to change the way they

10    operate.  In security, when our stuff wasn't the way

11    they wanted it, we had to change the way we did it

12    in order for us to be on the same page as them so,

13    you know, so we could pass audits.

14        Q.   Are there any other -- other than what you

15    testified to before, any other examples that you can

16    cite to where Viacom directed BET to change its

17    procedures?

18        A.   No.

19        Q.   You mentioned something about the

20    affiliate sales department being rolled into where?

21        A.   Into the Viacom sales department.

107

1    Q.  How do you know that?

2    A.  Because I was there when they let them all

3    go and sent out an e-mail saying they were being

4    rolled into Viacom, the Viacom sales team.

5    Q.  What do you mean you were there when they

6    were all let go?

7    A.  I was there the day they terminated all

8    their salespeople that worked for BET because the

9    function now -- Viacom salespeople were going to now

10    sell BET to the affiliates.

11    Q.  When did that occur?

12    A.  Probably about three years ago.

13    Q.  Were you involved at all in that

14    transition?

15    A.  No.

16    Q.  How do you know about it?

17    A.  There was an e-mail sent from Deborah Lee

18    saying what was transpiring.

19    Q.  Do you have a copy of that e-mail?

20    A.  I don't, but I can check my in-box.

21    MR. BELL:  If she has it, we'll

108

1    provide it with the other documents on Monday.

2    BY MR. FERRER:

3        Q.  You mentioned also something about a

4    family discount.

5        A.  Yes.

6        Q.  What's that?

7        A.  Just when we were looking for space in LA

8    we went to CBS and they gave us the family discount

9    rate on real estate.  We got it at a reasonable rate

10    because we were part of the family.

11        Q.  What family are you referring to?

12        A.  The Viacom family.

13        Q.  Now --

14        A.  At the time we were all owned by Viacom,

15    so everything was discussed in terms of the family.

16        Q.  You say when we were looking at real

17    estate.  Who is "we"?

18        A.  Myself and Troy Saunders, Byron Marchant

19    and Ed Gilmore.

20        Q.  This is real estate for what purpose?

21        A.  It was for our production facility in

109

1   California.

2       Q.  That was BET's production facility?

3       A.  Yes.

4       Q.  When was this?

5       A.  2002.

6       Q.  Do you recall what the discount was?

7       A.  No.  It was always just thrown around, you

8   are going to get the family discount and I didn't

9   know specifically what it was, but I knew we were

10   paying a reasonable rent to be where we were.

11      Q.  You were renting the property from --

12      A.  CBS.

13      Q.  Was this property to --

14      A.  It was for the production people who would

15   do some of the shows.

16      Q.  Did you ever see anything, any

17   documentation or a particular document or policy

18   regarding this family discount you are referring to?

19      A.  No, it was just spoken.

20      Q.  Spoken by whom?

21      A.  Byron Marchant, Troy Saunders, Ed Gilmore,

110

1    Joe Soucko.  He's with CBS.

2        Q.  Do you know what his position was?

3        A.  I want to say he's a senior vice-president

4    of the facility, Studio City.

5        Q.  That's in California?

6        A.  Yes.

7        Q.  Going back to -- you had mentioned

8    something about the affiliate sales department.  I'm

9    assuming you are referring to BET's then I guess

10    affiliate sales department?

11        A.  Yes.

12        Q.  Was being rolled into Viacom.

13        A.  Yes.

14        Q.  Do you know who made that decision?

15        A.  It was made I think at the Viacom level,

16    at the upper level Viacom with Deborah Lee.

17        Q.  Why do you think that?

18        A.  Why do I think what?

19        Q.  Think that it was made at the highest

20    level of Viacom?

21        A.  If I recall correctly, the e-mail spoke to

111

1   it.  At that level, Deborah Lee and at the time Tom

2   Freston's level, they thought if Viacom was selling

3   the BET brand that they would get more money for it

4   than just BET because they could package it with the

5   other Viacom units, so they could demand a higher

6   dollar whereas if it was just being sold as BET they

7   couldn't get the dollars of it being packaged under

8   the Viacom umbrella.

9        Q.  You mentioned Tom who?

10       A.  Tom Freston.

11       Q.  Freston?

12       A.  Freston.

13       Q.  Who was that?

14       A.  He was at the time who Deborah Lee

15   reported to.  I believe he was the CEO.

16       Q.  Of?

17       A.  Viacom.

18       Q.  Is there any other reason you believe that

19   Viacom hired you as a property manager for BET in

20   December 2001?

21       A.  No more than I've already shared.

112

1      Q.   Looking at paragraph nine, Ms. Woodland,

2    it says:  In 2003 plaintiff was promoted to the

3    position of senior logistics manager for BET by

4    defendant.

5          What is your basis for alleging that Viacom

6    promoted you to the position of senior logistics

7    manager for BET?

8      A.   Because we're a unit and everything that

9    we do pretty much goes through the Viacom portal.

10         Do I know that someone sat down and said

11   this is my paperwork and handle it specially, no,

12   but I do know they are aware of the fact that I was

13   promoted based upon my salary change, my title

14   changed.

15         I've done business with them one on one as

16   the property manager and then as a senior manager of

17   logistics.  They were aware.  To what extent I'm not

18   sure, but they were aware.

19         Q.   So you were aware that Viacom knew that

20   you were promoted?

21         A.   Repeat that.

113

1     Q.  You were aware that Viacom knew that you

2   were promoted?

3     A.  I believe that they were aware.

4     Q.  How do you know that they were aware?  Why

5   do you believe that they were aware?

6     A.  Just based upon my payroll, the stock, the

7   stock certificate I was given, the employment action

8   form that's done, the employment form that's done to

9   generate more money.  They've got to put in a form

10    to tell Viacom why they are paying you more money.

11    Q.  Who puts in a form?

12    A.  Human Resources, the BET unit.  They have

13   to justify changing your salary.

14    Q.  Have you seen this form?

15    A.  Yes.

16    Q.  What goes into the form?

17    A.  Just your name, title, the current title,

18   the title changed to, the amount of the adjustment.

19   That's it.  Signatures authorizing it so Human

20   Resources would have to sign off on it.

21    Q.  Who in Human Resources, do you know?

114

1      A.   Quint Bowman, the senior vice-president,

2    Byron Marchant, who is the general counsel but who

3    also operates the corporate admin operations

4    division.  He's over that division so he would have

5    to sign off on it.

6          And the manager at the time, who was Troy

7    Saunders, he would have had to have prepared it and

8    gotten signatures from both Byron and Quint before

9    it would have been input into the system and become

10     activated.

11     Q.   Would you sign it?

12     A.   No.

13     Q.   Did you actually see this form?

14     A.   Yes.

15     Q.   Was a form like this filled out when you

16    switched from property manager to senior manager in

17    2003?

18     A.   No, it wasn't, because they did it around

19    evaluation time.  So my evaluation would have been

20    justification for them making the change that they

21    made.

115

1      Q.   Do you know when this employee action form

2   that you just described, do you know when such form

3   has to be filled out?

4      A.   I don't know the timeframe.  I do know

5   that it was filled out before June because that's

6   when they make adjustments, whatever, in the June

7   timeframe, June-July timeframe, but it may have been

8   before that.

9      Q.   I just want to be clear.  Do you know

10   whether a form was filled out for any of your

11   transitions?

12      A.   It had to be filled out when I first came

13   back to BET because they had to do an employee

14   requisition form that says we're going to hire this

15   person as X, Y and Z.  For the property manager, no,

16   because they did it around the time of an evaluation

17   so there was no form filled out.

18         My evaluation was used as justification for

19   change in the salary and then with the promotion, it

20   was an adjustment because it was 20 some thousand

21   dollars.  They had to get justification for doing

116

1   that.  So that was the form, changed title, new

2   title, and it was signed off by Byron, Quint and

3   Troy.

4       Q.  Anybody else that you are aware?

5       A.  I don't know at this time.  I think that

6   those three for the BET unit were who approved.  I

7   don't know who on the other side would have had to

8   approve it.

9       Q.  What other side is that?

10      A.  The Viacom side.

11      Q.  Do you know whether anyone from Viacom had

12  to approve?

13      A.  I'm not sure.  I know we are required to

14  give justifications when they do make adjustments

15  like that.  I don't know who on the Viacom side

16  demands it or who they would forward the information

17  to because it all goes into the system.

18      Q.  How do you know that Viacom has to approve

19  it?

20      A.  Well, I remember Mr. Bowman saying to me

21  that he had to really go to bat for me because it

117

1     was a substantial amount of money.  He had to

2     justify why they were giving me the money.

3          Q.   When did this conversation take place?

4          A.   Around 2003, around the time that the

5     money was being disbursed.

6          Q.   Do you recall where this conversation took

7     place?

8          A.   In his office at 1235 W Street, fourth

9     floor.

10          Q.   Was there anyone else there?

11          A.   No, just he and I.

12          Q.   What was said?

13          A.   That he really had to go to bat for me

14     because it was a large amount.

15          Q.   Did he say to whom he had to go to bat for

16     you?

17          A.   Deborah.

18          Q.   Deborah Lee?

19          A.   Yes.

20          Q.   Deborah Lee is located where?

21          A.   1235 W Street.

118

1     Q.  In 2003 when you were promoted to the

2   position of senior manager -- just so I'm clear, is

3   that when you had the 20,000 jump?

4     A.  Yes.

5     Q.  When that occurred, is it accurate to say

6   that you have no knowledge whether anyone from

7   Viacom was involved in your promotion?

8     A.  I'm going to say they had to have had

9   knowledge because we had to provide justification

10   for the moneys being allotted.  Everything is done

11   from a money standard.  Everything is inputted into

12   a system that goes to Viacom.

13     Q.  Isn't that after the fact, after the

14   promotion has already gone through?

15     A.  I'm not sure at what point it goes back.

16   I know that it does go to Viacom and I know we are

17   required to submit documentation.  I think Deborah

18   from an internal standpoint does sign off on it, but

19   I do know that it does go to Viacom.

20     Q.  How do you know that?

21     A.  Because I know they insert it into the

119

1    computer and it goes back there.

2        Q.  Do you know at what point they insert it

3    into the computer?

4        A.  I do not know exactly at what point.  It's

5    probably input into the computer after Deborah has

6    signed off on it.

7        Q.  So it could be inserted into the computer

8    once a promotion has gone through already?

9        A.  Yes.

10        Q.  Any other reasons why you believe that the

11    defendant Viacom promoted you to the position of

12    senior logistics manager for BET in 2003?

13        A.  No.

14            MR. FERRER:  Can we go off the

15    record?

16            MR. BELL:  Sure.

17            (A discussion takes place which is

18     held off the record)

19    BY MR. FERRER:

20        Q.  Ms. Woodland, I'm going to ask you a

21    question about this bonus program.  I just want to

120

1    go back to that real quickly that you testified

2    about.

3          To your knowledge, is every BET employee

4    eligible for the bonus?

5        A.   Yes.

6        Q.   What is it based on in terms of --

7        A.   It's based on performance.

8        Q.   BET's performance or individual

9    performance?

10       A.   Both.  It's based upon BET's revenue

11   performance, but it also is based upon the

12   associate's performance because before the bonus

13   structure is given they do interim performance

14   appraisals and that determines the amount, either

15   over or less, what you will get on your bonus.

16       Q.   The individual aspect of it you said is

17   based on the individual's evaluation?

18       A.   Yes.

19       Q.   When does that occur?

20       A.   I believe performance appraisals are done

21   December-January period.  It's like exactly six

121

1    months after June.  So December, they are done in

2    December.

3        Q.  Of every year?

4        A.  Yes.

5        Q.  An employee gets evaluated you said

6    December every year.  Again, what role, if any, does

7    that play into the amount of bonus you receive?

8        A.  Based upon the interim evaluations, they

9    have a tier system.  Regular associates get five

10    percent, managers get seven percent, directors get

11    ten percent, I believe vice-presidents get

12    15 percent and so on and so forth, of your salary.

13        Q.  Five percent for associates?

14        A.  Seven percent for managers, ten percent

15    for directors and 15 percent for VP's.  And all that

16    is up to your executive vice-president's discretion.

17    They've been known to give you more or less than,

18    depending on your appraisal.

19        Q.  Who would that be in your case?

20        A.  Byron Marchant.

21        Q.  Did you ever receive any documentation

122

1    about this particular bonus program?

2        A.  I'm not sure.

3        Q.  How do you know the breakdown percentages

4    that you just testified about?

5        A.  I've been told.

6        Q.  Let's talk about a particular year.  Let's

7    say 2003.  Did you receive a bonus that year?

8        A.  I did.

9        Q.  When did you receive the bonus?

10       A.   In the February time period.  The 6th of

11   February I believe would be a Friday, that year was

12   Friday, because quite a few people waited until they

13   got their bonus checks and quit.

14       Q.  February 6, was that the bonus for the

15   prior year's performance?

16       A.  Yes.

17       Q.  What is BET's fiscal year, do you know?

18       A.  It ends in December.  It's from January

19   through December.

20       Q.  When did you receive your evaluation that

21   year?

123

1      A.  The interim evaluations they really

2   don't -- well, January I guess.

3      Q.  Is there another evaluation?

4      A.  Yes, in June.  That's an annual

5   performance.

6      Q.  Do both of the evaluations factor into the

7   bonus?

8      A.  Typically it's the interim, but I'm not

9   sure.  I don't make the decisions.

10      Q.  So you did receive a bonus?

11      A.  I did.

12      Q.  Do you recall how much?

13      A.  I want to say I think it was double.  I

14   think it was 14 percent, because that was the year

15   they also gave me the stock.

16      Q.  Excluding the stock?

17      A.  I'm not including the stock.  14 percent.

18   I can check that but I'm pretty sure that was the

19   year they gave me a double bonus.

20      Q.  When you say double, you think you were

21   eligible for seven percent?

124

1    A.  Yes.

2    Q.  That's of your salary, correct?

3    A.  Yes.

4    Q.  Do you know who decided to give you the

5    bonus?

6    A.  Byron Marchant ultimately makes the

7    decisions.

8    Q.  How do you know that?

9    A.  I've worked with the guy for a couple of

10   years.  He makes the decisions.

11   Q.  For whom?

12   A.  For the department.

13   Q.  What department?

14   A.  Corporate admin operations, corporate

15   administrative operations.

16   Q.  That department is located where?

17   A.  1235 W Street NE.

18   Q.  Did anyone else play a part in determining

19   that you were going to receive a bonus in 2003, to

20   your knowledge?

21   A.  My manager, Troy Saunders.

125

1      Q.   What role did he play, do you know?

2      A.   He had to write, I guess, the

3    documentation to submit it for approval.

4      Q.   Did you see the documentation?

5      A.   I did not.

6      Q.   Anyone else involved?

7      A.   I'm not sure.  Probably Human Resources,

8    most likely.

9      Q.   In the process you just described, to your

10    knowledge, is that how it works every year for the

11    bonus?

12      A.   I believe it does, yes.

13      Q.   You also mentioned again -- you testified

14    that the bonus is also contingent upon BET's

15    performance.

16      A.   Yes.

17      Q.   Are you talking of a separate bonus or the

18    bonus that you were just testifying about?

19      A.   The bonus that I was just testifying

20    about.  It's generated from the revenues that BET

21    has made the previous year and how we ended up.

126

1      Q.  How do you know this?

2      A.  Just conversations with Human Resources,

3  my manager, Troy Saunders.

4      Q.  If, for example, BET's performance,

5  financial performance that year is poor or below

6  expectations, does that mean that there won't be a

7  bonus?

8      A.  We haven't experienced that yet, but it

9  was low last year and Viacom approved for a special

10   amount.

11     Q.  You say last year.  You are referring to?

12     A.  2006.

13     Q.  I think there was some testimony -- you

14   provided some testimony earlier about this, but I

15   just want to be clear.  How do you know that Viacom

16   approved this bonus?  First of all, what was the

17   bonus?

18     A.  What was the bonus?

19     Q.  Yes, bonus amount.

20     A.  My bonus amount?

21     Q.  Does it vary?

127

1    A.  It varies.  Everyone gets their

2    percentage, whatever their percentage is, the

3    percentages that I spoke of, and because we didn't

4    do well last year, instead of getting 100 percent I

5    think we ended up getting 85 percent of the seven

6    percent of your salary.

7        Q.  Why do you believe Viacom played a role in

8    that?

9        A.  Because of the e-mail that I spoke about

10   from Deborah Lee telling us that it was because

11   Viacom approved the amount that she was able to give

12   us more than what we should have gotten based upon

13   our numbers.

14       Q.  In 2006, when did you receive that?

15       A.  2007.

16       Q.  In February?

17       A.  I want to say it was March this year

18   because we were waiting Viacom's approval and it

19   took longer than they thought it would.

20       Q.  This is annual bonus that you've been

21   testifying about?

128

1    A.  Yes.

2        MR. FERRER:  Mark this as exhibit

3    seven, please.

4        (Whereupon the proffered item was

5    marked as exhibit number 7.)

6    BY MR. FERRER:

7    Q.  I just handed you exhibit seven,

8    Ms. Woodland.  Can you identify that document?

9    A.  It is an e-mail from Quinton Bowman, the

10   senior vice-president of Human Resources, letting

11   all Viacom associates know that we will be able to

12   get a discount on Apple computers.  All Viacom

13   employees can take advantage of a new Apple

14   discount.

15   Q.  This was forwarded to you from Mr. Bowman?

16   A.  Yes, it was, to all Viacom employees.

17   Q.  To all Viacom?  It says to all BET.

18   A.  The first line says all Viacom employees

19   can take advantage of a new Apple discount.

20   Q.  I'm referring to the D2 line on the top of

21   the e-mail.

129

1      A.  He would only send out e-mails to those in

2   the BET unit, but he gets them from Viacom and he

3   spreads them to his unit just like Judy McGrath will

4   do for MTV.  They will do it for their individual

5   units.

6           MR. FERRER:  Mark this as eight,

7   please.

8           (Whereupon the proffered item was

9      marked as exhibit number 8.)

10  BY MR. FERRER:

11     Q.  Can you identify that for me?

12     A.  An internal Viacom memo from Quinton

13  Bowman, senior vice-president of BET Human

14  Resources, and it's to Viacom employees.

15     Q.  So you received this e-mail from

16  Mr. Bowman, correct?

17     A.  Correct.

18     Q.  The date at the bottom of the e-mail says

19  4/29/2007.

20     A.  Yes.

21     Q.  What is that date?

130

1      A.   That's the date that I printed it out.

2    The date that it was sent is Tuesday, June 1, 2004

3    at 10:21 a.m.

4      Q.   That was sent from Mr. Bowman to it says

5    all BET and all BET.com?

6      A.   Right.  And the subject says Viacom news,

7    Viacom memo, to Viacom employees.

8      Q.   Ms. Woodland, this is from Sumner

9    Redstone.  Who is he?

10      A.   A founder and chief executive officer.

11      Q.   Of?

12      A.   Of Viacom.  It's a memo saying BET will be

13    reporting to Tom Freston and Tom is the co-president

14    of Viacom.  Well, he was at the time of this e-mail.

15      Q.   Where is he located?

16      A.   Tom was -- he's no longer with Viacom, but

17    he was located in New York at the 1515 Broadway

18    building.

19      Q.   How about Mr. Redstone?

20      A.   Sumner Redstone is still there and he's

21    located at 1515 Broadway.

131

1    Q.   There's also a reference to a Leslie

2    Moonves.  Who is he?

3    A.   He is located in New York at 1515

4    Broadway.

5    Q.   Mr. Redstone, again, is the CEO of Viacom?

6    A.   Correct.

7    Q.   Tom Freston was with Viacom?

8    A.   He was with Viacom.  He was the

9    co-president and he was responsible for overseeing

10   Showtime, BET, Paramount Park, Simon and Shuster.

11   Q.   And Leslie Moonves?

12   A.   Leslie Moonves was responsible -- they

13   were co-presidents.  Leslie was responsible for CBS,

14   that side of the Viacom family.

