NOW COMES Carol Holland, who makes her statement and affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of her knowledge:

1.  I am over the age of 18 years of age.

Subject:    STATEMENT DEALING WITH THE CASE OF ANTOINETTE WOODLAND

1.  The purpose of this statement is to provide my observations of the performance, working environment and management actions regarding Ms. Antoinette Woodland, an employee of Black Entertainment Television, (BET) and Viacom.  (It was clear to us that we were Viacom employees for a variety of reasons.  We received pay stubs with VIACOM on them.  We were trained in human resources using Viacom employee handbooks, and we were given Viacom employee assistance phone numbers.)

2. **Background**.  I was the Director of Facilities and Logistics for Black Entertainment Television (a subsidiary of Viacom) from September 27, 2004 to June 17, 2004.  I resigned from the company to pursue other interests.  In my capacity as director of Facilities and Logistics, I worked directly for the Senior Director, Corporate Administrative Operations, (CAO), Mr. Ed Gilmore.  At the time that I reported, my direct reports included Ms. Antoinette Woodland, Senior Logistics Manager, the Chief Engineer, Mr. Andrew Combo, Tape Library manager, and Ms. Adrian Daniels, Office Coordinator. Soon after my arrival,   Mr. Samuel Williams reported on board (I was later informed by Mr. Williams that he actually had been interviewed for my same position).  I was not a part of the decision to hire Mr. Williams, I also was not aware that a position was open in my department.  There was considerable confusion regarding Mr. Williams responsibilities.  I recall one visit to New York with Mr. Ed Gilmore where he introduced me to the Vice President of VIACOM for Facilities as doing "one half of [my predecessors] former duties" inferring that the other half would be accomplished by Mr. Williams.  After Mr. Williams arrived, he became my direct report with the identical title, duties and responsibilities as Ms. Woodland previously held.  Additionally, her job title was changed to Logistics Coordinator with unspecified duties.   She no longer had managerial duties except to direct the work of the help desk ticket crew.

3. **Performance.**  I found Ms. Woodland's performance to be above average.  She took initiative to get the job done and she met or exceeded all of her performance objectives.  She was knowledgeable and experienced in all aspects of the Facilities, Logistics and Security Business as it related to BET(Viacom).  She was particularly helpful through all special evolutions because of her years experience in the position. Ms. Woodland's managerial skills were average. Before my tenure, I believe she hadn't been given cradle to grave management of projects, so as a result, she often wasn't aware of all issues required to manage a project from planning to completion.  However, under the leadership of Mr. Williams, her supervisor, she was improving in that area.  I observed

HOLLAND, CAROL STATEMENT Page 1 of 4
Signed:_____

her to be a good leader, and someone whom you would want in a high stress environment because of her ability to make good fast decisions, and to direct a large team in a variety of tasks.

4. **Working Environment.**  Soon after I arrived, my supervisor, Mr. Ed Gilmore, and the executive assistant to his supervisor, Mrs. Gwenn Dennis indicated to me in repeated verbal conversations that Ms. Woodland and another employee were poor performers, who probably should not remain with the company. Mr. Gilmore indicated to me on one occasion that Ms. Woodland was "banned from traveling" because on a previous business trip, she had failed to accomplish her mission and failed to report her results.  Ms. Dennis indicated to me that Ms. Woodland didn't arrive to work on time, and didn't work too hard while she was there.  When these comments were made, I asked the question of Mr. Gilmore, why the decision had not been made to fire her.  His response was that her performance appraisals didn't warrant it.  I later found out that she was never informed or counseled in any way that she had been "banned" from traveling.  Nor in my tenure did she ever report to work late, without gaining previous supervisor approval. I also found her work ethic to be above average.

   a. In mid October, 2004 the department was reorganized; Mr. Samuel Williams was given the same title Ms. Woodland previously held. Ms. Woodland was given the title of Logistics Coordinator, with no specific duties.  These decisions were made by Mr. Byron Marchant, Executive Vice President, Corporate Administrative Operations.

