1

```
 1  UNITED STATES DISTRICT COURT FOR THE
 2          DISTRICT OF COLUMBIA
 3  _____
 4  ANTOINETTE WOODLAND,       )
 5         Plaintiff,    )
 6  vs.              ) CASE NO.:
 7  VIACOM, INC.,         )  1:05CV01611
 8         Defendant.    )
 9  _____)
10          UPPER MARLBORO, MARYLAND
11         WEDNESDAY, SEPTEMBER 5, 2007
12  The deposition of:
13          EDWARD J. GILMORE,
14     called for oral examination by Counsel for the
15  Plaintiff, pursuant to notice, held in the Law
16  Office of Jimmy A. Bell, P.C., 9610 Old Marlboro
17  Pike, Upper Marlboro, Maryland, beginning at
18  11:58 a.m., before Cathelyn Matthews, Court Reporter
19  and a Notary Public in and for the State of
20  Maryland, when were present:
21
```

2

```
 1  APPEARANCES
 2    ON BEHALF OF DEFENDANT:
 3      JOHN FERRER, ESQUIRE
 4      MORGAN, LEWIS & BOCKIUS, LLP
 5      1111 Pennsylvania Avenue, N.W.
 6      Washington, D.C.  20004
 7      (202) 739-5317
 8      DAMIEN ALEXANDER, ESQUIRE
 9      Black Entertainment Television
10      Legal Affairs
11      1235 W. Street, N.E.
12      Washington, D.C. 20018-1211
13      (202) 608-2188
14
15    ON BEHALF OF PLAINTIFF:
16      JIMMY A. BELL, ESQUIRE
17      LAW OFFICE OF JIMMY A. BELL, P.C.
18      9610 Old Marlboro Pike
19      Upper Marlboro, Maryland  20772
20      (301) 599-7620
21  ALSO PRESENT:  Antoinette Woodland
```

3
```
 1          C O N T E N T S
 2  DEPOSITION OF EDWARD J. GILMORE        PAGE
 3     By Mr. Bell                  4
 4     By Mr. Ferrer               26
 5     By Mr. Bell                 27
 6
 7
 8          E X H I B I T S
 9            (NONE)
10
11
12        CERTIFIED QUESTIONS AND
13   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
14            (NONE)
15
16
17
18
19
20
21
```

4
```
 1          P R O C E E D I N G S
 2  Thereupon:
 3  The following proceedings were had:
 4             Edward J. Gilmore,
 5  having been previously duly sworn, testified as
 6  follows:
 7  BY MR. BELL:
 8     Q.  Can you state your name for the record.
 9     A.  Edward J. Gilmore.
10     Q.  And your education?
11     A.  A Bachelor Degree from the United States
12  Naval Academy.
13     Q.  What year?
14     A.  '76.
15     Q.  Any education after that?
16     A.  I attended a Masters Program at the
17  University of Redlands.  I did not complete the
18  degree.
19        THE COURT REPORTER:  Excuse me.  A little
20  louder and clearer.  University of Redlands?
21        THE WITNESS:  Sure.  The University of
```

5

1  Redlands in California, but did not complete the
2  degree.
3  BY MR. BELL:
4      Q.  Can you tell me what your job title is
5  now?
6      A.  My job title now?
7      Q.  Yes.
8      A.  I am a Consultant for BET.
9      Q.  Okay.  How long have you been in that
10 capacity?
11     A.  Since January of this year.
12     Q.  And what do you do as a Consultant for
13 BET?
14     A.  Mainly security matters for award shows.
15 Initially I started off with helping out with some
16 budge issues, which is a job that I held at BET.
17         But now I'm normally -- mainly security
18 issues.
19     Q.  By security do you mean physical security?
20 Like physical security like guarding security, or
21 does that mean security over computers?