15   Q.   Did you have any dealings with

16   Mr. Redstone?

17   A.   No.

18   Q.   How about Mr. Freston?

19   A.   Not really, no.

20   Q.   What do you mean "not really"?

21   A.   I've seen him in the Viacom building.

132

1    I've seen him when he would come to BET, but we

2    didn't have any dealings.

3        Q.   How about Mr. Moonves?

4        A.   No.

5             MR. FERRER:  This will be exhibit

6    nine.

7             (Whereupon the proffered item was

8        marked as exhibit number 9.)

9    BY MR. FERRER:

10       Q.   Can you identify this document,

11   Ms. Woodland?

12       A.   This is an e-mail from Quint Bowman,

13   senior vice-president of Human Resources.  It's a

14   direct deposit log-in document and it's to all

15   regular BET employees.  It's reminding us that we

16   have to log on to the Viacom website to have access

17   to our pay stubs.

18       Q.   What website are you referring to?

19       A.   HTTP://employeedocs.Viacom.com.

20       Q.   I notice again the date at the bottom of

21   the e-mail says 4/29/2007.  What's that date?

133

1      A.  The date I printed the document.  The

2   actual memo was dated July 8, 2004 and it was sent

3   at 7:57 p.m.

4      Q.  You received this e-mail from Mr. Bowman?

5      A.  I did.

6           MR. FERRER:  Mark this as ten,

7   please.

8           (Whereupon the proffered item was

9      marked as exhibit number 10.)

10  BY MR. FERRER:

11     Q.  I think you have in front of you exhibit

12  ten, is that correct, Ms. Woodland?

13     A.  Yes, I believe so.

14     Q.  Could you identify that document for me,

15  please?

16     A.  It is a Viacom business code conduct

17  recertification e-mail sent from Quint Bowman,

18  senior vice-president of Human Resources.

19     Q.  He sent it to you and who else?

20     A.  He sent it to all BET.

21     Q.  Looks like there's a memo or the body of

134

1   the e-mail, that it indicates it's to all regular

2   BET employees from Byron Marchant and Quinton

3   Bowman, is that right?

4       A.   That is correct, but it's regarding the

5   Viacom business conduct code of conduct

6   recertification and just briefly, it's all BET

7   employees attending training to ensure that they

8   understood the policies covered in the Viacom

9   business conduct statement.

10      Q.   That was the business conduct statement

11   we've been talking about which I believe is exhibit

12   three, is that right?

13      A.   It was the one for the 2004 year.

14      Q.   Turn to page two.  Look at the last

15   paragraph.  It indicates that all completed and

16   signed employee certification forms must be returned

17   to Shelly Johnson in the Human Resources department

18   no later than close of business, Monday, July 12,

19   2004.

20       Ms. Johnson, is that the one we've been

21   talking about?

135

1     A.   Yes.

2     Q.   Do you know what position she held at this

3   time?

4     A.   Manager of Human Relations.

5     Q.   She was located at BET?

6     A.   She was located at 1235 W Street.  Shelly

7   was responsible for collecting them, making sure

8   they were filed on site and sending Viacom copies of

9   the files.

10     Q.   How do you know she sent them to Viacom?

11     A.   Her assistant told me.

12     Q.   Who is her assistant?

13     A.   Karnette Davis.

14     Q.   When did you speak to Ms. Davis about

15   this?

16     A.   I don't know the specific date.  I just

17   know that that's what they do.  We had a side bar

18   conversation and she shared that they should -- what

19   the procedure was, a copy should stay on site and a

20   copy should be sent to Viacom to ensure that

21   everyone was in compliance.

136

1      Q.  Do you recall when this conversation took

2   place?

3      A.  I don't recall.

4      Q.  Do you recall where?

5      A.  Probably in the cafeteria or something

6   like that.

7      Q.  You're not sure where?

8      A.  No, I'm not.

9      Q.  What was Ms. Davis' title?

10     A.  Human Resources coordinator.

11     Q.  Would you say she was Ms. Johnson's

12   assistant?

13     A.  She assisted Ms. Johnson and assisted the

14   senior manager of benefits and the senior manager of

15   Human Relations.

16     Q.  Who was the senior manager of benefits?

17     A.  Stephanie Boykin.

18     Q.  Who was the other one you referred to?

19     A.  Shelly Johnson.

20     Q.  I thought you referred to one other title.

21     A.  Senior manager of Human Relations.

137

1     Q.  What brought on this conversation?  Why

2  were you talking about the certifications?

3     A.  Because everyone hadn't completed it and I

4  was wondering what the urgency was and that's when

5  she said we've got to send -- she has to collect

6  them and then they send a copy to Viacom and a copy

7  goes into the file.

8     Q.  Did she say who at Viacom they are sent

9  to?

10     A.  She didn't.

11     Q.  When she said she collects them, that is

12  Ms. Johnson?

13     A.  Yes.

14          MR. FERRER:  Mark this as exhibit

15  eleven, please.

16          (Whereupon the proffered item was

17      marked as exhibit number 11.)

18  BY MR. FERRER:

19     Q.  Can you identify what has been marked as

20  exhibit eleven, Ms. Woodland?

21     A.  It is an e-mail from Quint Bowman, senior

138

1    vice-president of Human Resources.  It's a message

2    from Leslie Moonves to all CBS, Paramount and Viacom

3    employees, dated August 10, 2004.

4              (Pause)

5    BY MR. FERRER:

6        Q.   Again, do you see the date at the bottom

7    is 4/29/2007?  Is that when you printed this mail

8    out?

9        A.   It is.

10       Q.   Did you have any dealings with

11   Mr. Moonves?

12       A.   No.

13       Q.   Just briefly, what was the context of this

14   memo?

15       A.   Mr. Moonves sent out the e-mail to all

16   CBS, Paramount and Viacom employees.  He was

17   announcing the creation of CBS, Paramount

18   international television, the new television sales

19   and distribution entity, will merge the significant

20   resource of CBS, CBS Broadcast International and

21   Paramount International.  This is to make the Viacom

139

1  family stronger with the international presence.

2      Q.  I think you said -- I want to clarify.

3  You received this e-mail from Mr. Bowman, is that

4  correct?

5      A.  That is correct.

6      Q.  There's a gentleman pictured here, Armando

7  Nunez, Jr, attached is his bio.

8      A.  He was named the president.

9      Q.  Of?

10      A.  CBS Broadcast International and the

11  president of the new combined organization.

12      Q.  Looks like he was formerly the president

13  of CBS Broadcasting International, is that right?

14      A.  The new president of the combined

15  organization, of the international organization.

16      Q.  And formerly the president of CBS

17  Broadcasting International?

18      A.  Yes.

19      Q.  Have you ever had any dealings with

20  Mr. Nunez?

21      A.  Not him personally, no.

140

1          MR. FERRER:  Mark this as exhibit

2     twelve, please.

3               (Whereupon the proffered item was

4          marked as exhibit number 12.)

5     BY MR. FERRER:

6          Q.   Would you identify this document, please?

7          A.   It's an internal e-mail sent from Quint

8     Bowman, senior vice-president of Human Resources.

9     The subject is Viacom employee cellular discounts.

10     It's a message from Viacom Telecommunications.

11          Q.   Mr. Bowman sent this to you, is that

12     correct?

13          A.   He did.

14          Q.   He sent it to -- the "to" line is all BET,

15     is that right?

16          A.   Yes, he did.

17          Q.   So that the record is clear, the date at

18     the bottom of the e-mail, 4/29/2007 is when you

19     printed it out?

20          A.   Correct, but it was received on Friday,

21     August 13, 2004 at 10:52 a.m.

141

1      Q.  What's the context of this e-mail?

2      A.  Viacom Telecommunications would like to

3  remind you of the many savings, opportunities

4  available to employees, families and friends via our

5  corporate agreement with most cellular providers,

6  and it's merely telling the Viacom associates that

7  as an associate we're entitled to a discount with

8  Verizon Wireless, Sprint PCS and AT&T Wireless.

9          MR. FERRER:  Mark this as exhibit 13,

10  please.

11          (Whereupon the proffered item was

12      marked as exhibit number 13.)

13  BY MR. FERRER:

14      Q.  Can you identify that document for us?

15      A.  An internal e-mail from Quint Bowman, SVP

16  of Human Resources.  Viacom business conduct

17  statement and electronic systems policy.

18      Q.  You received this via e-mail by

19  Mr. Bowman?

20      A.  I did.

21      Q.  Turn to the second page, last line.  It

142

1    says please call Human Resources at

2    (202)608-2070 should you not receive your copy of

3    the policies.  What Human Resources is that?

4        A.  That's inside the BET unit.

5        Q.  That's the phone number, I presume, at the

6    time?

7        A.  It is.  It's typically, whenever we get

8    things, our Human Resources, the BET unit Human

9    Resources will process it and then in turn forward

10   it to Viacom.

11       Q.  Say that again.

12       A.  I said typically whenever we have

13   something that's Human Resources related the BET

14   unit on site will process it and then it's forwarded

15   to Viacom.  You are not sending a million things to

16   Viacom, so it's all collected on site and then

17   forwarded.

18       Q.  What is forwarded?

19       A.  Excuse me?

20       Q.  What is forwarded?

21       A.  Whatever.  We all had to sign copies of

143

1    this.

2        Q.   Copies of this e-mail?

3        A.   No.  This was the Viacom business conduct

4    statement.  It's telling us what's going on.  We

5    have to sign copies.

6        Q.   That's the same time that we've been

7    talking about?

8        A.   Correct.

9        Q.   Other than what you testified about

10   already, what's the basis of your knowledge that

11   once you sign, for example, the business conduct

12   statement, that it's forwarded to Viacom?

13       A.   No more than what I've previously stated.

14           MR. FERRER:  Mark this as exhibit 14.

15           (Whereupon the proffered item was

16       marked as exhibit number 14.)

17   BY MR. FERRER:

18       Q.   I've handed you, Ms. Woodland, exhibit 14.

19   Can you identify that document for us?

20       A.   It is an internal document from Quint

21   Bowman, BET Human Resources.  It's a message from

144

1    Sumner Redstone, Tom Freston -- the message line

2    reads message from Sumner, Tom and Leslie.  It's a

3    Viacom internal memo.  It's to Viacom corporate

4    employees.

5        Q.  Just so the record is clear, the date

6    4/29/2007 is when you printed this e-mail?

7        A.  It is, but the e-mail was sent Tuesday,

8    November 16, 2004 at 11:51 a.m.

9        Q.  Looking at the first paragraph, it

10    mentions some individuals, Carl Folta, head of

11    corporate relations.  Do you know who that is?

12        A.  I do not.

13        Q.  Carol Melton, do you know who that is?

14        A.  I do not.  I don't know her personally,

15    no.

16        Q.  Do you know who she works for?

17        A.  No, I don't.

18        Q.  How about Mr. Folta?

19        A.  No.

20        Q.  Bill Roskin?

21        A.  Yes, I've heard his name on multiple

145

1    occasions.

2        Q.  Who does he work for?

3        A.  He is no longer with the company, but when

4    he was with the company he was working for Tom

5    Freston.

6        Q.  Viacom?

7        A.  Yes.

8        Q.  At?

9        A.  1515.

10        Q.  Broadway?

11        A.  Yes.

12        Q.  How about Marty Shea?

13        A.  Marty Shea is with -- I don't know if he's

14    still there but he's with Viacom.

15        Q.  Did you have any dealings with Mr. Roskin?

16        A.  I didn't have any dealings with Mr. Roskin

17    but I know a lot of the -- a lot of things that were

18    coming down, it was told to me that it was from Bill

19    Roskin because he was the general counsel.  He was

20    over Human Resources.  So a lot of things came from

21    Bill Roskin.

146

1     Q.   Like what things, do you know?

2     A.   Human Resources.  He oversaw Human

3   Resources.  He was instrumental in trying to make

4   sure our Human Resources kind of -- that we in turn

5   were responsible to the Viacom Human Resources.

6        He was also the person -- his name is on the

7   stock certificate.  He issued them as senior

8   vice-president of Human Resources and

9   administration, number six.

10    Q.   While you have that, the first page of

11   that exhibit -- what exhibit number is that again?

12    A.   Six.

13    Q.   Is from Mr. Roskin, correct?

14    A.   Correct.

15    Q.   Doesn't have your name on it?

16    A.   It was a generic e-mail.  It was provided

17   to employees who was given stock.

18    Q.   Your name is not on that?

19    A.   It's not on this one.  My name is on the

20   stock certificate.

21    Q.   That's the second page?

147

1     A.   Right.  Just for the record, it was

2   provided to you as -- the second paragraph just

3   basically says it was provided to me as I continue

4   as an employee of Viacom and the next one, granted

5   to me, the employee of Viacom.

6     Q.   Going back to Mr. Roskin, you said

7   something about you were told that everything came

8   from Mr. Roskin with respect to I guess HR

9   procedures.

10     A.   Yes.

11     Q.   Do you know what specifically came from

12   Mr. Roskin with respect to HR?

13     A.   Right now I can't off the top of my head.

14   His name has been thrown around so many times and it

15   was always pertaining to rules and regulations.

16   What rules and regulations, I don't recall.

17     Q.   You never worked for the HR department for

18   BET, right?

19     A.   No.

20     Q.   Marty Shea, did you ever have any dealings

21   with Mr. Shea?

148

1       A.  I have not.

2       Q.  You didn't have any dealings with

3   Mr. Folta?

4       A.  No.

5       Q.  And Ms. Melton?

6       A.  No.

7           MR. FERRER:  Mark this as exhibit 15,

8   please.

9           (Whereupon the proffered item was

10          marked as exhibit number 15.)

11  BY MR. FERRER:

12      Q.  I've handed you exhibit 15, Ms. Woodland.

13  Can you identify this document?

14      A.  It's an internal e-mail sent from

15  Mr. Quint Bowman, senior vice-president of Human

16  Resources.  It's a Viacom memo to all Viacom

17  employees dated 4/29/2007, but it was actually sent

18  Thursday, April 14, 2005 at 12:40 p.m.

19      Q.  April 29, 2007, that is when you --

20      A.  Printed it.

21      Q.  You received this e-mail from Mr. Bowman?

149

1     A.  I received it from Mr. Bowman who in turn

2  received it from Viacom.

3     Q.  The name highlighted in the second

4  paragraph, Mr. Henry Moniz, are you familiar with

5  him?

6     A.  I am not.

7     Q.  If you look at the last paragraph

8  highlighted is Cheryl Brunetti.  Are you familiar

9  with Ms. Brunetti?

10     A.  I am not.

11         MR. FERRER:  Please mark this as

12  exhibit 16.

13         (Whereupon the proffered item was

14     marked as exhibit number 16.)

15  BY MR. FERRER:

16     Q.  Can you identify that document?

17     A.  An internal memo sent from Quint Bowman,

18  senior vice-president of Human Resources.  The

19  message is message from Tom and Leslie.  It's a

20  Viacom memo to all Viacom employees.  It regards

21  project future update.

150

1    Q.  You printed it on 4/29/2007?

2    A.  I did.

3    Q.  You did receive this e-mail from I am

4    Bowman, correct?

5    A.  Correct.

6          MR. FERRER:  Mark this as exhibit 17.

7          (Whereupon the proffered item was

8    marked as exhibit number 17.)

9    BY MR. FERRER:

10   Q.  Can you identify this document,

11   Ms. Woodland?

12   A.  It's an internal document from senior

13   vice-president of Human Resources, Quint Bowman.

14   The subject line is message from Sumner Redstone.

15   It's a Viacom memo to all Viacom employees.

16   Q.  You received this e-mail from Mr. Bowman?

17   A.  I received it from Mr. Bowman on Tuesday,

18   June 14, 2005 at 5:45 p.m.

19   Q.  The 4/29/2007 date is when you printed it?

20   A.  Correct.

21         MR. FERRER:  Mark this one as 18,

151

1    please.

2           (Whereupon the proffered item was

3      marked as exhibit number 18.)

4    BY MR. FERRER:

5      Q.  Can you identify that document which has

6    been marked as exhibit 18, Ms. Woodland?

7      A.  It's an internal e-mail from Quint Bowman,

8    senior vice-president of Human Resources, subject

9    line is message from Tom and Leslie.  It is to all

10   Viacom employees.  It's a Viacom internal memo.

11     Q.  You printed it on 4/29/2007 which is the

12    date at the left hand corner?

13     A.  I did.

14     Q.  Let me direct your attention to this first

15    sentence below the subject line.

16     A.  Yes.

17     Q.  It says "below is a message from."

18     A.  Yes.

19     Q.  Is that from Mr. Bowman, that sentence?

20     A.  Yes, it is.

21            MR. FERRER:  Please mark this as

152

1   exhibit 19.

2           (Whereupon the proffered item was

3       marked as exhibit number 19.)

4   BY MR. FERRER:

5       Q.  Ms. Woodland, can you identify what has

6   been marked as exhibit 19?

7       A.  It's an internal memo from Quinton Bowman,

8   senior vice-president of Human Resources.  Its

9   subject is from Sumner, Tom and Leslie.  It's a

10   Viacom internal memo to all Viacom employees

11   worldwide.

12      Q.  The date at the bottom left hand corner is

13   when you printed it out?

14      A.  It's when I printed it out, but it was

15   received Friday, September 2, 2005 at 11:18 a.m.

16      Q.  You received this e-mail from Mr. Bowman?

17      A.  I received it from Mr. Bowman.

18          MR. FERRER:  Mark this as exhibit 20,

19   please.

20          (Whereupon the proffered item was

21      marked as exhibit number 20.)

153

1   BY MR. FERRER:

2       Q.   Can you identify what has been handed to

3   you as exhibits 20?

4       A.   It is an internal document from Human

5   Resources, Quint Bowman.  The subject line is Viacom

6   match of BET employee contributions to Hurricane

7   Katrina relief.  It is to all Viacom employees

8   worldwide.

9       Q.   You are referring -- when you said that

10  it's to all Viacom employees worldwide, you are

11  reading from the "to" line right below Viacom memo?

12      A.   Yes, under the Viacom memo.

13      Q.   The top portion above Viacom memo looks

14  like it's from Quint Bowman to all BET employees and

15  freelancers?

16      A.   Correct.  There he mentions some of you

17  have asked about the process that will be used by

18  Viacom to match BET employee contributions.  It's a

19  memo that speaks to Hurricane Katrina and Viacom

20  would match all employees' contributions to give

21  money to the rebuild of --

154

1      Q.  The date in the left hand corner is when

2    you printed this out?

3      A.  Correct.

4          MR. FERRER:  Mark this as exhibit 21.

5          (Whereupon the proffered item was

6      marked as exhibit number 21.)

7    BY MR. FERRER:

8      Q.  Can you identify what has been marked as

9    exhibit 21, Ms. Woodland?

10     A.   It is a message from Quint Bowman, senior

11    vice-president of Human Resources.  The subject is

12    message from Tom Freston.  It's a Viacom internal

13    memo to all employees from Tom Freston.

14     Q.  The date that you printed this out was

15    4/29/2007?

16     A.  Correct, but the date I received it was

17    September 9, 2005 at 1:18 p.m.

18     Q.  That was from Mr. Bowman?

19     A.  Correct.

20     Q.  If you look at the first paragraph, it

21    mentions a D.D. Lea?

155

1    A.  Yes.

2    Q.  Do you know who that is?

3    A.  I do not.

4    Q.  You've had no dealings with her?

5    A.  I have not.

6         MR. FERRER:  Mark this as exhibit 22,

7    please.

8         (Whereupon the proffered item was

9    marked as exhibit number 22.)

10   BY MR. FERRER:

11   Q.  Can you identify what has been marked as

12   exhibit 22?