   b. In the October through November timeframe, several instances took place, which led me to the conclusion that Ms. Woodland had been singled out for some reason.  The most glaring was the incident of the going away party for Mr. Troy Saunders, my predecessor.  When the invoice came for this party, Mr. Ed Gilmore indicated that he would not approve payment. He claimed that the obligations of funds by Ms. Woodland violated CAO policy.  In fact, upon conferring with Mr. Quinton Bowman, Senior Vice President of Human Resources for BET, it didn't violate policy, it was not unprecedented and since the services had already been rendered, the invoice needed to be paid. Mr. Gilmore again refused to pay, and only relented when directed by Mr. Byron Marchant.  There were several instances dealing with reimbursable payment that seemed to be centered on Ms. Woodland's requests, and no one else's.  In three separate instances, Mr. Gilmore refused to provide reimbursement through the petty cash fund, which he controlled, based on policies or precedents, which he cited that either didn't exist, or were not applied to any other request.  He finally wrote a petty cash policy, which severely restricted all use of the petty cash fund.  I believe these types of instances combined with the "reorganization "resulted in Ms. Woodland filing a complaint through the Human Resource Department of BET.  I witnessed all of these events, and came to the conclusion that Mr. Gilmore had a problem with Ms. Woodland and would never treat her fairly, nor would she ever be eligible for promotion while under his indirect supervision.

HOLLAND, CAROL STATEMENT Page 2 of 4
Signed:_____

    *c.* The investigation was never concluded nor was status ever reported despite several written requests for status. (*There may be an update to this statement now*)

    d. Prior to my departure from BET, I was asked to prepare performance appraisals for my staff. I did prepare the appraisals in accordance with he 1996 Performance Appraisal Procedure and in accordance with verbal direction from Mr. Ed Gilmore and Mr. Quinton Bowman. I spoke to both of them on several occasions. I understood that I was to prepare the appraisals, counsel the individuals and have them signed by June 1, 2005. I indicated to Mr. Gilmore that I would not have the performance appraisals for the tape library completed on time because there were three individuals who had been placed on probation, and I intended for HR to review those. He assented to my plan. I also indicated the same to Mr. Quinton Bowman. He assented to this plan. Those three appraisals were e-mailed to HR in late May early June timeframe. It's my understanding that a memo was given to the department rescinding all of the performance appraisals under my purview because they were not completed in accordance with CAO policy; specifically that the appraisals were not reviewed by HR and senior CAO management. This policy was never provided to me either verbally or in writing.

Prior to my decision to resign, I provided a five-page letter to Mr. Byron Marchant detailing what I considered to be poor management decisions, unprofessional and undermining behavior on the part of Mr. Gilmore. (It should be noted that the relationship of Mr. Gilmore and Mr. Marchant goes back at least 25 years to their time at the United States Naval Academy). At the time, Mr. Marchant indicated that he would investigate the matter. He also made it clear to me that he wanted to me to operate not as a department head, which was always my understanding, but more of a second in charge of a department. As such, the responsibilities and privileges I asserted as a department head would be Mr. Gilmore's not mine. I believed that my career had advanced beyond that level of supervision, and made up my mind to leave. At the time of our discussion, Mr. Marchant asked me twice not to resign. Since I submitted my resignation letter, Mr. Marchant has treated me as if I was fired, by escorting me out of the building on Wednesday June 8, 2005, prior to the completion of my two week notice and by posting my picture at the front gate (which is only done to former employees who are fired, not those who resign). I was made aware of this through several phone calls and e-mails from people from my previous department who have made to feel as if their jobs are at risk. They conveyed to me that they are concerned that anything they say or do to point out their concerns to anyone in the organizational chain will result in being dismissed.

**5. Conclusion**. It is my opinion that the "reorganization" of the Facilities Logistics Department was a *de facto* demotion of Ms. Woodland. I believe that a hostile working environment has been created by the efforts of Mr. Ed Gilmore, Ms. Gwenn Dennis, Mr. Quinton Bowman and Mr. Byron Marchant from at least September 2004 through present. I also believe that Ms. Woodland has been harassed by the creation of a hostile work environment through the constant negative comments about her performance, by her indirect supervisor, Mr. Ed Gilmore and others. I believe the attempt to rescind the performance appraisals is an attempt to justify not increasing salaries of members of the

HOLLAND, CAROL STATEMENT Page 3 of 4
Signed:_____

department, in particular Ms. Woodland.  Finally, I believe that she has been given no recourse through the agreed upon channels, i.e. the Human Resources Department of BET.  It should be noted that the HR Department reports directly to Mr. Byron Marchant.  Although several formal and informal complaints have been filed against Mr. Ed Gilmore in particular, directly to the Senior Vice President of HR, none of these complaints have resulted in any action or even a report to the complainants.

I swear under the penalty of perjury

Dated:  15 Nov 2007

_____
Carol Holland
1600 A Street NE
Washington DC 20002

HOLLAND, CAROL STATEMENT Page 4 of 4
Signed:_____