6

1         What type of security are you --
2     A.  No.  It's security around event planning
3  for a show involving talent.  VIPs, logistic issues
4  with parking, et cetera.
5     Q.  Okay.  Prior to January of '07, what was
6  your job title?
7     A.  Senior Director, Administrative
8  Operations.
9     Q.  And how long did you have that title?
10    A.  I had that title for four years.
11    Q.  And what were your responsibilities?
12    A.  I was responsible for the budget within
13 the CAO Division.  I still worked on Security.  I
14 was responsible for the Logistics facility as well
15 as Security and Travel.  In those functions.
16    Q.  Prior to that position, did you hold any
17 other positions at BET?
18    A.  My initial position was as Special Advisor
19 to the CAO.
20    Q.  And how long did you have that -- what
21 time frame did you hold that position?

7

1   A.  Approximately two years.
2   Q.  So you started when?
3   A.  '99.
4   Q.  Okay.  And what's your address?
5   A.  My current address?
6   Q.  Yes.
7   A.  1121 Heartfields Drive, Silver Spring,
8  Maryland.
9   Q.  Do you know Ms. Woodland?
10   A.  Yes, I do.
11   Q.  Can you tell me what capacity that you
12  know Ms. Woodland in?
13   A.  We worked together and initially when I
14  got to BET -- well, shortly after I got to BET,
15  Antoinette and Troy Saunders and I worked together
16  on a lot of real estate issues and logistics and
17  facilities issues within the CAO.
18   Q.  At what time period was that?
19   A.  I want to say 2001.  2000 or 2001, in that
20  time frame.
21   Q.  Was that prior to the Viacom purchase of

8

1  BET?
2   A.  I believe so.
3   Q.  Did you work on any of the logistics and
4  facilities issues as it relates to the purchase of
5  -- Viacom's purchase of BET?
6   A.  No.
7   Q.  What was the relationship between yourself
8  and Ms. Woodland?  Were you a supervisor?
9   A.  No.  She was working for Troy.  I was
10  still, at the time, Special Assistant to the CAO.
11       So I worked a lot with Troy on a lot of
12  different things, because in the department they had
13  the largest portion of our budget.  So I worked a
14  lot with him.  Was in his office a lot.  We were on
15  the phone a lot talking about various issues, CAO
16  issues.
17   Q.  Was there ever a time that you were in a
18  meeting in New York with Ms. Woodland?
19   A.  Yes.
20   Q.  Did there ever come a time that you made a
21  backhand motion as is you were going to strike

9

1  Ms. Woodland?
2     A.  No.
3     Q.  Have you ever heard of that allegation
4  before?
5     A.  Have I heard of the allegation before?
6  When I was -- initially, it was brought to my
7  attention that there was such an allegation, but not
8  from Ms. Woodland.
9     Q.  What year was that brought to your
10 attention?
11    A.  Just recently.
12    Q.  Do you know who Jackie Willis is?
13    A.  Yes, I do.
14    Q.  Can you tell me who Jackie Willis is?
15    A.  Jackie Willis was the Vice President of
16 Special Events under the Creative Services
17 Department.
18    Q.  Did you ever refer to Jackie Willis as a
19 "fat bitch"?
20    A.  No.
21    Q.  Have you ever heard of an allegation that

10

1  you referred to Jackie Willis a "fat bitch"?
2     A.  No.
3     Q.  Does the initials ICR mean anything to
4  you?
5     A.  ICR?
6     Q.  Yes.
7     A.  Yes.
8     Q.  Can you tell me what it means to you?
9     A.  The initials, it's an initial request for
10 capital or an initial capital request.
11    Q.  Okay.  Can you tell me what it is?
12    A.  Well, it's a form that's filled out to get
13 funding for a project that's a -- a project that is
14 -- it's a project that you plan to do, but it falls
15 outside of your operating budget.
16    Q.  Have you ever seen an ICR that was
17 submitted to you that had Ms. Woodland's name on it?
18    A.  I don't recall.
19    Q.  Do you know a person by the last name of
20 Holland?
21    A.  Yes, I do.