13   A.  It is an e-mail sent from Quint Bowman,

14   senior vice-president of Human Resources.  The

15   message is from Sumner Redstone.  It's a Viacom

16   internal memo and it's to all employees.

17   Q.  You printed this on 4/29/2007?

18   A.  I did, and it was received on Wednesday,

19   October 5, 2005 at 12:58 p.m.

20   Q.  You received this from Mr. Bowman?

21   A.  I did.

156

1      Q.   In the first paragraph, there's two names

2   mentioned, a Susan C. Gordon.  Do you know who that

3   is?

4      A.  I do not.

5      Q.  You've had no dealings with Mr. Gordon?

6      A.  I have not.

7      Q.  How about Jacques?

8      A.  No.

9      Q.  No what?

10      A.   I haven't had any dealings with him.

11      Q.   The last name of the person I'm referring

12   to is Jacques Tortoroli.  You don't know who that

13   is?

14      A.   No.

15           MR. FERRER:  This is exhibit 23,

16   please.

17           (Whereupon the proffered item was

18      marked as exhibit number 23.)

19   BY MR. FERRER:

20      Q.   Can you identify this one marked as

21   exhibit 23, Ms. Woodland?

157

1      A.  It is an internal memo from Quinton Bowman

2   that was sent to him from Tom Freston for

3   distribution.  It's a Viacom internal memo and it's

4   to all Viacom employees.

5      Q.  This e-mail was sent from Mr. Bowman to

6   you, correct?

7      A.  Yes.  But if you look at the top corner,

8   it was sent from Tom Freston to Mr. Bowman for

9   distribution.

10      Q.  Mr. Bowman sent it to you and then I guess

11   to all BET?

12      A.  Correct.

13      Q.  The 4/29/2007 date at the bottom --

14      A.  Was the date I printed it off.  The day I

15   received it was Wednesday, October 26, 2005 at

16   5:16 p.m.

17         MR. FERRER:  Please mark this as

18   exhibit 24.

19         (Whereupon the proffered item was

20      marked as exhibit number 24.)

21   BY MR. FERRER:

158

1    Q.  Can you identify this document?

2    A.  It is an internal document from Quinton

3    Bowman.  The message line is from Viacom corporate

4    relations.  It's to all BET.

5    Q.  The date at the bottom, 4/29/2007, is when

6    you printed it?

7    A.  Correct.  But it was sent Wednesday,

8    November 30, 2005 at 6:19 p.m.

9         MR. FERRER:  Mark this as exhibit 25,

10    please.

11         (Whereupon the proffered item was

12         marked as exhibit number 25.)

13    BY MR. FERRER:

14    Q.  Can you identify this?

15    A.  An internal memo sent from Quinton Bowman,

16    senior vice-president of Human Resources.  The

17    subject line reads "message from Sumner Redstone."

18    It's to all BET.

19    Q.  It also says all -- some of these other

20    e-mails we've been looking at, it says all BET.com.

21    What is all BET versus BET.com?

159

1      A.  BET.com is the website for BET, but it was

2   just recently merged back into BET.  It used to be a

3   stand-alone company, but it's under BET now.

4      Q.  There were separate employees under --

5      A.  They were, but now they're all under the

6   BET unit/Viacom.

7      Q.  They were separate employees under all

8   BET.com?

9      A.  Yes.

10      Q.   In the first line it says -- there are two

11   people mentioned, Felipe Dauman.  Do you see that?

12      A.  Yes.

13      Q.  Who is that?

14      A.  He's a new gentleman who has taken over

15   for Tom Freston.

16      Q.  And what's his title, do you know?

17      A.  President and chief executive officer.

18      Q.  For who?

19      A.  Viacom.

20      Q.  And Tom Dooley, do you know who that is?

21      A.  I do not but he's also a new member.

160

1     Q.  He's a new member of Viacom?

2     A.  Yes.

3     Q.  Have you had any dealings with Mr. Dauman?

4     A.  No.

5     Q.  How about Mr. Dooley?

6     A.  No.

7     Q.  Felipe Dauman, is that the individual

8  Felipe you were referring to earlier?

9     A.  Yes.

10    Q.  Just to clarify, 4/29/2007, the date at

11  the bottom of the e-mail, is when you printed this?

12    A.  Correct, but it was sent Tuesday,

13  September 5, 2006 at 8:17 p.m.

14    Q.  From Mr. Bowman?

15    A.  Correct.

16        MR. FERRER:  Please mark this as

17  exhibit 26.

18        (Whereupon the proffered item was

19      marked as exhibit number 26.)

20  BY MR. FERRER:

21    Q.  Can you identify that document, please?

161

1      A.   It's an internal document from Quint Tom

2   Bowman, senior vice-president of Human Resources.

3   It's a message from Felipe Dauman and it's to all

4   BET, all BET.com.

5      Q.   You printed this on 4/29/2007?

6      A.   Correct, but I received it on Tuesday,

7   September 5, 2006.

8      Q.   From Mr. Dauman?

9      A.   From Mr. Dauman.

10           MR. FERRER:  Please mark this as

11   exhibit 27.

12           (Whereupon the proffered item was

13      marked as exhibit number 27.)

14   BY MR. FERRER:

15      Q.   Can you identify this document, please?

16      A.   It is an internal document sent from Quint

17   Bowman, senior vice-president of Human Resources,

18   sent to a few people including myself.  The subject

19   is Viacom business conduct training and

20   certification.

21      Q.   This is the business conduct statement

162

1    that you've been testifying about today?

2         A.   Correct.

3         Q.   Let me go through some of these names,

4    make sure we have all these straight.  Dana Brooks?

5         A.   That's Woodruff.  She was recently

6    married.  Yes, Human Resources.

7         Q.   Bernadette Williams?

8         A.   She is no longer with the company.

9         Q.   What was her position?

10        A.   Director of travel.

11        Q.   She was at BET?

12        A.   Yes.

13        Q.   John Blaine?

14        A.   John Blaine, he is the chief engineer.

15        Q.   Where is he located?

16        A.   1235 W Street NE.

17        Q.   He's employed by BET?

18        A.   He's employed by BET.  He's employed by

19   the BET unit, Viacom.

20        Q.   Edith Thomas?

21        A.   The travel manager.

163

1    Q.  Where is Ms. Thomas located?

2    A.  1235 W Street NE.

3    Q.  She is employed by BET?

4    A.  By Viacom, the BET unit.

5    Q.  Carmen Arias, what's her position?

6    A.  She is Quint Bowman's assistant.

7    Q.  Where is she located?

8    A.  1235 W Street NE.

9    Q.  She is at BET?

10    A.  She is on the campus, yes.

11    Q.  Viacom doesn't have an office at

12  1235 W Street, do they?

13    A.  No.

14    Q.  You had mentioned -- you said that

15  Ms. Thomas, Mr. Blaine -- let me ask you, Ms. Arias,

16  is she employed by BET?

17    A.  She is under the umbrella, yes.

18    Q.  What does that mean?

19    A.  That means that she is employed at BET,

20  but we all work for Viacom.

21    Q.  Other than the reasons that you testified

164

1  already, what is your basis for believing that

2  Mr. Blaine, Ms. Thomas, Ms. Arias are employed by

3  Viacom?

4     A.  Because in the business conduct statement,

5  page two, it states that accordingly, we have

6  promulgated the Viacom business conduct statement

7  which applies to all employees and directors, and

8  everyone in this e-mail has signed this.

9     Q.  Where are you?

10     A.  I'm on exhibit two, page number two, the

11  second bullet point which applies to all employees

12  and directors and all of us were made to sign this.

13  I'm referring to the business, the Viacom business

14  conduct statement.

15     Q.  That's why you believe these individuals

16  you just mentioned are employees of Viacom?

17     A.  They signed it just like I did.

18     Q.  Is there anything else?

19     A.  No.

20     Q.  We're still looking at exhibit 27.

21     A.  Okay.

165

1    Q.   You received that e-mail from Mr. Bowman,

2    correct?

3    A.   Yes.

4    Q.   On February 8, 2007.  It looks like he's

5    attached or at least the bottom of the e-mail is a

6    memo from Deborah Lee, correct?

7    A.   Correct.  The subject is the Viacom

8    business conduct statement training and

9    certification.

10    Q.   Looking at the second page, the second to

11    last paragraph in the body of the memo from Ms. Lee

12    where it says the BCS compliance officer.  Do you

13    see that?

14    A.   Yes.

15    Q.   We talked about him.  We talked about

16    Mr. Bowman.  Ms. Cooper, Donna Cooper, who is that?

17    A.   She is an attorney for BET, Viacom.

18    Q.   Where is she located?

19    A.   She is located at 1235 W Street.

20    Q.   Why do you say that Ms. Cooper -- you said

21    she is an attorney for BET, correct?

166

1      A.   She works for BET under the Viacom

2   umbrella, yes.  She signed the same document.  The

3   business conduct statement, she signed it, so she is

4   an employee of theirs as well.

5      Q.   Based on the reasons that you stated

6   already?

7      A.   Yes.

8      Q.   Any other reasons?

9      A.   In signing this document, we all are

10   pretty much saying that we're their employee.

11      Q.   Viacom's employee?

12      A.   Yes.

13           MR. FERRER:  We can go off the

14   record.

15           (A discussion takes place which is

16   held off the record)

17           (Luncheon recess)

18           (Recess from 2:24 p.m. - 3:05 p.m.)

19           (Afternoon Session)

20           MR. FERRER:  Mark this as exhibit 28.

21           (Whereupon the proffered item was

167

1       marked as exhibit number 28.)

2   BY MR. FERRER:

3       Q.   Ms. Woodland, can you identify exhibit 28

4   for me, please?

5       A.   It is my identification card.

6       Q.   Where was this created?

7       A.   At 1515 Broadway.

8       Q.   Is that where you took the picture?

9       A.   Yes.

10      Q.   What do you use the ID for?

11      A.   Access to the Viacom building.

12      Q.   When was this created?

13      A.   2002, 2003.

14      Q.   So you went to New York to get this

15  created?

16      A.   Yes.  I was in New York working and I

17  needed access to get in the building so all

18  employees have ID's.

19      Q.   What did you use prior to 2002?

20      A.   I wasn't going there.  As soon as I

21  started doing business in the New York area, in the

168

1    building, they gave me an ID.

2        Q.   This ID is specifically for the building

3    in New York?

4        A.   Yes.

5        Q.   So this doesn't work at 1235 W Street at

6    the BET facility?

7        A.   There's another one for that one.  I could

8    use this one but this one, it's a swipe system at

9    Viacom that will allow you access.  That system is

10    not in place at 1235.

11       Q.   Is this one still effective?

12       A.   Yes.

13       Q.   Do you have a copy of the other ID card?

14       A.   Not on me but I can get you a copy if you

15    would like.

16       Q.   Does it look the same or how is it

17    different, if it is?

18       A.   It looks the same except it's vertical

19    instead of horizontal.

20       Q.   Different picture I'm assuming?

21       A.   Yes.

169

1     Q.  Does the other one that you are referring

2  to, does that work anywhere else other than BET?

3     A.  I can get into the Viacom building.  I can

4  get into any location with the BET ID that we have a

5  building, where we have offices.

6     Q.  Now --

7     A.  It's just that particular one scans to the

8  building.  The one I have for D.C., it scans for

9  that building.

10     Q.  The other ID, where was that created?

11     A.  1235 W Street.

12     Q.  Do you recall what you were working on

13  when this ID was created?

14     A.  We were moving the ad sales department

15  into the Viacom building.

16          MR. FERRER:  Would you mark this as

17  29, please?

18          (Whereupon the proffered item was

19          marked as exhibit number 29.)

20  BY MR. FERRER:

21     Q.  Could you identify this document?

170

1      A.  It is a copy of my business cards from

2    property manager to senior manager, corporate

3    planning, then senior manager, the most recent card.

4      Q.  Just so the record is clear, there's a

5    number seven looks like on the document.  Did you

6    write that?

7      A.  I did.

8      Q.  Why did you write that number down?

9      A.  Because I believe it was the number in

10   which I was providing information for in the

11   questioning, the request.

12     Q.  These are your various business cards of

13   the positions stated on the business card?

14     A.  Yes.

15          MR. FERRER:  Mark this as exhibit 30.

16          (Whereupon the proffered item was

17      marked as exhibit number 30.)

18   BY MR. FERRER:

19     Q.  Can you identify exhibit 30 for me?

20     A.  It's an interim performance appraisal that

21   was done in July 2002 through December 2002.

171

1    Q.   What did you say this was?

2    A.   An interim performance appraisal.

3    Q.   Who performed this appraisal?

4    A.   Troy Saunders.

5    Q.   Did anyone else perform it?

6    A.   No.  It was customarily that the manager

7    could give the performance appraisals and he did.

8    Q.   What was Mr. Saunders' title at the time?

9    A.   He was director of corporate

10   administrative operations.

11   Q.   Looks like there is a space on the second

12   page for associate's signature but it's not signed.

13   A.   This is just my copy.  I signed their

14   copy.

15   Q.   This is your copy of your evaluation for

16   this time period?

17   A.   Correct.

18   Q.   Is that correct?

19   A.   Yes, it is.

20   Q.   To your knowledge, other than

21   Mr. Saunders, no one else had any input in this

172

1   evaluation?

2      A.   Correct.

3            MR. FERRER:  Mark this as 31, please.

4            (Whereupon the proffered item was

5      marked as exhibit number 31.)

6   BY MR. FERRER:

7      Q.   Can you identify this document,

8   Ms. Woodland?

9      A.   It is a performance appraisal from the

10   period July 1, 2002 through June 30, 2003.

11      Q.   Unlike the one we just talked about,

12   exhibit 30, this one is for the entire year?

13      A.   Correct.

14      Q.   Who performed this appraisal of you?

15      A.   Troy Saunders.

16      Q.   Did anyone else have any input into your

17   appraisal?

18      A.   Not to my knowledge, no.

19            MR. FERRER:  Exhibit 32, please.

20            (Whereupon the proffered item was

21      marked as exhibit number 32.)

173

1    BY MR. FERRER:

2        Q.  Can you identify what's been marked as

3    exhibit 32, Ms. Woodland?

4        A.  It's a performance appraisal for the

5    period July 1, 2003 through June 30, 2004.

6        Q.  Who performed this appraisal?

7        A.  Troy Saunders.

8        Q.  To your knowledge, did anyone else have

9    any input in this appraisal?

10       A.  Not to my knowledge, no.

11       Q.  If you turn to page five, is that your

12   signature?

13       A.  That is my signature.

14       Q.  As well as Mr. Saunders'?

15       A.  Yes.

16       Q.  Return to exhibit 30, please, and turn to

17   the last page.  Is that your signature?

18       A.  Yes.

19            MR. FERRER:  Exhibit 33, please.

20            (Whereupon the proffered item was

21        marked as exhibit number 33.)

174

1    BY MR. FERRER:

2        Q.   Ms. Woodland, can you please identify that

3    document?

4        A.   A performance plan management worksheet

5    dated from July 1, 2004 through June 30, 2005.

6        Q.   Attached to it is your performance

7    appraisal?

8        A.   Yes.

9        Q.   Looks like it's from July 1, 2004 to

10   June 30, 2005, is that right?

11       A.   Yes.

12       Q.   Who performed this performance appraisal?

13       A.   Samuel Williams.

14       Q.   Other than Mr. Williams, did anyone, to

15   your knowledge, have any input in this performance

16   appraisal?

17       A.   Yes, Carol Holland.

18       Q.   Ms. Holland's name -- she didn't sign

19   this, is that correct?

20       A.   Correct.  Because at the time I was

21   reporting directly to Samuel Williams and he was

175

1   reporting to her.

2       Q.  How do you know Ms. Holland had input into

3   this appraisal?

4       A.  Because she told me.

5       Q.  When did she tell you?

6       A.  Around the review period time, April,

7   Mayish timeframe of 2005.

8       Q.  Other than Mr. Williams and Ms. Holland,

9   did anyone else have any input into this performance

10   appraisal of you?

11      A.  Not to my knowledge.

12      Q.  The appraisals we've just gone through,

13   including 33, exhibit 32, 31, exhibit 30, were these

14   the evaluations that you were referring to before

15   which factor into your bonus, your annual bonus?

16      A.  Yes.

17      Q.  Do you still have the complaint in front

18   of you, Ms. Woodland?

19      A.  I do.

20      Q.  I direct your attention to paragraph 83 of

21   the complaint on page 12.

176

1      A.  Okay.

2      Q.  Paragraph four says that plaintiff

3   suffered an unlawful, discriminatory and adverse

4   employment -- I'm sorry.  I meant 83.  Looking at

5   paragraph 83:  Plaintiff suffered an unlawful,

6   discriminatory and adverse change in employment with

7   respect to her terms, conditions or privileges of

8   employment, including promotion based on her

9   membership in a protected class, namely her sex,

10    female.

11        That's what it says, correct?

12      A.  Correct.

13      Q.  What is the adverse change in employment

14   in paragraph 83 that you believe you suffered?

15      A.  My demotion from senior manager to

16   coordinator with no responsibilities.

17      Q.  You said to coordinator.  I don't think we

18   used that title.  Are you referring to --

19      A.  Logistics coordinator.

20      Q.  When did that occur?

21      A.  October of 2004, I believe, October of

177

1    2004.

2       Q.   Is there any other basis for your

3    allegation in this paragraph that you suffered an

4    adverse change in employment?

5       A.   I guess a demotion with no

6    responsibilities, all responsibilities being taken

7    away and given to a man, a gentleman.

8       Q.   Who was that?

9       A.   Sammy Williams.

10      Q.   Are we still talking the same timeframe,

11   October --

12      A.   This all happened the same day.

13      Q.   Do you recall the date?

14      A.   I do not recall the exact date.

15      Q.   Just so I'm clear, the responsibilities

16   you are referring to that were taken away and given

17   to Mr. Williams, this still relates to your being

18   changed from senior manager to logistics

19   coordinator?

20      A.   Yes.

21      Q.   Is there anything else?

178

1      A.  Not right now, I don't think so.

2      Q.  Let's talk about the change from senior

3   manager to logistics coordinator which you allege to

4   be a demotion, right?

5      A.  Yes.

6      Q.  Why did you believe that this change was a

7   demotion?

8      A.  Because it was.  Professionally I went

9   from being a senior manager to being a coordinator,

10   a logistics coordinator.  That's a demotion in any

11   professional environment.

12      Q.  What was your pay as a senior manager?

13      A.  67,000, something like that.

14      Q.  What was your pay when you were changed to

15   a logistics coordinator?

16      A.  The same.  My pay was not affected.

17      Q.  Were your benefits affected?

18      A.  No, they were not.

19      Q.  As logistics coordinator, you were no

20   longer considered a senior manager?

21      A.  No.

179

1      Q.  How do you know that?

2      A.  Because I was told I wasn't.  All my

3   responsibility was removed.  I was reduced to

4   answering the telephone.

5      Q.  Who told you this?

6      A.  My manager at the time, Carol Holland, who

7   was instructed by Mr. Gilmore that that would be the

8   new order of operations.

9      Q.  Just so we get this straight, Mr. Williams

10   at the time, his position again was what?

11      A.  Senior logistics manager.

12      Q.  And Ms. Holland?

13      A.  Director of corporate admin operations.

14      Q.  And Mr. Gilmore?

15      A.  Senior director of corporate admin

16   operations.

17      Q.  Who told you that by becoming the

18   logistics coordinator that you were no longer a

19   senior manager?

20      A.  Who told me?  Byron Marchant, Quint

21   Bowman, Ed Gilmore.

180

1     Q.  What did Mr. Marchant tell you

2     specifically?

3     A.  He brought me in a room with everyone who

4     used to report to me and my colleagues and peers and

5     passed out an org chart that showed I was a

6     coordinator as opposed to a member of the management

7     team.