11
1  Q. Can you tell me who she is?
2  A. Carol Holland was the Director of
3 Facilities at BET.
4  Q. Do you ever recall talking to Ms. Holland
5 regarding Ms. Woodland in an ICR situation?
6  A. I don't.
7  Q. Does that mean it didn't happen or at this
8 point you just can't remember?
9  A. I don't recall ever talking about an ICR.
10  Q. Do you ever recall asking Ms. Holland to
11 remove Ms. Woodland's name from the ICR Request
12 Form?
13  A. I do not.
14  Q. What type of authority did you have in
15 your position when you were at BET before you became
16 a contractor?
17  A. Before I became a contractor I was Senior
18 Director of Corporate Administrative Operations. I
19 was in charge of the budget, travel, logistic
20 facilities, security.
21  Q. Did you have any involvement with

12
1 Ms. Woodland's job title change from Senior Manager
2 to Logistics Coordinator?
3  A. No.
4      MR. FERRER: Objection. It assumes facts
5 not in evidence.
6      MR. BELL: You're making speaking
7 objections. Are you aware that you can object to
8 the form? You can instruct him not to answer, but
9 you cannot, under the rules of the court, make
10 speaking objections.
11      MR. FERRER: Bell, I'm aware of what I can
12 and cannot do.
13      MR. BELL: Okay.
14 BY MR. BELL:
15  Q. Did you ever make a comment to Ms. Holland
16 that Ms. Woodland violated a company policy for any
17 type of party?
18      (Telephone Interruption)
19      THE WITNESS: Did I ever -- could you
20 repeat the question, please?
21 BY MR. BELL:

13

1   Q.  I'll have her read it back to you.
2       (Record read)
3  BY MR. BELL:
4   Q.  Let me ask it a different way.  Did you
5  ever talk to Ms. Holland regarding any situation
6  where you believed Ms. Woodland had violated any
7  type of a policy?
8   A.  No.
9       MR. BELL:  Can we take a break for about
10 two or three minutes.
11      (Pause in proceedings)
12 BY MR. BELL:
13  Q.  When you were working at BET, prior to
14 January of 2007, what involvement did you have with
15 Logistics?
16  A.  Logistics was a department that was
17 underneath my -- it was in my purview.
18  Q.  Did you ever tell Ms. Holland to remove
19 Ms. Woodland from all logistical processes?
20  A.  No.
21  Q.  Did you tell me who Ms. Holland was?

14

1   A.  Ms. Holland was the Senior Director for
2  Facilities.
3   Q.  Who was she in relation to Ms. Woodland?
4   A.  She would have been her boss at the time.
5   Q.  And who was Ms. Holland in relation to
6  you?
7   A.  She was a subordinate to me.
8   Q.  Okay.  What involvement did you have in
9  making organizational charts?
10  A.  None.
11  Q.  Were you in a meeting when Quinton Bowman
12 gave out the organizational chart which listed
13 Ms. Woodland as a Logistical Coordinator?
14  A.  Was I in a meeting?
15  Q.  Yes.
16  A.  Yes.
17  Q.  Do you remember a discussion of why she
18 was made a Logistic Coordinator?
19  A.  No, I don't.
20  Q.  Do you know whether her job duties
21 changed?