8     Q.  When did this meeting take place?

9     A.  The end of October.

10     Q.  2004?

11     A.  Yes.

12     Q.  Who was present at the meeting?

13     A.  Byron Marchant, Quint Bowman, Ed Gilmore,

14     Carol Holland, Erwin Hicks, Carlos Medina, Andre

15     Combo, Anthony Walton, Miriam Vargas, Jose Reyes.  I

16     think that's it.  Oh, Adrian Daniels also.

17     Q.  Who is Mr. Hicks?

18     A.  He's an engineer on the staff.

19     Q.  And Mr. Combo?

20     A.  He was the manager of the tape library.

21     Q.  And Walton, what was the first name?

181

1      A.  Anthony Walton.  He was an engineer as

2   well.

3      Q.  And Vargas?

4      A.  Mailroom operator.

5      Q.  Mr. Reyes?

6      A.  Mailroom operator.  And Jason Lewis also.

7      Q.  That's someone else who was at the

8   meeting?

9      A.  Yes.

10     Q.  Who was that?

11     A.  He was a warehouse manager, warehouse

12  clerk of some sort.

13     Q.  Mr. Daniels?

14     A.  Ms. Daniels.  She was the office

15  assistant.

16     Q.  For whom?

17     A.  She supported Troy and when he left she

18  started supporting me.

19     Q.  Where did this meeting take place?

20     A.  1235 W Street, sixth floor, multi-purpose

21  room.

182

1      Q.   To the best of your recollection, tell me

2   what happened during this meeting and what was said

3   and by whom.

4      A.   The dynamics of the business have changed.

5      Q.   Who is speaking?

6      A.   Byron Marchant is speaking.  The dynamics

7   of the business have changed and he's making changes

8   based upon those needs.

9      Q.   What else did he say, if anything?

10      A.   That's it.  Passed out the new org charts.

11      Q.   Did he say what the changes were?

12      A.   No, he did not.  He just passed out the

13   charts.

14      Q.   Did anyone else speak?

15      A.   No.

16      Q.   How long did the meeting last?

17      A.   Five minutes.

18      Q.   Is there anything else you remember about

19   the meeting?

20      A.   No.  It was brief.

21          MR. FERRER:  Mark this as the next

183

1    exhibit.

2         (Whereupon the proffered item was

3    marked as exhibit number 34 A,B,C,D.)

4    BY MR. FERRER:

5         Q.  I've handed you what's been marked, a four

6    page document, the first page is 34A, the second

7    page 34B, the third page is 34C and the fourth page

8    is 34D.  Would you tell me what these documents are?

9         A.  A series of organizational charts.

10        Q.  Looking at the first one, 34A, it looks

11   like Byron Marchant's name is underlined.  That's

12   not your writing, is it?

13        A.  No.

14        Q.  Looking at with the number one written on

15   that document, is that your writing?

16        A.  Yes.

17        Q.  Does that mean anything?

18        A.  Just that it was the first of what will

19   become many organization charts.

20        Q.  Looking at 34B, looks like there are some

21   markings connecting the jobs.  Are those your

184

1   markings?

2       A.  I believe so.

3       Q.  Also there's written on here, it says old

4   2002.  Is that your handwriting?

5       A.  Yes.

6       Q.  34C, again there's some more handwriting,

7   some markings.  Are those yours?

8       A.  No, those aren't.  Those were Carol

9   Holland's.

10      Q.  Which ones are Carol Holland's?

11      A.  All of the ones prepared performance

12   plans, the job descriptions, special events,

13   uniforms, remember to look into reference account,

14   contact, track, something like that.

15      Q.  There are some markings within the chart.

16   There's a square around your name.

17      A.  The black square is my writing.  This is

18   the org chart that Byron Marchant passed out in a

19   meeting.

20      Q.  How about new 2005, whose writing is that?

21      A.  That's mine.

185

1      Q.   Prior to 34C, what chart was in effect,

2   what org chart?  Any of these?

3      A.   Yes, the latest one was B.  That was in

4   effect until C came into place.

5      Q.   Mr. Marchant never said -- never told you

6   that your change in job title from senior manager to

7   logistics support coordinator meant that you were no

8   longer considered a senior manager?  He never said

9   that to you?

10      A.   No, but I think his actions displayed

11   that.  I'm no longer a member of management.  I'm a

12   coordinator.  I mean, the placement on the org chart

13   tells you where I moved from.

14      Q.   Looks like there were a lot of movements,

15   is that right?

16      A.   I'm not sure.  I was only concerned about

17   mine.  I'll take a look.

18   Q.   Sure.

19      (Pause)

20      THE WITNESS:  There were some moves,

21   yes.

186

1   BY MR. FERRER:

2       Q.   Did other individuals have their titles

3   changed?

4       A.   No.  I was the only one.

5       Q.   Look at 34B, right hand -- bottom right

6   hand box, Jose Reyes, operations specialist, and

7   then 34C is -- the new title is mailroom clerk, is

8   that right?

9       A.   On B he was a day porter.  During the

10   period between B and 3 we bid out xerox because

11   their contract was coming in too high.  He went into

12   the mailroom.  He was doing mailroom and day porter

13   responsibilities.

14       Q.   Day what?

15       A.   Day porter, cleaning the bathrooms, things

16   like that, and delivering mail.

17       Q.   But his title changed, right?

18       A.   It changed on this form.  I doubt if it

19   changed in Human Resources.

20       Q.   But you don't know whether it did or not?

21       A.   I doubt it.

187

1     Q.  But you don't know, is that right?

2     A.  I don't know.

3     Q.  Looking at Adrian Daniels on 34B, his

4     title is procurement operations, correct?

5     A.  She was always operations logistics

6     coordinator.  She provided procurement operations

7     support to that person in addition to being the

8     assistant to Troy Saunders.  She was a backup for

9     Bernadette with vendor management and finance.

10     Q.  Her title on 34C is administrative

11     assistant?

12     A.  Basically.  Yes, she went from a

13     coordinator to administrative assistant.

14         Although, none of them were members of

15     management and was reduced to a member of

16     non-management.

17     Q.  I'm looking at 34C, comparing the two

18     charts.  The whole chain starting with Mr. Combo,

19     Andre Combo on down, they weren't even on 34B, is

20     that right?

21     A.  34B was just a logistics and facilities,

1    asset management, so they wouldn't have been on that

2    one.  It was our inter-department one.

3       Q.   What department was Mr. Combo and everyone

4    underneath him, what department were they in?

5       A.   In the tape library.  It was under CAO,

6    the corporate admin operations department, but they

7    didn't work for Troy so they weren't on the B org

8    chart.

9       Q.   I don't see Troy on 34C.

10      A.   He was gone by that time.

11      Q.   Mr. Gilmore, looks like he took or

12   replaced Mr. Saunders, is that right?

13      A.   Yes.

14      Q.   His title changed too.  It changed from

15   what Mr. Saunders' title was, is that right?

16      A.   Yes.

17      Q.   What did you call it, the department that

18   Mr. Combo was in?

19      A.   Tape library.

20      Q.   After this change did that department now

21   report to Mr. Gilmore?

189

1     A.   That department always reported to

2   Mr. Gilmore.  That's what he was responsible for.

3   We went under him when Troy left.  Facilities and

4   logistics went under him when Troy went away, but he

5   always had the responsibility of the tape library.

6     Q.   Was his title always what it states on

7   34C?

8     A.   No.  The titles changed often.

9     Q.   Was there a merger of these two

10   departments under this one head which is at this

11   point again on 34C headed by Mr. Gilmore?

12     A.   Yes.

13     Q.   All this occurred after Mr. Marchant had

14   this meeting in October 2004?

15     A.   It started before and then he had a

16   meeting and made it public knowledge.

17     Q.   He handed out 34C during this meeting and

18   that was it?

19     A.   That was it.

20     Q.   Did you speak with anyone else about your

21   change in title from senior manager to logistics

190

1    support coordinator?

2        A.  I did.

3        Q.  Who was that?

4        A.  Carol Holland.

5        Q.  When did you speak with Ms. Holland?

6        A.  Directly after I received the change,

7    Quint Bowman.

8        Q.  Are these altogether or individually?

9        A.  Individually.

10       Q.  Let's start with Ms. Holland.  When did

11   you -- where did this conversation take place?

12       A.  In our offices at 1235 W Street.

13       Q.  Was anyone else present?

14       A.  No.

15       Q.  What was said?

16       A.  That she didn't understand why they had

17   done it.

18       Q.  Done what?

19       A.  Demoted me to a logistics support

20   coordinator, because she was new.  She didn't

21   understand it.

191

1      Q.  Were those her words?

2      A.  Yes.

3      Q.  What else was said, do you recall?

4      A.  That was it, because I left.  We didn't

5   say much more because I left right after that was

6   said.

7      Q.  Who else did you speak with?

8      A.  The following -- two days later I spoke

9   with Quint Bowman.

10     Q.  Where did that meeting take place?

11     A.  In his office, 1235 W Street.

12     Q.  Anyone else present?

13     A.  No.

14     Q.  What was said?

15     A.  He said that -- Ed said that he had some

16   concerns and my comment was where is the

17   documentation.

18     Q.  Ed Gilmore?

19     A.  Yes.  He said he had some concerns.  At

20   the time Mr. Bowman couldn't list one concern.  When

21   I asked for documentation he couldn't provide it.

192

1    Q.  What else was said, do you recall?

2    A.  Mr. Bowman basically said that my salary

3    hadn't changed, that my salary would still be the

4    same.

5    Q.  Do you recall anything else about that

6    conversation?

7    A.  No.

8    Q.  Did you speak with anyone else?

9    A.  Not at that time, no.

10    Q.  How about later, did you talk to anyone

11    else about the change in your title?

12    A.  Probably Troy Saunders.

13    Q.  When did you speak with Mr. Saunders?

14    A.  The day it actually happened.

15    Q.  Was he still working there?

16    A.  No.

17    Q.  Where was he at the time?

18    A.  At his new job in Atlanta.

19    Q.  Where did this conversation take place?

20    A.  On the cell phone.

21    Q.  What was said during that conversation?

193

1    A.  Just explained what had happened.

2    Q.  Do you recall what you said specifically?

3    A.  Yes, I was demoted today to coordinator.

4    Q.  What did he say?

5    A.  He couldn't believe it.

6    Q.  When did he leave BET, do you remember?

7    A.  June of 2004, I believe.

8    Q.  Do you recall anything else about that

9    conversation with Mr. Saunders?

10    A.  No.

11    Q.  Mr. Marchant when he made this

12    change -- well, let me back up.

13        Is this when you first became informed that

14    your title was being changed?

15    A.  Yes.

16    Q.  What were your duties as senior manager?

17    A.  Vendor management, interior decorating.

18    Let me find my notes.

19        (Pause)

20    BY MR. FERRER:

21    Q.  We have all those documents.  Just what

194

1  you can recall.

2      A.   Okay.  Managing day to day operations of

3  the campus, interior design for the BET campus,

4  coordinating logistics facility concerns.

5      Q.   I don't mean to interrupt you but, again,

6  I'm asking you just based on what you can recall.

7  That's in the complaint.  I understand that and

8  that's what you are reading from.

9      A.   Project management, bill paying, signing

10  AP vouchers, day to day management, security,

11  cleaning, mail room document center, warehouse

12  management, marketing effort for remote sites and

13  other things that are in the document, in the

14  complaint document.

15      Q.   How did your duties change, if at all,

16  when you became logistics coordinator?

17      A.   I was responsible for answering the phone.

18  That's it.

19      Q.   Answering what phone?

20      A.   The help desk line, the complaint line.

21      Q.   What type of inquiries?

195

1     A.  Excuse me?

2     Q.  What type of inquiries would be called in

3    to this help desk?

4     A.  It's too cold, it's too hot, the toilet is

5    stopped up.

6     Q.  Regarding the facility maintenance?

7     A.  Yes, maintenance requests, facility

8    requests.

9     Q.  When you were senior manager who reported

10    to you?

11     A.  The receptionist.

12     Q.  What was her name?

13     A.  Mae McClarty, Regina Wilson.

14     Q.  How do you spell the first name?

15     A.  M-C-C-L-A-R-T-Y.  The cafeteria staff, the

16    security team on site, the chief engineer, the

17    assistant chief engineer and the two engineer

18    supports, the warehouse manager, the mail room

19    manager and the mail room associates, the records

20    management manager, the document center, the office

21    managers at the remote locations.

196

1    Q.  Where are the remote locations?

2    A.  Chicago, New York, LA.  I think that's

3    probably it.

4    Q.  All these people directly reported to you?

5    A.  Yes.  They reported through the chief

6    engineer.  At one point they were reporting to me

7    and then as my responsibilities grew it was narrowed

8    down.

9        They started reporting to the chief engineer

10    who in turn reported to me.  He took all the

11    facility related, the engineers and the day porters

12    and the vendors all still reported to me, along with

13    him.

14    Q.  Vendors reported straight to you?

15    A.  Yes.

16    Q.  The chief engineer again was?

17    A.  Carlos Medina.

18    Q.  You say Medina was at --

19    A.  The BET location.

20    Q.  When you became logistics coordinator who

21    reported to you?

197

1    A.  No one.

2    Q.  When you were senior manager to whom did

3  you report?

4    A.  As senior manager I reported to Troy

5  Saunders and when Troy Saunders left, Ed Gilmore.

6    Q.  I thought earlier you testified -- at some

7  point you testified you reported to Mr. Williams.

8    A.  There was a transition period.  They

9  didn't come immediately after Troy left.  I was

10  reporting directly to Mr. Gilmore.  Then in late

11  September, October of 2004 was when Carol Holland

12  came and two weeks later Sammy Williams came and

13  then I started reporting to them.

14    Q.  When you became logistics coordinator, who

15  did you report to?

16    A.  Sammy Williams.

17    Q.  It was after you became logistics

18  coordinator you started reporting to Mr. Williams?

19    A.  Yes.

20    Q.  Mr. Williams reported to Ms. Holland?

21    A.  Yes.

198

1    Q.  Can you tell me again why you feel that

2    this was a demotion?

3    A.  Because it was.  I went from a senior

4    manager to a coordinator.  Professionally speaking,

5    it killed me.

6    Q.  Again, why?

7    A.  Because titles mean something in our

8    particular industry, in all of our industries.

9    Titles mean something.  It was said throughout the

10   company that I was demoted.  Regardless of what they

11   think, they demoted me.

12   Q.  You mean the change in your title?

13   A.  The change in my title, correct.  If I had

14   taken Byron Marchant from a VP to a coordinator,

15   would that have been a demotion for him?

16   Q.  Do you have 34C in front of you?

17   A.  Yes.

18   Q.  Mr. Williams, his title is logistics

19   operations.

20   A.  They don't know what his title is.  This

21   was just made up in Byron's office while we all sat

199

1   in the conference room waiting for them to put this

2   together.

3       The people who put this together didn't know

4   what anybody's titles were.  They only know they was

5   going to make me a coordinator at the end of the

6   day.

7       Q.  Is there any other reason why you believe

8   this change was an adverse change in your employment

9   other than what you've told me already?

10      A.  I think I've said enough.

11      Q.  Tell me all the reasons why you believe

12  what you call demotion was based on your gender.

13      A.  Because my responsibilities and everything

14  was given to a man.  The man who was responsible for

15  doing it was allowed to do it with no documentation.

16  He did it only because I was a woman.

17      This is a man who commonly referred to women

18  as bitches.  The same man who acted as if he was

19  going to back-hand me in a meeting, this is a man

20  who has a problem with women.

21      Q.  You have to use names?

200

1    A.  Ed Gilmore.  It's also the same person who

2    two other women came and filed complaints against

3    before they would do anything about my complaint.

4    Q.  You believe Mr. Gilmore gave your

5    responsibilities to a man?

6    A.  Yes.

7    Q.  What man was that?

8    A.  Sammy Williams.

9    Q.  Why do you think he gave your prior duties

10    to Mr. Williams?

11    A.  He has a problem with women.

12    Q.  Why do you think he has a problem with

13    women?

14    A.  Because he always refers to them as

15    bitches.  He always refers to them as that.  Every

16    woman in his chain of command has had problems with

17    him and has gone to Human Resources to complain, the

18    same complaints I complained about.  Just his

19    conversations, the conversations that he's had

20    around me about women, they've always been

21    derogatory.

201

1     Q.  Can you give me any specific examples?

2     A.  He's always referred to the vice-president

3   of special events who was a woman as a B, a fat B

4   actually.

5           MR. BELL:  Let's go off the record.

6           (A discussion takes place which is

7     held off the record)

8   BY MR. FERRER:

9     Q.  Just to clarify the record, when you were

10    referring to B, what are you referring to?

11    A.  Bitches.

12    Q.  When you said he referred to the VP of

13   special events --

14    A.  Jackie Willis.  He used to always call her

15   a fat bitch.

16    Q.  You heard this firsthand?

17    A.  I did, Troy Saunders did.  He said it

18   often.

19    Q.  Any other specific instances that you can

20   refer to or you can testify about regarding why you

21   believe Mr. Gilmore has a problem with women?

202

1    A.  I guess the way he treated me and others,

2    trying to back-hand me, acting as if he was going to

3    back-hand me in a meeting.

4    Q.  When was this?

5    A.  There was a meeting actually at CBS, 524

6    West 57th Street, probably 30 people around the

7    table.  I reported it to Human Resources when I got

8    back from New York.

9    Q.  You reported it to Human Resources?

10    A.  Quint Bowman.  Myself and Troy Saunders

11    both went to speak with Quint Bowman to tell him of

12    the incident.

13    Q.  When did this occur?

14    A.  In 2003 maybe.

15    Q.  What was the result of the --

16    A.  Nothing.

17    Q.  So you went and spoke with Mr. Bowman?

18    A.  Yes.

19    Q.  And you said Mr. Saunders was with you?

20    A.  Yes, we both went to talk to Mr. Bowman,

21    to let him know what had happened in the meeting.

203

1      Q.   What happened?

2      A.   We were around a table at a meeting.  I

3   was looking through my notes to look for a telephone

4   number for someone to dial in on the Polycom and he

5   made a gesture like he was going to back-hand me.

6      Q.   What happened next?

7      A.   We finished the meeting.  We went back to

8   D.C., went into the offices and had a conversation

9   with Quint Bowman about his inappropriate behavior

10   at the meeting.

11      Q.   About whose inappropriate behavior?

12      A.   Mr. Gilmore's.

13      Q.   Did you ever put anything in writing?

14      A.   I went to Mr. Bowman.  I don't know if he

15   did.  It wasn't practice to put -- you normally have

16   a conversation with Human Resources and they deal

17   with the person or what have you, but they did

18   nothing with Mr. Gilmore.

19      Q.   How do you know they did nothing?

20      A.   I know they didn't.  When we were talking

21   to Mr. Bowman, he made light of it like it was no

204

1  big deal.

2      Q.  Can you recall what was said during that

3  conversation with Mr. Bowman?

4      A.  Yes.  Mr. Gilmore is a damn soup sandwich.

5  He doesn't know how to act and I don't know why

6  Byron allows him to continue to act the way he does.

7      Q.  Who said this?

8      A.  Mr. Bowman.

9      Q.  What did you or Mr. Saunders say to

10  Mr. Bowman?

11      A.  When he made that comment?

12      Q.  Let's start from the beginning.  You went

13  to Mr. Bowman after this meeting in CBS, correct?

14      A.  Yes.

15      Q.  What did you say or what -- first, what

16  did you say to Mr. Bowman?

17      A.  We came to tell you what happened at the

18  meeting in New York with Ed.

19      Q.  What else was said?

20      A.  What happened?  We explained to him the

21  situation and what he had done, how it was

205

1    unprofessional, and the looks of all the women

2    around the table, just how -- it was professionally

3    embarrassing for me, but it was more professionally

4    embarrassing for BET, that they would send somebody

5    like him to conduct business.