                                15
1   A.  Her job duties did not change.  No.
2   Q.  How do you know her job duties didn't
3  change?
4   A.  Well, for a person's job duties to change,
5  that requires a Change of Status form that would
6  have been signed -- it would have gone through me.
7       Through HR up to the CAO, who was Byron
8  Marchant, and no document like that ever -- does not
9  exist.
10   Q.  And so are you saying the only way her job
11  duties can change is if a document exists?
12   A.  You asked me if her title changed or if
13  her job duties changed.  If your job duties change
14  formally and you receive the last pay or whatever,
15  it's a Change of Status form.
16   Q.  But if your job duties change but you
17  don't receive less pay, but you receive a dimension
18  of duties, does that require a form?
19   A.  No.
20   Q.  So when I asked you earlier did her job
21  duties change, and you said no, can you explain

                                16
1  that?
2   A.  What I knew of her doing, they didn't
3  change in my -- in my -- I had nothing to do with
4  any change of anyone's job duties.
5   Q.  Do you know what her job duties were?
6   A.  What they were?
7   Q.  Yes.
8   A.  She was Manager of Occupant Services.
9   Q.  And then it changed to Logistical
10  Coordinator?
11   A.  Not in my eyes, it didn't.  I didn't see
12  anything that formally changed anybody's duties.
13   Q.  Did you see an organizational chart that
14  Quinton Bowman passed out?
15   A.  I saw an organization chart.
16   Q.  Did that chart have her as Logistical
17  Coordinator?
18   A.  That organization chart is a function.  It
19  shows what everybody's function is within the
20  organization.
21      It doesn't say what everybody's titles

                                17
1  are.
2     Q.  But it said Ms. Woodland was a Logistical
3  Coordinator in that organizational chart; am I
4  correct?
5     A.  It's a function.  That was the function.
6  That was her function within the organization chart.
7  Yes.
8     Q.  And prior to that meeting with that
9  organizational chart, her title was Senior Manager;
10 am I correct?
11    A.  I believe so.
12    Q.  Do you know what her job duties actually
13 were after the organizational chart came out?
14    A.  Do I?
15    Q.  Yes.
16    A.  No, I don't.
17    Q.  Who would have a better understanding of
18 what her job duties were?
19    A.  Probably Samuel Williams who was her
20 supervisor.
21    Q.  Would Ms. Holland have a good

                                18
1  understanding --
2     A.  She probably would.
3     Q.  Mr. Williams, what was his title?  What
4  was his title?
5     A.  He was brought in to be the Manager of
6  Logistics.
7     Q.  Is that that same time period that
8  Ms. Woodland's job duties -- I mean job title was
9  changed to Logistical Coordinator?
10        MR. FERRER:  Objection.  I don't he's ever
11 testified that --
12        MR. BELL:  You can't make speaking
13 objections.
14        MR. FERRER:  Well, I'm just trying to
15 clarify what --
16        MR. BELL:  There's a question --
17        MR. FERRER:  -- what -- you're making
18 conclusions --
19        MR. BELL:  There's a question on the
20 table, and you cannot make speaking objections that
21 tend to give any answer --

19

1    MR. FERRER:  I object to the form.  And,
2  again, you're assuming a fact that this person
3  hasn't testified to.
4    MR. BELL:  You can object to the form.
5    MR FERRER:  Okay.
6    MR. BELL:  But the rest of the speaking
7  objection, you can't deal with.  Now this is the
8  second time I've talked to you about that.
9    MR. FERRER:  I don't know how to say any
10 shorter than you're assuming facts, again, that this
11 person hasn't testified to.
12   MR. BELL:  But that's the whole issue.
13 That's something that you cannot do under federal
14 rules.
15   MR. FERRER:  I mean, we can agree to
16 disagree.  But --
17   MR. BELL:  Can you read back the question?
18   (Record read)
19 BY MR. BELL:
20   Q.  Okay.  When Mr. Williams came in as Senior
21 Manager, was that the same time period that

20

1  Ms. Woodland became the Logistics Coordinator?
2    A.  I'm trying to -- he came in in the October
3  time frame.  And that chart that you're talking
4  about, I think it was put out in the November time
5  frame, the org chart.
6       So, no, he came before the org chart came
7  out.
8    Q.  The duties that he acquired under the new
9  org chart, were those duties that Ms. Woodland had
10 before the org chart?
11   A.  No, because the org -- when Carol Holland
12 was brought in, Troy had the title of Senior
13 Director of Facilities and Logistics.
14      But when Carol Holland was hired, she was
15 hired as Senior Director of Facilities.  Samuel
16 Williams was hired as Director of Logistics.
17      So Ms. Woodland never had the title of
18 Logistics anything.
19   Q.  I didn't ask you, title.  I said job
20 duties.
21   A.  No.  The answer is no.