6         We explained everything that transpired at

7    the meeting and Mr. Bowman just basically said he's

8    a soup sandwich, he's broke, he doesn't know why

9    Byron continues to allow him to act the way he does.

10        Q.  Do you recall what was specifically said

11   by you or anyone else at that particular meeting?

12        A.  Just what I said, what happened.

13        Q.  Do you recall the specific words that you

14   said or Mr. Saunders said to Mr. Bowman other than

15   what you testified to already what Mr. Bowman said,

16   anything specifically he said?

17        A.  No.  We basically told him the story and

18   he just basically made comments and that was it.  He

19   didn't say he was going to file a report.

20        Q.  Did you request he file a report?

21        A.  I didn't think I had to, but I didn't

206

1    request it.  I came to tell him what transpired.  As

2    a vice-president I would have thought he would have

3    done something.  I couldn't believe what had

4    happened.

5        Q.  Did you ask him to take any action against

6    Mr. Gilmore?

7        A.  I did not.  I just felt like I didn't have

8    to.  He was the vice-president of Human Resources.

9    Me telling him, he should have taken action with the

10    fact that myself and my manager both went to him to

11    complain.

12        Q.  Did Mr. Saunders ask him to take any

13    action?

14        A.  I'm not sure.  They talked -- I left after

15    I said what had happened.  I left the office.

16        Q.  Just so the record is clear -- I think I

17    have an idea what you are talking about, but when

18    you say Mr. Gilmore acted like he was going to

19    back-hand you, can you describe for us in words what

20    he did?

21        A.  He raised his hand in an effort to strike

207

1    me, like he was going to strike me.

2        Q.   Did he strike you?

3        A.   Of course not, no, he didn't.

4        Q.   The incident about -- when you said he

5    refers to -- you said he referred to a Jackie Willis

6    as a fat bitch, did you report that to anyone?

7        A.   At the time Quint Bowman and I and Troy

8    Saunders, we would have lunch together.  We were all

9    very buddies.  We were buddies.  We had lunch

10   together, talked and whatever.  Quint was aware of

11   Ed's behavior.  He was aware how Ed spoke to women.

12   He was aware of all of it.

13       Q.   How do you know he was aware?

14       A.   Because we shared it with him, myself and

15   Troy.

16       Q.   What did you share with him?

17       A.   The comments that Ed would make, the

18   things that he would do.  Everything that he did

19   pretty much we would have a conversation with

20   Mr. Bowman, but everyone knew that it wasn't going

21   to go anywhere because Ed is Byron's friend.

208

1      Q.  Do you recall any specific conversations

2   you had with Mr. Bowman during which you reported to

3   Mr. Bowman this alleged conduct by Mr. Gilmore?

4      A.  I know I've told him on several instances

5   when Ed has called Jackie Willis out of her name,

6   I've told him that.

7      Q.  Do you remember any specific incidents?

8      A.  Yes.  We were all at the awards show in

9   2003 I believe it was and he told the executive

10   vice-president who had just had a baby, a woman --

11      Q.  Who is he?

12      A.  Ed Gilmore told Kelly Lawson that they

13   were going to have to put a rope around her neck to

14   hold her from going up because she was so fat.

15      Q.  Mr. Gilmore told -- I'm sorry.  You've got

16   to use names as much as possible so the record is

17   clear.

18      A.  He told Kelly Lawson, the EVP of

19   marketing, who just had a baby that she was so fat

20   they were going to have to put a chain around her

21   neck to keep her from going up like a balloon.  I

209

1   shared that with Mr. Bowman because I couldn't

2   believe he made that comment.

3       Q.  Ms. Lawson had just had a baby?

4       A.  Yes.

5       Q.  At what awards show was it?

6       A.  Maybe the third annual awards show.

7       Q.  What year was that?

8       A.  2003.

9       Q.  When did you tell Mr. Bowman this?

10      A.  Couple of hours after it happened.  He was

11  out there.

12      Q.  What did you tell him?

13      A.  The comment that Ed had made to Kelly,

14  Kelly's response.  She was very upset that he made

15  the comment, and how inappropriate I thought it was.

16      Q.  You told Mr. Bowman had inappropriate it

17  was?

18      A.  Yes.

19      Q.  Did you ask Mr. Bowman to take any action?

20      A.  I did not.

21      Q.  Any other instance that you can recall as

210

1   to why you believe Mr. Gilmore had a problem with

2   women?

3       A.   Other than two other women in his chain of

4   command filing complaints on him, no.

5       Q.   Who are those women?

6       A.   Carol Holland and Ofie Kodjoe.

7       Q.   How do you know Ms. Holland and Ms. Kodjoe

8   filed complaints?

9       A.   Ms. Holland wrote a five page letter to

10   Byron Marchant asking to be removed from

11   Mr. Gilmore's management chain because of his

12   behavior.  Ofie Kodjoe went to Human Resources.

13       Q.   When you say "him," use names.

14       A.   Ofie Kodjoe went to Human Resources

15   regarding Mr. Gilmore.

16       Q.   How do you know that Ms. Holland wrote a

17   letter to Byron Marchant?

18       A.   She forwarded me a copy of it.

19       Q.   How do you know that Ms. Kodjoe -- well,

20   let me back up.

21       Who did she write a letter to?

211

1    A.  Who?

2    Q.  Ms. Kodjoe.

3    A.  She didn't write a letter.  She went to

4    Quint Bowman and filed a complaint against Ed

5    Gilmore.

6    Q.  How do you know Ms. Kodjoe went to

7    Mr. Bowman to file a complaint?

8    A.  Because she told me.  She told me and

9    outside counsel told me.

10    Q.  Who is outside counsel?

11    A.  They brought an outside counsel in -- when

12    I filed, when I filed a complaint against

13    Mr. Gilmore they brought in outside counsel.  A

14    couple of months later Ofie Kodjoe and Carol Holland

15    filed similar complaints and they brought in a

16    second outside counsel and all the complaints were

17    against Mr. Gilmore.

18    Q.  Is there anything else?

19    A.  That's it.

20    Q.  Let me go back to this question.  Other

21    than what you testified to already and what you've

212

1  alleged about Mr. Gilmore, are there any other

2  reasons why you believe your alleged demotion was

3  due to your gender?

4      A.  That's about it.

5      Q.  You allege that Mr. Williams took over

6  your duties, is that correct?

7      A.  He did.

8      Q.  When did Mr. Williams start?

9      A.  The end of October of 2004.

10      Q.  When he first came on, that's when he took

11  over your duties?

12      A.  Yes.

13      Q.  When did Ms. Holland come on?

14      A.  The 1st of October, end of September, 1st

15  of October.

16      Q.  Mr. Williams reported to Ms. Holland, is

17  that correct?

18      A.  Yes.

19      Q.  You indicated that you filed a complaint

20  against Mr. Gilmore.

21      A.  Yes.

213

1    Q.  When did you do that?

2        Ma'am, testify to your knowledge, please.

3    If you want to say it's in my complaint, you can say

4    that.

5    A.  It's in my complaint.  August maybe.

6    Q.  What year?

7    A.  2004.

8    Q.  This is before your change in title from

9    senior manager to logistics coordinator?

10   A.  Actually, it wasn't August 2004.  It was

11   in December after my change of title when he started

12   trying to -- when Mr. Gilmore asked Carol Holland to

13   write me up on a fraudulent subject.

14   Q.  Tell me about that.

15   A.  Mr. Gilmore sent Carol Holland an e-mail

16   and in the e-mail he tasked her with disciplining me

17   for a going away party given to Troy Saunders in

18   June.

19   Q.  He told her to do what?

20   A.  To counsel me.

21   Q.  Why did he tell Ms. Holland to counsel

214

1   you?

2       A.  I don't know why.

3       Q.  What reason did he give?

4       A.  He said that I had used funds -- I had

5   used the company funds without approval.

6           MR. FERRER:  Exhibit 35.

7           (Whereupon the proffered item was

8       marked as exhibit number 35.)

9   BY MR. FERRER:

10      Q.  Can you identify what has been marked as

11  exhibit 35, Ms. Woodland?

12      A.  It's an internal memo from Carol Holland

13  to Shelly Johnson, Antoinette Woodland and Quint

14  Bowman on the subject line, confidential complaint.

15  It was sent Wednesday, December 8, 2004 at 4:44 p.m.

16      Q.  The document I've handed you is three

17  pages, correct?

18      A.  Correct.

19      Q.  It looks like it is a chain of e-mails, is

20  that right?

21      A.  It is.

215

1     Q.  Directing your attention to the second

2   page, it looks like a message from Carol Holland to

3   you copying Mr. Williams on December 6, 2004.  Do

4   you see that one?

5     A.  Yes.

6     Q.  In it she says:  Antoinette, I've been

7   tasked with providing counseling for you with regard

8   to this party and incurring obligations on behalf of

9   BET.

10       Is she referring to in this e-mail the

11   counseling you just testified about that you say

12   Mr. Gilmore told her to give you?

13     A.  Yes.

14     Q.  The party she is referring to is the party

15   for whom?

16     A.  Troy's going away party.

17     Q.  That was Mr. Saunders?

18     A.  Yes.

19     Q.  Then the text above that or the message

20   above Ms. Holland's is your reply to Ms. Holland, is

21   that right?

216

1     A.   Yes.

2     Q.   Now turning to the first page, the message

3   dated Monday, December 6, 2004 at 5:43 p.m. from

4   Ms. Holland to Mr. Gilmore, copying Mr. Bowman, it

5   appears as though she was forwarding -- is that your

6   reply to her, forwarding your reply to Ms. Holland?

7     A.   Yes.

8     Q.   The message above that, December 7, 2004,

9   looks like Mr. Gilmore's reply, is that right, to

10   Ms. Holland?

11     A.   Yes.

12     Q.   Then at the top is the December 8 message

13   from Ms. Holland to you, Ms. Shelly Johnson,

14   Mr. Bowman?

15     A.   Correct.

16     Q.   Does your e-mail dated December 6, 2004 at

17   5:18 p.m., is this your complaint?

18     A.   This is what started the ball rolling.

19     Q.   What was your complaint regarding

20   Mr. Gilmore?

21     A.   Just character assassination.  At this

217

1   time it was character assassination.  It was

2   baseless.

3       Q.   Directing your attention to your e-mail

4   again, December 6, 2004, it says:  I would like to

5   formally request that these attempts at slander and

6   character assassination cease immediately.

7       A.   Right.

8       Q.   That's the complaint that you made to

9   Ms. Holland regarding Mr. Gilmore?

10      A.   Yes.

11      Q.   Looking at Mr. Gilmore's e-mail response,

12  December 7, 2004, 2:25 p.m., do you see that?

13      A.   I do.

14      Q.   It says, the second paragraph:  Secondly,

15  you need to investigate the slanders and character

16  assassinations that Antoinette is referring to in

17  her e-mail below.

18          So Mr. Gilmore asked Ms. Holland to

19  investigate your complaints, is that right?

20      A.   Yes, he asked her to investigate my

21  complaints because I asked him to stop the slander

218

1    and Quint Bowman was CC'd on it.

2        Q.   CC'd on your e-mail?

3        A.   Of course.

4        Q.   Were your complaints investigated?

5        A.   They were.

6        Q.   Before we leave this e-mail, nowhere in

7    this e-mail -- and I guess you only have one e-mail

8    in this e-mail chain, but nowhere in there do you

9    allege that you received any adverse action because

10    of your gender?

11        A.   No, not in this particular e-mail.  I was

12    dealing with the subject at hand, the counseling.

13        Q.   Again, looking at the first page, do you

14    see the writing?  Again, I'm looking at

15    Mr. Gilmore's e-mail after the first paragraph.  It

16    looks like it says not true.  Bowling party for

17    Byron's direct reports.

18        Whose handwriting is that?

19        A.   That's my handwriting.

20        Q.   Number 25 at the top, that's your

21    handwriting as well?

219

1     A.  Yes.

2     Q.  I'm assuming that is the number to which

3  you were responding to our discovery requests?

4     A.  Right.

5     Q.  Who were your complaints investigated by?

6     A.  Outside counsel was brought in.

7     Q.  Do you recall that counsel's name?

8     A.  Naomi something.  It should be inside of

9  my information requested.  Naomi Bryce or something

10  like that.

11     Q.  She was not employed by BET?

12     A.  No.  She was an outside counsel.

13     Q.  Do you recall what firm or who she was

14  with?

15     A.  I can't remember exactly, but I'm quite

16  sure it's in my information.

17     Q.  Were you interviewed as part of the

18  investigation?

19     A.  I was.

20     Q.  Do you know who else was interviewed?

21     A.  A bunch of people.  Carol Holland, Sammy

220

1   Williams, the guys in the mailroom, Jason Lewis.

2   I'm not quite sure.  I wasn't privy to the list of

3   people that they called in.

4       Q.   The individuals you just mentioned, how do

5   you know they were interviewed?

6       A.   Because they told me.

7       Q.   Were you notified of the results of the

8   investigation?

9       A.   No.  I requested it, but I wasn't given

10   the findings of the investigation.

11       Q.   Were you given any feedback regarding the

12   findings of the investigation?

13       A.   Mr. Bowman prepared a letter which is in

14   information that I submitted that doesn't address

15   the -- that didn't address -- in my opinion didn't

16   address my concern.

17       Q.   Do you feel that the investigation was

18   thorough, the investigation conducted by Naomi?

19       A.   I'm not sure because I wasn't privy to

20   what her findings were or who all she spoke with so

21   I can't say whether it was or not.

221

1          MR. FERRER:  36.

2               (Whereupon the proffered item was

3      marked as exhibit number 36.)

4    BY MR. FERRER:

5      Q.   Before we talk about exhibit 36,

6    Ms. Woodland, let me just back up a little bit.

7          With respect to the change in your title,

8    other than what you testified before about the

9    conversation -- the meeting that was held by

10   Mr. Marchant and the organizational chart that he

11   gave out that day, I think your testimony was that

12   was the first time that you learned of your change

13   in title?

14     A.   Yes.

15     Q.   Do you know who was involved in that

16   decision?

17     A.   I do not.  I know it was Byron, Quint, Ed.

18   They were all in Byron's office putting together the

19   form.

20     Q.   How do you know that?

21     A.   Because they had us all waiting outside of

222

1    his office for him to come and speak with us.

2        Q.   Do you know what they were doing inside

3    his office?

4        A.   I was told making changes to the org

5    chart.

6        Q.   Who told you that?

7        A.   Carol Holland.

8        Q.   Was she in the office?

9        A.   No.

10       Q.   Why does she believe that?

11       A.   At the time she was department head.  I

12   guess they shared it with her.

13       Q.   But you don't know how she knew?

14       A.   I didn't ask her how she knew.

15       Q.   Other than your belief that those three

16   individuals, Mr. Gilmore, Mr. Marchant and you said

17   Mr. Bowman may have been involved in making this

18   change, do you know anyone else who was involved in

19   making the change from your title from senior

20   manager to logistics coordinator?

21       A.   No.

223

1    Q.  I believe you said that the allegation

2    from Mr. Gilmore was that there was some type

3    of -- or there was an alleged misappropriation of

4    funds related to Mr. Saunders' going away party?

5    A.  Yes.

6    Q.  And that he directed Ms. Holland to

7    counsel you?

8    A.  Correct.

9    Q.  Did Ms. Holland ever counsel you?

10    A.  No.

11    Q.  Did you ever receive any discipline

12    regarding Mr. Gilmore's allegations?

13    A.  No.  Well, not that one, not for the

14    party.

15    Q.  There was another incident?

16    A.  No, there weren't any other incidents but

17    apparently he had been going to Mr. Bowman, making

18    false accusations and that was what led to him being

19    able to demote me to a coordinator.

20    Q.  I thought you just testified you didn't

21    know who was responsible for demoting you.

224

1      A.   I said it was Mr. Bowman, Mr. Gilmore and

2   Byron Marchant.  That's what I said.

3      Q.   You think that Mr. Gilmore going to

4   Mr. Bowman factored into that decision?

5      A.   I know that it did.

6      Q.   How do you know that?

7      A.   Well, first of all, the letter states --

8   this letter that Quint sent out states that

9   Mr. Gilmore had said he had some concerns with my

10   work.  I had a conversation with Mr. Bowman in his

11   office where he said that, but he also said that

12   there was no documentation, that Ed didn't produce

13   any documentation.

14        Carol Holland and myself spoke about it when

15   he started talking bad about me to her and she said

16   where is the documentation and he finally admitted

17   to her -- the first time she asked for it he said he

18   had it.  She asked for it the second time.  He

19   finally admitted he didn't have any documentation

20   and I had excellent performance reviews.

21        Q.   The letter you just referenced, is this

225

1    the letter you are referring to by Mr. Bowman?

2        A.  Yes, the last paragraph on the first page.

3        Q.  This is exhibit 36 you are referring to?

4        A.  Yes.

5        Q.  Could you identify what this document is?

6        A.  This is a letter from Quint Bowman to

7    Antoinette Woodland, sent to me overnight courier to

8    my home and it's entitled regarding the

9    investigation.

10        Q.  Dated June 24, 2005?

11        A.  Correct.

12        Q.  There's a number 19.  Is that your

13    writing?

14        A.  That's my writing.

15        Q.  Does that have any bearing on the actual

16    document itself?

17        A.  No, it does not.

18        Q.  Did you have any discussions with

19    Mr. Bowman about this letter?

20        A.  I did not.

21        Q.  What did you understand this letter to

226

1    mean?

2        A.  To be honest, it didn't mean anything to

3    me because it was a bunch of lies.  I knew what

4    transpired.  I had witnesses who were there who was

5    a part of it who knew this was a bunch of baloney.

6            It was just him trying to give up something

7    because my doctor sent me out on stress release.  He

8    generated this letter the same day my doctor took me

9    off work for two weeks.

10       Q.  The letter says "Re:  Investigation."

11           This is the investigation that you are

12   referring to that was conducted by an outside

13   counsel.

14       A.  Yes.

15       Q.  This investigation looked into your

16   allegations of slander and character assassination?

17       A.  Yes.

18       Q.  You testified that it was in this letter

19   that you learned that Mr. Gilmore had made remarks

20   about your performance, is that right?

21       A.  No.  In this letter, it was reiterated

227

1    that Mr. Gilmore made remarks about my performance.

2    I had spoken with Mr. Bowman and he said that

3    Mr. Gilmore had made comments about my performance.

4        He and I went back and forth.  He and I went

5    back and forth.  I asked for documentation and none

6    existed and when I asked for documentation, then the

7    conversation was pretty much over because Mr. Bowman

8    knew he didn't have any.

9        Q.  The discussion that you are just referring

10    to with Mr. Bowman, that occurred prior to this

11    letter?

12        A.  Yes.

13        Q.  When did that discussion occur?

14        A.  After they made the change.

15        Q.  It was after October 2004?

16        A.  Right.

17        Q.  I believe you testified that you felt that

18    this letter was I think you said insufficient, is

19    that right?

20        A.  I believe it to be, yes.

21        Q.  Why is that?

228

1    A.  Because it didn't touch on what had

2    transpired.  I think it was just something doctored

3    up.

4        I was never given a copy of her findings.

5    This was something that Mr. Bowman threw together to

6    appease me.  I never knew what came out of the

7    investigation.

8    Q.  You say her findings.  You are --

9    A.  Naomi, the outside counsel.  I don't know

10   her last name.

11   Q.  Did you ever voice your concern to

12   Mr. Bowman or to anyone that you thought that this

13   letter was insufficient?

14   A.  Yes.

15   Q.  Who was that?

16   A.  Mr. Bowman.

17   Q.  When was that?

18   A.  Two weeks after June 4 when I came back to

19   work.