21

1   Q.  Okay.  Did you ever tell Ms. Holland to
2  fire Ms. Woodland?
3   A.  I did not.
4   Q.  Did you ever tell Ms. Holland that
5  Ms. Woodland was a poor performer?
6   A.  I did not.
7   Q.  Did you ever have any documented concerns
8  regarding Ms. Woodland's work performance?
9   A.  Documented concerns?  I don't understand
10  your question.
11   Q.  Did you ever produce something in writing
12  to say that she was a poor performer or working at a
13  standard below acceptable?
14   A.  I did not.  No.
15   Q.  Do you know a person by the last name of
16  Saunders?
17   A.  Saunders?
18   Q.  Yes.
19   A.  Troy Saunders?
20   Q.  Yes.  Can you tell me who Troy Saunders
21  is?

22

1   A.  Who?
2   Q.  Who he is, yes.
3   A.  He was the Senior Director of Facilities
4  and Logistics.
5   Q.  Do you ever remember an invoice being
6  presented to you for his going away luncheon?
7   A.  Yes.
8   Q.  Did you ever tell anyone that you didn't
9  authorize that invoice for that luncheon?
10   A.  That I had authorized it?
11   Q.  That you had not authorized it?
12   A.  I didn't -- that wouldn't have been my
13  purview.  So, no, I did not say that to anybody.
14   Q.  Did you ever direct Ms. Holland to counsel
15  Ms. Woodland regarding the invoice for Mr. Saunder's
16  going away luncheon?
17   A.  No.
18   Q.  Did Ms. Woodland ever communicate with you
19  regarding -- did Ms. Woodland ever ask for
20  authorization from you to pay for Mr. Saunder's
21  going away luncheon?

                                  23
1    A.  Did she ever come to me and ask me?  Is
2  that the question?
3    Q.  Did she ever ask you, email you, write
4  you?
5    A.  No, she did not.
6    Q.  Did she ever talk to you about it?
7    A.  She never talked to me about it.
8    Q.  Did you ever speak to anyone regarding
9  Ms. Woodland's failure to follow company policies
10  regarding the paying for Mr. Saunder's going away
11  luncheon?
12    A.  Yes.
13    Q.  Tell me about that.
14    A.  I spoke to Carol Holland when the paid
15  voucher came up for payment for the party.  It was
16  brought to my attention and I spoke to Carol Holland
17  about it.
18    Q.  And what did you tell her?
19    A.  I asked her to look into it.
20    Q.  What do you mean by, look into it?
21    A.  Why are we getting this?  Why are we

                                  24
1  paying for a luncheon when Troy had already had two
2  parties that was paid for by the CAO?
3    Q.  And what happened?
4    A.  She looked into it and came back and said
5  that it was clear that Antoinette had authority to
6  do it.  That's what she said to me.
7         MR. BELL:  What about 10 minutes?  I'm
8  almost done.
9         (Brief Recess)
10  BY MR. BELL:
11    Q.  Ms. Holland, did you say she was a Senior
12  Director?
13    A.  Yes.
14    Q.  She wasn't a Director?
15    A.  Senior Director.
16    Q.  Okay.  What's the difference between a
17  Director and a Senior Director?
18    A.  It's a step below Vice President.
19    Q.  Okay.  And Sam Williams was what?
20    A.  He was hired as a Manager.
21    Q.  Okay.  Quinton Bowman's title was what at