20   Q.  June 4, 2005?

21   A.  It was two weeks after June 4, 2005.  So

229

1    July, the second week of July, something like that.

2        Q.  So you did have a discussion with

3    Mr. Bowman about this letter?

4        A.  Yes.

5        Q.  Where did this take place?

6        A.  In his office.

7        Q.  Who was present?

8        A.  Just he and myself.

9        Q.  What was said?

10        A.   That I didn't -- that I asked for a copy

11    of the outside counsel's findings and his comment

12    was that he provided this.  I said that wasn't

13    outside counsel's findings.  That was something you

14    generated and I wanted a copy of the outside

15    counsel's findings.

16        Q.  What did he say?

17        A.  He just looked at me like I was crazy.

18        Q.  Do you recall anything else that was said

19    during that conversation?

20        A.  He said this was the findings and pretty

21    much that was it.

230

1      Q.   Did you talk to anyone else about how you

2   felt about the investigation?

3      A.   Carol Holland.

4      Q.   When did you speak with Ms. Holland?

5      A.   Probably a day or two after I received the

6   letter.

7      Q.   Where did that conversation take place?

8      A.   Over the telephone.

9      Q.   Do you recall what was said during that

10   conversation between you and Ms. Holland?

11      A.   Basically I read the letter to her and she

12   just basically thought it was a bunch of crap.

13      Q.   Do you recall anything else about the

14   conversation?

15      A.   No, I don't recall the words verbatim that

16   was said, but the end result was she thought it was

17   a bunch of crap.

18      Q.   Did you ask Mr. Bowman when you met with

19   Mr. Bowman to do anything?  Did you make any

20   request, take any action with respect to your

21   dissatisfaction with the investigation or the

231

1    conclusion of the investigation?

2        A.  I asked to be removed from the department,

3    to be moved to another department, from the

4    corporate admin operations department.

5        Q.  To what department?

6        A.  I didn't make a request.  I just wanted to

7    be out from that department.

8        Q.  What did he say?

9        A.  He didn't respond.

10       Q.  Was your request ever granted?

11       A.  No.

12       Q.  Did you ask Ms. Holland to do anything

13   about your dissatisfaction with the results of the

14   investigation?

15       A.  When all this started happening and he

16   started harassing her, she quit.

17       Q.  When who started harassing?

18       A.  When Mr. Gilmore started harassing Carol.

19   When Mr. Gilmore started harassing Carol Holland,

20   she filed a complaint with Mr. Bowman.  She sent an

21   e-mail to Byron Marchant.  They brought in outside

232

1    counsel.

2        Mr. Marchant responded to her that he did

3    not believe her although she submitted a five page

4    document for his review.  She submitted a

5    resignation and left.

6        Q.  When was this?

7        A.  Probably around the June timeframe,

8    somewhere in June, July of 2005.

9        Q.  She was gone by the time --

10       A.  I believe she was gone by the time this

11   letter came out.  That's why I called her on the

12   telephone to tell her about it.

13       Q.  Did you speak with anyone else other than

14   Mr. Bowman, Ms. Holland regarding your

15   dissatisfaction with the results of this

16   investigation?

17       A.  Troy Saunders.

18       Q.  When was that?

19       A.  The day that I received the letter, the

20   24th or 25th, June 25, 2005.

21       Q.  At that time Mr. Saunders was no longer

233

1     working in BET?

2         A.   He was not.

3         Q.   What did you tell Mr. Saunders?

4         A.   I read him the letter.  He couldn't

5     believe that Quint had written the letter.

6         Q.   Do you recall what you said?

7         A.   I just read him the letter.  I said you

8     are not going to believe what Quint has put together

9     and sent to me.

10        After I read the letter, he couldn't believe

11     Quint had wrote it knowing the background of all the

12     individuals.  He couldn't believe that Quint had put

13     the letter together.

14        Q.   Did you speak with anyone else?

15        A.   No, not to my recollection.

16        Q.   Other than the individuals that you have

17     mentioned, was there anyone else that you're aware

18     of that took part in the investigation of your

19     complaint?

20        A.   I'm not sure.  I'm not sure.  I wasn't

21     privy to that information.

234

1      Q.   Did anyone else provide you a response

2   other than Mr. Bowman as to the results of the

3   investigation?

4      A.   No.

5      Q.   Did you ever complain to anyone about your

6   alleged demotion?

7      A.   To my manager, Carol Holland, to Human

8   Resources and that's probably it.

9      Q.   Did you ever complain to anyone that your

10   alleged demotion was because of your gender?

11     A.   I'm not sure.  I was angry at the time so

12   I may have said it to someone.  I'm not sure.

13     Q.   Now --

14     A.   I know it did happen at a time when three

15   women were complaining about this man.  So we were

16   all pretty much saying it was gender related, Ofie

17   Kodjoe, Carol Holland and myself.

18        Members of Human Resources has also said he

19   has a problem with women.  So we weren't the only

20   people who said he had a problem with women.

21     Q.   You didn't file any type of formal

235

1    complaint or any complaint for that matter with

2    anyone alleging that your demotion was due to your

3    gender?

4        A.  I did not at the time, no.

5        Q.  You referred to a complaint by

6    Ms. Holland.  What do you know about that complaint?

7        A.  I know that she wrote a five page letter

8    to Byron Marchant complaining about Mr. Gilmore.  I

9    know that she met with Byron Marchant to complain in

10    person and submitted a five page document as

11    documentation for what she was enduring under his

12    leadership.

13        From what she shared with me, he told her he

14    did not believe her and would not remove her from

15    Mr. Gilmore's chain of command and that's when she

16    tendered her resignation.

17        Q.  This conversation she had with whom?

18        A.  Byron Marchant.

19        Q.  Were you present?

20        A.  I was not.

21        Q.  How do you know that this conversation

236

1    took place?

2        A.   Because I was there in the office when she

3    went to meet with him and when she came back after

4    having met with him she explained what happened.

5                MR. FERRER:  Please mark this as

6    exhibit 37.

7                (Whereupon the proffered item was

8        marked as exhibit number 37.)

9    BY MR. FERRER:

10       Q.   Can you identify exhibit 37, Ms. Woodland?

11       A.   It's an e-mail from Carol Holland, a

12   letter from Carol Holland to Byron Marchant dated

13   May 26, 2005.

14       Q.   Is this the letter that you are referring

15   to --

16       A.   Yes.

17       Q.   -- that Ms. Holland told you she gave to

18   Mr. Marchant?

19       A.   Yes.

20       Q.   Said she gave you a copy of this, is that

21   right?

237

1     A.  Yes.

2     Q.  I notice on the last page -- just for the

3  record, it's a five page letter.  It's not signed.

4         How do you know this is a letter she

5  actually gave to Mr. Marchant?

6     A.  I saw when she went to the meeting and

7  printed it all.  I believe her to have given it to

8  him.

9     Q.  That's what she told you?

10     A.  That's what she told me.

11     Q.  You weren't at that meeting, is that

12  right?

13     A.  No, I wasn't.

14     Q.  Other than what you've testified about

15  already, do you know what the outcome was of

16  Ms. Holland's complaint regarding Mr. Gilmore?

17     A.  Mr. Marchant told her that he did not

18  believe her and that -- he didn't believe her.

19     Q.  This is what Ms. Holland told you?

20     A.  Yes.

21     Q.  Now --

238

1      A.   He said he did not believe her so she

2    tendered her resignation.

3      Q.   With respect to Ms. Kodjoe's complaint,

4    what is your knowledge of her complaint?

5      A.   Just that she had a complaint with

6    Mr. Gilmore, his management of her and she went to

7    Human Resources to ask to be removed out of his

8    chain of command.  She went to Quint Bowman to be

9    asked to be taken out of his chain of command.

10      Q.   How do you know that?

11      A.   Because she shared it with me.

12      Q.   Verbally?

13      A.   Yes.

14      Q.   When did she make this complaint?

15      A.   Somewhere in the May 2005, if not

16    April 2005 timeframe.

17      Q.   Did she tell you what the substance of her

18    complaints were?

19      A.   She didn't.  She didn't go into detail.

20    If she did, I don't recall because I had so much

21    going on of my own.  But his management, the way he

239

1   was managing her, she had a problem with it.

2      Q.  Let me go back to Ms. Holland.  Did she

3   share with you the substance of her complaints other

4   than she didn't want to be under Mr. Gilmore's

5   direction anymore?

6      A.  His treatment of her.  He was very

7   disrespectful to women.

8       I remember an incident when they were in

9   New York and it was her first trip to New York to

10   meet the remote site people and she started talking

11   to -- he introduced her as half of Troy to her

12   Viacom counterparts and then he told one of the

13   office managers there to just talk to her, whatever,

14   but she is not making any decisions.  You just tell

15   me.  I'm going to make all decisions.

16      Q.  Were you there?

17      A.  I was not there, but the young lady, the

18   office manager, she called me and told me what he

19   did, Jennifer Pena.  I think his exact words, he

20   told her don't pay no attention to her.  I'm going

21   to make all the decisions.

240

1      Q.  Who said that?

2      A.  Ed Gilmore said that to Jennifer Pena

3   about Carol Holland.

4      Q.  Who is Ms. Pena?

5      A.  She is the office manager for the

6   programming office at 555 West 57th Street,

7   New York.

8      Q.  Who is she employed by?

9      A.  She is with the BET unit under the Viacom

10  umbrella.

11      Q.  Other than what you testified before, is

12  there any other reason other than what you said

13  already as to why you believe Ms. Pena who works for

14  BET is an employee of Viacom?

15      A.  Repeat yourself.

16      Q.  Is there any other reason, other than what

17  you testified about, as to why you believe Ms. Pena

18  is a Viacom employee?

19      A.  No.

20      Q.  What was the result -- if you know, what

21  was the result of Ms. Kodjoe's -- you said it was a

241

1   verbal complaint, right?

2       A.   Yes.

3       Q.   To Mr. Bowman?

4       A.   They denied her request to be removed from

5   under his chain of command and she tendered her

6   resignation and left.

7       Q.   Do you know who denied her request?

8       A.   Both Quint Bowman and Byron Marchant.

9       Q.   How do you know this?

10      A.   She told me.

11      Q.   Ms. Kodjoe told you?

12      A.   Yes.

13      Q.   When did she tell you that?

14      A.   Right before she was about to leave.

15          MR. FERRER:  Can we go off the

16   record?

17          (A discussion takes place which is

18      held off the record)

19   BY MR. FERRER:

20      Q.   Ms. Woodland, other than what you

21   testified about already, are there any other reasons

242

1    why you believe that your alleged demotion was due

2    to your gender?

3        A.  No.

4        Q.  Look at paragraph 84 of the complaint,

5    please.

6        A.  All right.

7        Q.  Paragraph 84 states that:  Plaintiff

8    suffered an unlawful, discriminatory and adverse

9    employment action, change, limitation, and/or

10   classification that deprived and/or tended to

11   deprive plaintiff of employment opportunities and

12   otherwise adversely affected her status as an

13   employee and/or privileges of employment based on

14   her membership in a protected class, namely her sex,

15   female.

16       What is your basis, Ms. Woodland, of

17   alleging -- what is the adverse employment action

18   that you are referring to in paragraph 84?

19       A.  The demotion, professional demotion.

20       Q.  Is there any other adverse employment

21   action that is the basis of your allegation in

243

1   paragraph 84?

2       A.  Repeat your question.

3       Q.  Is there any other adverse employment

4   action that is the basis for paragraph 84?

5       A.  No.

6       Q.  Other than what you testified about

7   already, is there anything -- any other reasons that

8   you believe -- any other evidence that you want to

9   tell me about why you believe that your demotion was

10   due to your gender?

11      A.  I think I pretty much covered it in the

12   last question.

13      Q.  Just looking at paragraph 85, you say your

14   position was subsequently filled by a person outside

15   your protected class?

16      A.  Yes.

17      Q.  Who are you referring to?

18      A.  Sammy Williams.

19      Q.  Mr. Williams, he had a different title

20   than you, is that right?

21      A.  I think he brought him in as senior

244

1    manager of logistics.  He had a different title, but

2    they gave him all my responsibilities.

3        Q.  How do you know that?

4        A.  The org chart for visible proof will speak

5    to the fact they gave him all my responsibilities.

6        Q.  Any other reason why you believe they gave

7    him all your responsibility other than the org

8    chart?

9        A.  They did.  A conversation with Carol

10   Holland, conversation with Sammy Williams.

11       Q.  What was your conversation with

12   Ms. Holland regarding this issue?

13       A.  She didn't understand why they had done

14   it.

15       Q.  Done what?

16       A.  Taken all my responsibilities and given

17   them to Sammy Williams.  She didn't understand it.

18       Q.  Where did this conversation take place?

19       A.  In her office, 1235 W Street.

20       Q.  When was that?

21       A.  After the -- a couple of days after the

245

1   org chart was passed out.

2       Q.  Do you recall anything else?  Was it just

3   you and her?

4       A.  Yes.

5       Q.  Do you recall anything else that was said

6   during this conversation?

7       A.  Not really.  Just she didn't understand

8   it.  She didn't think that they would have taken all

9   my responsibilities, and that was pretty much the

10   gist of it.

11      Q.  You said you spoke with Mr. Williams.

12      A.  Yes.

13      Q.  When did you speak with him?

14      A.  Probably a couple of months later.

15      Q.  Where did that conversation take place?

16      A.  In my office.

17      Q.  Who was present?

18      A.  He and myself.

19      Q.  Do you recall what was said?

20      A.  A little bit.

21      Q.  Tell me what you recall.

246

1     A.  He asked me if I ever dated Mr. Gilmore.

2  He thought Mr. Gilmore was acting like a jealous

3  lover.  He thought I dated him and dumped him based

4  upon his conversations with Mr. Gilmore.

5     Q.  What was your response?

6     A.  Never.

7     Q.  Can you recall what else was said during

8  that conversation?

9     A.  His verbatim was did you ever date this

10  guy?  He seems like he's hung up on you.  My comment

11  was no, never.  He just went into how Mr. Gilmore,

12  he would go into Mr. Gilmore's office and

13  Mr. Gilmore would sit him down and talk to him about

14  me for hours on end.  He didn't understand it.  He

15  thought it was a relationship or something.  He just

16  didn't understand it.

17     Q.  Did you tell anyone about this

18  conversation that you had -- or what Mr. Williams

19  told you about Mr. Gilmore, what Mr. Gilmore said

20  about you?

21     A.  Probably Troy Saunders.

247

1    Q.  Do you recall speaking with Troy Saunders?

2    A.  At that time I was talking to him every

3    day.  He was kind of like my venting board as the

4    what was going on.

5    Q.  At the time Mr. Saunders was --

6    A.  Not employed with BET.

7    Q.  Where was Mr. Saunders?

8    A.  Where was he?

9    Q.  Yes.

10   A.  In Atlanta.  He relocated to Atlanta.

11   Q.  Who was he working for?

12   A.  Home Depot in their corporate offices.

13   Q.  Does he still work for Home Depot?

14   A.  Yes.

15   Q.  Other than what you testified, are there

16   any other reasons -- any other information that

17   forms the basis of you believing that your job

18   responsibilities as senior manager were given to

19   Mr. Williams?

20   A.  Nothing other than what I've said.

21        MR. FERRER:  Please mark this as

248

1    exhibit 38.

2        (Whereupon the proffered item was

3        marked as exhibit number 38.)

4    BY MR. FERRER:

5        Q.   Would you identify exhibit 38 for me,

6    Ms. Woodland?

7        A.   Yes.  It is my performance appraisal from

8    December 18, 2001 through June 30, 2002.

9        Q.   For the record, it's a five page document.

10    Would you turn to page five, please?

11        A.   Yes.

12        Q.   There's a place for associate's signature.

13    It bears no signature.

14        Is it your testimony that this is a copy of

15    your appraisal from this time period?

16        A.   Yes, it is.

17        Q.   Who performed this appraisal?

18        A.   Troy Saunders.

19        Q.   To your knowledge, did anyone else have

20    any input in your appraisal?

21        A.   I'm not sure.  It's my understanding that

249

1    Troy Saunders prepared them himself.

2        Q.   What did Mr. Saunders do with the

3    appraisal, if you know, after?

4        A.   They were all turned in to Byron Marchant

5    for his review and then they were given to the

6    associates and then once they were completed and

7    signed they were turned over to Human Resources.

8        Q.   Do you have the org charts in front of

9    you, exhibit 34A through D?

10       A.   Okay.

11       Q.   Looking at 34A, will you tell us the

12   timeframe for when this org chart was in effect?

13       A.   This is in 2001 to the end of 2002, I

14   believe.

15       Q.   Why do you say that?

16       A.   I didn't get promoted to senior manager

17   until 2003.

18       Q.   Turning to 34B, when was that in effect?

19       A.   Late 2002, I believe, 2003.

20       Q.   34C?

21       A.   This took place in 2004, October 2004.

250

1    Q.  How about 34D?

2    A.  2005, August sometime, I believe, 2005.

3    Q.  Is this the one that's currently in

4    effect?

5    A.  No.

6    Q.  How long was this one in effect, do you

7    know?

8    A.  Probably four or five months.

9    Q.  On this 180 title is senior manager,

10    occupant services, help desk?

11    A.  Yes.

12    Q.  That's the position that you are currently

13    in, correct?

14    A.  No.  I'm back to my original title.

15    Q.  Which is?

16    A.  Senior manager, corporate planning, asset

17    management operations.

18    Q.  How long have you been back in that title?

19    A.  Since August, I believe, 2006 to the

20    present day.

21    Q.  How long were you in the senior manager

251

1    occupant services help desk?

2        A.   Probably about six to eight months.

3        Q.   Can you put a month and a year on there

4    for me?

5        A.   I started in August, went through maybe to

6    February, March 2006 before it was changed.

7        Q.   It was changed to your current one?

8        A.   Correct.

9        Q.   Other than the earnings that you've had,

10   Ms. Woodland, at BET since your complaint was filed,

11   have you had other sources of income outside of BET?

12       A.   Yes.

13       Q.   Are those reflected on your tax returns,

14   do you know?

15       A.   Yes.

16       Q.   They are?

17       A.   Yes.

18       Q.   Let's go back to 2004.  Did you have any

19   sources of income outside of BET in 2004?

20       A.   Yes.

21       Q.   Who was that with?

252

1      A.  Freelance work, different people.

2      Q.  What type of work?

3      A.  Styling.

4      Q.  What was your income from that?

5      A.  I don't recall.  I would need to see the

6    documents because I don't recall.

7      Q.  You believe that's in your tax return?

8      A.  I know it's in my tax returns.

9      Q.  How about 2005?

10     A.   There was also some work in 2005.  Every

11   year there was freelance work.

12     Q.  Do you recall the totals each year?

13     A.  I don't, not off the top of my head.

14     Q.  Other than your tax returns, which we

15   should have shortly, any other documents that you

16   have that are related to your income?

17     A.  No.

18     Q.  Other than pay stubs?

19     A.  No.

20     Q.  Do you know what the amount of monetary

21   damage you are claiming that you have lost as a

253

1     result of your alleged demotion?

2         A.  I haven't figured it out.

3         Q.  In your complaint you seek punitive

4     damages.  Can you tell me all the reasons why you

5     believe you are entitled to punitive damages?

6         A.  Yes.  I wasn't given the position.  I

7     haven't been given a raise since I filed

8     a -- because I filed a formal complaint against

9     Mr. Gilmore.

10        I've been given annual, every year, four

11    percent, but I haven't been given a promotion and I

12    was on the fast track professionally there before

13    this incident took place.

14        Q.  I thought you testified earlier that you

15    were promoted from coordinator to senior manager?

16        A.  That's not a promotion.  They gave me a

17    title that was similar to the one that I lost.  That

18    wasn't a promotion.  My pay stubs will show in the

19    past when I've received a promotion it was

20    documented through payroll.

21        The coordinator back to occupant services

254

1    senior manager was nothing other than a title change

2    on paper.  They did not reward me with

3    financial -- with monies as they normally do.