25

1  that time?
2     A.  Vice President of Human Relations.
3     Q.  Where was he on the organizational chart
4  compared to you?
5     A.  He was the Vice President of Human
6  Relations.
7     Q.  So what does that mean?  I have to make a
8  transcript.
9     A.  I mean, I don't understand your question.
10    Q.  Was he above you, below you, equal to you?
11    A.  No, he was above me.  A Senior Director
12  was a step below a Vice President.
13    Q.  Okay.  So he was two steps above you?  Two
14  steps above you?
15    A.  One.
16    Q.  One step above you.  Okay.
17       MR. BELL:  Nothing further, counsel.
18       MR. FERRER:  Can I have a minute?
19       MR. BELL:  You got it.  How about five?
20       MR. FERRER:  I probably don't need that
21  many.

26

1       (Pause in proceedings)
2       MR. FERRER:  All right.  I just have a few
3  questions.
4  BY MR. FERRER:
5     Q.  Mr. Gilmore, Mr. Bell asked you about a
6  reorganization that took place within your
7  department, and he referred to or he made reference
8  to Ms. Woodland's job title changing to being
9  Logistics Coordinator.
10       To your knowledge, did Ms. Woodland's job
11  title ever change to Logistic's Coordinator?
12    A.  No, it did not.
13    Q.  Okay.  In order to change an employee's
14  job title, was there a process in place?
15    A.  There is a process.
16    Q.  And what is that process?
17    A.  It's a Change of Status form that's filled
18  out.
19    Q.  Did you ever see a Change of Status form
20  changing Ms. Woodland's job title?
21    A.  I did not.

27

1  Q.  In order to change Ms. Woodland's job
2  title, would you have had to have -- or would such a
3  form have to come across your desk?
4  A.  Yes, it would.
5  Q.  Okay.  And again, such a form did not come
6  across your desk; is that right?
7  A.  It did not.
8     MR. FERRER:  I have nothing further.
9     MR. BELL:  One last thing.
10 BY MR. BELL:
11 Q.  I just want to make sure I make this clear
12 for the record.  Changing of the job title is
13 different than changing of job duties; am I correct?
14 A.  Yes.
15 Q.  And you don't need to fill out a form to
16 change someone's job duties; am I correct?
17 A.  That's correct.
18    MR. BELL:  Nothing further.
19    MR. FERRER:  Mr. Gilmore, you have the
20 right to review the transcript of your testimony to
21 make any corrections.  Would you like to exercise

28

1  that right?
2     THE WITNESS:  Yes, I would.
3     MR. FERRER:  Okay.
4     (Signature having not been waived,
5      the deposition of EDWARD J. GILMORE
6      was concluded at 12:55 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

```
                                29
 1         CERTIFICATE FOR READING AND SIGNING
 2
 3      I hereby certify that I have read and examined
 4  the within transcript and the same is a true and
 5  accurate record of the testimony given by me.
 6      Any corrections that I feel are necessary, I
 7  have listed on the separate ERRATA SHEET enclosed,
 8  indicating the page and line number of each
 9  correction.
10
11
12           _____
13                 EDWARD J. GILMORE
14
15
16           _____
17                      DATE
18
19
20
21
```

```
                                30
 1  CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
 2          I, Cathelyn Matthews, a Notary Public of
 3  the State of Maryland, Baltimore County, do hereby
 4  certify that the within-named witness personally
 5  appeared before me at the time and place herein set
 6  out, and after having been first duly sworn by me,
 7  according to law, was examined by counsel.
 8          I further certify that the examination
 9  was recorded stenographically by me, and that this
10  transcript is a true record of the proceedings.
11          I further certify that I am not of
12  counsel to any of the parties, nor an employee of
13  counsel, nor related to any of the parties, nor in
14  any way interested in the outcome of the action.
15          As witness my hand and seal this 5th day
16  of September, 2007.
17
18
19               Cathelyn Matthews
20               My Commission Expires
21               11-08-08
```