4        Q.  You went from logistics coordinator to

5    senior manager occupant services help desk and your

6    salary stayed the same?

7        A.  Yes.

8        Q.  What was that, do you recall?

9        A.  Probably 70 something at that time.

10       Q.  Your benefits stayed the same?

11       A.  They did.

12       Q.  How about when you went from senior

13   manager occupant services help desk to senior

14   manager, what you are now?

15       A.  Planning and asset management operations.

16       Q.  Did you get a bump in salary?

17       A.  No.

18       Q.  Your salary stayed the same?

19       A.  It did.

20       Q.  Benefits stayed the same?

21       A.  They did.

255

1      Q.  Any other reasons why you think you are

2   entitled to punitive damages?

3      A.  That's all I can think of right now.

4      Q.  I believe you testified earlier about some

5   medical leave or stress related leave.

6      A.  Yes.

7      Q.  When was that?

8      A.  June 24, 2005.

9      Q.  Did you seek medical attention?

10      A.  I did.

11      Q.  When did you seek that medical attention?

12      A.  I'm not sure of the exact date but the

13   leave slip is right there.

14      Q.  What happened?

15      A.  What happened with what?

16      Q.  What caused you to go to the doctor?  What

17   was going on?

18      A.  Chest pains, not able to sleep at night

19   and so I went to the doctor and he put me through a

20   series of tests and came back and put me through

21   another series of tests and labeled it stress.

256

1          MR. FERRER:  Mark this as exhibit 39,

2    please.

3          (Whereupon the proffered item was

4    marked as exhibit number 39.)

5    BY MR. FERRER:

6    Q.  Can you identify that document?

7    A.  Yes.  It's a medical leave slip that I was

8    given from my doctor.

9    Q.  Who is your doctor?

10    A.  Dr. Ieon Dawson.

11    Q.  Heart Masters Medical Center, which is on

12    this document, that's where Dr. Dawson works?

13    A.  Correct.

14    Q.  You went to see Mr. Dawson specifically

15    for the chest pains?

16    A.  Chest pains.

17    Q.  What was the diagnosis?

18    A.  That it was a stress condition.  It was a

19    condition brought on by stress.

20    Q.  Were you out of work?

21    A.  Two weeks, yes.

257

1     Q.   Did you incur any medical expenses?

2     A.   My insurance covered the cost on this.

3     Q.   Have you sought any counseling for any

4     emotional or psychological issues?

5     A.   I did.

6     Q.   When was that?

7     A.   Starting in December, I believe, of 2005.

8     Q.   Who did you see?

9     A.   I can't recall the guy's name, but it's in

10    my paperwork.

11    Q.   Did you see one or more than one doctor?

12    A.   I saw one weekly, every week, Tuesdays at

13    12:00.

14    Q.   For how long?

15    A.   Six months I believe.

16    Q.   Specifically what were you going to this

17    doctor for?

18    A.   To help relieve stress.

19    Q.   What type of doctor was he?

20    A.   He was a psychologist.

21    Q.   Do you know where his office was?

258

1    A.  It was on Massachusetts Avenue in

2    northeast Washington.

3    Q.  What was this doctor's diagnosis?

4    A.  That it was stress related and that I

5    should consider going on meds.

6    Q.  What kind of meds?

7    A.  I don't recall exactly what meds he

8    thought, but he thought that I should be on meds to

9    help control it.

10    Q.  Did you go on the meds?

11    A.  No.

12    Q.  So you stopped seeing him six months

13    later?

14    A.  Yes.

15    Q.  After December 2005?

16    A.  Yes.

17    Q.  Did you incur any medical expenses?

18    A.  I think I ended up paying him $20 a visit

19    or something like that.  I believe BET only paid for

20    a few visits and then I ended up having to pay out

21    of pocket $20 a visit.

259

1    Q.  Do you have receipts or records of those

2    payments?

3    A.  I have checks.  I wrote him checks.

4    Q.  Other than those two doctors you

5    mentioned, did you seek any other medical attention?

6    A.  No.

7         MR. FERRER:  Please mark this as

8    exhibit 40.

9         (Whereupon the proffered item was

10        marked as exhibit number 40.)

11        MR. FERRER:  Mark this as 41, please.

12        (Whereupon the proffered item was

13        marked as exhibit number 41.)

14        MR. FERRER:  Exhibit 42.

15        (Whereupon the proffered item was

16        marked as exhibit number 42.)

17        MR. FERRER:  Would you mark this as

18    exhibit 43, please?

19        (Whereupon the proffered item was

20        marked as exhibit number 43.)

21        MR. FERRER:  Exhibit 44.

260

1          (Whereupon the proffered item was

2      marked as exhibit number 44.)

3          MR. FERRER:  This is 45.

4          (Whereupon the proffered item was

5      marked as exhibit number 45.)

6   BY MR. FERRER:

7      Q.  I've just handed you a series of

8   documents, Ms. Woodland.  Let's start with exhibit

9   40.  Would you identify that document for me?

10     A.  It's my 2001 tax return.

11     Q.  Does this reflect all your earnings in

12  2001?

13     A.  It does.

14     Q.  This reflects your earnings in 2001 while

15  you worked at BET as well?

16     A.  It does.

17     Q.  Other than what is in this document, did

18  you receive any other earnings for 2001?

19     A.  No.

20     Q.  Would you take a look at exhibit 41,

21  please?  Can you identify that document for me?

261

1     A.   It's my 2002 tax document.

2     Q.   Does this document reflect all your

3   earnings in 2002?

4     A.   It does.

5     Q.   Are there any other earnings that you

6   received in 2002 that are not listed in this

7   document?

8     A.   No.

9     Q.   This reflects your earnings at BET?

10     A.   It does.

11     Q.   Can you identify exhibit 42, please?

12     A.   It's my 2003 tax return.

13     Q.   Does this document reflect all of your

14   earnings in 2003?

15     A.   It does.

16     Q.   Does it also reflect your earnings at BET

17   in 2003?

18     A.   Yes.

19     Q.   Are there any other earnings that you

20   received in 2003 not included in this?

21     A.   No.

262

1      Q.   Identify, please, exhibit 43.

2      A.   My 2004 tax return.

3      Q.   Does this reflect your earnings in 2004?

4      A.   It does.

5      Q.   Are there any other earnings that you

6    received in 2004 not reflected in this document?

7      A.   No.

8      Q.   This reflects also your earnings from BET?

9      A.   Correct.

10      Q.   Exhibit 44, can you identify that?

11      A.   It's my 2005 tax return.

12      Q.   This reflects your earnings for 2005?

13      A.   Yes.

14      Q.   Are there any other earnings in 2005 that

15    are not reflected in this document?

16      A.   No, there aren't.

17      Q.   This also includes or reflects your

18    earnings from BET in 2005?

19      A.   Yes.

20      Q.   Exhibit 45?

21      A.   It is my 2006 tax return.

263

1     Q.  This reflects all of your earnings in

2   2006?

3     A.  It does.

4     Q.  Are there any other earnings that you had

5   in 2006 that are not reflected in this document?

6     A.  No.

7     Q.  This reflects your earnings from BET?

8     A.  Yes.

9         MR. FERRER:  Mark this as 46, please.

10        (Whereupon the proffered item was

11     marked as exhibit number 46.)

12   BY MR. FERRER:

13     Q.  Do you recognize this document?

14     A.  I do.

15     Q.  What is it?

16     A.  It is a statement written from Carol

17   Holland on my behalf regarding the situation at BET.

18     Q.  Who wrote it?

19     A.  Carol Holland.

20     Q.  Did you ask Ms. Holland to write this

21   statement?

264

1      A.  I did.

2      Q.  When?

3      A.  June 23.  It's dated June 20.  I don't

4  recall exactly what day I asked her to write it.

5      Q.  Why did you ask her to write this

6  statement?

7      A.  Because I was seeking counsel at this

8  point.

9      Q.  You mean seeking an attorney?

10      A.  Yes.

11      Q.  Is Ms. Holland an attorney?

12      A.  No.

13      Q.  Why did you ask her for this statement?

14      A.  Because she was my employer.  She was my

15  supervisor and was witness to what was going on.

16          MR. FERRER:  Would you mark this as

17  exhibit 47, please?

18          (Whereupon the proffered item was

19      marked as exhibit number 47.)

20  BY MR. FERRER:

21      Q.  Exhibit 47, Ms. Woodland, do you recognize

265

1    this document?

2        A.  I do.

3        Q.  What is it?

4        A.  It's entitled memorandum for record.  It

5    was provided by Sammy Williams for Antoinette

6    Woodland and the subject is entitled "environment of

7    workplace."

8        Q.  Who wrote this?

9        A.  Sammy Williams.

10       Q.   Did you ask Mr. Williams to write this

11   statement?

12       A.  I did.

13       Q.  When?

14       A.  Around the same time, the 24th or so,

15   June, somewhere in June.  I'm not clear as to exact

16   date.

17       Q.  Why did you ask Mr. Williams to write this

18   statement?

19       A.  Because I realized that the situation was

20   getting worse at my place of employment.  It was

21   becoming a hostile work environment.

266

1     Q.  What situation?

2     A.  Between Mr. Gilmore and myself.

3     Q.  Why do you claim it was a hostile work

4  environment?

5     A.  Because it was.  My job was threatened

6  every day.  The environment became very tense.  It

7  was unproductive.  People stopped speaking to me.

8  Everyone knew what was going on.

9         He had started spreading these malicious and

10  false rumors about me around the company.  Every day

11  I was dealing with the rumors that he had spread and

12  receiving no support from Human Resources as I would

13  go to them and complain.

14     Q.  You said your job was being threatened.

15     A.  Right.

16     Q.  How was your job being threatened?

17     A.  Carol Holland and Sammy Williams were told

18  when they first came in that they needed to fire me.

19  For the first three months they were looking to find

20  reasons to fire me.  They didn't know what they were

21  going told was lies.

267

1    Q.  Who told them that?

2    A.  Ed Gilmore and Gwen Dennis.

3    Q.  How do you know this?

4    A.  Because both Carol and Sammy's statement

5    say it and they told me verbally.  Once they

6    realized that everything that they were hearing

7    wasn't factual information, then they shared with me

8    what had been said to them upon their arrival at

9    BET.

10    Q.  What did Ms. Holland tell you Mr. Gilmore

11    said?

12    A.  That her first order was to fire me, I was

13    a terrible employee, that my performance was very

14    bad, that I didn't respect people in my chain of

15    command, that I never showed up for work on time,

16    all kinds of crazy stuff along those lines, that I

17    didn't do my job, that I traveled and didn't do what

18    I was supposed to take care of when I was on the

19    road, poor performer were his words.

20    Q.  Did Ms. Holland ever discipline you for

21    any of those alleged performance issues?

268

1     A.  No, because they didn't exist.  She asked

2  him how come -- if I was so terrible how come he

3  hadn't documented the performance, to which he

4  replied he had documented it and after several

5  meetings of the aforementioned type she finally

6  asked him to show her the documentation, to which he

7  replied he doesn't have any.

8     Q.  What you just testified about, that's what

9  Ms. Holland told you Mr. Gilmore said to her?

10    A.  Yes.

11    Q.  When did he tell her this?

12    A.  Upon her arrival at BET.

13    Q.  That was when?

14    A.  She started in August of 2004.  I'm sorry,

15  October.  Well, no, probably August of 2004.

16    Q.  As a result of what Mr. Gilmore allegedly

17  told Ms. Holland, was any action taken against you

18  by Ms. Holland?

19    A.  Initially yes.  No one talked to me in the

20  department.  I was excluded from all meetings.  I

21  just basically sat in my office all day because no

269

1    one talked to me based upon the information that

2    they were getting from Mr. Gilmore.

3        Q.  What meetings were you no longer invited

4    to?

5        A.  None, none.  The weekly meetings, the

6    departmental meetings, anything that pertained to

7    the department.

8            My old assistant was a participant and I

9    wasn't.  I was excluded from all of the business

10   dealings.

11       Q.  What were these weekly meetings about?

12       A.  Department, the goings and comings of the

13   department, what's going on, what services we're

14   trying to acquire, projects.  Anything department

15   related, company related I was excluded from.

16       Q.  Did you complain to anyone about your

17   exclusion from these activities?

18       A.  No, because at this point the org chart

19   had been finalized and I had spoken with Mr. Bowman

20   previous and he didn't give me any information so I

21   was done talking to them at that point.

270

1      Q.   Were you given any reason as to why you

2   were no longer invited to these meetings?

3      A.   No.  Well, I was told that Ed told them to

4   exclude me from all the processes.

5      Q.   Who told you?

6      A.   Carol Holland, who reported directly to Ed

7   Gilmore.  "Remove her from all the processes."

8      Q.   Who is Ms. Dennis?

9      A.   Byron's assistant.

10      Q.   What were her alleged remarks?

11      A.   That myself and Adrian didn't show up to

12   work on time.  I don't recall the gist of her's, but

13   they were lies that were soon found out.

14      Q.   This information came from Ms. Holland?

15      A.   Ms. Holland and Mr. Williams.

16      Q.   Who is Adrian?

17      A.   Adrian is the office coordinator.  She

18   used to work with myself.  She was Troy's assistant

19   and then she assisted me when he left.

20      Q.   You said Ms. Dennis.  What was her

21   official title?

271

1    A.  She is the executive assistant to Byron

2    Marchant.

3    Q.  Did she have any reports?

4    A.  No.

5    Q.  When you learned of this information from

6    Ms. Holland and Mr. Williams, did you complain to

7    anyone about Ms. Dennis' comments?

8    A.  I did.  I complained to Quint Bowman and

9    then to Shelly Johnson.

10    Q.  When was that?

11    A.  About two and a half months after Carol

12    Holland and Sammy Williams started working at BET,

13    they started to realize what they were being told by

14    Ms. Dennis and Mr. Gilmore were allies because

15    everything that they had said didn't come to

16    fruition and they saw a different person in myself

17    and in Adrian Daniels.

18    So they started questioning things and doing

19    their own research and realized that Ed and Gwen

20    were both basically liars.  So that's when they

21    started sharing everything they had been told upon

272

1    arrival, who said what, when they said it, how they

2    spent hours sitting down talking to Mr. Gilmore

3    about crazy stuff.

4        Q.   Did Ms. Holland or Mr. Williams tell you

5    that Mr. Gilmore was making similar remarks about

6    Adrian Daniels?

7        A.   They said the comments were made and I

8    can't recall if Ed made the comments about Adrian,

9    but they just started saying -- it was like a damn

10    bursting and they started saying everything that was

11    said to them upon their arrival and I don't recall

12    exactly who said what.

13        Q.   Did you receive any discipline or any

14    adverse action as a result of what Mr. Gilmore,

15    Ms. Dennis told these individuals, Ms. Holland and

16    Mr. Williams?

17        A.   Well, it assisted in the hostile work

18    environment because you have two supervisors who are

19    brought in to the department who are supposed to be

20    your immediate supervisor and no one is talking to

21    you.  They have been given this impression you are

273

1  this terrible person who don't perform well so they

2  are looking to fire you.  There is limited

3  conversation.  You are not involved in anything.

4      Yes, I think it was an adverse action.

5      Q.  Did anyone -- other than when you found

6  out from Ms. Holland or Mr. Williams about these

7  alleged remarks, did anyone tell you again why you

8  were being excluded from these meetings?

9      A.  Because it was at Mr. Gilmore's

10  instructions.  He instructed them not to include me,

11  to exclude me from everything, from all processes.

12      Q.  At that time the change, the

13  reorganization had taken place, is that right?

14      A.  Yes.

15      Q.  Did it have anything to do with the fact

16  that you were now logistics coordinator?

17      A.  No.  I think it had a lot -- let me say

18  this.  I don't know if it had.  They were told to do

19  this when they first came in.  They were just doing

20  what they were told from the beginning before the

21  org chart was put in place.  Once the org chart was

274

1     put in place, then it was just he told us to remove

2     you from all of the business, just remove you.

3          Q.  I think you said you went to Mr. Bowman

4     about what Ms. Dennis said, is that right?

5          A.  Yes.

6          Q.  What did he do, if anything?

7          A.  Nothing.  He said outside counsel -- they

8     are going to bring in outside counsel and they'll do

9     an investigation to find out what was said and so

10     forth and so on.

11          Q.  Was this a part of the investigation that

12     went on by Naomi, the outside counsel?

13          A.  Yes.

14          Q.  What did you tell Ms. Johnson?

15          A.  Everything that was told to me and then

16     Sammy Williams, Carol Holland went in and gave their

17     testimony to Shelly Johnson about what was said to

18     them.

19          Q.  When did you speak with Ms. Johnson?

20          A.  The e-mails went around the 8th and I

21     think Shelly and I probably sat down around the 15th

275

1   or 16th of December 2004.

2       Q.  This investigation that you are referring

3   to goes to the documents we were looking at before,

4   the e-mails?

5       A.  Yes.

6       Q.  And your allegation that Mr. Gilmore was

7   being slanderous and was engaging in character

8   assassination?

9       A.  Correct.

10      Q.  What happened after you spoke with -- did

11  the investigation continue with Naomi?

12      A.  She took a few statements from a few

13  people.

14      Q.  Who is she?

15      A.  Shelly Johnson took statements from

16  myself, Carol Holland, Sammy Williams, I believe

17  Adrian Daniels and then -- and others probably.  I'm

18  not sure exactly who.  Then outside counsel was

19  brought in probably in February.

20      Q.  You testified to what the result of that

21  investigation was?

276

1     A.   Yes.

2     Q.   Your answers to our interrogatories, do

3   you have that?

4     A.   Right.

5     Q.   Looking at the responses on page two, in

6   response, your answer to number one of Viacom's

7   interrogatory, it's a list of witnesses here.

8       Other than the conversations that you've

9   already testified about earlier, have you spoken to

10   any of these individuals?

11     A.   Spoken to them in what way?

12     Q.   Spoken to them in regard to this matter.

13   Again, other than what you've already testified

14   about.

15     A.   I think at some point I probably have

16   spoken with probably all of them because at some

17   point they had engaged me in conversation.

18       For instance, Deborah Heard, she notified me

19   of the comments Mr. Gilmore had made about me.  So a

20   conversation took place at that time.

21     Q.   When was that?

277

1      A.  I do not remember the date and time of

2    that conversation.  Ofie Kodjoe, when she was going

3    through her situation I was going through mine, so

4    she shared with me that she spoke with Mr.-- spoke

5    with Byron Marchant about her decision to leave.

6      Q.   You testified about your conversations

7    with her.  Any other conversations you had with any

8    of these individuals?

9      A.   Probably, but I don't know the nature of

10    it.  We've had conversations.  It wasn't my case in

11    particular.  It was more along the lines of what was

12    going on at the company.

13      Q.   You reference Ms. Heard.  Do you have a

14    statement from Ms. Heard?

15      A.   I do not have a statement from Ms. Heard,

16    but her statement was included in the outside

17    counsel's investigation and BET's investigation

18    because they spoke with her.

19      Q.   So you are saying you believe that

20    Ms. Heard gave BET and an outside counsel a

21    statement?

278

1    A.  I believe so, yes.

2    Q.  Anybody else on this list?

3    A.  Milton Branch.

4    Q.  When did you have a discussion with him?

5    A.  Milton Branch and I talked almost every

6    day.  He was a member of the department so he knew

7    what it was like before and saw what was going on

8    afterwards and would call me to give me words of

9    encouragement.

10    Q.  Anything else you and Mr. Branch talked

11    about?

12    A.  No.

13    Q.  Other than the individuals who are listed,

14    are there any other individuals whom you believe

15    have personal knowledge of the matters related to

16    the allegations in your complaint?

17    A.  I think everyone listed would have

18    personal knowledge.

19        MR. FERRER:  Give me one second.  I

20    think that's it.

21        (Pause)

279

1          MR. FERRER:  I have no further

2    questions.

3          MR. BELL:  I've got some.

4    CROSS EXAMINATION:

5    BY MR. BELL:

6       Q.  Turn to deposition exhibit number four,

7    exhibit number four, the complaint.  Go to page

8    seven.

9       A.  Yes.

10      Q.  Ms. Woodland, paragraph 45 in the

11    complaint --

12          MR. BELL:  And I'll be brief,

13    Counsel, because of the time at the end of the day.

14          MR. FERRER:  Sure.

15    BY MR. BELL:

16      Q.  Paragraph 45, does that accurately reflect

17    the job duties you had as a senior manager?

18      A.  Yes.

19      Q.  This paragraph -- you have 16 items there,

20    is that right?

21      A.  Yes.

280

1      Q.   Does paragraph 46 accurately reflect the

2    job duties that you had as a logistics coordinator

3    where it says no specific duties whatsoever?

4      A.   Yes.

5      Q.   Paragraph 47, does that accurately reflect

6    the ad hoc assignments that you received such as

7    ordering coffee for the work campus and answering

8    the help desk?

9      A.   Yes.

10          MR. FERRER:  Off the record.

11          (A discussion takes place which is

12      held off the record)

13    BY MR. BELL:

14      Q.   The allegations that are alleged in the

15    complaint that has been offered as deposition

16    exhibit number four, is this accurate?

17      A.   Yes.

18      Q.   Counsel asked you a lot of times regarding

19    the definition of a Viacom employee.  Do you recall

20    him asking you about that?

21      A.   Yes.

281

1     Q.  He asked you could you think of anything

2   else as your reasons, anything other than what you

3   already gave as your belief that Viacom is your

4   employer.

5        Do you remember him asking you that

6   question?

7     A.  Yes.

8     Q.  Counsel asked you and you testified that

9   you had worked at BET in 1998.

10     A.  Correct.

11     Q.  Is that prior to BET's sale to Viacom?

12     A.  Yes.

13     Q.  When you worked at BET in 1998, did you

14   sign any documents that indicated you were a BET

15   employee?

16     A.  I did.  I signed the BET handbook.

17     Q.  Was that BET handbook different than

18   exhibit number two, which is the business conduct

19   statement?

20     A.  Yes, it was.

21     Q.  Deposition exhibit number five, which were

282

1    your statement of earnings, do you see that?

2        A.   Yes.

3        Q.   It has on the bottom of it Viacom payroll

4    department.

5        A.   Yes.

6        Q.   Was this the same statement of earnings

7    and deductions document that you received in 1998

8    from BET?

9        A.   No.

10       Q.   What did you receive in 1998?

11       A.   We received checks drawn on a local bank

12   with just the BET name on them.  I believe it was

13   Suntrust or Citibank, but it was a local branch.

14       Q.   You said you signed an employee manual,

15   employee handbook.

16       A.   Yes.

17       Q.   Did that employee handbook have policies

18   and procedures of BET?

19       A.   Yes.

20       Q.   Were those different than the policies and

21   procedures in exhibit number, deposition exhibit

283

1    number two, the business conduct statement?

2        A.   Yes, they were.

3            MR. BELL:  Exhibit number 36,

4    counsel.

5            MR. FERRER:  Okay.

6    BY MR. BELL:

7        Q.   I'm showing you what's been marked as

8    exhibit number 36, the June 24, 2005 overnight

9    letter from Quinton Bowman.

10       A.   Yes.

11       Q.   Counsel asked you a question and he

12   coached it with whether or not this letter was

13   regarding the complaints you made regarding -- the

14   complaints you made regarding your defamation of

15   character, is that correct?

16       A.   Yes.

17           MR. FERRER:  Objection,

18   mischaracterizing the question and testimony.

19   BY MR. BELL:

20       Q.   Does this document also reflect that they

21   investigated for discrimination?

284

1      A.  No, it doesn't.

2      Q.  Does it say the investigation did not

3  support a finding of unlawful discrimination?

4      A.  Yes, it does.

5      Q.  Does it say the evidence does not support

6  any finding that Mr. Gilmore has engaged in any

7  unlawful conduct of his treatment of or statements

8  about you?

9      A.  Yes, it does.

10     Q.  Did you tell the investigator about the

11  meeting at CBS where he was going to try to

12  back-hand you?

13     A.  Yes, I did.

14     Q.  Did you tell the investigator about the

15  statements where he referred to senior official,

16  women officials, as bitches?

17     A.  I did.

18     Q.  After you told that to the investigator,

19  did you give the investigator names of individuals

20  who could verify your statements?

21     A.  I did.

285

1     Q.  Did the investigator ever come back to you

2     and tell you this is management's articulated

3     nondiscriminatory reasons for their actions?

4     A.  No.

5     Q.  Were you ever given a chance to show

6     documentation, produce evidence or witnesses to

7     prove that management's articulated

8     nondiscriminatory reason was untrue?

9     A.  No, I wasn't.

10     Q.  After your first communication with the

11     investigator -- and by investigator I mean the

12     outside counsel person that you spoke to -- did she

13     ever come back to you with management's side?

14     A.  No, she did not.

15     Q.  So you never had the opportunity to refute

16     whatever it is that they said?

17     A.  No.

18     Q.  Does this document written by Quint Bowman

19     indicate that the investigation dealt with unlawful

20     discrimination?

21     A.  Repeat your question.

286

1      Q.  Does the document indicate that the

2  investigation involved unlawful discrimination?

3           MR. FERRER:  Objection.

4           THE WITNESS:  Yes.

5  BY MR. BELL:

6      Q.  When counsel asked you did you ever make

7  any complaints regarding events that you believe

8  were discriminatory to management, did you, in fact,

9  make a complaint?

10     A.  I did.  Actually I made several because I

11  was part of both investigations with two outside

12  counsel.

13     Q.  Let me go back to deposition exhibit

14  number two.  This is Viacom's business conduct

15  statement.  On page number two, does it say that the

16  Viacom business statement applies to all employees

17  and directors?

18     A.  Yes.

19     Q.  On page 27 of exhibit two, does it deal

20  with equal employment opportunity?

21     A.  It does.

287

1    Q.  Does it say in the third paragraph that we

2    should strive to administer all personnel actions in

3    a bias-free manner?

4    A.  Yes.

5    Q.  On page 28 does it state unlawful

6    bias-free and harassment-free workplace?

7    A.  Yes.

8    Q.  Does it state on page 28 that Viacom will

9    not tolerate intolerance?

10    A.  It does.

11    Q.  On page 31, does it dealing with

12    harassment-free workplace?

13    A.  Yes.

14        MR. FERRER:  I'm going to object,

15    Counsel.  The document speaks for itself.

16        MR. BELL:  That's fine.

17    BY MR. BELL:

18    Q.  Does it state that conduct which may

19    constitute a hostile environment include

20    inappropriate comments which can be overheard?

21    A.  Yes.

288

1      Q.  You stated that you went to Quinton Bowman

2  regarding the inappropriate comments that were made

3  by your supervisor.

4      A.  Yes.

5      Q.  Did he do anything?

6      A.  No.

7      Q.  On page 32, does it state that a bias-free

8  and harassment -- talk about a bias-free and

9  harassment-free workplace?

10      A.  Yes.

11      Q.  Does it state that any incidents of

12  discrimination or harassment must be reported to

13  your supervisor?

14      A.  Yes.

15      Q.  Did you report it to your supervisor?

16      A.  I did.

17      Q.  Did you report it to Human Resources?

18      A.  I did.

19      Q.  Did they do anything?

20      A.  No.

21      Q.  Does page 33 deal with reporting

289

1   harassment or any violation of the business conduct

2   statement?

3       A.   Yes.

4       Q.   When you reported the inappropriate

5   comments, was a prompt investigation done?

6       A.   No.

7       Q.   When you reported the incident where your

8   supervisor acted like he was going to back-hand you,

9   was a prompt investigation done?

10      A.   No.

11      Q.   What you didn't describe was the reaction

12  from the people in the room when he acted like he

13  was going to back-hand you.  Can you tell us what

14  their reaction was, what you observed?

15      A.   The women were mortified and the men were

16  embarrassed.

17      Q.   Tell me exactly what you observed.

18      A.   When I looked around the room, the women

19  had shocked expressions upon their face and the

20  men's expressions were more I can't believe he just

21  did that.

290

1     Q.   Your supervisor went with you to Quint

2     Bowman to report this?

3     A.   He did.

4     Q.   Was a prompt investigation done?

5     A.   No, there was no investigation conducted.

6     Q.   Counsel asked you on direct-examination

7     did you ever put your complaints in writing.  Do you

8     remember that question?

9     A.   Yes.

10    Q.   On page 36, does it deal with how you

11    report a violation?

12    A.   Yes.

13    Q.   Does it state that you can do it in

14    person?

15    A.   It does.

16    Q.   Does page 37 deal with to whom you report?

17    A.   It does.

18    Q.   Does it state you report to your

19    supervisor?

20    A.   Yes.

21    Q.   Does it state that you report to your

291

1    Human Resources representative?

2        A.  Yes.

3        Q.  Did you report it to your supervisor?

4        A.  Yes, I did.

5        Q.  Did you report it to the Human Resources

6    representative?

7        A.  Yes.

8        Q.  Did they do anything?

9        A.  No.

10       Q.  Did you report it to a department head?

11       A.  I did.

12       Q.  Did they do anything?

13       A.  No.

14       Q.  Did you ever supervise anyone while you

15   were at the BET business unit?

16       A.  Yes.

17       Q.  As a supervisor were you required to

18   follow the business conduct statement?

19       A.  Yes, I was.

20       Q.  How do you know you were required to

21   follow it?

292

1    A.  Because we all had to sign it.  There was

2    training on the business conduct statement.  Every

3    year we all had to go through training and sign

4    paperwork saying we were certified as to having been

5    through training.

6    Q.  Who is "we all"?

7    A.  Every associate, every Viacom associate

8    had to go through it.

9    Q.  You used the word "associate."  What do

10   you mean by that?

11   A.  Every Viacom employee.

12   Q.  How do you know you were a Viacom

13   employee?

14   A.  Because we had to -- they sent the

15   paperwork down and we had to fill it out every year.

16   Every employee was required to fill it out every

17   year.

18   Q.  I'm turning your attention to deposition

19   exhibit number three, the Viacom business conduct

20   employee certification form.

21   A.  Yes.

293

1     Q.  Does it state that Viacom requires that

2   all employees complete and return this form?

3     A.  Yes.

4     Q.  Were you required to complete and return

5   the form?

6     A.  Yes, I was.

7     Q.  I'm turning your attention now to exhibit

8   number six.  Exhibit number six is your letter

9   from --

10     A.  William Roskin.

11     Q.  Does this say I'm pleased to advise that

12   the compensation committee of Viacom's board of

13   directors has approved to grant you a nonqualified

14   stock option for Viacom's class B common stock?

15     A.  Yes, it does.

16     Q.  Does it also say that you may exercise

17   these options at any time until they expire at the

18   close of business on January 29, 2013 provided you

19   continue as an employee?

20     A.  Yes, it does.

21         MR. FERRER:  Objection, Counsel.  You

294

1    can make these arguments when it's the appropriate

2    time.

3           MR. BELL:  Are you making speaking

4    objections?

5    BY MR. BELL:

6       Q.   Does this document, exhibit number six,

7    this letter from William Roskin, what letterhead is

8    it on?

9       A.   Viacom.

10      Q.   Does it have Mr. Roskin's title?

11      A.   It does.

12      Q.   What does it say his title is?

13      A.   Senior vice-president, Human Resources and

14   administration.

15      Q.   What does it have his address is?

16      A.   Viacom, Inc., 1515 Broadway, New York,

17   New York, 10036.

18      Q.   On the second page of that document,

19   exhibit number six, can you tell me what that is?

20      A.   It's 2000 long term management incentive

21   plan stock option certificate.

295

1    Q.   It says you had how many shares?

2    A.   500.

3    Q.   Does it say that this certifies that

4    Viacom, Inc., the company, granted to the employee

5    named above on the above date, a grant of

6    nonqualified stock?

7    A.   Yes, it does.

8    Q.   Are you the employee named above?

9    A.   Yes.

10   Q.   Does it state your name?

11   A.   Antoinette Woodland, it does state that.

12   Q.   You are the employee named above?

13   A.   Yes, I am.

14   Q.   During counsel's questioning you presented

15   a lot of exhibits that had Viacom -- that were

16   e-mailed to you from Quinton Bowman which had Viacom

17   memo in the document.

18   A.   Yes.

19   Q.   Prior to BET being acquired by Viacom, did

20   you ever receive a memo when you worked at BET from

21   Viacom?

296

1    A.  No.

2    Q.  You said you've seen a doctor for

3  depression.

4    A.  Yes.

5        MR. FERRER:  Objection.

6  BY MR. BELL:

7    Q.  You can answer.

8    A.  I did see a psychologist, yes.

9    Q.  Did you have any other symptoms?

10    A.  He thought that it was depression or

11  something.  He thought it was depression.

12    Q.  Did you experience any loss of sleep?

13    A.  I did.

14    Q.  Can you explain that?

15    A.  I was getting three hours of sleep at

16  night maximum because of chest pains and I just

17  couldn't sleep through the night.

18    Q.  Did you experience any loss of eating?

19    A.  I did, loss of appetite.

20    Q.  Did you experience any loss of society,

21  socializing with your family members or friends?

297

1          MR. FERRER:  Objection, leading.

2          THE WITNESS:  I did not socialize as

3    much as I had in the past.

4    BY MR. BELL:

5        Q.  Did you --

6        A.  I became more of a loner.

7        Q.  On your organizational chart, on 34B,

8    counsel referred to Carlos Medina.  He reported to

9    you, correct?

10       A.  Yes.

11       Q.  He was not your equal, was he?

12       A.  No.

13       Q.  He was a subordinate to you?

14       A.  Yes.

15          MR. FERRER:  Which one are you

16   looking at?

17          MR. BELL:  34B.

18   BY MR. BELL:

19       Q.  And Adrian Daniels, she was not management

20   like you, was she?

21       A.  No, she wasn't.

298

1      Q.  She was subordinate to you?

2      A.  Yes.

3           MR. FERRER:  Objection, leading.

4  BY MR. BELL:

5      Q.  Counsel asked you regarding the BET

6  building in Washington, D.C.  What's the address you

7  gave to that?

8      A.  1235 W Street.

9      Q.  Counsel asked you was that Viacom's

10  building.

11           MR. FERRER:  Objection,

12  mischaracterizing the question.

13  BY MR. BELL:

14      Q.  Is that BET's building or Viacom's

15  building?

16      A.  It's Viacom's building.  It was acquired

17  with the company in 2000.

18      Q.  How do you know?

19      A.  All assets were rolled into the purchase

20  of the BET sale to Viacom.

21      Q.  How do you know that?

299

1    A.  I know it because I was around at the time

2    and that's when I started working in the facilities

3    and operations side of things so I knew it to be the

4    case.

5    Q.  Counsel asked you questions about where is

6    Viacom located.  You said New York.  Can you explain

7    why you said New York?

8    A.  Their main headquarters is in New York at

9    1515 Broadway but they own -- for all of our

10   locations across the country, they are owned by

11   Viacom.

12       Viacom has say in where we go, how much we

13   pay for rent, how much we spend to redecorate the

14   buildings.  It's all Viacom's money.

15   Q.  Exhibit number 20, do you recall

16   testifying about this document?

17   A.  Yes.

18       MR. FERRER:  What's 20?

19       MR. BELL:  This.

20   BY MR. BELL:

21   Q.  Counsel pointed out that it was from BET,

300

1   the e-mail you received that had indicated BET Human

2   Resources, right?

3       A.  Yes.

4       Q.  Does BET -- is it your understanding BET

5   follows Viacom's business conduct statement?

6       A.  Yes, it is.

7       Q.  How do you get that understanding?

8       A.  We're all made to sign the Viacom business

9   conduct statement as employees of Viacom and all the

10   memos are sent to Quint from Viacom Human Resources

11   to disburse to BET entities.

12      Q.  Quinton Bowman -- counsel asked you

13   earlier regarding Quinton Bowman, and you said that

14   he was employed by BET.

15      A.  He's employed by Viacom.  He signed the

16   same business conduct statement as we all signed.

17   Everyone is required to sign it.

18      Q.  Turning you to exhibit number 17, do you

19   remember testifying to exhibit number 17?

20      A.  I do.

21      Q.  Where it says today the Viacom board of

301

1    directors have approved the creation of two separate

2    public traded companies for Viacom's businesses?

3        A.   Yes.

4        Q.   Is that the same board of directors, do

5    you know, that approved and granted you nonqualified

6    stock options for Viacom class B stock?

7        A.   Yes.

8            MR. FERRER:  Objection.

9            THE WITNESS:  It would be, yes.

10           MR. BELL:  Number 19, Counsel.

11   BY MR. BELL:

12       Q.   Showing you exhibit number 19, you stated

13   earlier that Viacom acquired all of BET's properties

14   in the sale.

15       A.   Yes.

16       Q.   Does exhibit number 19 include BET as one

17   of Viacom's media properties?

18       A.   It does.

19       Q.   This is from who?

20       A.   That is from Sumner Redstone, Tom Freston

21   and Leslie Moonves.

302

1      Q.  For the judge, could you say who Sumner

2    Redstone was?

3      A.  Sumner Redstone was the founder of Viacom.

4      Q.  And Tom Freston is who?

5      A.  At that time he was one of the CEO's.

6      Q.  Of what?

7      A.  He was a CEO who was presiding over BET,

8    MTV and Leslie Moonves was presiding over CBS.

9      Q.  That's for Viacom?

10      A.   For Viacom, all Viacom.

11          (A discussion takes place which is

12      held off the record)

13          MR. FERRER:  The parties have agreed

14      to continue the deposition on July 12 at 10:00 a.m.

15      at the office of Morgan, Lewis.  Mr. Bell has

16      indicated that he has at least an hour left of

17      questioning and the parties will agree upon a date

18      to extend the deadline for filing dispositive

19      motions in this matter.

20          MR. BELL:  That's the full agreement

21      from the plaintiff.

303

1          MR. FERRER:  Nothing further for

2    today.

3              (Deposition adjourned at 7:00 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

304

1          Reporter's Certificate

2

3          I, the undersigned, Certified Court Reporter,

4     do hereby certify that the foregoing transcript of

5     testimony was taken by me in stenotype and

6     thereafter reduced to print under my direction,

7     that said transcript is a full, true and

8     substantially accurate record of the proceedings,

9     to the best of my ability.

10

11         I do further certify that I am neither counsel

12    for, related to, nor employed by any of the parties

13    to the action in which this deposition was taken;

14    and, further, that I am not a relative or employee

15    of any attorney or counsel employed by the parties

16    hereto, nor financially or otherwise interested

17    in the outcome of the action.

18

19    _____

20         Certified Realtime Reporter

21

305

1          Certificate of Deponent

2          I hereby certify that I have read and

3      examined the foregoing transcript, and the same

4      is a true and accurate record of the testimony

5      given by me.

6          Any additions or corrections that I feel

7      are necessary I will attach on a separate sheet

8      of paper to the original transcript.

9

10          _____

11                  Signature of witness

12          I hereby certify that the individual

13      representing him/herself to be the above named

14      individual, appeared before me this _____

15      day of _____ and executed the above

16      certificate in my presence.

17

18

19

20              _____

21                  Notary Public

306

1

2          Errata Page of Deponent

3    Please note any errors on this sheet. The

4    reasons may be general, such as "to correct

5    stenographic error" or "to clarify the record."

6    When completed, send this page to the attorney

7    who took your deposition, NOT the court reporter.

8    Page   Line    Correction    Reason For Change

9

10

11

12

13

14

15

16

17

18

19

20

21